have drawn were that (1) IndyMac's reported ALL and Secondary Market Reserves were insufficient and that the Company had failed to account for, *inter alia*, the high-risk, low-quality loans it originated, bought, and/or sold, in violation of GAAP; and (2) that IndyMac's internal controls over financial reporting were so ineffective that the Company's financial statements were not fairly presented in accordance with GAAP.

142. For example, as part of its audit planning, as well as its required assessment and testing of internal controls, Ernst was required by GAAS and PCOAB standards, but either failed to test on a sufficient basis, or recklessly disregarded, to determine whether IndyMac's mortgage loans were being originated both (1) using a system of internal controls and (2) in material compliance with the Company's established underwriting standards. As set forth above, IndyMac management's claim that IndyMac adhered to its published underwriting guidelines was false, and this lack of compliance with and numerous exceptions to underwriting guidelines was one of the major reasons why IndyMac's loans were experiencing increasing delinquencies and defaults throughout 2006 and 2007 and at the time of Ernst's audits.

143. Because, as alleged in detail below in ¶¶ 209-285, Defendants' wrongdoing resulted in a material understatement of the ALL and Secondary Market Reserves, it is clear that a "material weakness" existed within the realm of the calculation of those amounts, whether referred to as such or not by Ernst. AS 2, Paragraph 10, which applied to Ernst's 2006 audit, defines a "material weakness" as: "a significant deficiency, or combination of significant deficiencies, that results in *more than a remote likelihood* that a material misstatement of the annual or interim financial statements will not be prevented or detected." In promulgating AS 5 in 2007, the PCAOB adopted a new definition of "material weakness," which is the same definition used by the SEC in 17 C.F.R. § 210.1-02. This definition, which applied to Ernst's 2007 audit, provides that: "[t]he term material weakness

1279119v1/010900

73

means a deficiency, or a combination of deficiencies, in internal control over financial reporting...such that there is a *reasonable possibility* that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."

3. **Ernst Acted with Scienter when it Certified that Internal Controls Were Effective in the 2006 10-K Signed on March 1, 2007**

144. Ernst signed its 2006 audit opinion on March 1, 2007. By that time, Ernst had actual knowledge of material weaknesses in IndyMac's internal controls.

145. The most glaring example was the Conduit division, which originated 33% of all of IndyMac's loans in 2006. IndyMac internal audit teams identified serious problems with the Conduit Division in both 2005 and 2006. More importantly, Ernst itself reported on financial control deficiencies stemming from the Conduit Division in 2006. Ernst found that the Division did not have an effective process or system in place to oversee the execution of its trading activities or for monitoring the exposure to sellers. At the IndyMac board meeting on December 5, 2006, a director noted that loans originated through the Conduit Division were especially likely to lead to early payment defaults, which would require IndyMac to repurchase loans it had sold to third parties at a loss. Assuming that it complied with applicable audit standards, Ernst reviewed the minutes of this meeting. Despite having actual knowledge of the material weaknesses in the internal controls of that division, Ernst issued an unqualified opinion that the internal controls were effective. The Conduit Division ultimately accounted for a material part of IndyMac's losses in 2007.

1279119v1/010900                    74

146. The material weaknesses in the Conduit Division were not corrected by the time Ernst issued its March 1, 2007 opinion. OTS began a comprehensive examination of IndyMac on January 8, 2007, and completed that investigation on March 21, 2007. The OTS found that the problems in the Conduit Division remained uncorrected, and referred the matter to IndyMac's Board of Directors for corrective action. With respect to the Conduit Division, the OTS required the Board to "provide actions taken (1) to address the internal audit findings noted in the 2006 and 2007 internal audits, (2) to improve the internal control environment, and (3) to ensure the Division develops more robust, transparent management reports." The OTS also required IndyMac to take certain "corrective actions" for the Conduit Division, including: "Ensure the Conduit Division corrects the internal audit findings noted in the last report and ensure that the Division is operating in a strong internal control environment." Though these findings were issued after Ernst's March 1, 2007 opinion, they confirm that Ernst knew that the problems that Ernst itself had previously identified had not gone corrected. Indeed, the Treasury Report confirms that the problems went uncorrected until *November 2007*, when the Conduit Division was closed. Moreover, Ernst was required to make inquiries to OTS examiners *even "if the examination [was] still in progress," "or [if] their examination report [was] still pending."* 2006 AAG, § 5.180.

147. Moreover, even if the material weaknesses had been corrected by March 1, 2007—which they were not—Ernst still had the duty to disclose them in its audit opinion because the loans originated in the Conduit division in 2006 remained part of the Company's portfolio and would—and did—affect IndyMac's losses throughout the following year. Indeed, despite being closed in Fall 2007, the Conduit Division would ultimately account for 18% of IndyMac's net losses in 2007. In short, Ernst had actual

1279119v1/010900

75

Exhibit F, Page 283

knowledge of serious unresolved deficiencies in the internal controls of the Conduit division as of March 1, 2007 and nonetheless certified the effectiveness of those internal controls. Ernst's certification was false and, at the very least, deliberately reckless.

4. **Ernst Acted with Scienter when it Certified that Internal Controls Were Effective in the 2007 10-K Signed on February 29, 2008**

148. Ernst certified the effectiveness of the internal controls in IndyMac's 2007 10-K on February 29, 2008. By this time, Ernst had received the final results of the 2007 OTS Examination finding that the problems in the Conduit Division remained uncorrected. Perry's announcement of the planned closure of the Conduit Division on November 6, 2007, did not "cure" the problems that IndyMac suffered as a result of that division's severe internal control problems because those assets remained on IndyMac's books and needed to be accounted for in IndyMac's reserves.

149. Further, by the time Ernst issued its February 29, 2008 certification, other internal control deficiencies had been identified and—assuming Ernst complied with audit standards—brought to Ernst's attention, including:

- The findings by the OTS in the 2007 examination that there were serious deficiencies in IndyMac's appraisal practices and that IndyMac needed to refine its ALLL practices so as not to rely on historical models;

- The findings of an independent auditor in early 2008 that IndyMac's appraisal policies were deficient and underwriting was not centrally managed and was not consistent across the Company;

**Exhibit F, Page 284**

1
2
3
4
5

• The January 2008 findings of a second independent auditor that no internal controls were in place to ensure that different divisions were applying the same ALL standards and that no internal controls were in place to ensure that they were using sound methodology in calculating ALL.

6   In light of these facts, Ernst's unqualified February 28, 2008 opinion regarding the
7   effectiveness of IndyMac's internal controls was materially false and misleading.

8

9   **C.    On February 12, 2008, Defendants Perry and Keys Mislead**
10          **Investors Regarding IndyMac's Dealings With the Office of**
11          **Thrift Supervision and the Soundness of the Company**
12          **1.    OTS Initiates Its Review of IndyMac Four Months Early**
13               **and Issues an Initial Ratings Downgrade on January 17,**
14               **2008**

15          150.    As indicated above, IndyMac Bank was regulated by OTS.    This
16   supervision was critical to investors, who relied on OTS to ensure that IndyMac
17   was properly valuing assets and liabilities and ensuring that the Company remained
18   "well-capitalized."    As Roth Capital Partners observed in a May 1, 2007 analyst
19   report, "the benefit of neither the company's access to the [Federal Home Loan
20   Bank] system or its supervision by the OTS should be underestimated in our
21   opinion."    Thus, investors evaluating the health of the company relied heavily upon
22   the views of and actions taken by OTS.

23          151.    According to the OTS Fact Sheet on IndyMac, the OTS    became
24   concerned with IndyMac's financial condition by November 2007.    According to
25   the OTS Fact Sheet, IndyMac changed its business model in November 2007 to
26   focus on originating agency-eligible loans "[i]n response to market conditions and
27   OTS concerns."

28

1279119v1/010900                        77

152. As set forth in the Trustee Complaint, by November 2007, senior management became aware that OTS intended to downgrade IndyMac's composite CAMELS rating from a "2" to a "3." In accordance with OTS's enforcement guidance, there is the presumption that formal enforcement action will be taken for an institution with a composite rating of "3." Furthermore, as early as November 2007, the OTS recommended to senior management that, based on the Bank's capital ratios, IndyMac needed to raise significant outside capital. Thus, no later than November 2007, both Perry and Keys were aware of the OTS' serious concerns about IndyMac and its precarious position, and any statements to the contrary were false and misleading.

153. On January 7, 2008, OTS began an examination of IndyMac "four months ahead of schedule due to concerns the agency noted through its off-site monitoring and meetings with management." *See id.* According to OTS spokesman William Ruberry, OTS also "called in the FDIC with us early on in the process." The Treasury Report confirms that OTS contacted FDIC on December 20, 2007 "because of IndyMac's deteriorating position."

154. Ten days after initiating the exam, on January 17, 2008, OTS "[i]ssued initial ratings downgrades based on the off-site monitoring and the initial findings of the regular examination." Specifically, OTS issued a letter to IndyMac's board of directors, chairman, and CEO, stating that the bank's composite CAMELS rating was downgraded from a 2 to a 3, effective December 31, 2007. The Asset Quality and Earnings component ratings were adjusted from a 2 to a 4.[3] Within six months of beginning its examination, the OTS repeatedly

---

[3] A "4" is the second lowest rating. According to the FDIC Manual, an Asset Quality rating of "4" is "assigned to financial institutions with deficient asset quality or credit administration practices." This means that "the levels of risk and problem assets are significant, inadequately controlled, and subject the financial institution to potential losses that, if left unchecked, may threaten its viability."

1279119v1/010900

78

downgraded the Bank's CAMELS ratings, and even sought a consent order to address the Bank's unsafe and unsound banking practices.

155. The Treasury Report indicates that the severity of the downgrade of the critical composite CAMELS rating from a 2 to a 3 on January 17, 2008, would almost certainly trigger a formal enforcement action by the OTS under OTS's enforcement guidelines. Thus, as of at least November 2007, and certainly by January 17, 2008, Perry and Keys knew that OTS had serious concerns about, among other issues, the Bank's capital adequacy and that it was virtually certain that a formal enforcement action would be taken.

156. As a result of the examination commencing January 7, 2008, OTS identified and enumerated *ten* different matters that required the attention of IndyMac's Board of Directors, chaired by Perry, including:

- (i) "Return the Bank's capital ratios to a level that supports its risk profile."

- (ii) "Provide the OTS with a forecast that includes a range of capital necessary to achieve and maintain sufficient capital ratios until implementation of the new strategic plan can provide income at a level that will support the Bank operations."

- (iii) "Ensure that liquidity strategies are in place to manage the Bank's inability to access high-rate brokered deposits, and if additional restrictions are placed on Federal Home Loan Bank Board (FHLB) and Federal Reserve Bank (FRB) borrowing limits."

- (iv) "Develop a clear strategy including scripts for media and customer inquiries to minimize effects of public disclosure of capital position and potential run on deposits."

1279119v1/010900

79

- (v) "Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values."

- (vi) "Provide the OTS with a detailed plan for reducing the level of classified and non-performing assets."

- (vii) "Provide OTS with a detailed business plan and budget supporting the new Government Sponsored Enterprise Business oriented business model, or any alternative business strategy."

- (viii) "Ensure that all significant risks are identified, quantified, monitored and controlled to preserve the safety and soundness of the institution."

- (ix) "Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report."

157. OTS also identified *twenty-four* different "corrective actions to be taken by IndyMac," including:

- (i) "Develop a contingency plan to ensure uninterrupted funding should the bank be unable to access broker deposits."

- (ii) "Develop plans for responding to media and customer inquiries regarding the Bank's inability to meet funding obligations."

- (iii) "Augment capital to ensure that it supports the Bank's risk profile."

- (iv) "Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values."

1279119v1/010900

80

Exhibit F, Page 288

- (v) "Enhance the forecasting process to include worst case scenarios and contingency plans."

- (vi) "Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report."

158.   Thus, at least by November 2007, and at the very latest by the end of January 2008, IndyMac—including its two most senior officers, Perry and Keys— were well aware of the dire financial position of IndyMac and the OTS's serious concerns about IndyMac's viability.

        2.   **Perry, Keys, and other IndyMac Officials Internally Discuss the Dire Financial Condition of IndyMac**

159.   By January 2008, IndyMac's dire financial condition was the primary topic of discussion at IndyMac board meetings. At the January 9, 2008 board meeting, Perry warned the Board that IndyMac could not count on raising any capital due, in part, to the poor market performance of IndyMac's stock. FDIC Complaint ¶ 74(a). Also at this meeting, the Board discussed the risk of a run on the bank.

160.   On or around February 8, 2008, Perry described IndyMac to an outside investor as "literally fighting for" its life. Id. ¶ 74(b). That same day, IndyMac's senior management told the Board that there was "a very real risk that the OTS could soon pressure the Bank to raise dilutive capital." Id. ¶ 137(c).

161.   By March 2008, the Bank, at the OTS's suggestion, and in recognition of its precarious state, began consideration of a "good bank/bad bank" strategy and "what happens" to IndyMac's senior managers if IndyMac failed. Id. ¶ 74.

1279119v1/010900                                              81

3.   **Perry and Keys Make False and Misleading Statements Regarding IndyMac's Dealings with OTS and IndyMac's Financial Condition Following the Commencement of the January 2008 Emergency Examination.**

162.   At the February 12, 2008 Fourth Quarter 2007 Earnings Conference Call, Perry was questioned by a securities analyst regarding regulatory actions that might be taken against IndyMac:

**Michael Rogers, Conning Assessment Management, Analyst:** . . . For the regulatory perspective, do you see the tenor of regulation and the scrutiny and the *potential regulatory actions* that your regulator could take, do you see that being maybe more severe going forward? Are they - any sense that they might require some more stressful reserve additions?

**Defendant Perry:** *I don't think so*, on the strip (sic) more stressful reserve additions. I think we've had - we worked really hard over the years to build a very strong, positive and open relationship with our regulators. . . .

I think they have complimented us on our nimbleness in terms of our ability to change our business model, okay? Certainly, they're concerned about the whole industry, what regulator wouldn't be, given what has gone on in the whole financial services sector. And certainly, they're more concerned about entities that are more susceptible to the housing market, like IndyMac. And I think that, given that, that we continue to have a positive relationship with them, *they haven't asked us to do anything that -- they haven't asked us to do anything.  . . . So, I feel like they think we're doing a pretty good job managing through this crisis period.. . . I don't think they're going to have concerns about our reserves* (emphasis added).

1279119v1/010900                                      82

163. Perry's response was materially false and misleading. Perry knew, as early as November 2007, that OTS was commencing, four months early, an investigation into IndyMac, and intended to downgrade the Bank's CAMELS rating, and also knew that the OTS had informed senior management, including Perry, that based on OTS' serious concerns about the Bank's capital adequacy, OTS concluded that IndyMac needed to raise significant outside capital.

164. As OTS Director John M. Reich would later state regarding the examination, "[t]he OTS had significant concerns with the bank's funding strategy, had directed appropriate changes and was finalizing a new set of enforcement actions to address its numerous problems. IndyMac was actively seeking to arrange a significant capital infusion or find a buyer." As described above, the "matters requiring IndyMac board attention" and the "corrective actions to be taken" were numerous and serious. In addition, OTS had raised concerns regarding the Conduit Division in the January 7, 2007 inspection and required numerous corrective actions.

165. In light of these facts — none of which were disclosed to investors during the Class Period — Perry's statements that (a) he did not think the OTS would require more stressful reserve additions; (b) OTS had not "asked us to do anything"; (c) OTS "think[s] we're doing a pretty good job managing through this crisis period"; and (d) "I don't think they're going to have concerns about our reserves," were all materially false and misleading. They were intended to, and did, convey the materially false impression that OTS was somehow satisfied with IndyMac's financial condition and had vouched for IndyMac's viability, when in fact precisely the opposite was true.

166. Also on February 12, 2008, Keys and Perry signed and filed an 8-K reassuring investors worried about the financial condition of the Company. In that filing, Keys and Perry stated that *"We remain in a fundamentally sound financial position. . . . We believe we can maintain our 'well-capitalized' capital ratios*

1279119v1/010900

83

*even under worsening industry conditions.*" This statement was made four days after Perry had privately described IndyMac as "literally fighting for its life," and a month after the IndyMac board had discussed the likelihood of a run on the bank and the inability to raise capital.

167. These statements were false and misleading in light of the drastic actions taken by OTS and FDIC a month earlier. OTS had just initiated a review four months ahead of schedule, which ultimately required board response on issues such as "[d]evelop a clear strategy including scripts for media and customer inquiries to minimize effects of public disclosure of capital position and potential run on deposits" and "[e]nsure that liquidity strategies are in place to manage the Bank's inability to access high-rate brokered deposits." Perry and Keys did not believe their statement that IndyMac was in a "fundamentally sound financial position," and, even if they did, it was still misleading because it failed to disclose known facts tending to seriously undermine the accuracy of those statements.

4.    **Perry and Keys Made the Foregoing Statements With
      Scienter**

168. Perry and Keys made the foregoing statements with scienter because they had *actual knowledge* of OTS's actions and serious concerns about IndyMac, including concerns with the Bank's capital adequacy and high concentration of risky assets. Perry, as IndyMac's controlling officer, was the principal contact between IndyMac and the OTS. As Perry told investors on February 12, 2008: "throughout this whole crisis . . . I probably send [our regulators] a note a day, okay." As discussed in the 2007 Proxy, Keys was responsible for all audit findings, and he and Perry were jointly responsible for reviewing and certifying IndyMac's internal controls (which are necessarily implicated by the OTS findings).

169. As alleged in the Trustee Complaint, and as discussed above, Perry was aware, *as early as November 2007*, of the OTS' concerns about IndyMac's extremely weak financial condition, and its intention to downgrade IndyMac's

1279119v1/010900                                84

CAMELS ratings. Perry and Keys were aware that regulators had initiated an examination four months ahead of schedule due to concerns specific to IndyMac. They also knew that, on January 17, 2008, OTS issued a letter notifying IndyMac's board of directors, chairman, and CEO that the Bank's composite CAMELS rating was downgraded from a 2 to a 3, and its asset quality rating was downgraded from 2 to 4. In light of these facts, Perry's and Keys' February 12, 2008 statements — such as that OTS "thinks we're doing pretty good job managing through this crisis period" — were knowingly false. Indeed, OTS examiners believed that IndyMac investors were being so misled by such statements that, in April 2008, one of them recommended that OTS "should publicly disclose IndyMac's poor earnings position to prevent any liability to investors who had the potential to lose money should the institution fail."

### D. Defendants Perry and Keys Make Misleading Statements About IndyMac's Liquidity During the Class Period

#### 1. False Statements on Liquidity

170. During the Class Period, Defendants Perry and Keys made numerous false statements touting IndyMac's supposedly "tremendous" and "strong" liquidity and "strong capital position" while in the possession of evidence clearly showing that IndyMac was under extreme financial distress, and that its survival was seriously in jeopardy. Specifically, Perry and/or Keys made the following false and misleading statements:

a) "You know, we have tremendous liquidity.... So, you know, the bottom line is I think we have a very strong and secure funding source and tremendous liquidity which I think, when you combine strong capital position with strong liquidity, that's what gets you through these cycles in the mortgage market." Statement of Perry, on July 31, 2007 2Q 2007 Earnings Call.

b) "[W]e have very strong liquidity, a good amount of excess capital and there are no realistic scenarios that I can foresee that would impair

127911 9v1/010900                                                    85

IndyMac's viability[.]"   August 2, 2007 posting on IMBreport.com (the "IMB Blog") (quoting Perry).

c)   Downplaying liquidity risks as "about as close to none as you could have."   Statement of Perry, at September 7, 2007 "Investor Day" Conference.

d)   Assuring investors that "our liquidity is at an all-time high," and bragging that "we have very strong capital, reserves and liquidity to weather the current storm in our industry." November 6, 2007 posting on the IMB Blog (quoting Perry).

e)   Stating that and that "we are considered 'well-capitalized' by regulatory standards"   and that "[w]e...are confident that our liquidity position will remain strong going forward."   November 6, 2007 posting on the IMB Blog (quoting Perry).

f)   Reassuring investors that "[l]ong term, with our strong capital, reserves, and liquidity and with the great team we have in place, there is no doubt that we will be a mortgage industry survivor[.]"November 6, 2007 posting on the IMB Blog (quoting Perry).

g)   "We remain in a fundamentally sound financial position... We believe we can maintain our 'well-capitalized' capital rations [sic] even under worsening industry conditions. ... We still have a solid cushion above the well-capitalized ratios." February 12, 2008 Form 8-K (signed by Perry and Keys) and February 12, 2008 Annual Shareholder Letter (signed by Perry).

2.   **The Truth About IndyMac's Grave and Incurable Liquidity Crisis**

171.   On July 11, 2008, OTS placed IndyMac into receivership, formed a newly chartered thrift (IndyMac Federal Bank, FSB), and named the FDIC as conservator.   On July 31, 2008, IndyMac Bancorp filed for protection under the

1279119v1/010900                                    86

Chapter 7 liquidation provisions of the bankruptcy laws. The estimated loss to the FDIC from the failure of IndyMac is $12.75 billion.

172. The public did not learn there was a significant risk that IndyMac would be unable to continue as a going concern until May 12, 2008, the close of the Class Period, when the stock price fell 32%.

173. On May 12, 2008, Perry revealed for the first time that, contrary to his prior representations, IndyMac might not be able to continue as a going concern because it faced a grave and incurable liquidity crisis. Specifically, Perry admitted that "our capital ratios have clearly been depleted," and "clearly, there are scenarios in this environment where we could not be well capitalized and end up being [in]adequately capitalized for a short period of time."

174. Also on May 12, 2008, in a small note in the "Capital" section of what would become IndyMac's last 10-Q released before receivership, the Company revealed that it was no longer a well-capitalized institution and that it was headed for insolvency. Specifically, IndyMac reported that during April 2008, Moody's and Standard & Poor's downgraded the ratings on a large number of mortgage-backed security bonds, including $160 million of those issued by IndyMac and which the Bank retained in its portfolio. IndyMac admitted that these downgrades would have negatively impacted the Company's risk-based capital ratio as of June 30, 2008, and further revealed that had these lowered ratings been in effect at March 31, 2008, the Company's total risk-based capital would have been 9.27%. IndyMac warned that if its regulators found its capital position to have fallen below well-capitalized (i.e. minimum 10% risk-based capital ratio) to "adequately capitalized" (8-10% risk-based capital ratio), the Bank might no longer be able to use brokered deposits as a source of funds. The Bank further revealed that if its level of deposit liquidity was reduced in this way, the Bank anticipated that it would reduce its assets and, most likely, curtail its lending activities.

1279119v1/010900                                    87

**Exhibit F, Page 295**

175.   According to IndyMac's third quarter Form 10-Q issued on May 12, 2008, the Bank's risk-based capital ratio had dropped to 10.26% as of March 31, from 10.81% the previous quarter.  This ratio, which factors in asset quality and loan loss reserve coverage, must be at least 10% for an institution to be "well-capitalized" under regulatory guidelines.  IndyMac reported in the 10-Q that the Bank's risk-based capital was only $47 million above the minimum required for this 10% mark.  But it concealed the fact that, as explained below, some of that $47 million was actually fictional, the result of an improper, backdated $18 million contribution to capital from IndyMac's parent company.  As set forth below, had Ernst not allowed this improper, retroactive contribution to capital, IndyMac would have been forced to report that its capital had already slipped below the minimum level that regulators require for classifying banks as "well-capitalized," thus putting $6.8 billion of brokered deposits -- or 37% of IndyMac's total deposits -- at risk.

176.   Immediately following these revelations, analysts lowered their earnings estimates for IndyMac, citing IndyMac's uncertain financial condition, serious credit challenges, and "questionable" capital adequacy.  Analysts remarked that IndyMac appeared "at risk from regulatory intervention," and that "the implications...could be very severe for the bank," including "very draconian actions by regulators."

### 3.   Defendants Perry's and Keys' False Statements About IndyMac's Liquidity Were Made With Scienter

177.   Contrary to these statements, IndyMac in fact had serious and long-standing liquidity problems.  As detailed in the Trustee Complaint, IndyMac had repeatedly violated its own liquidity policy and it knew no later than Fall 2007 that it would have to raise substantial capital in order to survive.

178.   On March 20, 2006, and March 31, 2006, Perry and Keys were sent memoranda from David Hayes, Senior Vice President of Corporate Finance,

1279119v1/010900

88

advising that IndyMac had breached its own Liquidity Policy as of January 31, 2006 and February 28, 2006, respectively, due to "minimal loan sales" "relative to funding volume." Trustee Complaint ¶ 203(b)(c).

179. On October 3, 2006, Perry was advised that IndyMac had violated its own Liquidity Policy because it had been unable to sell into the secondary market the loans it had generated, which caused Loans Held for Sale to increase by $2.9 billion. Perry acknowledged his awareness of the problem, and specifically IndyMac's violation of its own Liquidity Policy, by e-mail, noting, "I see this as a problem." *Id.* ¶ 206. On October 30, 2006, Keys acknowledged his awareness of the same issue, admitting at an Audit Committee meeting that: (a) "problem assets are trending up"; (b) only 84% of the loan production from the Conduit Division had been sold in the third quarter, far short of 100% in the previous quarter; and (c) that Early Payment Defaults were rising. *Id.* ¶ 216.

180. On or about March 8, 2007, the OTS presented IndyMac's Treasurer, Francisco Nebot, with a memorandum titled "Examiner Recommendations," listing five separate violations of IndyMac's Liquidity Policy that occurred in 2006. Id. ¶ 208.In addition to the foregoing facts, the following facts and communications identified in the Trustee Complaint all establish Defendants' knowledge, during the Class Period, of IndyMac's desperate financial condition and regulatory capital problems, its pressing need to raise billions in funds to remain well-capitalized, and the dismal prospects for raising such enormous amounts of outside capital:

181. By September 2007, IndyMac's liquidity problems had worsened. On September 5, 2007, one of IndyMac's directors emailed senior management regarding a recent analysis by Moody. That director stated that Moody's "estimates are alarming" and "*it appears that we are drastically under-estimating our losses.*" Trustee Complaint ¶ 228.

a)As early as November 2007, the OTS recommended to senior management that, based on the Bank's capital ratios, IndyMac needed to raise

significant outside capital. *Id.* ¶ 137(b). At around the same time, senior management became aware that OTS intended to downgrade IndyMac's composite CAMELS rating from a "2" to a "3," creating a presumption that formal enforcement action would be taken. *Id.* ¶ 137(b).

b)     On January 4, 2008, Perry informed the Board of Directors and related parties that he did not want potential investors to conduct due diligence before submitting a term sheet because of concerns about how the marketplace would perceive Bancorp. *Id.* ¶ 139(b).

c)     January 9, 2008 IndyMac Board minutes – which Ernst was required to review -- memorialize a discussion among IndyMac directors, including Perry, on capital raising and *the risk of a run on the Bank* in which *Perry warns that IndyMac cannot count on raising any capital due*, in part, to the poor market performance of IndyMac's stock. *Id.* ¶ 74(a).

d)     On or around February 8, 2008, Perry described IndyMac to an outside investor as "*literally fighting for*" its life. *Id.* ¶ 74(b).

e)     Also on February 8, 2008, IndyMac's senior management told the Board that there was "*a very real risk that the OTS could soon pressure the Bank to raise dilutive capital*." *Id.* ¶ 137(c).

f)     Incredibly, on February 12, 2008, just four days after the February 8 statements, Perry and Keys told investors that IndyMac was in a "*fundamentally sound financial condition*."

E.     **Defendant Ernst Misleads Investors by Failing to Include a "Going Concern" Reservation in Its 2007 Audit Opinion**

182.     Ernst was deliberately reckless in failing to include a "going concern" reservation in its February 29, 2008 audit opinion. Such a reservation would have stated what the Defendants knew and investors did not:     that there was a significant risk that IndyMac would be unable to meet its obligations over the next few months, and would likely be forced into liquidation. Because of Ernst's failure

1279119v1/010900                                         90

to include a going concern reservation in its 2007 Audit Opinion, the public did not learn there was a significant risk that IndyMac would be unable to continue as a going concern until May 12, 2008, the close of the Class Period, when IndyMac revealed that it was no longer a well-capitalized institution and that it was headed for insolvency.

1. **Ernst Violated the Auditing Standards Governing the Issuance of a "Going Concern" Reservation**

183. AU § 341 requires auditors to evaluate whether there is "substantial doubt" about the entity's ability to continue as a going concern for the following year. Where substantial doubts exist, the auditor's opinion should contain a "going concern reservation." As set forth in AU § 341.12: "If ... the auditor concludes that substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time remain, the audit report should include an explanatory paragraph (following the opinion paragraph) to reflect that conclusion." AU § 341.12. As defined in AU § 341.02, "reasonable period of time" means "not to exceed one year beyond the date of the financial statements being audited." Of course, IndyMac did not last even close to one year, and was instead placed into conservatorship by the FDIC on July 11, 2008, less than five months after Ernst's "clean" opinion.

184. The 2006 AAG states that there are five primary factors that an auditor must consider in determining whether a going concern reservation is needed:

1. Recurring operating losses;

2. Indications of strained liquidity;

3. Failure to meet minimum regulatory capital requirements or to adhere to the terms of an approved capital plan;

1279119v1/010900

91

4.    Concerns expressed or actions taken by regulatory authorities regarding alleged unsafe or unsound practices; and

5.    Indications of strained relationships between management and regulatory authorities. 2006 AAG at §§ 5.108-118.

185. *Four of these five* conditions were present at IndyMac by February 29, 2008. Specifically: (1) IndyMac had experienced operating losses in Q3 and Q4; (2) liquidity was a recurrent concern of the Board of Directors, as described in the Trustee Complaint; (3) the CAMELS downgrade had already been communicated by the OTS on January 17, 2008; and (4) the communications discussed in Board minutes indicated a strained relationship between OTS and IndyMac. And, a month later, IndyMac had fallen out of compliance with minimum capital requirements.

        2.    **Ernst Acted with Scienter in Failing to Provide a Going Concern Reservation in Its 2007 Audit Opinion**

186. The allegations in the Trustee Complaint and the related Transcript provide compelling facts to support a cogent inference that Ernst was deliberately reckless in failing to include a "going concern" reservation in its 2007 Audit Opinion on February 29, 2008. The facts demonstrating Ernst's scienter include:

(a)    In October 2007, Keys informed the Board of Directors that IndyMac had violated its own Liquidity Policy because it had transferred $175 million to IndyMac Bank. Trustee Complaint ¶ 209.

(b)    In November 2007, senior management had been informed that OTS intended to downgrade the Bank's CAMELS rating from "2" to "3", and would require IndyMac to raise significant outside capital. *Id.* ¶ 137(b).

(c)    At a January 9, 2008 Joint IndyMac and IndyMac Bank Board Special Meeting, Perry warned that IndyMac could not count on raising

1279119v1/010900

92

capital due to poor market conditions and discussed the risk of a run on the bank. *Id.* ¶ 74(a). Ernst was obligated to review these Board Minutes as part of its 2007 audit, and therefore knew that liquidity problems and the risk of a bank run were being discussed internally.

(d)     On January 17, 2008, more than a month before Ernst issued its audit opinion, OTS issued a letter to all members of IndyMac's Board stating that the Bank's CAMELS assets rating had been downgraded from "2" to "4" effective December 31, 2007. Ernst was required to review this letter as part of its audit.

(e)     IndyMac Board Meeting Minutes of February 8, 2008, which Ernst was required to review, acknowledge the "very real risk" that OTS would require IndyMac to raise dilutive capital. *Id.* ¶ 137(c).

(f)     Perry stated to an outside investor on February 8, 2008 that IndyMac was *"literally fighting for"* its life." *Id.* ¶ 74(b).

(g)     By March 2008, FDIC determined that, to avoid failure, the Bank needed to raise an astonishing *$3.5 billion* in additional capital to avoid collapse. *Id.* ¶ 137(e).

187.  Ernst was also aware of the fact that OTS commenced its 2008 examination four months early "because of IndyMac's deteriorating position." The Treasury Report confirms that OTS contacted the FDIC on December 20, 2007. ." The FDIC becomes involved in examinations "when a thrift exhibits material deteriorating conditions that could result in the institution becoming troubled in the near future. In this regard, FDIC may need to develop contingency plans for a thrift's possible failure or begin the resolution process." Treasury Report at 43.

188.  Ernst's scienter is further supported by Ernst's approval of Perry and other IndyMac senior managers' fraudulent backdating of a cash infusion to March 31, 2008 in order to mask the fact that IndyMac did not meet the minimum capital requirements for classification as "well-capitalized" at March 31, 2008, as

1279119v1/010900                               93

confirmed in the OIG's May 21, 2009 Audit Report entitled "Safety and
Soundness: OTS Involvement With Backdated Capital Contributions by Thrifts"
(OIG-09-037) (The "Backdating Report"), and by allegations in the Trustee
Complaint.

189.   The improper backdating approved by Ernst was specifically designed
to conceal—and did conceal—from investors the fact that the threat to IndyMac's
financial viability. Ernst's conduct violated the requirements that an auditor
maintain independence in actions and appearance during an audit engagement (see
AU § 220) professional integrity and professional skepticism (AU § 230 and AU §
316), and demonstrates that Ernst was *not* acting as an independent auditor.

190.   On April 20, 2010, the Bankruptcy Court conducted a hearing at
which the court denied the motions of defendant Perry and the other former
IndyMac Bancorp directors to dismiss the Trustee's Complaint. *See* Adversary
Proceeding Case No. 2:09-ap-02645-BB, Docket No. 67-4, filed May 14, 2010
("Transcript") Transcript at 132-133. The court found that IndyMac's Chapter 7
Trustee adequately alleged that the directors had wrongly "downstreamed" $355
million from the parent into IndyMac. Of the $355 million "downstreamed"
money, $175 million was transferred in 2007, despite defendants' knowledge that
the situation at IndyMac was a "hopeless" lost cause, because IndyMac's hopes for
survival hinged on a *$3.5 billion* capital infusion, which defendants knew was
impossible to obtain, and defendants knew of red flags indicating that the Bank
was in danger of being seized by the OTS or FDIC at any time. The court agreed
that this was a total waste of Bancorp's assets, because defendants knew the money
was being poured into a "rathole," "that the OTS was going to -- or the FDIC was
going to be taking over any time." Transcript at 32, 41, 57.

1279119v1/010900

94

F. **Defendant Perry Misleads Investors Regarding IndyMac's Dramatic Over-Reliance on Brokered Deposits**

    1. **During the Class Period, IndyMac Relied Excessively on Brokered Deposits to Maintain Its Reported Solvency, and Later Admitted That Those Brokered Deposits Were Used from an "Expediency Perspective" Only**

191. Brokered deposits are certificates of deposit that are marketed to independent brokers who are charged with dividing holdings of wealthy individuals or cash-rich businesses into $100,000 units to enable them to take full advantage of FDIC insurance. Brokered deposits are also known to bank analysts and examiners as "hot money." Unlike consumer deposits, in which there is a relationship between the bank and the consumer and the deposit base therefore remains relatively constant, brokered deposits will quickly move to whichever institution will pay the highest interest rate. Thus, while brokered deposits can help boost liquidity, they also can pose liquidity risks when large numbers are withdrawn in a short period.

192. Excessive reliance on brokered deposits is a red flag to investors and has been implicated in many of history's largest bank failures. As FDIC Chairwoman Sheila Bair has stated: "It is quite easy to get brokered deposits, and there's not a lot of market discipline with the brokered deposits. When there's excessive reliance on them, particularly to fuel rapid growth on the balance sheet, that's definitely a high-risk factor." Steve Andrews, President and CEO of the Bank of Alameda, has made similar comments: "As a general rule, if an institution is relying on brokered deposits to fuel asset growth, it should raise a red flag with both investors and regulators. . . Keeping the percentage under 10 percent is a prudent approach versus letting the percentage creep over 25 percent or more."

193. From December 2006 to March 2008, 64% of IndyMac's growth in overall deposits was fueled by brokered deposits. As of March 31, 2008, brokered

1279119v1/010900

95

1  deposits made up 37% of IndyMac's overall deposits. These facts — which were
2  highly material and would have immediately raised red flags with investors —
3  were never disclosed in a meaningful and reasonably accessible fashion to
4  investors during the Class Period.

5     194.  According to the *Los Angeles Business Journal*, in a "Special Report"
6  on IndyMac titled "IndyMac's Last Gasps," published on September 15, 2008,
7  IndyMac's core deposits in the first quarter of 2008 — $3 billion out of total
8  deposits of $19 billion — were far below the industry standard:  For many banks,
9  core deposits can account for more than 50 percent of a deposit base.  The article
10  quotes a bank president and consultant as noting that "Anytime you see an
11  institution that is growing through noncore deposits, it is one of the big red flags
12  that should alert either the regulators or the public that the institution may be
13  engaged in some kind of higher-risk, higher-reward activity."

14     195.  According to the *Los Angeles Business Journal*, Perry favored
15  brokered deposits as part of his strategy to use the Company's thrift status as an
16  engine for making more loans rather than building a stable deposit base of local
17  customers with checking and savings accounts.  Perry fostered the use of brokered
18  deposits to help fund IndyMac's rapid growth.  The article quotes a former CFO of
19  IndyMac's Mortgage Bank who said that Perry "did not value deposit gathering —
20  period.  [Perry] said, 'Deposit gathering is a commodity business and asset
21  gathering is where the money is.'"

22     196.  On May 12, 2008, the final day of the Class Period, IndyMac
23  disclosed for the first time the extent of its reliance on brokered deposits, telling
24  investors in the Form 10-Q that if IndyMac were to fall under well-capitalized
25  levels (as it simultaneously revealed it might), and that "even with a [brokered
26  deposit] waiver, if the interest rate limitations on brokered and solicited deposits
27  were to be reduced, either by the lack of a full brokered deposit wavier or by the
28  interest rate limits on brokered or solicited deposits, we anticipate that we would

1279119v1/010900                                    96

reduce our assets and, most likely, curtail our lending activities." In other words, IndyMac was stating that it was so heavily reliant on brokered deposits that *any* limitation on its ability to accept them would cause the Company to restrict its lending activities.

197. As explained below, these disclosures directly contradicted Defendants' Class Period statements that the Company's reliance on brokered deposits "isn't on our radar screen of being important to us."

198. On June 30, 2008, IndyMac admitted that it had been forced to rely on brokered deposits since "last summer" to maintain liquidity when the credit market collapsed. IndyMac further stated that brokered deposits "were used from an expediency perspective" only and that IndyMac had been working on reducing its reliance upon them. Thus, IndyMac admitted that brokered deposits are not a prudent and stable funding base.

199. In an August 1, 2008 interview, FDIC chairwoman Sheila Bair confirmed that IndyMac was "unattractive" to buyers precisely because of its reliance on brokered deposits: "[IndyMac] did not have a strong what we call a core deposit base. A lot of the deposits were brokered, meaning securities brokers just placed deposits [for] the institution — as opposed to the institution having a relationship with the customer directly. ... So there are a number of things about this institution that, to be honest with you, make it unattractive to a potential purchaser."

200. The Treasury Report concludes that "lack of core deposits" was a key trigger of IndyMac's failure. The Treasury Report accurately characterizes brokered deposits as one of IndyMac's "volatile funding sources," which the Report defined as a "source of funds that may present a potential risk to earnings and capital associated with brokered or other rate-sensitive deposits that may be only temporarily available or require premium rates to retain."

Exhibit F, Page 305