1   JOHN W. SPIEGEL (SBN 78935)
    john.spiegel@mto.com
2   KATHLEEN M. McDOWELL (SBN 115976)
    kathleen.mcdowell@mto.com
3   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, 25th floor
4   Los Angeles, CA 90071-1560
    Telephone: (213) 683-9100
5   Facsimile: (213) 687-3702

6   Attorneys for Defendants/Counterclaimants
    LOUIS E. CALDERA, LYLE E. GRAMLEY,
7   HUGH M. GRANT, PATRICK C. HADEN,
    TERRANCE G. HODEL, ROBERT L. HUNT
8   II, LYDIA H. KENNARD, and BRUCE G.
    WILLISON

9

10                  UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13

14  XL SPECIALTY INSURANCE              Case No. 2:11-CV-2078-GHK-JCG
    COMPANY, et al.,
15                                      ANSWER AND
                  Plaintiffs,           COUNTERCLAIMS OF
16                                      OUTSIDE DIRECTOR
    v.                                  DEFENDANTS
17
    MICHAEL W. PERRY, et al.,           Judge: Hon. R. Gary Klausner
18
                  Defendants.
19

20  LOUIS E. CALDERA, LYLE E.
    GRAMLEY, HUGH M. GRANT,
21  PATRICK C. HADEN, TERRANCE G.
    HODEL, ROBERT L. HUNT II,
22  LYDIA H. KENNARD, and BRUCE G.
    WILLISON,
23
                  Counterclaimants,
24
    v.
25
    XL SPECIALTY INSURANCE
26  COMPANY, ARCH INSURANCE
    COMPANY, ACE AMERICAN
27  INSURANCE COMPANY, AXIS
28  INSURANCE COMPANY, CATLIN

14458672.4

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

1   INSURANCE COMPANY, LTD,
    ZURICH AMERICAN INSURANCE
2   COMPANY; TWIN CITY FIRE
    INSURANCE COMPANY; and
3   CONTINENTAL CASUALTY
    COMPANY,
4
                    **Counterdefendants**
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

# ANSWER

Defendants Louis Caldera, Lyle Gramley, Hugh Grant, Patrick Haden, Terrence Hodel, Robert L. Hunt II, Lydia Kennard, and Bruce Willison (collectively, the "Outside Directors") respectfully submit this Answer to the Complaint as follows:

1.   The Outside Directors admit that the Complaint purports to be a declaratory relief action filed by Plaintiffs seeking to resolve an actual controversy over the existence of insurance coverage.

2.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint, and on that basis, deny each and every allegation.

3.   The Outside Directors admit that on March 12, 2007 a Complaint in the matter *Reese v. IndyMac Bancorp, Inc., et al.*, No. 07-CV-1653-GW-VBk ("Tripp litigation") was filed.  The Complaint therein is the best evidence of its allegations and on that basis, the Outside Directors deny each and every allegation of paragraph 3 of the Complaint.

4.   The Outside Directors deny that the 08-09 Side A Policies are the only relevant insurance policies issued by Plaintiffs.  The Outside Directors admit that the 08-09 Side A Policies contain the quoted language.

5.   The Outside Directors admit that after the inception dates of the 08-09 Side A Policies a number of actions were initiated.  However, the Outside Directors were named as defendants only in the action entitled *Siegel v. Caldera, et al.*, 2:09-ap-2645-BB (C.D. Cal. Bankr.) (the "Trustee Litigation").  Accordingly, the Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 5 other than those related to the Trustee Litigation and on that basis deny each and every such allegation.  With respect to the Trustee Litigation, the complaint therein is the best evidence of its terms, and on

1   that basis, the Outside Directors deny each and every allegation in paragraph 5
2   related to said complaint.

3       6.      The Outside Directors deny each and every allegation of Paragraph 6
4   of the Complaint.

5       7.      The Outside Directors deny each and every allegation of Paragraph 7
6   of the Complaint.  In particular, the Outside Directors deny that there is no
7   coverage for the Trustee Litigation under the 08-09 Side A Policies.

8                           **PARTIES**

9       8.      The Outside Directors lack knowledge and information sufficient to
10  form a belief as to the truth of the allegations in Paragraph 8, and upon that basis
11  deny each and every such allegation.

12      9.      The Outside Directors lack knowledge and information sufficient to
13  form a belief as to the truth of the allegations in Paragraph 9, and upon that basis
14  deny each and every such allegation.

15      10.     The Outside Directors lack knowledge and information sufficient to
16  form a belief as to the truth of the allegations in Paragraph 10, and upon that basis
17  deny each and every such allegation.

18      11.     The Outside Directors lack knowledge and information sufficient to
19  form a belief as to the truth of the allegations in Paragraph 11, and upon that basis
20  deny each and every such allegation.

21      12.     The Outside Directors admit that Plaintiffs provided Side A insurance
22  coverage to the Outside Directors for the policy period from March 1, 2007 to April
23  1, 2009 and that each Outside Director was a director of IndyMac Bancorp, Inc.
24  from at least March 1, 2007 to July 2008.  The Outside Directors do not have
25  knowledge or information sufficient to form a belief as to the truth of the other
26  allegations in Paragraph 12 and, on that basis, deny each and every such allegation.

27      13.     The Outside Directors admit that Mr. Perry was the Chairman of the
28  Board and Chief Executive Officer of Bancorp from February 2002 to July 2008;

14458672.4

- 4 -

1    that Mr. Perry was a director of Bancorp from October 1997 to July 2008; and that

2    Bancorp and Bank's principal place of business was 888 E. Walnut Street,

3    Pasadena, CA.  The Outside Directors do not have knowledge or information

4    sufficient to form a belief as to the truth of the other allegations in Paragraph 13

5    and, on that basis, deny such allegations.

6        14.    The Outside Directors admit that Mr. Keys was the Chief Financial

7    Officer of the Bank from 2002 to April 2008. The Outside Directors do not have

8    knowledge or information sufficient to form a belief as to the truth of the other

9    allegations in Paragraph 14 and, on that basis, deny such allegations.

10       15.    The Outside Directors admit that Mr. Caldera served as a director of

11   the Bank and Bancorp from at least 2004 to July 2008. Mr. Caldera admits that he

12   has been a resident of Maryland since 2009. The Outside Directors (except Mr.

13   Caldera) do not have knowledge or information sufficient to form a belief as to the

14   truth of the other allegations in Paragraph 15 and, on that basis, deny each and

15   every such allegation.

16       16.    The Outside Directors admit that Mr. Gramley served as a director of

17   the Bank and Bancorp from at least 2004 to July 2008.  Mr. Gramley admits that he

18   is a resident of the State of Maryland. The Outside Directors (except Mr. Gramley)

19   do not have knowledge or information sufficient to form a belief as to the truth of

20   the other allegations in Paragraph 16 and, on that basis, deny each and every such

21   allegation.

22       17.    The Outside Directors admit that Mr. Grant served as a director of the

23   Bank and Bancorp from at least 2004 to July 2008.  Mr. Grant admits that he is a

24   resident of the State of California.  The Outside Directors (except Mr. Grant) do not

25   have knowledge or information sufficient to form a belief as to the truth of the other

26   allegations in Paragraph 17 and, on that basis, deny each and every such allegation.

27       18.    The Outside Directors admit that Mr. Haden served as a director of the

28   Bank and Bancorp from at least January 2004 to July 2008. Mr. Haden admits that

1   he is a resident of the State of California. The Outside Directors (except Mr. Haden)

2   do not have knowledge or information sufficient to form a belief as to the truth of

3   the other allegations in Paragraph 18 and, on that basis, deny each and every such

4   allegation.

5          19.    The Outside Directors admit that Mr. Hodel served as a director of the

6   Bank and Bancorp from at least January 2004 to July 2008. Mr. Hodel admits that

7   he is a resident of the State of California. The Outside Directors (except Mr. Hodel)

8   do not have knowledge or information sufficient to form a belief as to the truth of

9   the other allegations in Paragraph 19 and, on that basis, deny each and every such

10   allegation.

11          20.    The Outside Directors admit that Mr. Hunt served as a director of the

12   Bank and Bancorp from at least January 2004 to July 2008. Mr. Hunt admits that he

13   is a resident of the State of California. The Outside Directors (except Mr. Hunt) do

14   not have knowledge or information sufficient to form a belief as to the truth of the

15   other allegations in Paragraph 20 and, on that basis, deny each and every such

16   allegation.

17          21.    The Outside Directors admit that Ms. Kennard served as a director of

18   the Bank and Bancorp from January 2007 to July 2008. Ms. Kennard admits that

19   she is a resident of the State of California. The Outside Directors (except Ms.

20   Kennard) do not have knowledge or information sufficient to form a belief as to the

21   truth of the other allegations in Paragraph 21 and, on that basis, deny each and

22   every such allegation.

23          22.    The Outside Directors admit that Mr. Willison served as a director of

24   Bancorp from July 2005 until July 2008. Mr. Willison admits that he is a resident of

25   the State of California. The Outside Directors (except Mr. Willison) do not have

26   knowledge or information sufficient to form a belief as to the truth of the other

27   allegations in Paragraph 22 and, on that basis, deny each and every such allegation.

28

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

23.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and upon that basis deny each and every such allegation.

24.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and upon that basis deny each and every such allegation.

25.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and upon that basis deny each and every such allegation.

26.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and upon that basis deny each and every such allegation.

27.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and upon that basis deny each and every such allegation.

28.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and upon that basis deny each and every such allegation.

29.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and upon that basis deny each and every such allegation.

30.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and upon that basis deny each and every such allegation.

31.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and upon that basis deny each and every such allegation.

32.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and upon that basis deny each and every such allegation.

33.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and upon that basis deny each and every such allegation.

34.     The Outside Directors admit that IndyMac Bancorp was headquartered in and had its principal place of business in Pasadena, California, but, each for himself or herself, denies that he or she conducted business in those offices during all time periods relevant to this Complaint.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of those allegations with respect to other defendants, and upon that basis deny each and every such allegation.

## JURISDICTION AND VENUE

35.     The Outside Directors admit that this action is brought pursuant to 28 U.S.C. §§ 1332, 2201 and 2202.

36.     The Outside Directors admit that there is an actual controversy among the parties.  However, the Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 36 and upon that basis deny each and every such allegation.

37.     The Outside Directors admit the allegations of Paragraph 37 of the Complaint.

## THE POLICIES

**The 08-09 XL Side A Policy**

38.     The Outside Directors allege that XL Specialty Insurance Company Policy No. ELU103295-08 is a written document that speaks for itself and further admit that Exhibit A is a copy of the 08-09 XL Side A Policy.

39.     The Outside Directors admit that the 08-09 XL Side A Policy contains the quoted language.

40.     The Outside Directors admit that the 08-09 XL Side A Policy contains the quoted language.

41.     The Outside Directors admit that the 08-09 XL Side A Policy contains the quoted language.

42.     The Outside Directors admit that the 08-09 XL Side A Policy contains the quoted language.

43.     The Outside Directors admit that the 08-09 XL Side A Policy contains the quoted language.

**The 08-09 Arch Side A Policy**

44.     The Outside Directors allege that the 08-09 Arch Side A Policy is a written document and is the best evidence of its terms and admit that Exhibit B is a copy of the 08-09 Arch Side A Policy, except insofar as it is missing Endorsement 1.

45.     The Outside Directors admit that the 08-09 Arch Side A Policy contains the quoted language.

46.     The Outside Directors admit that the 08-09 Arch Side A Policy contains the quoted language.

47.     The Outside Directors admit the allegations of Paragraph 47 of the Complaint.

48.     The Outside Directors deny the allegations of Paragraph 48 of the Complaint.

**The 08-09 ACE Side A Policy**

49.     The Outside Directors allege that the 08-09 ACE Side A Policy is a written document and is the best evidence of its terms and admit that Exhibit C is a copy of the 08-09 ACE Side A Policy.

50.     The Outside Directors admit the allegations of Paragraph 50 of the Complaint.

51.     The Outside Directors admit the allegations of Paragraph 51 of the Complaint.

52.     The Outside Directors admit the allegations of Paragraph 52 of the Complaint.

53.     The Outside Directors admit that the 08-09 ACE Side A Policy contains the quoted language in the first sentence of Paragraph 53 of the Complaint.. The Outside Directors deny that said language is the only relevant part of Section II of the 08-09 ACE Side A Policy.  The Outside Directors admit the allegations of the second sentence of Paragraph 53 of the Complaint.

**The 08-09 AXIS Side A Policy**

54.     The Outside Directors allege that the 08-09 AXIS Side A Policy is a written document and is the best evidence of its terms and admit that Exhibit D is a copy of the 08-09 Axis Side A Policy.

55.     The Outside Directors admit that the 08-09 AXIS Side A Policy contains the quoted language, but further allege that the "Underlying Insurance" is specifically alleged to be "DIC Underlying Insurance."

56.     The Outside Directors admit the allegations of Paragraph 56 of the Complaint.

57.     The Outside Directors admit the allegations of Paragraph 57 of the Complaint, except the Outside Directors allege that the 08-09 AXIS Side A Policy states that the policies referenced are "Underlying Side A DIC Policies."

**The 07-08 XL Side A Policy**

58.     The Outside Directors admit that XL Specialty issued a Side A Policy for the 07-08 Policy Period, that this policy affords coverage to the Outside Directors, and allege that the written policy is the best evidence of its terms and

conditions.

**The 07-08 Arch Side A Policy**

59.    The Outside Directors admit that Arch Insurance Company issued a Side A Policy for the 07-08 Policy Period, that this policy affords coverage to the Outside Directors, and allege that the written policy is the best evidence of its terms and conditions.

**The 07-08 ACE Side A Policy**

60.    The Outside Directors admit that ACE American Insurance Company issued a Side A Policy for the 07-08 Policy Period, that this policy affords coverage to the Outside Directors, and allege that the written policy is the best evidence of its terms and conditions.

**The 07-08 AXIS Side A Policy**

61.    The Outside Directors admit that AXIS Reinsurance Company issued a Side A Policy for the 07-08 Policy Period, that this policy affords coverage to the Outside Directors, and allege that the written policy is the best evidence of its terms and conditions.

62.    The Outside Directors admit that Plaintiffs are not seeking declarations regarding coverage under the 07-08 Side A Policies, but deny each and every other allegation of Paragraph 62 of the Complaint.

## THE UNDERLYING MATTERS

63.    The Outside Directors admit that IndyMac Bancorp, Inc. was the parent company of IndyMac Bank, F.S.B., that the Bank sold various kinds of loan products to home borrowers, and that IndyMac was at one time a large mortgage originator and servicer.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63 of the Complaint and upon that basis deny and every such allegation.

64.    The Outside Directors admit that IndyMac Bancorp, Inc. issued a written press release on January 16, 2007 that disclosed its Q4 earnings, but the

1  Outside Directors lack knowledge and information sufficient to form a belief as to

2  the truth of the other allegations in Paragraph 64, and upon that basis deny each and

3  every such allegation.

4      65.    The Outside Directors admit that on or about March 12, 2007 a case

5  entitled *Claude A. Reese v. IndyMac Financial, Inc., Richard A. Wohl, and Scott*

6  *Keys* was filed in the United States District Court for the Central District of

7  California, but the Outside Directors allege that said complaint is the best evidence

8  of its terms, and on that basis deny each and every remaining allegation in

9  Paragraph 65 of the Complaint.

10     66.    The Outside Directors admit that IndyMac Bancorp issued a press

11 release on or about May 12, 2008 about its financial condition and that it suspended

12 the dividend payment on its preferred shares in 2008.  The Outside Directors allege

13 that the press release is the best evidence of its terms, and further that they lack

14 knowledge and information sufficient to form a belief as to the truth of the

15 allegations in Paragraph 66 of the Complaint, and upon that basis deny each and

16 every such allegation.

17     67.    The Outside Directors admit that on July 11, 2008, the Office of Thrift

18 Supervision seized IndyMac Bank, F.S.B.  The Outside Directors lack knowledge

19 and information sufficient to form a belief as to the truth of the remaining

20 allegations in Paragraph 67 of the Complaint, and upon that basis deny each and

21 every such allegation.

22     68.    The Outside Directors admit that on July 31, 2008, IndyMac Bancorp,

23 Inc. filed a petition for bankruptcy in the United States Bankruptcy Court for the

24 Central District of California, but the Outside Directors allege that said petition is

25 the best evidence of its terms, and upon that basis deny each and every other

26 allegation of Paragraph 68 of the Complaint.

27     69.    The Outside Directors admit that the OIG issued a report in February

28 2009, that the report contains the quoted language, and allege that the report is a

14458672.4                                    - 12 -

1    written document and thus is the best evidence of its terms, and on that basis the

2    Outside Directors deny each and every remaining allegation in Paragraph 69 of the

3    Complaint.

4    **The Tripp Litigation**

5        70.    The Outside Directors admit that on March 12, 2007 a Complaint in

6    the Tripp litigation was filed, and allege that Exhibit E purports to be the Sixth

7    Amended Complaint, filed February 16, 2010, in the Tripp litigation.  The

8    complaint therein is a written document and is therefore the best evidence of its

9    terms, as is the alleged Order dated June 18, 2007, and upon that basis the Outside

10   Directors deny each and every remaining allegation of Paragraph 70 of the

11   Complaint.

12       71.    The complaint in the Tripp litigation is a written document and is

13   therefore the best evidence of its terms, and on that basis the Outside Directors deny

14   each and every allegation of Paragraph 71 of the Complaint.

15       72.    The Outside Directors deny the allegations of Paragraph 72 of the

16   Complaint.

17   **Subsequent Notices**

18       73.    The Outside Directors admit that Plaintiffs were given notice of

19   various actions under the 07-08 Side A Policies, the 08-09 Side A Policies, or each

20   of them.  The Outside Directors lack knowledge and information sufficient to form

21   a belief as to the truth of the remaining allegations in Paragraph 73 of the

22   Complaint, and upon that basis deny and every such allegation

23       74.    The Outside Directors admit that various purported class action

24   securities lawsuits were filed, but lack knowledge and information sufficient to

25   form a belief as to the truth of the remaining allegations in Paragraph 74, and upon

26   that basis deny each and every such allegation.

27       75.    The Outside Directors admit that various purported class actions were

28   filed and consolidated into the "Daniels litigation," and that Exhibit F purports to be

14458672.4                              - 13 -

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

1  a copy of the Fourth Amended Consolidated Complaint, filed September 9, 2010, in

2  the Daniels litigation, but lack knowledge and information sufficient to form a

3  belief as to the truth of the remaining allegations in Paragraph 75, and upon that

4  basis deny each and every such allegation.

5       76.    The Outside Directors lack knowledge and information sufficient to

6  form a belief as to the truth of the allegations in Paragraph 76, and upon that basis

7  deny each and every such allegation.

8       77.    The Outside Directors admit that the FDIC filed a lawsuit, and that

9  Exhibit H purports to be a copy of the complaint, filed July 2, 2010, in the FDIC

10  litigation, but lack knowledge and information sufficient to form a belief as to the

11  truth of the allegations in Paragraph 77, and upon that basis deny each and every

12  such allegation.

13       78.    The Outside Directors admit that Siegel gave notice to Plaintiffs on or

14  about May 28, 2009 of his claims, that this notice was given in a written document

15  which is the best evidence of its terms, and that Exhibit I purports to be a copy of

16  the Siegel notice.  The Outside Directors lack knowledge and information sufficient

17  to form a belief as to the truth of the remaining  allegations of Paragraph 78, and on

18  that basis deny each and every such allegation.

19       79.    The Outside Directors admit the allegations of Paragraph 79 of the

20  Complaint.

21       80.    The Outside Directors lack knowledge and information sufficient to

22  form a belief as to the truth of the allegations in Paragraph 80, and upon that basis

23  deny each and every such allegation.

24       81.    The Outside Directors lack knowledge and information sufficient to

25  form a belief as to the truth of the allegations in Paragraph 81, and upon that basis

26  deny each and every such allegation.

27

28

14458672.4

- 14 -

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

82.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 82, and upon that basis deny each and every such allegation.

83.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 83, and upon that basis deny each and every such allegation.

84.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and upon that basis deny each and every such allegation.

85.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 85, and upon that basis deny each and every such allegation.

86.     The Outside Directors admit that they have sought coverage for the Siegel action under the 08-09 Side A Policies,  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86 of the Complaint, and upon that basis deny each and every such allegation.

87.     The Outside Directors admit that Plaintiffs have denied coverage under the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87 of the Complaint, and upon that basis deny each and every such allegation.

88.     The Outside Directors admit that they have "taken issue" with the Plaintiffs' position on coverage under the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88 of the Complaint, and upon that basis deny each and every such allegation.

89.     The Outside Directors admit that certain coverage issues pertaining to the Trustee Litigation are ripe for adjudication.  The Outside Directors deny the remaining allegations of Paragraph 89.

## ANSWER TO FIRST CAUSE OF ACTION

90.     The Outside Directors incorporate by reference each and every statement in Paragraphs 1-89 above.

91.     The Outside Directors admit that an actual controversy exists between the Outside Directors and Plaintiffs regarding certain positions on coverage under the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 of the Complaint, and upon that basis deny each and every such allegation.

92.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 92 of the Complaint, and upon that basis deny each and every such allegation.

93.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 93, and upon that basis deny each and every such allegation.

94.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 94, and upon that basis deny each and every such allegation.

95.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 95, and upon that basis deny each and every such allegation.

96.     The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and upon that basis deny each and every such allegation.

97.    The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 97, and upon that basis deny each and every such allegation.

**ANSWER TO SECOND CAUSE OF ACTION**

98.    The Outside Directors incorporate by reference each and every statement in Paragraphs 1-89 above.

99.    The Outside Directors admit that an actual controversy exists between the Outside Directors and Plaintiffs regarding certain positions on coverage under the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99 of the Complaint, and upon that basis deny each and every such allegation.

100.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 100 of the Complaint, and upon that basis deny each and every such allegation.

101.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 101 of the Complaint, and upon that basis deny each and every such allegation.

102.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 102 of the Complaint, and upon that basis deny each and every such allegation.

103.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 103 of the Complaint, and upon that basis deny each and every such allegation.

104.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 104 of the Complaint, and upon that basis deny each and every such allegation.

105.   The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 105 of the Complaint, and upon that basis deny each and every such allegation.

## ANSWER TO THIRD CAUSE OF ACTION

106.   The Outside Directors incorporate by reference each and every statement in Paragraphs 1-89 above.

107.   The Outside Directors admit that an actual controversy exists between the Outside Directors and Plaintiffs regarding certain positions on coverage under the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107 of the Complaint, and upon that basis deny each and every such allegation.

108.   The Outside Directors deny each and every allegation contained in Paragraph 108 of the Complaint.

109.   The Outside Directors deny that the Trustee Litigation is based only upon, arises only out of, only directly or indirectly resulted from, is only in consequence of, or only involves the Tripp Litigation or facts, circumstances or situations, transactions, events or wrongful acts or series of facts, circumstances, situations, events or transactions underlying or alleged in the Tripp Litigation. Accordingly, the Outside Directors deny each and every allegation contained in the second sentence of Paragraph 109 of the Complaint.

110.   The Outside Directors deny that the Trustee Litigation is based only upon, arises only out of, only directly or indirectly resulted from, is only in consequence of, or only involves facts, circumstances or situations, transactions, events or wrongful acts which, before the Inception Date of the 08-09 Side A Policies, was the subject of any notice given under any other management liability insurance, directors' and officers' insurance, or any similar insurance. Accordingly,

1 the Outside Directors deny each and every allegation contained in the second

2 sentence of Paragraph 110 of the Complaint.

3   111. The Outside Directors deny that the Trustee Litigation arises only from

4 the same Interrelated Wrongful Acts as the Tripp Litigation.  Accordingly, the

5 Outside Directors deny each and every allegation contained in the second sentence

6 of Paragraph 111 of the Complaint.

7   112. The Outside Directors deny each and every allegation contained in

8 Paragraph 112 of the Complaint.

9   113. The Outside Directors admit the allegations of Paragraph 113 of the

10 Complaint.

11   114. The Outside Directors admit the allegations of Paragraph 114 of the

12 Complaint.

13       **ANSWER TO FOURTH CAUSE OF ACTION**

14   115. The Outside Directors incorporate by reference each and every

15 statement in Paragraphs 1-89 above.

16   116. The Outside Directors admit that an actual controversy exists between

17 the Outside Directors and Plaintiffs regarding certain positions on coverage under

18 the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack

19 knowledge and information sufficient to form a belief as to the truth of the

20 remaining allegations in Paragraph 116 of the Complaint, and upon that basis deny

21 each and every such allegation.

22   117. The Outside Directors lack knowledge and information sufficient to

23 form a belief as to the truth of the allegations in Paragraph 117 of the Complaint,

24 and upon that basis deny each and every such allegation.

25   118. The Outside Directors lack knowledge and information sufficient to

26 form a belief as to the truth of the allegations in Paragraph 118 of the Complaint,

27 and upon that basis deny each and every such allegation.

28

1       119.   The Outside Directors lack knowledge and information sufficient to

2  form a belief as to the truth of the allegations in Paragraph 119 of the Complaint,

3  and upon that basis deny each and every such allegation.

4       120.   The Outside Directors lack knowledge and information sufficient to

5  form a belief as to the truth of the allegations in Paragraph 120 of the Complaint,

6  and upon that basis deny each and every such allegation.

7       121.   The Outside Directors lack knowledge and information sufficient to

8  form a belief as to the truth of the allegations in Paragraph 121 of the Complaint,

9  and upon that basis deny each and every such allegation.

10      122.   The Outside Directors lack knowledge and information sufficient to

11  form a belief as to the truth of the allegations in Paragraph 122 of the Complaint,

12  and upon that basis deny each and every such allegation.

13                 **ANSWER TO FIFTH CAUSE OF ACTION**

14       123.   The Outside Directors incorporate by reference each and every

15  statement in Paragraphs 1-89 above.

16       124.   The Outside Directors admit that an actual controversy exists between

17  the Outside Directors and Plaintiffs regarding certain positions on coverage under

18  the 08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack

19  knowledge and information sufficient to form a belief as to the truth of the

20  remaining allegations in Paragraph 124 of the Complaint, and upon that basis deny

21  each and every such allegation.

22       125.   The Outside Directors lack knowledge and information sufficient to

23  form a belief as to the truth of the allegations in Paragraph 125 of the Complaint,

24  and upon that basis deny each and every such allegation.

25       126.   The Outside Directors lack knowledge and information sufficient to

26  form a belief as to the truth of the allegations in Paragraph 126 of the Complaint,

27  and upon that basis deny each and every such allegation.

28

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

1    127.   The Outside Directors lack knowledge and information sufficient to

2  form a belief as to the truth of the allegations in Paragraph 127 of the Complaint,

3  and upon that basis deny each and every such allegation.

4    128.   The Outside Directors lack knowledge and information sufficient to

5  form a belief as to the truth of the allegations in Paragraph 128 of the Complaint,

6  and upon that basis deny each and every such allegation.

7    129.   The Outside Directors lack knowledge and information sufficient to

8  form a belief as to the truth of the allegations in Paragraph 129 of the Complaint,

9  and upon that basis deny each and every such allegation.

10    130.   The Outside Directors lack knowledge and information sufficient to

11  form a belief as to the truth of the allegations in Paragraph 130 of the Complaint,

12  and upon that basis deny each and every such allegation.

13                    **ANSWER TO SIXTH CAUSE OF ACTION**

14    131.   The Outside Directors incorporate by reference each and every

15  statement in Paragraphs 1-89 above.

16    132.   The Outside admit that an actual controversy exists between the

17  Outside Directors and Plaintiffs regarding certain positions on coverage under the

18  08-09 Side A Policies for the Trustee Litigation.  The Outside Directors lack

19  knowledge and information sufficient to form a belief as to the truth of the

20  remaining allegations in Paragraph 132 of the Complaint, and upon that basis deny

21  each and every such allegation.

22    133.   The Outside Directors lack knowledge and information sufficient to

23  form a belief as to the truth of the allegations in Paragraph 133 of the Complaint,

24  and upon that basis deny each and every such allegation.

25    134.   The Outside Directors lack knowledge and information sufficient to

26  form a belief as to the truth of the allegations in Paragraph 134 of the Complaint,

27  and upon that basis deny each and every such allegation.

28

14458672.4

- 21 -

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

135.    The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 135 of the Complaint, and upon that basis deny each and every such allegation.

136.    The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 136 of the Complaint, and upon that basis deny each and every such allegation.

137.    The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 137 of the Complaint, and upon that basis deny each and every such allegation.

138.    The Outside Directors lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 138 of the Complaint, and upon that basis deny each and every such allegation.

## RESERVATION OF RIGHTS

The reservation of rights paragraph does not appear to make any allegations relevant to this action.  Therefore, the Outside Directors neither admit nor deny said statements.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

### Ripeness

136.    Plaintiffs' right to obtain the relief sought in the Complaint is barred, in whole or in part, because not all aspects of the claims are ripe.

### Second Affirmative Defense

### Waiver

137.    Plaintiffs, by acts, omissions and/or conduct, have waived, in whole or in part, their right to obtain the relief sought in the Complaint.

### Third Affirmative Defense

### Unclean Hands

138.    Plaintiffs' right to obtain the relief sought in the Complaint is barred,

14458672.4

- 22 -

in whole or in part, by the doctrine of unclean hands.

## Fourth Affirmative Defense

### Estoppel

139. Plaintiffs, by acts, omissions, and/or conduct, are estopped, in whole or in part, from obtaining the relief sought in the Complaint

## Fifth Affirmative Defense

### Standing

140. Plaintiffs' claims fail, in whole or in part, to the extent that Plaintiffs lack standing to seek the relief sought in the Complaint.

## Sixth Affirmative Defense

141. The Outside Directors hereby adopt and incorporate by reference any and all other defenses asserted, or that may hereafter be asserted, by any other defendant to the extent such defense may be applicable to the Outside Directors.

## PRAYER FOR RELIEF

**WHEREFORE**, the Outside Directors seek judgment:

1. Denying all relief sought in the Complaint against the Outside Directors;

2. Awarding the costs of defending this action, including reasonable attorneys' fees, costs and disbursements; and

3. Granting such other and further relief as this Court may deem just and proper.

## COUNTERCLAIMS OF DEFENDANTS/COUNTERCLAIMANTS LOUIS E. CALDERA, LYLE E. GRAMLEY, HUGH M. GRANT, PATRICK C. HADEN, TERRANCE G. HODEL, ROBERT L. HUNT II, LYDIA H. KENNARD, AND BRUCE G. WILLISON

Pursuant to Federal Rules of Civil Procedure 13 and 19, Defendants and Counterclaimants Louis E. Caldera, Lyle E. Gramley, Hugh M. Grant, Patrick C. Haden, Terrance G. Hodel, Robert L. Hunt II, Lydia H. Kennard, and Bruce G.

Willison (collectively, the "Outside Directors" or "Counterclaimants"), for their counterclaims, hereby allege as follows:

## INTRODUCTION

1.     Counterclaimants were outside directors of Indymac Bank, F.S.B., a bank formerly based in Pasadena, California (hereinafter, "Bank") and presently under receivership of the Federal Deposit Insurance Corporation ("FDIC"), and Indymac Bancorp, Inc., its parent company (hereinafter, "Bancorp"). Counterclaimants are named insureds under two "towers" of directors and officers insurance policies purchased by Bancorp, one covering claims made and reported during the period March 1, 2007 to March 1, 2008 ("Tower 1"), and the other covering claims made and reported during the period March 1, 2008 through April 1, 2009 ("Tower 2"). In total, the two towers provide $160 million in insurance coverage—coverage for which Bancorp paid millions of dollars in premiums and which the Outside Directors counted on to be available if needed.

2.     Counterclaimants are now named defendants in a lawsuit brought by Bancorp's Chapter 7 Trustee ("Trustee"). The Trustee's lawsuit was filed well after the Tower 1 policy period expired and involves claims that indisputably trigger coverage under the Tower 2 policies. Nonetheless, the Tower 2 Insurers have entirely failed to fulfill their contractual obligations—denying, without reasonable justification, that there is any possibility of coverage under the Tower 2 Policies and refusing to reimburse Counterclaimants for any of the hundreds of thousands of dollars in defense costs already incurred in litigating the Trustee's claims. As such, Counterclaimants are entitled to a declaratory judgment that the Tower 2 Policies provide coverage for the underlying lawsuit.

## THE PARTIES

3.     Defendant and Counterclaimant Louis E. Caldera is a resident of the State of Maryland. From at least 2004 through July 2008, Mr. Caldera served as a director of Bank and Bancorp.

4.      Defendant and Counterclaimant Lyle E. Gramley is a resident of the State of Maryland.  From at least 2004 through July 2008, Mr. Gramley served as a director of Bank and Bancorp.

5.      Defendant and Counterclaimant Hugh M. Grant is a resident of the State of California.  From at least 2004 through July 2008, Mr. Grant served as a director of Bank and Bancorp.

6.      Defendant and Counterclaimant Patrick C. Haden is a resident of the State of California.  From at least 2004 through July 2008, Mr. Haden served as a director of Bank and Bancorp.

7.      Defendant and Counterclaimant Terrance G. Hodel is a resident of the State of California.  From at least 2004 through July 2008, Mr. Hodel served as a director of Bank and Bancorp.

8.      Defendant and Counterclaimant Robert L. Hunt II is a resident of the State of California.  From at least 2004 through July 2008, Mr. Hunt served as a director of Bank and Bancorp.

9.      Defendant and Counterclaimant Lydia H. Kennard is a resident of the State of California.  From January 2007 through July 2008, Ms. Kennard served as a director of Bank and Bancorp.

10.     Defendant and Counterclaimant Bruce G. Willison is a resident of the State of California.  From July 2005 through July 2008, Mr. Willison served as a director of Bank and Bancorp.

11.     Each of Counterclaimants is an insured under the various insurance policies described below.

12.     Counterclaimants are informed and believe, and thereupon allege, that counter-defendant Catlin Insurance Company, Ltd. ("Catlin") is a United Kingdom corporation with its principal place of business in London, England.  Catlin is a participant in the "Lloyds 2008-09 Policy," referenced below.  Catlin is a necessary or proper party to this action under the terms of Federal Rule of Civil Procedure 19.

13.    Counterclaimants are informed and believe, and thereupon allege, that counter-defendant Zurich American Insurance Company ("Zurich) is a New York corporation with its principal place of business in Schaumburg, Illinois. Zurich issued the "Zurich 2008-09 Policy," referenced below. Zurich is a necessary or proper party to this action under the terms of Federal Rule of Civil Procedure 19.

14.    Counterclaimants are informed and believe, and thereupon allege, that counter-defendant Twin City Fire Insurance Company ("Twin City") is a Indiana corporation with its principal place of business in Hartford, Connecticut. Twin City issued the "Twin City 2008-09 Policy," referenced below. Twin City is a necessary or proper party to this action under the terms of Federal Rule of Civil Procedure 19.

15.    Counterclaimants are informed and believe, and thereupon allege, that counter-defendant Continental Casualty Company ("CNA") is a Illinois corporation with its principal place of business in Chicago, Illinois. CNA issued the "CNA 2008-09 Policy," referenced below. CNA is a necessary or proper party to this action under the terms of Federal Rule of Civil Procedure 19.

16.    Counterclaimants are informed and believe, and thereupon allege, that counter-defendant XL Specialty Insurance Company ("XL") is a Delaware corporation with its principal place of business in the State of Connecticut. XL issued the "XL 2008-09 Policy," referenced below.

17.    Counterclaimants are informed and believe, and thereupon allege, that counter-defendant Arch Insurance Company ("Arch") is a Missouri corporation with its principal place of business in the State of New York. Arch issued the "Arch 2008-09 Policy," referenced below.

18.    Counterclaimants are informed and believe, and thereupon allege, that counter-defendant ACE American Insurance Company ("ACE") is a Pennsylvania corporation with its principal place of business in Pennsylvania. ACE issued the "ACE 2008-09 Policy," referenced below.

19.    Counterclaimants are informed and believe, and thereupon allege, that

14458672.4

- 26 -

counter-defendant AXIS Insurance Company ("AXIS") is an Illinois corporation with its principal place of business in the State of Georgia.  AXIS issued the "AXIS 2008-09 Policy," referenced below.

20.     Counter-defendants Catlin, Zurich, Twin City, and CNA are hereinafter referred to collectively as the "Tower 2 Side ABC Insurers."  Counter-defendants XL, Arch, ACE, and AXIS are hereinafter referred to collectively as the "Tower 2 Side A Insurers."  The Tower 2 Side ABC Insurers and the Tower 2 Side A Insurers are hereinafter referred to collectively as the "Tower 2 Insurers."  On information and belief, each of the Tower 2 Insurers was authorized to do business as an insurer in the State of California and is doing business in the State of California.

21.     Counterclaimants are ignorant of the true names and capacities of the defendants sued here as Does 1 through 50, inclusive, and therefore sue said defendants by said fictitious names.  Outside Directors will amend this pleading to state their true names and capacities when the same are ascertained.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1332, 2201 and 2202, because there is complete diversity of citizenship between the Outside Directors and the Counter-Defendants, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is an actual controversy between the parties.

23.     This Court also has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1334(b), because they are related to the Chapter 7 bankruptcy case of Bancorp (Case No. 08-bk-21752-BB (Bankr. C.D. Cal.).  In addition, this Court has jurisdiction over these counterclaims pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a).

24.    Pursuant to 28 U.S.C. § 1391, venue is proper in this District because the events giving rise to this dispute occurred within this District.

### THE POLICIES

25.    The insurance policies discussed herein are referred to collectively as the "D&O Policies." The D&O Policies consist of a total of $160 million in insurance coverage spread over 16 policies. The 16 policies are divided into two "Towers" covering different policy years. "Tower 1" consists of eight policies covering the policy year March 1, 2007 through March 1, 2008, providing a total of $80 million in insurance coverage spread evenly over the policies. "Tower 2" consists of eight policies covering the policy year March 1, 2008 through April 1, 2009, providing a total of $80 million in insurance coverage spread evenly over the policies.

26.    Tower 1 can be divided into two sets of policies. The first set consists of the Tower 1 primary policy and the three ensuing excess policies (collectively, the "Tower 1 Side ABC Policies"). The Tower 1 Side ABC Policies provide $40 million in insurance and provide the following types of coverage:

(a)    Coverage for losses resulting from claims made against the directors and officers of Bancorp, the Bank, and/or their subsidiaries during the policy year ("Side A Coverage");

(b)    Coverage for losses sustained by Bancorp, the Bank and/or their subsidiaries as a result of indemnifying their officers and directors for losses resulting from claims made against those officers and directors during the policy year ("Side B Coverage"); and

(c)    Coverage for losses sustained by Bancorp, the Bank and/or their subsidiaries resulting from claims involving alleged Securities Law Violations made against Bancorp, the Bank and/or their subsidiaries during the policy year ("Side C Coverage").

27.  The second set of Tower 1 policies consist of four policies that, collectively, provide an additional $40 million of coverage for Side A claims only (the "Tower 1 Side A Policies").  These policies are excess of the Tower 1 Side ABC policies.

28.  The eight policies that make up Tower 2 are similarly divided as follows: (a) a primary policy and three ensuing excess policies that consist of $40 million in insurance and provide Side A, B, and C coverages (referred to herein collectively as the "Tower 2 Side ABC Policies"); and (b) an additional $40 million in excess policies that provide only Side A Coverage (referred to herein collectively as the "Tower 2 Side A Policies").  The "Tower 2 Side ABC Policies" and the "Tower 2 Side A Policies" are referred to herein collectively as the "Tower 2 Policies."

29.  Attached as Exhibit 1 hereto is a true and correct copy of the "Directors, Officers and Company Liability Policy," Policy No. 509/QA11608 (hereinafter, the "Lloyds 2008-09 Policy"), including a nine-page Marsh Ltd Broker Insurance Document for Policy No. 509QA011608.

30.  Attached as Exhibit 2 hereto is a true and correct copy of the "Financial Institutions Excess Insurance Policy," Policy No. DOC-9035134-01, issued by Zurich (hereinafter, the "Zurich 2008-09 Policy").

31.  Attached as Exhibit 3 hereto is a true and correct copy of  "The Hartford Universal Excess$^{TM}$ Policy," Policy No. 00 DA 0248886-08, issued by Twin City (hereinafter, the "Twin City 2008-09 Policy").

32.  Attached as Exhibit 4 hereto is a true and correct copy of the "Excess Insurance Policy," Policy No. DOX 287221440, issued by CNA (hereinafter, the "CNA 2008-09 Policy").

33.  Attached as Exhibit 5 hereto is a true and correct copy of the "Classic A-Side Management Liability Insurance Policy," Policy No. ELU103295-08,

1   issued by XL (hereinafter, the "XL 2008-09 Policy").  Exhibit 5 is identical to

2   Exhibit A to the Plaintiffs' Complaint in this action.

3       34.   Attached as Exhibit 6 hereto is a true and correct copy of the "Excess

4   Insurance Policy," Policy No. ABX0020231-01, issued by Arch (hereinafter, the

5   "Arch 08-09 Policy").

6       35.   Attached as Exhibit 7 hereto is a true and correct copy of the "Excess

7   Liability Insurance Policy," Policy No. DOX G21681647 003, issued by ACE

8   (hereinafter, the "ACE 2008-09 Policy").  Exhibit 7 is identical to Exhibit C to the

9   Plaintiffs' Complaint in this action.

10       36.   Attached as Exhibit 8 hereto is a true and correct copy of the

11   "SecurExcess Policy," Policy No. MNN 712064/01/2008, issued by Axis

12   (hereinafter, the "Axis 2008-09 Policy").  Exhibit 8 is identical to Exhibit D to the

13   Plaintiffs' Complaint in this action.

14       37.   Each of the Tower 1 and Tower 2 Policies is a "wasting" policy,

15   meaning that any defense costs incurred in litigating claims covered by the policy

16   reduces the limits of the policy, thus depleting the amount of insurance available in

17   the applicable tower.

18       **THE TRUSTEE LITIGATION**

19       38.   Counterclaimants have been named as defendants in a lawsuit brought

20   by Bancorp's Chapter 7 Trustee (the "Trustee Litigation").  The Trustee Litigation

21   was filed on November 13, 2009.

22       39.   Attached hereto as Exhibit 9 is a true and correct copy of the original

23   complaint in the Trustee Litigation, excluding Appendices 1 and 2 and Exhibit 1-5

24   thereto.

25       40.   The Trustee Litigation involves two sets of claims against

26   Counterclaimants.  The first set of claims alleges that, in 2008, Counterclaimants

27   breached their duties of care and loyalty to Bancorp by virtue of the following:

28   (a) allegedly facilitating or allowing the repeated "downstreaming" of certain funds

14458672.4     - 30 -

from Bancorp to Bank that drained Bancorp of capital and were insufficient to prevent Bank's failure; (b) allegedly failing to oversee the raising of the necessary capital for Bank to survive; and (c) allegedly "backdating" an $18 million capital contribution to Bank from Bancorp in May 2008, supposedly to conceal the true financial condition of Bank. The second set of claims involves allegations of breach of fiduciary duty arising out of the following: (a) the alleged "downstreaming" of funds from Bancorp to Bank in late 2007; (b) the alleged failure of directors to properly supervise and exercise independent oversight over management; and (c) the directors' alleged failure to recognize various "red flags" with respect to the financial difficulties faced by Bank.

41.    To date, Counterclaimants have incurred hundreds of thousands of dollars in defense costs in the Trustee Litigation—amounts that are increasing as the litigation continues. Those defense costs are covered, at least in part, by the Tower 2 Policies. To date, none of those defense costs has been reimbursed by the Tower 2 Insurers.

## THE TOWER 2 INSURERS DENY
## COVERAGE FOR THE TRUSTEE LITIGATION

42.    Pursuant to the terms of the Tower 2 Policies, on February 26, 2009 (prior to the expiration of the Tower 2 policy period), Counterclaimants sent "notice of circumstances" letters to the Tower 2 Insurers. Therein, Counterclaimants informed the Tower 2 Insurers of what was known to them at that time—that "the bankruptcy trustee [has] indicated that [it] may assert claims against one or more of the Individual Insureds…," and that "[t]he foregoing circumstances may give rise to a Claim or Claims within the coverage of the Policies…"

43.    Attached hereto as Exhibit 10 is a true and correct copy of the February 26, 2009 letter sent from Todd J. Rosen to the Tower 2 Side ABC Insurers.

44.    Attached hereto as Exhibit 11 is a true and correct copy of the

14458672.4

- 31 -

1    February 26, 2009 letter sent from Todd J. Rosen to the Tower 2 Side A Insurers.

2         45.    None of the Tower 2 Insurers responded to the "notice of

3    circumstances" letter until nearly two months after it was sent.  Then, on May 19,

4    2009, after the Tower 2 policy period had ended, Zurich responded, claiming that

5    the letter it received was insufficient because it did not state whether the Outside

6    Directors believed that the Trustee's potential claim would exceed 25% of the

7    primary policy's limits and the applicable retention.

8         46.    Attached hereto as Exhibit 12 is a true and correct copy of the May 19,

9    2009 letter sent from Zurich to Counterclaimants.

10        47.    Zurich's insufficient notice argument is contrary to the language of the

11   Tower 2 Policies, which require only that the insureds "describe as precisely as

12   possible all facts and details including the reasons for anticipating a Claim with full

13   particulars as to dates and persons involved and an estimate of quantum."  That is

14   precisely what Counterclaimants did in their February 26, 2009 letters, and

15   pursuant to the terms of the policies, the Trustee Litigation is thereby deemed a

16   claim made during the Tower 2 policy period.

17        48.    Moreover, the February 26, 2009 "notice of circumstances" letters

18   were not the only information provided to the Tower 2 Insurers during the policy

19   period.  In February 2009, the Tower 2 Insurers were provided a copy of the Audit

20   Report of the Office of Inspector General ("OIG").  The OIG Audit Report

21   identified a number of the alleged events at issue in the Trustee Litigation,

22   including the May 2008 "downstreaming" transfer of capital from Bancorp to Bank.

23   Thus, the OIG Audit Report also placed the Tower 2 Insurers on notice of a

24   possible claim against the Outside Directors related to those factual circumstances.

25        49.    Attached hereto as Exhibit 13 is true and correct copy of a letter from

26   John K. Villa to the Tower 2 Insurers dated February 27, 2009, which attached the

27   OIG Audit Report.

28        50.    Each of the Tower 2 Insurers has denied coverage for the Trustee

Litigation under the Tower 2 Policies and refused to reimburse any of the defense costs incurred by Counterclaimants in the Trustee Litigation. The Tower 2 Insurers have denied coverage on two grounds, neither of which is meritorious or reasonable.

51.   First, the Tower 2 Insurers claim that the Trustee Litigation is precluded from coverage by the Tower 2 Policies' "*Tripp* Exclusion," which bars coverage for any claims "based upon, arising out of, directly or indirectly resulting from or in consequence of or in any way involving" a securities fraud class action lawsuit hereinafter referred to as the "*Tripp* Action."

52.   The *Tripp* Action was filed on March 12, 2007, during the Tower 1 policy period. Counterclaimants are not named defendants in the *Tripp* Action.

53.   Attached hereto as Exhibit 14 is a true and correct copy of the Second Amended Complaint in the *Tripp* Action. Exhibit 14 was the operative complaint in the *Tripp* Action as of March 1, 2008.

54.   The *Tripp* Exclusion does not bar coverage for the Trustee Litigation. The original complaint in the *Tripp* Action alleged a putative class consisting of those who purchased Bancorp securities between January 26, 2006 and January 25, 2007. This putative class was later amended to constitute those who purchased Bancorp securities in the period March 1, 2006 to March 1, 2007. In general terms, the *Tripp* Action alleges that Bank, under the direction of the named defendants (who do not include the Outside Directors) abandoned its own loan underwriting guidelines and approved a substantial number of high risk mortgage loans for the purpose of increasing the reported volume of such loans. The plaintiffs further allege that the named defendants made materially false statements during the class period in the company's annual and quarterly reports, conference calls and presentations.

55.   Because the Trustee Litigation involves, at least in part, facts and circumstances that are not based upon, arising out of, directly or indirectly resulting

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

1  from or in consequence of or in any way involving the *Tripp* Action, including but

2  not limited to the alleged down-streaming of funds and the backdating of such

3  transfers in 2008 (events that are alleged to have occurred well after the *Tripp*

4  Action was filed and are thus not at issue in that case), the Trustee Litigation does

5  not fall within the *Tripp* Exclusion.

6      56.    Second, the Tower 2 Insurers contend that the Trustee Litigation is not

7  covered because it involves alleged wrongful acts that are "interrelated" to those at

8  issue in the *Tripp* Action, and thus coverage is barred under the exclusion for

9  wrongful acts predating the Tower 2 policy period.  The Tower 2 Policies define

10  "interrelated wrongful acts" as those having as "a common nexus any fact,

11  circumstance, situation, event, transaction or series of facts, circumstances,

12  situations, events or transactions."

13      57.    The Tower 2 Insurers' position is without merit, as the Trustee

14  Litigation involves facts and circumstances that post-date the filing of the *Tripp*

15  Action and that are not at issue in the *Tripp* Action.  Given that those claims

16  indisputably are not "interrelated" to the claims in the *Tripp* Action, the Tower 2

17  Insurers have a duty to reimburse Counterclaimants for the reasonable defense costs

18  incurred in the Trustee Litigation.  Their failure to do so is unreasonable and

19  constitutes a clear breach of their obligations under the Tower 2 Policies.

20  ## FIRST CAUSE OF ACTION

21  (Declaratory Relief With Respect To The Tower 2 Insurers' Duty to Reimburse

22  Reasonable Defense Costs Incurred In The Trustee Litigation)

23  (Against Counter-Defendants XL, Arch, ACE, AXIS, Catlin, Zurich, Hartford and

24  CNA)

25      58.    Counterclaimants incorporate paragraphs 1-57, inclusive, of this

26  Counter-Complaint, as though fully set forth hereat.

27      59.    A present, actual controversy exists between Counterclaimants, on the

28  one hand, and the Tower 2 Insurers, on the other hand, with respect to the Tower 2

14458672.4                                    - 34 -

1   Insurers' obligation to reimburse the reasonable defense costs incurred by

2   Counterclaimants in the Trustee Litigation.  Specifically, Counterclaimants

3   contend, and the Tower 2 Insurers deny, that the Tower 2 Insurers have an

4   obligation to reimburse the reasonable defense costs incurred by Counterclaimants

5   in the Trustee Litigation under the Tower 2 Policies.

6         60.    A declaratory judgment is necessary at this time to determine whether

7   the Tower 2 Insurers have an obligation to reimburse the reasonable defense costs

8   already incurred by Counterclaimants, or any of them, in the Trustee Litigation

9   under the Tower 2 Policies, as well as the reasonable defense costs to be incurred

10  by Counterclaimants in the Trustee Litigation, which is ongoing.

11              **SECOND CAUSE OF ACTION**

12  (Declaratory Relief With Respect To The Tower 2 Insurers' Duty to Indemnify The

13                Outside Directors In The Trustee Litigation)

14  (Against Counter-Defendants XL, Arch, ACE, AXIS, Catlin, Zurich, Hartford and

15                              CNA)

16        61.    Counterclaimants reincorporate paragraphs 1-60, inclusive, of this

17  Counter-Complaint, as though fully set forth hereat.

18        62.    In their Complaint, the Tower 2 Side A Insurers appear to contend that

19  a present, actual controversy exists between Counterclaimants and the Tower 2

20  Insurers with respect to the Tower 2 Insurers' obligation to indemnify the Outside

21  Directors in the Trustee Litigation.

22        63.    Counterclaimants do not believe that the indemnity issue with respect

23  to the Trustee Litigation is ripe at this time, as the Trustee Litigation is ongoing.

24  Nonetheless, as a protective measure, if the Court finds that the indemnity issue is

25  ripe, the Outside Directors seek a declaration that the Tower 2 Insurers have an

26  obligation to indemnify the Outside Directors, or any of them, in the Trustee

27  Litigation under the Tower 2 Policies.

28

14458672.4                           - 35 -

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants pray for judgment against the Tower 2 Insurers as follows:

1.     On the First Cause of Action, for a declaration that the Tower 2 Insurers have a contractual duty to reimburse the reasonable defense costs incurred by Counterclaimants in the Trustee Litigation under the Tower 2 Policies, including an order to enforce the declaratory judgment.

2.     On the Second Cause of Action, for a declaration that the Tower 2 Insurers have a contractual duty to indemnify Counterclaimants in the Trustee Litigation under the Tower 2 Policies, including an order to enforce the declaratory judgment.

3.     On all Causes of Action, for such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Counterclaimants hereby demand a trial by jury on their claims to the extent authorized by law.

DATED:  July 20, 2011

MUNGER, TOLLES & OLSON LLP
JOHN W. SPIEGEL
KATHLEEN M. MCDOWELL

By:   *Kathleen M. McDowell*
          KATHLEEN M. MCDOWELL

ATTORNEYS FOR DEFENDANTS/COUNTERCLAIMANTS Louis E. Caldera, Lyle E. Gramley, Hugh M. Grant, Patrick C. Haden, Terrance G. Hodel, Robert L. Hunt II, Lydia H. Kennard, and Bruce G. Willison

14458672.4

- 36 -

OUTSIDE DIRECTOR DEFENDANTS' ANSWER TO COMPLAINT; COUNTERCLAIMS

# Exhibit 1



## BROKER INSURANCE DOCUMENT

# MARSH

**MMC** MARSH MERCER KROLL
GUY CARPENTER OLIVER WYMAN

**Marsh Ltd**
**UK Operations** *for*
**FINPRO PRACTICE**

MARSH RISK & INSURANCE SERVICES
777 SOUTH FIGUEROA STREET
LOS ANGELES, CA 90017-5822
USA

FOR ATTN: KATE FREEMANTLE                Date: 3rd April 2008

Please always quote this No: QA011608 / 1

In accordance with your instructions we have arranged cover as follows:

### RISK DETAILS

**UNIQUE MARKET**
**REFERENCE:**           B0509QA011608

**TYPE:**                Directors and Officers and Company Liability Insurance

**INSURED:**             Indymac Bancorp Inc. and its predecessor company, Indymac Mortgage Holdings, Inc.

**PRINCIPAL**
**ADDRESS:**             888 East Walnut Street
                         Pasadena
                         CA 91101
                         USA

**PERIOD:**              From: 1st March, 2008
                         To:    1st April, 2009
                         Both days at 12:01 a.m. Local Standard Time at the Principal Address

**INTEREST:**            Directors and Officers and Company Liability

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

Registered in: England Number: 1507274
Registered Office: 1 Tower Place West Tower Place London EC3R 5BU
Marsh Ltd is authorised and regulated by the Financial Services Authority

# MARSH


**MMC** MARSH   MERCER   KROLL
GUY CARPENTER   OLIVER WYMAN

**CONTINUATION SHEET**
Page 2 of 9

Attaching to and forming
part of Broker Insurance Document No:      QA011608 / 1

**LIMIT OF
LIABILITY:**            USD 10,000,000  in the aggregate for the Policy Period

**RETENTIONS:**      USD Nil            each of the Directors and Officers each Claim but in
                                        no event exceeding

                     USD Nil            in the aggregate each Claim all Directors and Officers
                                        under Insuring Clause I.A

                     USD 2,500,000      each Claim under Insuring Clause I.B

                     USD 5,000,000      each Claim under Insuring Clause I.B and I.C. with
                                        respect to a Securities Law Violation

**INSURED
PERCENTAGE
OF LOSS:**              100% of Loss in excess of retention under Insuring Clause I.A

                        100% of Loss in excess of retention under Insuring Clause I.B

                        100% of Loss in excess of retention under Insuring Clause I.C

                        Not withstanding the above the Insured Percentage of Loss with respect
                        to Securities Law Violation under Insuring Clause I.B and I.C. shall be
                        80% (i.e. 20% coinsurance)

**SITUATION:**          Worldwide

**CONDITIONS:**      1.     Wording:   As attached hereto and including:

                     2.     NMA45 – New Short Rate Cancellation Table Endorsement
                            (USA), wording as attached.

                     3.     NMA1168 - Small Additional or Return Premiums Clause (USA),
                            wording as attached.

                     4.     NMA1256 - Nuclear Incident Exclusion Clause-Liability-Direct
                            (Broad) (USA), wording as attached.

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

 

# MARSH

**MMC** MARSH  MERCER  KROLL
GUY CARPENTER   OLIVER WYMAN

**CONTINUATION SHEET**
Page 3 of  9

Attaching to and forming
part of Broker Insurance Document No:      QA011608 / 1

**CONDITIONS
(CONTINUED):**

5.   NMA1477 - Radioactive Contamination Exclusion Clause-
     Liability-Direct (USA), wording as attached.

6.   NMA2918 - War and Terrorism Exclusion Endorsement, wording
     as attached.

7.   NMA2975 - Special Cancellation Clause, wording as attached.

8.   LMA5091 – U.S. Terrorism Risk Insurance Act of 2002 as
     amended New & Renewal Business Endorsement, wording as
     attached.

9.   Optional Extension Period: 365 days at 175% additional
     premium, wording as attached.

10.  Specific Litigation Exclusion and Interrelated Wrongful Acts
     Endorsement, wording as attached.

11.  Notice of Claims to:

     Theodore A. Boundas
     Boundas, Skarzynski, Walsh & Black, LLC
     200 East Randolph Drive
     Suite 7200
     Chicago, IL 60601
     USA

**SUBJECTIVITIES:**        None

**CHOICE OF LAW
AND JURISDICTION:**        As per Policy Wording.

**PREMIUM:**               USD 1,030,684

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

 

# MARSH

**MMC**  MARSH  MERCER  KROLL
GUY CARPENTER  OLIVER WYMAN

**CONTINUATION SHEET**
**Page 4 of 9**

Attaching to and forming
part of Broker Insurance Document No:   QA011608 / 1

**PAYMENT TERMS:**          <u>PREMIUM PAYMENT WARRANTY:</u>

The Premium must be paid to and received by Insurers on or before
24:00 hrs on 16th April, 2008.  If this warranty is not complied with, then
this insurance shall be cancelled ab initio.  Any amendment to the
payment due date is to be agreed by the Slip Leader only.

**TAX(ES) PAYABLE**
**BY THE INSURED**
**AND ADMINISTERED**
**BY INSURERS:**          None.

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

 

# MARSH

**MMC**  MARSH  MERCER  KROLL
GUY CARPENTER  OLIVER WYMAN

**CONTINUATION SHEET**
Page 5 of 9

Attaching to and forming
part of Broker Insurance Document No:    QA011608 / 1

## INFORMATION

- Mortgage Bankers Insurance Application dated 27th February, 2008.

- Indymac Organisational Structure and Corporate Structure.

- Director, Officers and Senior Management Biographies.

- Underwriter meeting with Scott Keys, Jules Vogel, Ruthann Melbourne, Roobik Galoosian at Indymac headquarters, Pasadena CA, on 30th January, 2008.

- 2007 Annual Shareholder Letter.

- 4th Quarter press release dated 12th February, 2008.

- 4th Quarter Review presentation dated 12th February, 2008.

- Form 8-K dated 12th February, 2008.

- 3rd Quarter Review presentation dated 6th November, 2007.

- "November Update" document.

- Bond Investor Relations presentation dated September, 2007.

- Update on Tripp Litigation Conference Call dated 27th February, 2008.

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

 

# MARSH

**MMC**   MARSH   MERCER   KROLL
      GUY CARPENTER   OLIVER WYMAN

**CONTINUATION SHEET**
Page 6 of 9

Attaching to and forming
part of Broker Insurance Document No:    QA011608 / 1

## SECURITY DETAILS

**(RE)INSURER'S**
**LIABILITY:**       <u>LMA3333</u>

<u>(Re)insurer's liability several not joint</u>:

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

<u>Proportion of liability</u>:

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

 

# MARSH

MARSH  MERCER  KROLL
**MMC**  GUY CARPENTER   OLIVER WYMAN

**CONTINUATION SHEET**
Page 7 of  9

Attaching to and forming
part of Broker Insurance Document No:   QA011608 / 1

**(RE)INSURER'S**
**LIABILITY**
**(CONTINUED):**

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed").  In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together).  A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line".  The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**   100%

**BASIS OF**
**WRITTEN LINES:**   Percentage of Whole

**SIGNING**
**PROVISIONS:**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the underwriters.

However:

(a)   in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

 

# MARSH

**MMC**   MARSH   MERCER   KROLL
       GUY CARPENTER   OLIVER WYMAN

**CONTINUATION SHEET**
**Page 8 of 9**

Attaching to and forming
part of Broker Insurance Document No:    QA011608 / 1

**SIGNING
PROVISIONS
(CONTINUED):**      (b)      the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the underwriters and all underwriters whose lines are to be varied. The variation to the contracts will take effect only when all such underwriters have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

# MARSH



**MMC** MARSH MERCER KROLL
GUY CARPENTER  OLIVER WYMAN

**CONTINUATION SHEET**
**Page 9 of 9**

Attaching to and forming
part of Broker Insurance Document No:    QA011608 / 1

## SIGNING SCHEDULE:

<u>HEREON:</u>      100.0000%

| | |
|---|---|
| 50.0000% | Lloyd's Underwriter Syndicate No. 2987 BRT, LONDON |
| 25.0000% | Lloyd's Underwriter Syndicate No. 4000 PEM, LONDON |
| 25.0000% | Catlin Insurance Company (UK) Ltd, LONDON<br>Per: Catlin Underwriting Agency U S Inc of New York, NEW YORK |

100.0000%

Authorised Signatory

The Company may place business with markets with which it or its affiliates are connected.
No representation is hereby made in relation to the financial security of insurers hereon.
Marsh Ltd conducts its general insurance activities on terms that are set out in the document "Our Business Principles and Practices".
Full details may be viewed on our website http://www.marsh.co.uk/aboutMarsh/principles.html

QA011608 (1)

## NOTICE

1.  THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2.  THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.

3.  THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4.  CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER.  ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST.

5.  FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE, AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER:  1-800-927-4357.

6.  IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

12/04
LSW1147A

QA011608 (1) 

### DECLARATIONS

### DIRECTORS, OFFICERS AND COMPANY
### LIABILITY POLICY

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY **CLAIM** FIRST MADE DURING THE **POLICY PERIOD** PROVIDED SUCH **CLAIM** IS REPORTED TO UNDERWRITERS AS SOON AS PRACTICABLE AFTER THE INSURANCE RISK MANAGER OF THE **PARENT COMPANY** FIRST BECOMES AWARE OF SUCH CLAIM BUT IN NO EVENT LATER THAN 60 DAYS AFTER THE END OF THE **POLICY PERIOD**. AMOUNTS INCURRED AS **COSTS, CHARGES AND EXPENSES** SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY UNDERWRITERS TO DEFEND ANY OF THE **ASSUREDS**.

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Assureds** and Underwriters.

**Policy No:**    509/QA011608

**Item A.**    **Parent Company:**

INDYMAC BANCORP INC., AND ITS PREDECESSOR COMPANY, INDYMAC MORTGAGE HOLDINGS, INC.

**Principal Address:**

888 East Walnut Street
Pasadena
California 91101
U.S.A.

**State of Incorporation:**

Delaware

**Item B.**    **Policy Period:**

**From:**    1st March 2008    **To:** 1st April 2009

Both days at 12.01 a.m. local standard time at the Principal Address stated in Item A.

**Item C.**    **Limit of Liability:**

USD10,000,000 in the aggregate for the **Policy Period**.

QA011608 (1) 

Item D.       **Retentions:**

USD  Nil       each of the **Directors and Officers** each **Claim** but in no
               event exceeding

USD  Nil       in the aggregate each **Claim** all **Directors and Officers**
               under Insuring Clause I.A.

USD2,500,000   each **Claim** under Insuring Clause I.B.

USD5,000,000   each **Claim** under Insuring Clause I.B and/or I.C.
               with respect to a **Securities Law Violation.**

Item E.       **Insured Percentage:**

              100% of **Loss** in excess of retention under Insuring Clause I.A.
              100% of **Loss** in excess of retention under Insuring Clause I.B.
              100% of **Loss** in excess of retention under Insuring Clause I.C.

              Not withstanding the above the Insured Percentage of Loss with respect to
              Securities Law Violation under Insuring Clause I.B and I.C. shall be 80%.

Item F.       **Premium:**

              USD 1,030,684, including TRIA

Item G.       1.    Premium for **Optional Extension Period:**   175%   of   the   total
                    premium as provided in
                    Clause VIII.

              2.    Length of **Optional Extension Period:**  365 days.

Item H.       **Notification pursuant to Clause VI. shall be given to:**

              For the attention of Theodore A. Boundas
              Boundas, Skarzynski, Walsh & Black LLC,
              200 East Randolph Drive,
              Suite No 7200,
              Chicago, Illinois 60601.

Item I.       **Outside Entities:**

              Lydia Kennard:
              •      Unihealth Foundation
              •      University of Southern California
              •      Polytechnic School
              Stuart Gabriel:
              •      Genesis Los Angeles Economic Growth Corporation

QA011608 (1)

**Item J.**        **Service of process in any suit shall be made upon:**

Mendes and Mount
445 South Figueroa Street
38th Floor
Los Angeles,
California 90017.

**Dated in
London:**        28th February 2008

 

QA011608 (1)

## DIRECTORS, OFFICERS AND COMPANY
## LIABILITY POLICY

In consideration of the payment of the premium, in reliance on the **Application** and subject to all of the provisions of this Policy, Underwriters and the **Assureds** agree as follows:

**I.    INSURING CLAUSES**

    A.    Underwriters shall pay on behalf of the **Directors and Officers Loss** resulting from any **Claim** first made against the **Directors and Officers** during the **Policy Period** for an **Individual Act.**

    B.    Underwriters shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Directors and Officers** resulting from any **Claim** first made against the **Directors and Officers** during the **Policy Period** for an **Individual Act.**

    C.    Underwriters shall pay on behalf of the **Company Loss** resulting from any **Claim** first made against the **Company** during the **Policy Period** for a **Corporate Act.**

**II.    DEFINITIONS**

The following terms whenever used in this Policy in boldface type shall have the meanings indicated.

    A.    **"Application"** means

        1.    the application for this Policy or any policy issued in the last three years of which this Policy is a renewal; and

        2.    any materials submitted therewith, which shall be retained on file by Underwriters and shall be deemed attached hereto, as if physically attached hereto.

    B.    **"Assureds"** means the **Company** and the **Directors and Officers.**

    C.    **"Bail Bond and Civil Bond Expenses"** means the reasonable premium (but not collateral) for a bond or other financial instrument to guarantee for up to 12 months a **Director's** or **Officer's** contingent obligation for a specified amount required by a court hearing a **Claim** for any **Wrongful Act.**

    D.    **"Claim"** means:

        1.    any written demand for damages or other relief against any of the **Assureds,**

        2.    any civil, criminal, administrative or regulatory proceeding initiated against any of the **Assureds,** including

            (a)    any appeal therefrom;

QA011608 (1)



(b) any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body with jurisdiction over any **Employment Practice Violation;**

(c) any formal investigatory proceeding commenced by the service or entry of a formal order of investigation or similar document;

(e) any investigation by the Securities and Exchange Commission or similar federal, state or foreign government agency commenced by the service of a subpoena or similar document.

E. **"Company"** means:

1. the **Parent Company;** and

2. any **Subsidiary.**

In the event a bankruptcy proceeding shall be instituted by or against the **Parent Company** or a **Subsidiary,** the term **Company** shall include a resulting debtor-in-possession, if any.

F. **"Corporate Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the **Company** involving a **Securities Law Violation.**

G. **"Corporate Takeover"** means:

1. the acquisition by any person or entity of more than 50% of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

2. the merger of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

H. **"Costs, Charges and Expenses"** means reasonable and necessary legal fees and expenses incurred by the **Assureds** in defense of any **Claim** and cost of attachment or similar bonds, but shall not include

1. salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the **Company;** or.

2. any amounts incurred in defense of any **Claim** for which any other Directors and Officers Liability or Employment Practices Liability insurer has a duty to defend.

I. **"Directors and Officers"** means:

1. all persons who were, now are, or shall be directors, officers or general counsel of the **Company** and all persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary;**




QA011608 (1)

2.     all persons who were, now are, or shall be employees of the **Company**, to the extent any **Claim** is for an **Employment Practice Violation** or when named as a co-defendant with any person set forth in II. Definition I. (1) or (3),

3.     all persons who were, now are, or shall be managers of any limited liability companies as defined in Clause II.T. or any person serving in a functionally equivalent role for such limited liability company operating or incorporated outside the United States, and

4.     the lawful spouse, or domestic partner of any of the persons set forth in the above provisions of this definition, but only to the extent the spouse or domestic partner is a party to any **Claim** solely in the capacity as spouse or domestic partner of any such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and the spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner,

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

J.     **"Employment Practice Violation"** means any actual or alleged:

1.     wrongful dismissal, discharge or termination of employment whether actual or constructive;

2.     employment related misrepresentations;

3.     violation of any federal, state or local law concerning employment or discrimination in employment, including the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Law of 1964 (as amended), the Pregnancy Discrimination Act of 1978, the Civil Rights Act of 1866, the Family and Medical Leave Act of 1993, the Older Workers Benefit Protection Act of 1990, the Fifth and Fourteenth Amendments of the United States Constitution, or any rule or regulation promulgated thereunder;

4.     sexual or other harassment in the workplace;

5.     wrongful deprivation of career opportunity, employment or promotion;

6.     wrongful discipline or evaluation;

7.     failure to adopt adequate employment or workplace policies and procedures; or

8.     Retaliation.

K.     **"Individual Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by any of the **Directors and Officers**, while acting in their capacity as:





QA011608 (1)

1. a director or officer of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

2. a director, officer, trustee, governor, executive director of any not-for-profit organization where such **Directors and Officers** serve with such not-for-profit organization where such service is with the knowledge and consent of the **Company;**

3. a director or officer of any of the entities specified in Item I. of the Declarations; or

4. an employee of the **Company** but only if the **Claim** is for an **Employment Practice Violation** or a **Securities Law Violation.**

**Individual Act** also means any **Claim** against any of the **Directors and Officers** solely by reason of their status as a person referenced in items 1, 2, or 3 above.

L. **"Interrelated Wrongful Acts"** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

M. **"Judicial Order"** means:

(i) an interim or interlocutory judicial order; or

(ii) with respect to any proceeding concerning the deportation or extradition of any **Director or Officer**, any judicial order;

entered against a **Director or Officer** in connection with a **Claim** against such **Director or Officer** that is covered under any insurance cover of this Policy. **Judicial Order** shall not include a final order made in the disposition or adjudication of such **Claim.**

N. **"Loss"** means damages, judgments , settlements and **Costs, Charges and Expenses** incurred by any of the **Directors and Officers**, but shall not include:

1. punitive or exemplary damages where applicable law expressly prohibits coverage for punitive or exemplary damages;

2. that portion of any multiplied damages award which exceeds the amount multiplied where applicable law expressly prohibits coverage for multiplied damages;

3. taxes, criminal or civil fines or penalties imposed by law;

4. matters deemed uninsurable under the law pursuant to which this Policy shall be construed; or

5. any wages, salary or benefits owed pursuant to the terms of any employment contract.

With respect to any coverage for punitive or exemplary damages and multiplied damages in any **Claim**, the law of the jurisdiction most favourable





QA011608 (1)

to the insurability of those damages shall control for the purpose of resolving any dispute between the Underwriters and the **Assured** regarding whether such damages are insurable, provided that such jurisdiction is where:

(1)   those damages were awarded or imposed,

(2)   any **Wrongful Act** occurred for which such damages were awarded or imposed,

(3)   any **Parent Company** is incorporated or has its principal place of business,

(4)   the **Director or Officer** who is subject to such damages resides.

O.   **"Official Detention"** means confinement of a **Director** or **Officer** in secure custodial premises, operated by or on behalf of a governmental or judicial agency in connection with a **Claim** against such **Director** or **Officer** and either without charge or without a judicial finding of culpability or liability in that **Claim**.

P.   **"Optional Extension Period"** means the period described in Clause VIII.A.

Q.   **"Parent Company"** means the entity named in Item A. of the Declarations.

R.   **"Policy Period"** means the period from the effective date and hour of this Policy to the Policy expiration date and hour as set forth in Item B. of the Declarations, or its earlier cancellation date and hour, if any, or the end of the **Optional Extension Period**, if purchased.

S.   **"Prosecution Costs"** means reasonable and necessary legal fees and expenses, incurred by a **Director** or **Officer** with the prior written consent of the Underwriters, to bring legal proceedings.

T.   **"Public Relations Consultant"** means the person or entity retained by the **Director** or **Officer**, subject to the prior approval of the Underwriters, to mitigate the adverse effect on that **Director's** or **Officer's** reputation from a **Claim** first made during the **Policy Period** for any **Wrongful Act**, by disseminating findings made in a final judicial disposition of that **Claim** which exonerates the **Director** or **Officer** from fault, liability or culpability.

U.   **"Public Relations Expenses"** means reasonable and necessary fees and expenses of the **Public Relations Consultant**.

V.   **"Retaliation"** means an **"Employment Practice Violation"** by an **Assured** relating to or alleged to be in response to any of the following activities:

1.   the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency or authority, of any act by an **Assured** which act is alleged to be a violation of the law, common or statutory, of any state, territory, jurisdiction, or political subdivision thereof;

2.   the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any law relating to **Employee** rights;

3.   the filing of any claim under the Federal False Claim Act or any other federal, state, local or foreign "whistle-blower" law.





QA011608 (1)

W.    **"Securities Law Violation"** means any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission under either or both Acts, similar securities laws or regulations of any state or equivalent laws or regulations in any applicable countries world-wide, or any common law relating to any transaction arising out of, involving, or relating to the purchase or sale of or offer to purchase or sell any securities of the **Company**, whether on the open market or through a public or private offering.

X.    **"Subsidiary"** means any entity including but not limited to any limited liability company, including but not limited to any limited liability corporation, while more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company** directly or indirectly, if such entity:

    1.    was so owned prior to the inception date of this Policy and was insured under a policy issued by Underwriters of which this Policy is a renewal;

    2.    was so owned on the inception date of this Policy;

    3.    becomes so owned after the inception date of this Policy provided the assets of the entity do not exceed 10% of the consolidated assets of the **Company** as set forth in the latest quarterly financials released by the **Parent Company**; or

    4.    becomes so owned after the inception date of this Policy provided that if the assets of the entity exceed 10% of the consolidated assets of the **Company** as set forth in the latest quarterly financials released by the **Parent Company**, the provisions of Clause VII.B. must be fulfilled.

Y.    **"Wrongful Act"** means any **Corporate Act** or **Individual Act**.

## III.    EXCLUSIONS

Underwriters shall not be liable to make any payment in connection with any **Claim**:

A.    for actual or alleged sickness, disease, death, false arrest, false imprisonment, damage to or destruction of tangible property (including loss of use thereof) or, except to the extent the **Claim** is for an **Employment Practice Violation**, for bodily injury, assault, battery, invasion of privacy, mental anguish, emotional distress, libel, slander or defamation;

B.    based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1.    any **Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given prior to the **Policy Period** under any other Directors' and Officers' or Employment Practices Liability policy, or

    2.    any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**;

  

QA011608 (1)

C.  to the extent it is insured under any other existing valid and collectible Directors and Officers Liability or Employment Practices Liability policy, whether such other insurance, is stated to be primary, contributory, excess, contingent or otherwise, other than insurance expressly written to be excess of this Policy; provided, however, this exclusion shall not apply to the amount of **Loss** which is in excess of the amount of **Loss** paid by such other policy where such **Claim** is otherwise covered by this Policy;

D.  for seepage, pollution or contamination of any kind; provided, however, this exclusion shall not apply to the coverage afforded under Insuring Clause I.A.

E.  for violation of the Employee Retirement Income Security Act of 1974 as amended (or any regulations promulgated thereunder) or similar provisions of any federal, state or local law;

F.  by, on behalf of, or at the direction of any of the **Assureds** within the United States of America, except and to the extent such **Claim**:

   1.  is brought by a security holder of the **Company** acting in their capacity as such who, when such **Claim** is first made, is acting independently of all of the **Assureds**,

   2.  is brought by any of the **Assureds** in the form of a crossclaim, third party claim or otherwise for contribution or indemnity which results directly from a **Claim** not otherwise excluded by the terms of this Policy;

   3.  is brought by any of the **Directors and Officers** for an **Employment Practice Violation**,

   4.  is brought or maintained by a bankruptcy trustee, examiner, rehabilitator, liquidator, receiver or administrative receiver, creditors' committee or similar person(s) or assignees thereof under the laws of any other jurisdiction, either directly or derivatively on behalf of the **Company** without the solicitation or active participation of any **Assureds** or the **Company**,

   5.  is brought by a former **Director or Officer** of the **Company** who has not been a **Director or Officer** of the **Company** or working as a consultant to the **Company** for 2 years or more, or

   6.  is brought by any protected whistleblower under 18 USC 1514A;

For the purposes of paragraph 1 above, where one or more security holders allege, certify or affirm there is likely support for the **Claim** by referring to any of the following actions taken by a **Director or Officer**, such allegation, certification or affirmation shall not, in itself, demonstrate such security holder is not "acting independently of all of the **Assureds**":

   a.  providing information to, causing information to be provided to, or otherwise assisting in an investigation conducted by a federal regulatory agency, a federal law enforcement agency, or any member or committee of the United States Congress regarding the possible violation by the **Company** or any **Director or Officer** of the laws, rules and regulations listed in 18 U.S.C. 1514A(a)(1);

 

QA011608 (1)

b.  filing, causing to be filed, testifying, participating in, or otherwise assisting in a proceeding relating to the possible violation by the **Company** or any **Director or Officer** of laws, rules or regulations listed in 18 U.S.C. 1514A(a)(2);

c.  filing a complaint with the United States Secretary of Labor, as authorized by 18 U.S.C. 1514A(b)(1)(A); or

d.  bringing an action at law or equity to the extent that such action seeks relief pursuant to 18 U.S.C. 1514A(b)(1)(B)

G.  brought about or contributed to by:

1.  any deliberately dishonest, fraudulent or criminal act or omission by any of the **Assureds**, or

2.  any personal profit or advantage gained by any of the **Directors and Officers** to which they were not legally entitled;

as determined by a final adjudication adverse to such **Assureds** in the underlying action or in a separate action or proceeding;

H.  for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company**, which payment without such previous approval shall be held by the court to be in violation of the law;

I.  against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving

1.  any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**, or

2.  any **Wrongful Act** occurring while such entity was a **Subsidiary** which together with a **Wrongful Act** occurring prior to the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts** except in respect of coverage under Insuring Clause I.A;

J.  based upon, arising out of, directly or indirectly, resulting from or in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Corporate Takeover**;

K.  based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving, service as a director, officer, trustee, employee, governor, executive director or in a functionally equivalent position with any entity other than the **Company**; provided, however, this exclusion shall not apply to:

(a)  **Loss** resulting from any **Claim** to the extent that such **Claim** is based on the service of one of the **Directors and Officers** as




QA011608 (1)

   1.   a director, officer, trustee, governor or executive director of any not-for-profit organization where such service is with the knowledge and consent of the **Company** and such **Loss** is not indemnified by such not-for-profit organization or any of its insurers, or

   2.   a director or officer of any of the entities specified in Item I. of the Declarations if the **Loss** resulting from the **Claim** is not indemnified by the specified entity or any of its insurers;

(b)   any **Claim** brought by a security holder of the **Company** acting in their capacity as such.

L.   based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission in connection with the performance of any professional services by or on behalf of the **Company** for the benefit of any other entity or person. however, this exclusion shall not apply to any **Claim** brought by a security holder of the **Company** alleging failure to supervise those who performed or failed to perform such professional services;

M.   Solely with respect to IndyMac, Inc. and **Directors and Officers** thereof:

based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving

   1.   any **Wrongful Act** actually or allegedly committed prior to 12.01 a.m. Local Standard Time on 1st July, 2000, or

   2.   any other **Wrongful Act** occurring on or subsequent to 12.01 a.m. Local Time on 1st July, 2000 which, together with a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts.**

For the purpose of determining the applicability of any of the Exclusions, no **Wrongful Act** shall be imputed to any other natural person, and solely with respect to the coverage available under Clause I. INSURING CLAUSES C., only the **Wrongful Acts** of any past, present or future, president, chairman, chief executive officer or chief financial officer of the **Parent Company** shall be imputed to the **Company.**

IV.   **LIMIT OF LIABILITY, RETENTIONS AND ORDER OF PAYMENTS**

A.   Underwriters shall be liable to pay the percentage of **Loss** set forth in Item E. of the Declarations in excess of the amount of the applicable Retention up to the Limit of Liability, it being warranted that the remaining percentage of **Loss** shall be uninsured.   The Retention applicable to Insuring Clause I.B. shall apply to **Loss** payable under Insuring Clause I.A. if indemnification by the **Company** is required by law or is legally permissible to the fullest extent permitted by law, regardless of whether or not actual indemnification is made, unless the **Company** is unable to make such actual indemnification by reason of its insolvency

B.   The amount shown in Item C. of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters under the Policy.





QA011608 (1)

C.   More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times:

    1.   the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

    2.   the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause VI.B.

D.   In the event more than one of the Insuring Clauses set forth in Clause I. are applicable to a **Claim** the Retentions set forth in Item D. of the Declarations shall be applied separately to that part of the **Loss** resulting from such **Claim** covered by each Insuring Clause.  The sum of the Retentions so applied shall constitute the Retention applicable to such **Claim**. The total Retention as finally determined shall in no event exceed the largest of the Retentions applicable to Insuring Clauses that are applicable to such **Claim**.

E.   Payments of **Loss** by Underwriters shall reduce the Limit of Liability. Underwriters shall pay **Loss** in the order in which **Loss** is incurred. However, if **Loss** payable under Insuring Clause I.A. and one or more of the other Insuring Clauses is incurred contemporaneously, Underwriters first shall pay **Loss** payable under Insuring Clause I.A. After such **Loss** has been paid, if the Limit of Liability has not been exhausted, Underwriters shall then pay **Loss** payable under Insuring Clause I.B.  After such **Loss** has been paid, if the Limit of Liability has not been exhausted, Underwriters shall then pay **Loss** payable under Insuring Clause I.C. Underwriters shall have no obligation to pay **Loss** after exhaustion of the Limit of Liability.

F.   Underwriters shall pay **Costs, Charges and Expenses** at least once every 90 days.

## V.   SETTLEMENTS AND DEFENSE

A.   No settlement shall be made and no **Costs, Charges and Expenses** shall be incurred without Underwriters' consent, such consent not to be unreasonably withheld, unless such settlement and/or **Costs, Charges and Expenses** do not exceed 50% of the applicable Retention set forth in Item D. of the Declarations and subject to the claim being settled "without prejudice".

B.   It shall be the duty of the **Assureds** and not the duty of the Underwriters to defend **Claims**.

## VI.   NOTIFICATION

A.   The **Assureds** shall, as a condition precedent to their rights to payment under this Policy, give to Underwriters notice in writing of any **Claim** as soon as practicable after the Insurance Risk Manager of the **Parent Company** first becomes aware of a **Claim** but in no event later than 60 days after the end of the **Policy Period**.




QA011608 (1)

B.    If during the **Policy Period** or the Optional Extension Period, if applicable, the **Assureds** first become aware of circumstances that might give rise to a **Claim**, and if the **Assureds** during the **Policy Period** or the Optional Extension Period, if applicable, give written notice to Underwriters of:

    1.    the specific circumstances and the anticipated **Wrongful Act** allegations;

    2.    the consequences which have resulted or may result therefrom; and

    3.    the circumstances by which the **Assureds** first became aware thereof,

then any **Claim** made subsequently arising out of such circumstances or **Wrongful Act** shall be deemed for the purposes of this Policy to have been made at the time such notice was first given.
A notice of such a circumstance must describe as precisely as possible all facts and details including the reasons for anticipating a **Claim** with full particulars as to dates and persons involved and an estimate of quantum.

C.    Notice to Underwriters provided for in Clause VI. shall be given to the firm shown under Item H. of the Declarations.

## VII.    GENERAL CONDITIONS

A.    Warranty Clause

It is warranted that the particulars and statements contained in the **Application** are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy the **Assureds** agree that:

    1.    the statements in the Application are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by Underwriters under this Policy and that this Policy is issued in reliance upon the truth of such representations;

    2.    no knowledge possessed by the **Company** or any of the **Directors and Officers** shall be imputed to any other **Director and Officers**;

    3.    in the event that the **Application** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy, this Policy shall be rescindable with respect to those **Assureds** who had knowledge of such misrepresentations

    4.    this Policy shall not afford any coverage under Insuring Clause I.C. if any of the following **Assureds** had knowledge of the misrepresentations set forth in Clause VII.A.3.: the Chief Executive Officer, Chief Financial Officer, General Counsel, President, or Chairperson of the **Parent Company**; and

 



QA011608 (1)

5.  except as provided in Clauses VII.A.3., VII.A.4., this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with each of the **Assureds**.

6.  notwithstanding the foregoing, this Policy shall be non-rescindable with respect to the coverage afforded under Insuring Clause I.A.

B.  Adjustment Clause

1.  This Policy is issued and the premium computed on the basis of the information submitted to Underwriters as part of the **Application**. In the event the **Company** acquires any other entity or acquires substantially all of the assets of another entity, or merges with another entity such that the **Company** is the surviving entity and where such assets acquired exceed 10% of the consolidated assets of the **Company** as set forth in the latest quarterly financials released by the **Parent Company** or creates or acquires a **Subsidiary** as defined in Clause II.X.3. after the inception of this Policy, coverage shall be afforded for a period of 90 days for any **Loss** in any way involving the assets acquired or the assets, liabilities, directors, officers or employees of the entity acquired or merged with, or such **Subsidiary**. Coverage beyond such 90 day period shall only be available if:

(a)  written notice of such transaction or event is given to Underwriters by the **Parent Company**;

(b)  the **Parent Company** provides Underwriters with such information in connection therewith as Underwriters may deem necessary;

(c)  the **Assureds** accept any special terms, conditions, exclusions or additional premium charge as may be required by Underwriters; and

(d)  Underwriters, at their sole discretion, agree to provide such coverage.

2.  In the event any entity ceased to be a **Subsidiary** as defined herein after the inception date of this Policy, or of any policy issued by Underwriters of which this Policy is a renewal or replacement, this Policy, subject to its terms, shall continue to apply to any of the **Directors and Officers** who were covered under this Policy because of their service with such entity and to such **Subsidiary** but only with respect to any **Wrongful Act** committed or allegedly committed prior to the time such entity ceased to be a **Subsidiary**.

3.  In the event of a **Corporate Takeover** after the inception date of this Policy or of any policy issued by Underwriters of which this Policy is a renewal or replacement, this Policy, subject to its terms, shall continue to apply to the **Directors and Officers** and to the **Company** but only with respect to any **Wrongful Act** committed or allegedly committed prior to the **Corporate Takeover**.

C.  Cancellation Clause



QA011608 (1)

 

1.   By acceptance of this Policy, the **Assureds** hereby confer the exclusive power and authority to cancel this Policy on their behalf to the **Parent Company**. Such entity may cancel this Policy by surrender thereof to Underwriters, or by mailing to Underwriters written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice shall be equivalent to mailing.

2.   Underwriters may cancel this Policy only for non-payment of premium by mailing to the **Parent Company** written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by Underwriters shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then such period shall be amended to afford the minimum notice period permitted thereunder.

3.   If this Policy is cancelled pursuant to 1. hereinabove, Underwriters shall retain the customary short rate proportion of the premium hereon. If this Policy is cancelled pursuant to 2. hereinabove, Underwriters shall retain the pro rata proportion of the premium hereon. Payment or tender of any unearned premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.

D.   Company Authorization Clause

By acceptance of this Policy the **Assureds** agree that the **Parent Company** will act on their behalf with respect to the giving of all notices to Underwriters, the receiving of notices from Underwriters, the payment of the premium and the receipt of any return premium.

Notwithstanding the foregoing, in the event that the **Parent Company** becomes insolvent the **Directors and Officers** are authorized to file notice of a **Claim** directly with Underwriters.

VIII.  **OPTIONAL EXTENSION PERIOD**

A.   If this Policy is not renewed by the **Parent Company** or by Underwriters, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item G.1. of the Declarations of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any **Claim** or circumstance which might give rise to a **Claim** first made during the period of time set forth in Item G.2. of the Declarations after the Policy expiration date, but only with respect to any **Wrongful Act** committed before such date.

B.   As a condition precedent to the right to purchase the **Optional Extension Period**, the total premium for this Policy must have been paid. The right to purchase the **Optional Extension Period** shall terminate unless written notice together with full payment of the premium for the **Optional Extension**



QA011608 (1)

Period is given to Underwriters within 30 days after the Policy expiration date. If such notice and premium payment is not so given to Underwriters, there shall be no right to purchase the **Optional Extension Period**.

C.   In the event of the purchase of the **Optional Extension Period**, the entire premium therefor shall be deemed earned at its commencement.

D.   In the event the **Optional Extension Period** is purchased, it shall terminate forthwith on the effective date of any contract of insurance or indemnity which replaces the coverage afforded by this Policy through the **Optional Extension Period** either in whole or in part, and in the event the **Optional Extension Period** is so terminated, Underwriters shall refund pro rata any unearned premium for the unexpired period of such extension.

E.   The exercise of the **Optional Extension Period** shall not in any way increase the Limit of Liability of Underwriters.

IX.   **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Assureds** agree to provide Underwriters with such information, assistance and cooperation as Underwriters or their counsel may reasonably request, and they further agree that they shall not take any action which in any way increases Underwriters' exposure under this Policy.

In the event of any payment under this Policy, Underwriters shall be subrogated to the **Assureds'** rights of recovery therefor against any person or entity. The **Assureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights including the execution of such documents as are necessary to enable Underwriters effectively to bring suit in their name, and shall provide all other assistance and cooperation which Underwriters may reasonably require. In no event however, shall Underwriters exercise their rights of subrogation against an individual **Assured** under this Policy unless such **Assured** has been convicted of a deliberate criminal act, or been determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such **Assured** was not legally entitled.

X.   **ASSIGNMENTS AND ACTION AGAINST UNDERWRITERS**

No action shall lie against Underwriters unless, as a condition precedent thereto, the **Assureds** shall have fully complied with all of the terms of this Policy, nor until the amount of the **Assureds'** obligation to pay shall have been determined either by judgment against them or by written agreement between them, the claimant and Underwriters. Nothing contained herein shall give any person or organization any right to join Underwriters as a party to any **Claim** against the **Assureds** to determine their liability, nor shall Underwriters be impleaded by the **Assureds** or their legal representative in any **Claim**. Assignment of interest under this Policy shall not bind Underwriters unless their consent is endorsed hereon.

XI.   **ENTIRE AGREEMENT**

By acceptance of this Policy, the **Assureds** agree that this Policy embodies all agreements existing between them and Underwriters or any of their agents relating to this Insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Underwriters shall not effect a waiver or a change in any part of this Policy or estop Underwriters from asserting any right under the terms



QA011608 (1)

of this Policy, nor shall the terms be waived or changed except by written endorsement or rider issued by Underwriters to form a part of this Policy.

**XII.   CHOICE OF LAW AND JURSDICTION**

This Policy shall be subject to the laws of the State of California.

It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters at the request of any person or entity insured hereunder will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon the firm shown under Item J. of the Declarations, and that in such suit instituted against any one of the Underwriters upon this Policy, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The firm shown under Item J. of the Declarations is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of any person or entity insured hereunder to give a written undertaking to such person or entity that it will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to the statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officers specified for that purpose in the statute, or any of their successors in office, as their true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate the firm shown in Item J. of the Declaration as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

NMA1998

**XIII.   ASSETS AND LIBERTY COSTS EXTENSION**

(i)   **Prosecution Costs**

The Underwriters will pay, where permitted by law, the **Prosecution Costs** of each **Director or Officer** to obtain the discharge or revocation of a **Judicial Order** entered during the **Policy Period** imposing:

(a)   confiscation, assumption of ownership and control, suspension or freezing of rights of ownership of real property or personal assets of such **Director or Officer;**

(b)   a charge over real property or personal assets of such **Director** or **Officer;**

(c)   a temporary or permanent prohibition on such **Director or Officer** from holding the office of or performing the function of a **Director and Officer;**




QA011608 (1)

(d)  restriction of such **Director's** or **Officer's** liberty to a specified domestic residence or an **Official Detention**;

(e)  deportation of a **Director** or **Officer** following revocation of otherwise proper, current and valid immigration status for any reason other than such **Director's** or **Officer's** conviction of a crime; or

(f)  extradition of such **Director** or **Officer**.

(ii)  **Bail Bond and Civil Bond Expenses**

The Underwriters will pay **Bail Bond and Civil Bond Expenses** of each **Director** or **Officer** incurred directly in connection with a **Claim** covered under any insurance cover of this Policy during the **Policy Period**.

(iii)  Damage to Reputation

The Underwriters will pay the **Public Relations Expenses** of each **Director** or **Officer**.

The Underwriters' total aggregate liability for cover under this Clause XIII. shall be a part of not in addition to the limit of liability stated in Item C. of the Declarations.

01/99
LSW1037 (Amended)



QA011608 (1)

<u>U.S.A.</u>
### NEW SHORT RATE CANCELLATION TABLE ENDORSEMENT

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this insurance is written it is agreed that in the event of cancellation thereof by the Assured the earned premium shall be computed as follows:-
A. For Insurance written for one year:

| Days Insurance in Force | Per Cent of One Year Premium | Days Insurance in Force | Per Cent of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154-156 | 53 |
| 2 | 6 | 157-160 | 54 |
| 3- 4 | 7 | 161-164 | 55 |
| 5- 6 | 8 | 165-167 | 56 |
| 7- 8 | 9 | 168-171 | 57 |
| 9- 10 | 10 | 172-175 | 58 |
| 11- 12 | 11 | 176-178 | 59 |
| 13- 14 | 12 | 179-182 (6 months) | 60 |
| 15- 16 | 13 | 183-187 | 61 |
| 17- 18 | 14 | 188-191 | 62 |
| 19- 20 | 15 | 192-196 | 63 |
| 21- 22 | 16 | 197-200 | 64 |
| 23- 25 | 17 | 201-205 | 65 |
| 26- 29 | 18 | 206-209 | 66 |
| 30- 32 (1 month) | 19 | 210-214 (7 months) | 67 |
| 33- 36 | 20 | 215-218 | 68 |
| 37- 40 | 21 | 219-223 | 69 |
| 41- 43 | 22 | 224-229 | 70 |
| 44- 47 | 23 | 229-232 | 71 |
| 48- 51 | 24 | 233-237 | 72 |
| 52- 54 | 25 | 238-241 | 73 |
| 55- 58 | 26 | 242-246 (8 months) | 74 |
| 59- 62 (2 months) | 27 | 247-250 | 75 |
| 63- 65 | 28 | 251-255 | 76 |
| 66- 69 | 29 | 256-260 | 77 |
| 70- 73 | 30 | 261-264 | 78 |
| 74- 76 | 31 | 265-269 | 79 |
| 77- 80 | 32 | 270-273 (9 months) | 80 |
| 81- 83 | 33 | 274-278 | 81 |
| 84- 87 | 34 | 279-282 | 82 |
| 88- 91 (3 months) | 35 | 283-287 | 83 |
| 92- 94 | 36 | 288-291 | 84 |
| 95- 98 | 37 | 292-296 | 85 |
| 99-102 | 38 | 297-301 | 86 |
| 103-105 | 39 | 302-305 (10 months) | 87 |
| 106-109 | 40 | 306-310 | 88 |
| 111-113 | 41 | 311-314 | 89 |
| 114-116 | 42 | 315-319 | 90 |
| 117-120 | 43 | 320-323 | 91 |
| 121-124 (4 months) | 44 | 324-328 | 92 |
| 125-127 | 45 | 329-332 | 93 |
| 128-131 | 46 | 333-337 (11 months) | 94 |
| 132-135 | 47 | 338-342 | 95 |



QA011608 (1)

| | | | |
|---|---|---|---|
| 136-138 | 48 | 343-346 | 96 |
| 139-142 | 49 | 347-351 | 97 |
| 143-146 | 50 | 325-355 | 98 |
| 147-149 | 51 | 326-360 | 99 |
| 150-153 (5 months) | 52 | 361-365 (12 months) | 100 |

B. For Insurances written for more or less than one year:-

1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2. If insurance has been in force for more than 12 months:
   a. Determine full annual premium as for an insurance written for a term of one year.
   b. Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written
   c. Add premium produced in accordance with items (a) and (b) to obtain earned premium during full period insurance has been in force.

N.M.A. 45







QA011608 (1)

### U.S.A.
### NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT (BROAD)
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:-

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause - Liability - Direct (Limited) applies.

This Policy*
does not apply:-

1.    Under any Liability Coverage, to injury, sickness, disease, death or destruction

      (a)    with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.    Under any medical Payments Coverage, or under any Supplementary Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

3.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

      (a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

      (b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.



QA011608 (1)

4.    As used in this endorsement:
"**hazardous properties**" include radioactive, toxic or explosive properties; "**nuclear material**" means source material, special nuclear material or byproduct material; "**source material**", "**special nuclear material**", and "**byproduct material**" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "**spent fuel**" means any fuel element of fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "**waste**" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "**nuclear facility**" means

(a)    any nuclear reactor,
(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "**nuclear reactor**" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "**injury**" or "**destruction**" includes all forms of radioactive contamination of property.
It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:- As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
**N.M.A. 1256**

 

QA011608 (1)

## U.S.A.
## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE - LIABILITY - DIRECT

(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause - Liability - Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A. its Territories or Possessions, Puerto Rico or the Central Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
**N.M.A. 1477**

QA011608 (1)              

**U.S.A.**
**SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE**

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the
premium for which this Insurance is written, it is understood and agreed that whenever an
additional or return premium of US$2 or less becomes due from or to the Assured on
account of the adjustment of a deposit premium, or of an alteration in coverage or rate
during the term or for any other reason, the collection of such premium from the Assured will
be waived or the return of such premium to the Assured will not be made, as the case may
be.

**N.M.A. 1168**

QA011608 (1)

 

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.      war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.      any act of terrorism.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918





QA011608 (1)

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### New & Renewal Business Endorsement

*This Endorsement is issued in accordance with the terms and conditions of the "U.S.
Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

In consideration of the premium paid, it is hereby noted and agreed with effect from
inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to
any "insured loss" directly resulting from any "act of terrorism" as defined in the "U.S.
Terrorism Risk Insurance Act of 2002", as amended ("TRIA").

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the
type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA.
The coverage provided by this Endorsement shall expire at 12:00 midnight 31st December,
2014, the date on which the TRIA Program is scheduled to terminate, or the expiry date of
the policy whichever occurs first, and shall not cover any losses or events which arise after
the earlier of these dates. The Terrorism exclusion, to which this Insurance is subject,
applies in full force and effect to any other losses and any act or events that are not included
in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject.
All other terms, conditions, insured coverage and exclusions of this Insurance including
applicable limits and deductibles remain unchanged and apply in full force and effect to the
coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not
responsible under the terms of TRIA (including subsequent action of Congress pursuant to
the Act) due to the application of any clause which results in a cap on the Underwriter's
liability for payment for terrorism losses.

**LMA5091**
**21/12/2007**
**Form approved by Lloyd's Market Association**

QA011608 (1)  

## SPECIAL CANCELLATION CLAUSE

In the event that an Underwriter:

a)    ceases underwriting; or

b)    is the subject of an order or resolution for winding up or formally proposes a scheme of arrangement; or

c)    has its authority to carry on insurance business withdrawn,

the Assured may terminate that Underwriter's participation on this risk forthwith by giving notice and the premium payable to that Underwriter shall be pro rata to the time on risk.  In the event there are any notified, reserved or paid losses or circumstances, premium shall be deemed fully earned.  Any return of premium shall also be subject to a written full release of liability from the Assured.

**NMA2975**
**30/05/03**
Form approved by Lloyd's Market Association [Non-Marine]

 

QA011608 (1)

## PREMIUM PAYMENT WARRANTY

The Premium must be paid to and received by Underwriters on or before 24.00hrs on 16th April 2008.  If this warranty is not complied with, then this Insurance shall be cancelled ab initio.

 

QA011608 (1)

### LINES CLAUSE

This Insurance, being signed for 100%, insures only that proportion of any loss, whether total or partial, including but not limited to that proportion of associated expenses, if any, to the extent and in the manner provided in this Insurance.

The percentages signed in the Table are percentages of 100% of the amount(s) of Insurance stated herein.

 

QA011608 (1)

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

LSW 1001 (Insurance)

  

QA011608 (1)

## SPECIFIC LITIGATION EXCLUSION AND INTERRELATED WRONGFUL ACTS ENDORSEMENT

It is hereby understood and agreed as follows:

A.    that Clause III. **EXCLUSIONS** is amended by the addition of the following:

"based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the following:

1. the litigation styled *Wayman Tripp and Sven Mossberg v. Indymac Bancorp, Inc., Michael W. Perry, and Scott Keys,* initiated 12 March 2007, in the United States District Court for the Central District of California under the caption *Claude A. Reese v. Indymac Financial Inc, Richard A. Wohl, and Scott Keys,* case number 2:07-cv-1635-GW-VBK (the "Tripp Litigation"); or
2. any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions underlying or alleged in the Tripp Litigation.

regardless of any legal theory upon which such Claim is predicated".

All other terms and conditions remain unchanged.



# MARSH



MARSH   MERCER   KROLL
GUY CARPENTER   OLIVER WYMAN

Marsh Ltd
1 Tower Place West
Tower Place
London EC3R 5BU

# Exhibit 2

## ZIGEX

# Financial Institutions Excess Insurance Policy
**Declarations**


**ZURICH**

**Zurich American Insurance Company (ZAIC)**

Policy Number: DOC-9035134-01        Renewal of Number:  DOC-9035134-00

Item 1.  Named Insured and Mailing Address:

INDYMAC BANCORP, INC. AND ITS PREDECESSOR
COMPANY, INDYMAC MORTGAGE HOLDINGS, INC.
888 EAST WALNUT STREET
PASADENA, CA  91101

Producer:

MARSH USA INC.
1166 AVENUE OF THE AMERICAS
NEW YORK, NY  10036

Item 2.  Limit of Liability:      $10,000,000 excess of $10,000,000 in the aggregate
Note that the Limit of Liability is reduced or exhausted by Defense Costs.

Item 3.  "Underlying Insurance":

    (A) "Primary Policy":     Directors, Officers and Company Liability Company
         Insurer:             London
         Policy Number:     509/QA011608
         Limit of Liability:    $10,000,000 retention of $0/$2,500,000/$5,000,000

    (B) Other Policy(ies):
         Insurer:             _____
         Policy Number:    _____
         Limit of Liability:   _____

*RECEIVED JUN 2 0 2008 Marsh Los Angeles FINPRO*

Item 4.  "Policy Period":  From 12:01 a.m. on  03/01/2008   To 12:01 a.m. on  03/01/2009.
                Local time at the address shown in Item 1.

Item 5.  Endorsement(s) Effective at Inception:     See Endorsement numbers 1 - 4 as attached.

Item 6.  Premium:     $1,003,625

In witness whereof, the "Insurer" issuing this policy has caused this policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the "Insurer".

ZURICH AMERICAN INSURANCE COMPANY (ZAIC)

Authorized Representative

Date  6/12/08

President

Corporate Secretary

U-ES-D-10047-A CW (4/98)
Page 1 of 1

COPY

*ZIGEX*

# Financial Institutions Excess Insurance Policy


**ZURICH**

In consideration of the payment of the premium and in reliance on all statements made and information furnished to the Company providing this insurance as indicated on the Declarations (hereinafter called the "Insurer"), and to the issuers of the "Underlying Insurance", all of which are made a part hereof, and subject to all of the provisions of this Policy, the "Insurer" and the "Insured(s)" agree as follows:

## I.   INSURING AGREEMENT

The "Insurer" shall provide the "Insured(s)" with excess insurance coverage over the "Underlying Insurance" as set forth in Item 3. of the Declarations during the "Policy Period" set forth in Item 4. of the Declarations.  Coverage hereunder shall attach only after all such "Underlying Insurance" has been reduced or exhausted by payments for losses and shall then apply in conformance with the same provisions, limitations, conditions and warranties of the "Primary Policy" at inception, except for premium, limit of liability and as otherwise specifically set forth in the provisions of this Policy.  In no event shall coverage under this Policy be broader than coverage under any "Underlying Insurance".

## II.  POLICY DEFINITIONS

A.   "Named Entity" means the organization named in Item 1. of the Declarations.

B.   "Insured(s)" means the "Named Entity" and those persons or organization(s) insured under the "Primary Policy", at its inception.

C.   "Policy Period" means the period from the effective date and hour of this Policy as set forth in Item 4. of the Declarations, to the Policy expiration date and hour set forth in Item 4. of the Declarations, or its earlier cancellation date or termination date, if any.

D.   "Primary Policy" means the policy scheduled in Item 3. (A) of the Declarations.

E.   "Pollutants" mean any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof.  Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials.  "Pollutants" shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and noise.

F.   "Underlying Insurance" means all those polices scheduled in Item 3. of the Declarations.  Such policies may include, but are not limited to, policies written on a claims made or reported basis or bonds written on a discovery basis.

## III. MAINTENANCE OF "UNDERLYING INSURANCE"

All of the "Underlying Insurance" schedule in Item 3. of the Declarations shall be maintained during the "Policy Period" in full effect, except for any reduction of the aggregate limit(s) of liability available under the "Underlying Insurance" solely by reason of payment of loss thereunder.  Failure to comply with the foregoing shall not invalidate this Policy but the "Insurer" shall not be liable to a greater extent than if this condition had been complied with.  To the extent that any "Underlying Insurance" is not maintained in full effect during the current "Policy Period", then the "Insured(s)" shall be deemed to have retained any loss for the amount of the limit of liability of any "Underlying Insurance" which is not maintained as set forth above.

In the event of a change to any "Underlying Insurance" by rewrite, endorsement or otherwise, coverage under this Policy shall become subject to such change only if and to the extent the "Insurer's" consent to such change is endorsed in writing on or to this Policy.  If such consent is not endorsed in writing on or to this Policy, the "Insurer" shall not be liable to a greater extent than it would have been in the absence of such change to the "Underlying Insurance".

It is further a condition of this Policy that the "Insurer" shall be notified in writing as soon as practicable of cancellation of any of the policies of "Underlying Insurance".

U-ES-10047-A CW  (4/98)
Page 1 of 3



In the event of any actual or alleged (a) failure by the "Insured(s)" to give notice or to exercise any extensions under any "Underlying Insurance" or (b) misrepresentation or breach of warranties by any of the "Insured(s)" with respect to any "Underlying Insurance", the "Insurer" shall not be liable hereunder to a greater extent than it would have been in the absence of such actual or alleged failure, misrepresentation or breach.

## IV. LIMIT OF LIABILITY

The amount of set forth in Item 2. of the Declarations shall be the maximum aggregate Limit of Liability of the "Insurer" and, shall be the maximum amount payable under this Policy for all loss or damages resulting from all claims or losses discovered during the "Policy Period".

Costs of defense shall be part of and not in addition to the Limit of Liability in Item 2. of the Declarations, and such costs of defense shall reduce the Limit of Liability stated in Item 2. of the Declarations.

## V. DEPLETION OF UNDERLYING LIMIT(S)

In the event of the depletion of the limit(s) of liability of the "Underlying Insurance" solely as a result of actual payment of loss thereunder by the applicable insurers, this Policy shall, subject to the "Insurer's" Limit of Liability and to the other terms of this Policy, continue to apply to loss as excess insurance over the amount of insurance remaining under such "Underlying Insurance". In the event of the exhaustion of all of the limit(s) of liability of such "Underlying Insurance" solely as a result of payment of loss thereunder, the remaining limits available under this Policy shall, subject to the "Insurer's" Limit of Liability and to the other provisions of this Policy, continue for subsequent loss as primary insurance, and any retention specified in the "Primary Policy" shall be imposed under this Policy as to each claim made; otherwise no retention shall be imposed under this Policy.

This Policy only provides coverage excess of the "Underlying Insurance". This policy does not provide coverage for any loss not covered by the "Underlying Insurance" except and to the extent that such loss is not paid under the "Underlying Insurance" solely by reason of the reduction or exhaustion of the available "Underlying Insurance" through payments of loss thereunder. In the event the insurer of one ore more of the "Underlying Insurance" polices fails to pay loss in connection with any claim covered under the "Underlying Insurance" as a result of the insolvency, bankruptcy, or liquidation or said insurer, then the "Insured(s)" hereunder shall be deemed to have retained any loss for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

If any "Underlying Insurance" bears an effective date which is prior to the effective date of this Policy and if any such insurance becomes exhausted or impaired by payment of loss with respect to any claim which shall be deemed to be made prior to the effective date of this Policy, then with respect to any claim made after the effective date of this Policy, the "Insured(s)" hereunder shall be deemed to have retained any loss for the amount of any such "Underlying Insurance" which is exhausted or impaired by payment of loss with respect to such claim made prior to the effective date of this Policy.

## VI. CLAIM PARTICIPATION

The "Insured(s)" shall not admit liability, consent to any judgment, or agree to any settlement which is reasonably likely to involve the Limit of Liability of this Policy without the "Insurer's" consent, such consent not to be unreasonably withheld.

The "Insurer" may, at its sole discretion, elect to participate in the investigation, settlement or defense of any claim against any of the "Insured(s)" for matter covered by this Policy even if the "Underlying Insurance" has not been exhausted. If the "Insurer" elects to so participate, the "Insured" shall fully cooperate with the "Insurer".

All provisions of the "Underlying Insurance" are considered as part of this Policy except that it shall be the duty of the "Insured(s)" and not the duty of the "Insurer" to defend any claims against any of the "Insured(s)".

## VII. SUBROGATION - RECOVERIES

In that this Policy is excess insurance coverage over the "Underlying Insurance", the "Insured(s)" and the "Insurer's" right of recovery against any person or other entity may not be exclusively subrogated. Despite the foregoing, in the event of any payment under this Policy, the "Insurer" shall be subrogated to all the "Insured's(s')" rights of recovery against any person or organization, and the "Insured(s)" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

Any amounts recovered after payment of loss hereunder shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the ration of respective recoveries.

U-ES-10047-A CW  (4/98)
Page 2 of 3






## VII. NOTICE

The "Insurer" shall be given notice in writing as soon as is practicable in the event of (a) the cancellation of any "Underlying Insurance" and (b) any additional or return premiums charged or allowed in connection with any "Underlying Insurance". Notice regarding (a) and (b) above shall be given to:  Zurich American Insurance Company, One Liberty Plaza, 30th Floor, New York, New York 10006, Attention:  Diversified Financial Institutions Department.

The "Insurer" shall be given notice as soon as is practicable of any claim or any situation that could give rise to a claim under any "Underlying Insurance" when the "Insured" reasonably believes that such claim or situation is likely to result in loss or damages that exceed twenty-five percent (25%) of the sum of the "Underlying Limits" and any retention specified in the "Primary Policy". Notice of any claim to the "Insurer" shall be given in writing to:  Zurich American Insurance Company, P.O. Box 307010, Jamaica, New York 11430-7010, Attention:  Diversified Financial Institutions Claims Department.

## IX.  COMPANY AUTHORIZATION CLAUSE

By acceptance of this Policy, the "Named Entity" agrees to act on behalf of all of the "Insured(s)" with respect to the giving and receiving of notice of claim or cancellations, the payment of premiums and receiving of any returned premiums that may become due under this Policy, and the "Insured(s)" agree that the "Named Entity" shall in all cases be authorized to act on their behalf.

## X.  ALTERATION

No change in or modification of this Policy shall be effective except when made by endorsement signed by an authorized employee of the "Insurer" or any of its agents relating to this Policy.

## XI.  EXCLUSIONS

Notwithstanding any provisions of the "Underlying Insurance", the "Insurer" shall not be liable to make payment for loss in connection with any claim based upon, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

1.  The actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of "Pollutants" into or on real or personal property, water or the atmosphere, or

2.  Any direction or request that any "Insured(s)" test for, monitor, clean up, remove, contain, treat, detoxify or neutralize "Pollutants", or any voluntary decision to do so.

## XII. CONDITIONS

No action shall be taken against the "Insurer" unless, as a condition precedent, there shall have been full compliance with all the provisions of this Policy, nor until the amount of the "Insured's(s')" obligation to pay shall have been finally determined either by final and nonappealable judgment against the "Insured's(s')" after trial, or by written agreement of the "Insured(s)", the claimant and the "Insurer".

## XIII. POLICY TERMINATION

This Policy shall terminate at the earliest of the following times:

1.  The effective date of termination specified in written prior notice by the "Named Entity" to the "Insurer",

2.  Upon expiration of the "Policy Period" as set forth in Item 4. of the Declarations,

3.  Ten (10) days after receipt by the "Named Entity" of a written notice of termination from the "Insurer" for failure to pay a premium when due, or

4.  At such time as may be agreed upon by the "Insurer" and the "Named Entity".

The "Insurer" shall refund the unearned premium computed at customary short rate if the Policy is terminated by the "Named Entity".  Under any other circumstances the refund shall be computed pro rata.

U-ES-10047-A CW  (4/98)
Page 3 of 3



## Important Notice – In Witness Clause



**ZURICH**®

In return for the payment of premium and subject to all the terms of the policy, the "Insurer" agrees with the "Insured(s)" to provide insurance as stated in this policy. This policy shall not be valid unless countersigned by the "Insurer's" duly authorized Representative.

In Witness Whereof, the "Insurer" has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly authorized Representative.

President

Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?** Your agent or broker is best equipped to provide information about your insurance. Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich North America
Customer Inquiry Center
1400 American Lane
Schaumburg, Illinois 60196-1056
1-800-382-2150 (Business Hours:  8 a.m. - 4 p.m. [CT])

---

U-ES-204-A CW (12/03)
Page 1 of 1





**ZURICH**

# NOTIFICATION OF IMPORTANT CHANGES
# RELATING TO TERRORISM RISK INSURANCE ACT

**To Our Valued Customers:**

The Terrorism Risk Insurance Act ("TRIA") had been scheduled to expire on December 31, 2007.  Prior to the termination of the program, Congress enacted an extension of TRIA until December 31, 2014.  There are several important changes to TRIA included with the extension of which you should be aware:

### A. Change in Definition of" Act of Terrorism"

Prior to the enactment of the extension legislation, TRIA applied only to acts of terrorism committed by an individual or individuals "acting on behalf of any foreign person or foreign interest."  This restriction has been removed such that the Secretary of Treasury may also certify acts of terrorism commonly described as "domestic terrorism."  Because your policy may contain a limitation or exclusion relating to "certified acts of terrorism" and/or "other acts of terrorism" or "non-certified acts of terrorism" this change in the law may impact coverage under your policy.  You should review your insurance policy and note the revised certification criteria under TRIA (as fully described in paragraph D. below).

### B. Clarification of Operation of $100 Billion Cap on All Insurer and Federal Obligations

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

### C. Change in the Recoupment of the Federal Share of Insured Losses

Should there be a terrorist act certified under TRIA, Treasury must recoup 133% of the amount of its payments under the program (limited to $27.5 billion minus the amount insurers retain in that calendar year as a result of the insurer deductible and co-share) through policyholder surcharges:
1. For an act of terrorism occurring prior to 2011, the collection must be completed by September 30, 2012;
2. For an act of terrorism occurring during 2011, the collection must be 35% completed by September 30, 2012 with the balance collected by September 30, 2017; and
3. For a later event, the collection must be completed by September 30, 2017.

### D. Revised Definition of Act of Terrorism under TRIA

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States:
1. to be an act of terrorism;
2. to be a violent act or an act that is dangerous to human life, property or infrastructure;
3. to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and
4. to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

Copyrighted © 2007 Zurich American Insurance Company
Includes copyrighted material of ISO properties, Inc. with its permission.

U-GU-766-A  (12/07)
Page 1 of 1



| Insured Name: | INDYMAC BANCORP, INC., AND ITS PREDECESSOR COMPANY, INDYMAC MORTGAGE HOLDINGS, INC. |  |
| Reference Number: | DOC-9035134-01 | |
| Effective Date: | 03/01/2008 **Error! Reference source not found.** | |

**THIS DISCLOSURE IS ATTACHED TO AND MADE PART OF YOUR POLICY.**

# DISCLOSURE OF IMPORTAN INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA:

$10,036.00

*Any information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.   Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of premium attributable is shown in the Schedule above. The premium shown in the Schedule above is subject to adjustment upon premium audit, if applicable.

**B.   Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government may pay a share of insured losses resulting from an act of terrorism. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the insurer retention. The insurer retention equals 20% of the insurer's prior calendar year direct earned premium associated with lines of insurance subject to TRIA. TRIA is scheduled to expire on December 31, 2014.

**C.   Disclosure of $100 Billion Cap on All Insurer and Federal Obligations**

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**D.   Availability**

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other that acts of terrorism.

**E.   Definition of Act of Terrorism under TRIA**

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States:

1.   to be an act of terrorism;
2.   to be a violent act or an act that is dangerous to human life, property or infrastructure;
3.   to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and
4.   to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an "act of terrorism" if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

Copyrighted © 2007 Zurich American Insurance Company
Includes copyrighted material of ISO properties, Inc. with its permission.

U-GU-630-C (12/07)
Page 1 of 1



Endorsement #      1
Named Insured:     INDYMAC BANCORP, INC. AND ITS PREDECESSOR COMPANY, INDYMAC MORTGAGE
                   HOLDINGS, INC.
Policy Number:     DOC-9035134-01                                                    INTERLINE
Effective Date:    03/01/2008                                                        01 21 01 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

**Financial Institutions Excess Insurance Policy**

1.  The insurance does not apply:

    A.  To liability:

        (1)  With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (2)  Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B.  Under any Medical Payments coverage, to expenses incurred with respect to liability resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C.  To liability resulting from "hazardous properties" of "nuclear material", if:

        (1)  The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

        (2)  The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

        (3)  The liability arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.  As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties.

    "Nuclear material" means "source material", "special nuclear material" or "by-product material".

    "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

    "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

© ISO Properties, Inc., 2000                                    Page 1 of 2



"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a)  Any "nuclear reactor";

(b)  Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c)  Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d)  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2000

Page 2 of 2



 

# California Changes



**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Additional Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC-9035134-01 | 03/01/2008 | 03/01/2009 | 03/01/2008 | n/a | n/a |

Named Insured:   INDYMAC BANCORP, INC., AND ITS PREDECESSOR COMPANY,       Endorsement Number:  2
INDYMAC MORTGAGE HOLDINGS, INC.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Financial Institutions Excess Insurance Policy**

It is agreed that Section **XIII. POLICY TERMINATION** is deleted in its entirety and replaced by the following:

**XIII. POLICY TERMINATION**

    A.  **Cancellation**

        1.  The "Insurer" may cancel this policy only for one or more of the following reasons:

            a.  Nonpayment of premium;

            b.  An "Insured's" conviction of a crime arising out of acts increasing the hazard insured against;

            c.  Acts or omissions by an "Insured" or an "Insured's" representative constituting fraud or material misrepresentation in the procurement of this policy, in continuing this policy or in presenting a claim under this policy;

            d.  Substantial change in the risk assumed, except to the extent that the "Insurer" should have reasonably foreseen the change or contemplated the risk in writing the contract;

            e.  Substantial breach of contractual duties or conditions;

            f.  Loss of reinsurance applicable to the risk insured against resulting from termination of treaty or facultative reinsurance initiated by the "Insurer's" reinsurer or reinsurers;

            g.  Determination by the Director of Insurance that the continuation of the policy would place the "Insurer" in violation of the insurance laws of this state or would jeopardize the "Insurer's" solvency;

            h.  Acts or omissions by an "Insured" or an "Insured's" representative which materially increase the hazard insured against;

            i.  A material change in limits, type or scope of coverage, or exclusions in one or more of the underlying policies;

            j.  Cancellation or nonrenewal of one or more of the underlying policies where such policies are not replaced without lapse; or

            k.  A reduction in financial rating or grade of one or more insurers, insuring one or more underlying policies based on an evaluation obtained from a recognized financial rating organization.

        2.  If the "Insurer" cancels this policy based on one or more of the above reasons, the "Insurer" will mail by certified mail to the "Named Entity", and mail to the agent, if any, written notice of cancellation stating the reasons for cancellation. The "Insurer" will mail this notice to the last mailing addresses known to the "Insurer", at least:

            a.  Fifteen (15) days before the effective date of cancellation if the "Insurer" cancels for nonpayment of premium; or

            b.  Sixty (60) days before the effective date of cancellation if the "Insurer" cancels for any of the other reasons.

U-ES-10049-A CA  (11/98)
Page 1 of 2



**Endorsement Number:   2 (Continued)**

3. If notice is mailed, proof of mailing will be sufficient proof of notice.

4. The "Named Entity" may cancel this policy by sending prior written notice of the effective date of termination to the "Insurer".

5. The "Insurer" shall refund the unearned premium computed at customary short rates if the policy is terminated by the "Named Entity".  Under any other circumstances the refund shall be computed pro rata.

**B.   Nonrenewal**

1. This policy shall terminate upon expiration of the "Policy Period" set forth in Item 4. of the Declarations.

2. If the "Insurer" elects not to renew this policy, the "Insurer will mail by certified mail to the "Named Entity", and mail to the agent, if any, written notice of nonrenewal.  The "Insurer" will mail this notice to the last mailing addresses known to the "Insurer" at least sixty (60) days prior to the expiration of this policy.

3. If notice is mailed, proof of mailing will be sufficient proof of notice.

4. If either one of the following occurs, the "Insurer" is not required to provide written notice of nonrenewal:

   a. The "Insurer" or a "Insurer" within the same insurance group has offered to issue a renewal policy; or

   b. An "Insured" has obtained replacement coverage or agreed in writing to do so.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Signed by: _____          Date _____6/12/08_____
              Authorized Representative

U-ES-10049-A CA  (11/98)
Page 2 of 2

COPY

90

# Reduction/Exhaustion of Limits


**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Additional Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC-9035134-01 | 03/01/2008 | 03/01/2009 | 03/01/2008 | n/a | n/a |

**Named Insured:** INDYMAC BANCORP, INC., AND ITS PREDECESSOR COMPANY,          **Endorsement Number:** 3
INDYMAC MORTGAGE HOLDINGS, INC.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Financial Institutions Excess Insurance Policy**

It is agreed that:

1.    Section I. INSURING AGREEMENT, is replaced with the following:

The "Insurer" shall provide the "Insured(s)" with excess insurance coverage over the "Underlying Insurance" during the "Policy Period". Coverage under this Policy shall attach only after:

A.    the insurer(s) of the "Underlying Insurance" shall have paid in legal currency the full amount of the limit(s) of liability of "Underlying Insurance";

B.    the "Insured(s)"shall have paid in legal currency the full amount of the limit(s) of liability of "Underlying Insurance" by reason of the financial insolvency of the insurer(s) of the "Underlying Insurance"; or

C.    the "Insureds" and the insurer(s) of the Underlying Insurance", pursuant to a "Limit Reduction Agreement" shall have paid in legal currency the full amount of the limit(s) of liability of "Underlying Insurance".

Coverage shall then apply in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms of the "Primary Policy" as in effect the first day of the "Policy Period", together with the warranties and limitations of any other "Underlying Insurance".

In no event shall coverage under this policy be broader than: (1) coverage under any "Underlying Insurance"; or (2) the terms of any "Limit Reduction Agreement".

Notwithstanding anything in this policy to the contrary, if the Limit(s) of Liability of the "Underlying Insurance" is reduced or exhausted by payments described in Subsection I.C. above, the unexhausted Limit(s) of Liability under this policy applicable shall be reduced by the largest percentage savings of the Underlying Insurance(s) Limit(s) of Liability as provided in the Limit Reduction Agreement(s).

2.    The following is added to Section II. POLICY DEFINITIONS:

"Limit Reduction Agreement" means an agreement between the "Insured(s)" and one or more insurer(s) of the "Underlying Insurance" pursuant to which such insurer(s) agrees to pay a portion of its unexhausted limit of liability in exchange for a release from the "Insured(s)", provided that the sole basis for such agreement and release is the compromise of good faith coverage issues under the "Underlying Insurance" and such basis does not relate to coverage issues, terms, conditions or premiums under any other policy.

Page 1 of 2



Endorsement Number:  3 (Continued)

3.   The first paragraph of Subsection III. MAINTENANCE OF "UNDERLYING INSURANCE" is replaced with the following:
All of the limit(s) of liability of the "Underlying Insurance" shall be maintained during the "Policy Period" in full effect with solvent insurers except for any reduction or exhaustion of the aggregate limit(s) of liability available under the "Underlying Insurance" solely by reason of actual payment of loss thereunder as set forth in Section I. INSURING AGREEMENT. Failure to comply with the foregoing shall not invalidate this policy but the "Insurer" shall not be liable to a greater extent than it would have if this condition were satisfied.  To the extent that the limit(s) of liability of any "Underlying Insurance" is not so maintained or one or more underlying insurers refuse to pay its limit of liability under any "Underlying Insurance" pursuant to a "Limit

Reduction Agreement", then the "Insureds" shall be deemed self-insured for the amount of the limit(s) of liability of any such "Underlying Insurance" and payments made by "Insureds" as a result of same shall be treated the same as if made by the underlying insurers for purposes of determining the reduction or exhaustion of the underlying limits of liability of such "Underlying Insurance",

4.   .The first two paragraphs of Section V. DEPLETION OF UNDERLYING LIMIT(S), are replaced with the following:

In the event of the depletion of the limit(s) of liability of the "Underlying Insurance" solely as a result of actual payment of loss thereunder as set forth in Section I. INSURING AGREEMENT, this Policy shall, subject to the "Insurer's" Limit of Liability and to the other terms of this Policy, continue to apply to loss as excess insurance over the amount of insurance remaining under such "Underlying Insurance".  In the event of the exhaustion of all of the limit(s) of liability of such "Underlying Insurance" solely as a result of payment of loss thereunder, as set forth in Section I. INSURING AGREEMENT, the remaining limits available under this Policy shall, subject to the "Insurer's" Limit of Liability and to the other provisions of this Policy, continue for subsequent loss as primary insurance, and any retention specified in the "Primary Policy" shall be imposed under this Policy as to each claim made; otherwise no retention shall be imposed under this Policy.

This Policy only provides coverage excess of the "Underlying Insurance".  This policy does not provide coverage for any loss not covered by the "Underlying Insurance" except and to the extent that such loss is not paid under the "Underlying Insurance" solely for one of the reasons set forth in Subsection I.B. or I.C.  In such event, the "Insured(s)" hereunder shall be deemed to have retained any loss for the amount of the limit of liability of said insurer which is not paid.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Signed by: _____          _____6/12/08_____
                Authorized Representative                          Date

Page 2 of 2

COPY

92

# Non-Follow Form



**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Additional Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC-9035134-01 | 03/01/2008 | 03/01/2009 | 03/01/2008 | n/a | n/a |

**Named Insured:**  INDYMAC BANCORP, INC., AND ITS PREDECESSOR COMPANY,          **Endorsement Number:**  4
INDYMAC MORTGAGE HOLDINGS, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Financial Institutions Excess Insurance Policy**

It is agreed that this Policy will not follow the 20% coinsurance for Securities Law Violation of the "Primary Policy" Risk Details,
Insured Percentage of Loss.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Signed by: _____          ___ 6/12/08 _____
            Authorized Representative                     Date

Page 1 of 1

COPY

FEB. 29. 2008  2:52PM                                                    NO. 6154   P. 0. 0

Insured Name:   INDYMAC BANCORP, INC., AND ITS PREDECESSOR COMPANY, INDYMAN
MORTGAGE HOLDINGS, INC.

**ZURICH**

Reference Number:   DOC-9035154-01
Effective Date:      03/01/2008

## THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY.
## THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

## DISCLOSURE OF PREMIUM
## (RELATING TO DISPOSITION OF TRIA)

### SCHEDULE*

(1) Premium attributable to risk of loss from certified acts of terrorism through the end of the policy period based on the extension of the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Extension Act of 2005, ("TRIA") for lines subject to TRIA:

**$10,036.00**

If TRIA terminates, the portion of this premium attributable to the remaining part of the policy period, as modified by any change shown in (2) of this Schedule, applies to the risk of loss from terrorism after the termination of TRIA.

(2) Premium change upon termination of TRIA or upon applicability of a Conditional Endorsement:

No change unless one of the following is completed-

Return Premium:  N/A

Additional Premium:  N/A

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the TRIA, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of your premium attributable is shown in the Schedule of this endorsement or in the Declarations.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% (85% for 2007) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. The Act currently provides for no insurance industry or United States government participation in terrorism losses that exceed $100 billion in any one calendar year. The federal program established by the Act is scheduled to terminate at the end of December 31, 2007 unless extended by the federal government.

**C. Possibility of Additional or Return Premium**

The premium attributable to the risk of loss from certified acts of terrorism coverage is calculated based on the coverage (if any) in effect at the beginning of your policy for certified acts of terrorism.  If your policy contains a Conditional Endorsement, the termination of TRIA or extension of the federal program with certain modifications (as explained in that endorsement) may modify the extent of coverage (if any) your policy provides for terrorism.  If TRIA terminates or the Conditional Endorsement becomes applicable to your policy, the return premium (if any) or additional premium (if any) shown in (2) of the Schedule will apply.  If the level or terms of federal participation change, the premium shown in (1) of the Schedule attributable to that part of the policy period extending beyond such a change may not be appropriate and we will notify you of any changes in your premium.

Includes copyrighted material of ISO Properties, Inc. with its permission
Copyright Zurich American Insurance Company 2006

U-GU-692-B CW (01/06)
Page 1 of 1

# Exhibit 3



**THE HARTFORD**
**UNIVERSAL EXCESS™ POLICY**

Policy Number __00 DA 0248886-08__

Agency Code, Name & Address
80004
MARSH USA INC ·
1166 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-2774

TWIN CITY FIRE INSURANCE CO. ·
INDIANAPOLIS, IN 46268-0930
a stock insurance company, herein called
the Insurer

NOTICE: THIS IS A CLAIMS MADE POLICY. EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THE COVERAGE
OF THIS POLICY IS LIMITED TO LIABILITY FOR ACTS COVERED BY UNDERLYING INSURANCE (ITEM D.)
FOR WHICH CLAIMS ARE FIRST MADE AGAINST THE INSURED(S) WHILE THE POLICY IS IN FORCE. THIS
POLICY DOES NOT PROVIDE FOR THE UNDERWRITERS TO DEFEND THE INSURED, AND ANY DEFENSE
COSTS AND OTHER CLAIM EXPENSE COVERED UNDER THE POLICY IS PART OF AND NOT IN ADDITION
TO THE LIMIT OF LIABILITY. <u>PLEASE READ AND REVIEW THE POLICY CAREFULLY.</u>

## DECLARATIONS

**ITEM A.** Name of Insured: (hereinafter called the "Insured")

                INDYMAC BANCORP, INC.
Address of Insured: 888 WALNUT ST.
                SUITE #500
                PASADENA, CA 91101

**ITEM B.** Policy Period: From 12:01 a.m. on   3/01/08   To 12:01 a.m. on   4/01/09
                  (Standard Time at the address stated in Item A)

**ITEM C. LIMIT OF LIABILITY:**   $10,000,000   Aggregate each Policy Period, including claim expense.

**ITEM D. SCHEDULE OF UNDERLYING INSURANCE:**

  (1)   Primary Policy:   DIRECTORS AND OFFICERS AND COMPANY LIABILITY

        Company: ·   LONDON UNDERWRITERS

        Policy Number:   B0509QAO11608

        Limit of Liability:   $10,000,000

  (2)   Underlying Excess Policy(ies):   SEE EXCESS SUPPLEMENTARY DECLARATIONS
**ITEM E. ENDORSEMENTS EFFECTIVE AT INCEPTION:**   SEE FORM GU207 (SCHEDULE OF ENDORSEMENTS)

**ITEM F. TERMINATION OF PRIOR POLICY(IES):**   N/A

**ITEM G. DISCOVERY CLAUSE:**

    (1) Additional Premium:   $1,492,891.75

    (2) Additional Period:   12 MONTHS

**ITEM H. POLICY PERIOD PREMIUM:**   $853,081.00

                                  06/18/08

Authorized Representative                Date
UE 00 H001 00 1004

**ENDORSEMENT**

GU 207
(6-78)

This endorsement, effective on    3/01/08           at 12:01 A.M. standard time, forms a part of

Policy No.   00 DA 0248886-08      of the          TWIN CITY FIRE INSURANCE CO.

Issued to    INDYMAC BANCORP, INC.

David Zwiener, President

SCHEDULE OF FORMS AND ENDORSEMENTS

|   | RN00N02600 | 05/93 | IN WITNESS PAGE |
|---|---|---|---|
| 1 | UE00H02800 | 10/04 | EXCESS SUPPLEMENTARY DECLARATIONS |
| 2 | HG00H00900 | 03/02 | MAILING ADDRESS FOR NOTICE ENDORSEMENT |
| 3 | UE00H02700 | 10/04 | EXCESS ABSOLUTE PRIOR NOTICE EXCLUSION |
| 4 | UE00H08201 | 12/06 | EXHAUSTION OF UNDERLYING INSURANCE |
| 5 | UE04H01600 | 12/04 | CALIFORNIA NONRENEWAL ENDORSEMENT |
|   | HG00H00102 | 04/06 | IMPORTANT NOTICE TO POLICYHOLDERS - TERRORISM RISK INSURANCE ACT |
|   | EL04R11101 | 05/05 | IMPORTANT INFORMATION TO POLICYHOLDERS |
|   | HR00H09300 | 02/07 | PRODUCER COMPENSATION NOTICE |

Rev. Ed. Date (04/02)
GU 207 (6-78)

ENDORSEMENT NO:      1

This endorsement, effective 12:01 am,        3/01/08                                              forms part
of policy number   00 DA 0248886-08

issued to:        INDYMAC BANCORP, INC.

by:               TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCESS SUPPLEMENTARY DECLARATIONS

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

ITEM D. SCHEDULE OF UNDERLYING INSURANCE, (2) Underlying Excess Policy(ies) of the Declarations is amended to
read as follows:

(2)   Underlying Excess Policy(ies):

Company:        ZURICH AMERICAN INSURANCE COMPANY

Policy Number:   DOC-9035134-01

Limit of Liability:    _$10,000,000_ excess of ____$10,000,000_

Company:

Policy Number:

Limit of Liability:   _____ excess of _____

Company:

Policy Number:

Limit of Liability:   _____ excess of _____

Company:

Policy Number:

Limit of Liability:   _____ excess of _____

All other terms and conditions remain unchanged.

David Zwiener, President

Page 1

UE 00 H028 00 1004                      © 2004, The Hartford

**The Hartford**

**UNIVERSAL EXCESS™ POLICY**

**I.   INSURING AGREEMENT**

The Insurer designated in the Declarations (a Stock Insurance Company herein called the "Underwriters"), in consideration of the payment of the premium and in reliance upon any application, materials or information made available by or on behalf of the Insured(s) to the Underwriters during the application or proposal process, and subject to all of the terms, conditions and exclusions of this policy, agrees with the Insured(s) as follows:

The Underwriters shall provide the Insured(s) with insurance during the Policy Period which is in excess of the total limits of liability and any retention/deductible under all Underlying Insurance, as set forth in Item D of the Declarations, whether collectible or not.

**II.   LIMIT OF LIABILITY**

A.   It is expressly agreed that liability for any loss shall attach to the Underwriters only after the Primary and Underlying Excess insurers shall have paid the full amount of their respective liability (hereinafter referred to as the "Underlying Insurance") or the Insured(s) shall have paid the full amount of such liability due to the financial insolvency of an insurer of the Underlying Insurance. The Underwriters shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in Item C of the Declarations, which shall be the maximum liability of the Underwriters in each Policy Period.

B.   In the event of the reduction or exhaustion of the aggregate limits of liability under the Primary and Underlying Excess Policy(ies) by reason of losses paid thereunder for claims first made while this policy is in force, this policy shall:

(1)   in the event of such reduction, continue in force excess of the reduced Primary and Underlying Insurance; or

(2)   in the event of exhaustion, continue in force as primary insurance, subject to the Underwriters' Limit of Liability and to the other terms, conditions and exclusions of this policy,

provided always that in the latter event this policy shall only pay excess of the retention/deductible applicable to such primary insurance as set forth in the Primary Policy, which shall be applied to any subsequent loss in the same manner specified in such primary insurance. Notice of exhaustion of Underlying Insurance shall be given the Underwriters upon such exhaustion. Nothing herein shall be construed to provide for any duty on the part of the Underwriters to defend any Insured or to pay defense or any claim expenses in addition to the Limit of Liability set forth in Item C of the Declarations.

C.   If the Primary Policy contains a specific grant of coverage that is subject to a sub-limit of liability, then coverage under this policy shall not apply to any claim which is subject to such sub-limit of liability. However, any such claim shall be recognized under this policy solely for purposes of reducing or exhausting, to any extent, the Underlying Insurance.

**III.   PRIMARY AND UNDERLYING INSURANCE**

A.   This policy is subject to the same warranties, terms, conditions, definitions, exclusions and endorsements (except as regards the premium, the amount and limits of liability, and duty to defend, and except as otherwise provided herein) as are contained in or as may be added to the Primary Policy, together with all the warranties, terms, conditions, exclusions and limitations contained in or added by endorsement to any Underlying Excess Policy(ies). In no event shall this policy grant broader coverage than is provided by the most restrictive Primary or Underlying Excess Policy(ies).

B.   It is a condition precedent to this policy that the policy(ies) of the Primary and Underlying Excess Insurers shall be maintained in full effect while this policy is in force except for any reduction of the aggregate limits contained therein (as provided for in Section II., B. above).

UE 00 H002 00 1004                              © 2004, The Hartford                              Page 1 of 3
     00 DA 0248886-08        3/01/08

C.   Failure of the Insured to comply with the foregoing shall not invalidate this policy, but in the event of such failure, the Underwriters shall be liable only to the extent that it would have been liable had the Insured complied therewith. To the extent that any Underlying Insurance is not maintained in full effect while this policy is in force, the Insured(s) shall be deemed to be self-insured for the amount of the limit of liability of the Underlying Insurance which is not maintained as set forth above.

## IV.   COSTS, CHARGES, EXPENSES AND COOPERATION

A.   No costs, charges or expenses for investigation or defense of claims shall be incurred, or settlements made, without the Underwriters' written consent, such consent not to be unreasonably withheld; however, in the event of such consent being given, the Underwriters will pay, subject to the provisions of Section II., such costs, settlements, charges or expenses.

B.   The Underwriters may, at their sole option, elect to participate in the investigation, settlement or defense of any claim even if the Underlying Insurance has not been exhausted. The Insured(s) shall, as a condition precedent to their rights under this policy, give to the Underwriters all information and cooperation as the Underwriters may reasonably require and shall do nothing that may prejudice the Underwriters' position or its potential or actual rights of recovery.

## V.   GENERAL CONDITIONS

A.   Definitions

1.   Insured(s) means those individuals and/or entities insured under the Underlying Insurance.

2.   Primary Policy means the policy scheduled in Item D(1) of the Declarations.

3.   Underlying Excess Policy(ies) means the policy(ies) scheduled in Item D(2) of the Declarations.

4.   Underlying Insurance means all those policies scheduled in Item D of the Declarations.

5.   Policy Period means the period set forth in Item B of the Declarations, subject to prior cancellation pursuant to Section V. C.

B.   Discovery Clause

If the Insured(s) elect and are granted a discovery period or extended reporting period under the Underlying Insurance, then the Insured(s) shall have the same ability to elect a discovery period or extended reporting period under this policy by: (i) satisfying the conditions as set forth in the Underlying Insurance; and (ii) paying the additional premium set forth in Item G(1) of the Declarations. If elected, the discovery period or extended reporting period shall be for the period of time set forth in Item G(2) of the Declarations.

C.   Cancellation Clause

The Underwriter may cancel this policy for non-payment of premium by sending not less than ten (10) days notice to the Insured(s) at their last known address. The Underwriter may not otherwise cancel this policy. This policy may be cancelled by the Insured(s) in accordance with the conditions of the Underlying Insurance. If the policy shall be cancelled by the Insured(s), the Underwriters shall retain the customary short rate proportion of the premium hereon.

D.   Termination of Prior Policy(ies)

The taking effect of this policy shall terminate, if not already terminated, the policy(ies) specified in Item F of the Declarations.

UE 00 H002 00 1004                    © 2004, The Hartford                         Page 2 of 3
        00  DA  0248886-08        3/01/08

E.   Notice

The Underwriters shall be given notice in writing as soon as practicable: (a) in the event of the cancellation or non-renewal of any Underlying Insurance; and (b) of any additional or return premiums charged or paid in connection with any Underlying Insurance.

Any changes in coverage in the Underlying Insurance or any changes in the Insured(s) that would require notice under the Underlying Insurance shall be reported to the Underwriters as soon as practicable and the Insured(s) shall, upon request, furnish the Underwriters with copies of such changes. The Underwriters shall not be subject to such changes without the Underwriter's consent, such consent not to be unreasonably withheld.

In the event any claim is made against any Insured, written notice shall be given to the Underwriters in the same manner as given to the Primary Policy at 2 Park Ave, 5th Floor, New York, NY 10016, ATTN:  Hartford Financial Products Claims Division [Fax # (917) 464-5972], and otherwise pursuant to all appropriate notice provisions contained in the Underlying Insurance.



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

**TWIN CITY FIRE INSURANCE COMPANY**
HOME OFFICE - INDIANAPOLIS, INDIANA
ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
(A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Brian S. Becker, Secretary

David Zwiener, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN
    00 DA 0248886-08    3/01/08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| **ENDORSEMENT NO.:** | 2 |
| **This endorsement effective on at 12:01 A.M. standard time** | 3/01/08 |
| **Forms part of Policy Number:** | 00 DA 0248886-08 |
| **Issued to:** | INDYMAC BANCORP, INC. |
| **By:** | TWIN CITY FIRE INSURANCE CO. |

## MAILING ADDRESS FOR NOTICE ENDORSEMENT

I.  **Notice of Claim or Wrongful Act**

    A.  It is hereby understood and agreed that a notice of any claim or wrongful act shall be given in writing to the following:

*THE HARTFORD*
*CLAIMS DEPARTMENT*
*HARTFORD FINANCIAL PRODUCTS*
*2 PARK AVENUE*
*5TH FLOOR*
*NEW YORK, NEW YORK 10016*

*FACSIMILE: (212) 277-0915*

    B.  It is hereby understood and agreed that where it is stated in the policy or declarations page that a notice of any claim or wrongful act shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115 shall be deleted in its entirety and replaced with the following:

Notice of any claim or wrongful act shall be given in writing to the following:

*THE HARTFORD*
*CLAIMS DEPARTMENT*
*HARTFORD FINANCIAL PRODUCTS*
*2 PARK AVENUE*
*5TH FLOOR*
*NEW YORK, NEW YORK 10016*

*FACSIMILE: (212) 277-0915*

HG 00 H009 00 0302

© 2002, The Hartford

Page 1 of 2

II.   **All Other Notices**

   A. **All notices for a claim or wrongful act must be mailed to the address as specified above in Item (I) of this endorsement.**

   B. It is hereby understood and agreed that all notices, except for a notice of claim or wrongful act, shall be given in writing to the following:

   *THE HARTFORD*
   *COMPLIANCE DEPARTMENT*
   *HARTFORD FINANCIAL PRODUCTS*
   *2 PARK AVENUE*
   *5TH FLOOR*
   *NEW YORK, NEW YORK 10016*

   C. With the exception of notice of a claim or wrongful act, it is hereby understood and agreed that where it is stated in the policy or declarations page that a notice shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115 shall be deleted in its entirety and replaced with the following:

   All notices, except for a notice of claim or wrongful act, shall be given in writing to the following:

   *THE HARTFORD*
   *COMPLIANCE DEPARTMENT*
   *HARTFORD FINANCIAL PRODUCTS*
   *2 PARK AVENUE*
   *5TH FLOOR*
   *NEW YORK, NEW YORK 10016*

All other terms and conditions of the policy remain unchanged.

HG 00 H009 00 0302
   00 DA 0248886-08          3/01/08 © 2002, The Hartford                    Page 2 of 2

ENDORSEMENT NO:      3

This endorsement, effective 12:01 am,      3/01/08                                         forms part
of policy number     00 DA 0248886-08

issued to:           INDYMAC BANCORP, INC.

by:                  TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCESS ABSOLUTE PRIOR NOTICE EXCLUSION

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

In addition to any exclusions made part of the Underlying Insurance, the following exclusion shall apply to this policy:

Underwriters shall not be liable to make any payment for loss in connection with any claim made against the Insured(s) where all or part of such claim is, directly or indirectly, based on, attributable to, arising out of, resulting from, or in any manner related to wrongful acts or any facts, circumstances or situations of which notice of claim or occurrence which could give rise to a claim, has been given prior to the effective date of this policy under any other policy.

All other terms and conditions remain unchanged.

David Zwiener, President

UE 00 H027 00 1004                          © 2004, The Hartford                          Page 1 of 1

ENDORSEMENT NO: 4

This endorsement, effective 12:01 am,    3/01/08                        forms part
of policy number    00 DA 0248886-08

issued to:         INDYMAC BANCORP, INC.

by:             TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXHAUSTION OF UNDERLYING INSURANCE

This endorsement modifies insurance provided under:

**UNIVERSAL EXCESS POLICY**

Section II. LIMIT OF LIABILITY, A., is deleted and replaced by the following:

A.   It is expressly agreed that liability for any covered Loss shall attach to the Underwriters only after the Primary and Underlying Excess insurers or the Insured shall have paid the full amount of their respective liability for such covered Loss. If the Insured shall pay, in the applicable legal currency, any such covered Loss, then the Underwriters shall recognize such payment for the depletion of the respective limits of liability of the Underlying Insurance. In no way shall such payment by the Insured constitute a waiver of any terms, conditions or exclusions of the Underlying Insurance or this policy. The Underwriters shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in Item C of the Declarations, which shall be the maximum liability of the Underwriters in each Policy Period.

All other terms and conditions remain unchanged.

David Zwiener, President

UE 00 H082 01 1206               © 2008, The Hartford               Page 1 of 1

ENDORSEMENT NO:     5

This endorsement, effective 12:01 am,     3/01/08                                                      forms part
of policy number     00 DA 0248886-08

issued to:         INDYMAC BANCORP, INC.

by:                TWIN CITY FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### CALIFORNIA NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

The Cancellation provision of the Policy is amended to include the following:

NOTICE OF NONRENEWAL

A.      If the Insurer decides not to renew the Policy, the Insurer shall mail or deliver to the producer of record and the Insured Notice of Nonrenewal at least sixty (60) days but no more than one hundred twenty (120) days prior to the end of the expiration date or anniversary date of the Policy. The Notice of Nonrenewal shall contain the reason for nonrenewal of the Policy.

B.      The Insurer is not required to send Notice of Nonrenewal in the following situations:

   1.   If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between the Insurer and a member of the Insurer's insurance group.

   2.   If the Policy has been extended for ninety (90) days or less, provided that notice has been given in accordance with the nonrenewal notice requirements cited in paragraph A above in the Nonrenewal Section.

   3.   If the Insured has obtained replacement coverage, or has agreed, in writing, within sixty (60) days of the termination of the Policy, to obtain that coverage.

   4.   If the Policy is for a period of no more than sixty (60) days and the Insured is notified at the time of issuance that it will not be renewed.

   5.   If the Insured requests a change in the terms or conditions or risks covered by the Policy within sixty (60) days prior to the end of the Policy Period.

   6.   If the Insurer has made a written offer to the Insured, in accordance with the time frames shown in the non-renewal notice requirements cited in paragraph A above in the Nonrenewal Section, to renew the Policy under changed terms or conditions or at an increased premium rate.

All other terms and conditions remain unchanged.

David Zwiener, President

UE 04 H016 00 1204                        © 2004, The Hartford                              Page 1 of 1

Named Insured:    INDYMAC BANCORP, INC.

Policy Number:    00 DA 0248886-08

Effective Date of this Notice:    3/01/08

Insurer:    TWIN CITY FIRE INSURANCE CO.

## IMPORTANT NOTICE TO POLICYHOLDERS – TERRORISM RISK INSURANCE ACT

You are hereby notified that under the Terrorism Risk Insurance Act (the "Act"), we must make terrorism coverage as defined by the Act available in your policy. However, the actual coverage provided by your policy for acts of terrorism, as is true for all coverages, is limited by the terms, conditions, exclusions, limits, other provisions of your policy, any endorsements to the policy and generally applicable rules of law.

Any terrorism coverage as defined by the Act made available in our policies is partially reinsured by the United States of America under a formula established by the Act. Under this formula, for losses occurring in 2006, the United States will pay 90% of covered terrorism losses exceeding a statutorily established deductible paid by insurers until such time as insured losses under the program reach $100 billion. For losses occurring in 2007, the United States will pay 85% of covered terrorism losses exceeding a statutorily established deductible paid by insurers until such time as insured losses under the program reach $100 billion. If losses under the program reach $100 billion, Congress will determine the procedures for, and the source of, any payments for losses in excess of $100 billion.

You will not be required to pay a premium for terrorism coverage at this time. If, upon renewal of your policy, a premium is going to be charged for terrorism coverage, we will provide you with notification of what that premium will be.

Losses that are not eligible for federal reinsurance under the Act include, but are not limited to, losses due to acts of terrorism to property located outside the United States (as defined in the Act) and losses due to acts of domestic terrorism.

HG 00 H001 02 0406          © 2008, The Hartford          Page 1 of 1

## IMPORTANT INFORMATION TO POLICYHOLDERS

In the event you need to contact someone about this policy/bond for any reason, please contact your producer. If you have additional questions, you may contact the insurance company issuing this policy/bond at the following address and telephone number:

*THE HARTFORD*
*COMPLIANCE DEPARTMENT*
*HARTFORD FINANCIAL PRODUCTS*
*2 PARK AVENUE*
*5TH FLOOR*
*NEW YORK, NEW YORK 10016*
*1-212-277-0400*

If you have a problem with your insurance company, its producer or representative that has not been resolved to your satisfaction, please call or write to the Department of Insurance.

Consumer Services Division
California Department of Insurance
300 South Spring Street
14th Floor
Los Angeles, CA 90013
1-800-927-4357 or -1-213-897-8921

Written correspondence is preferable so that a record of your inquiry can be maintained. When contacting your producer, company or the Bureau of Insurance have your policy/bond number available.

ILNP 85 14 03 89 CA
EL 04 R111 01 0505

00 DA 0248886-08    3/01/08

**Producer Compensation Notice**


**THE HARTFORD**

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.

F-5287-0
HR 00 H093 00 0207                    © 2007, The Hartford                    Page 1 of 1

00 DA 0248886-08      3/01/08

109

# Exhibit 4



| CNA INSURANCE COMPANIES | DECLARATIONS |
| 333 S. Wabash Ave. | EXCESS INSURANCE |
| Chicago, IL 60604 | POLICY |

### NOTICE

**THIS IS A "CLAIMS MADE" POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. NO COVERAGE EXISTS FOR ANY CLAIM FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED REPORTING PERIOD APPLIES. THE LIMIT OF LIABILITY SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS.**

| ACCOUNT NUMBER | COVERAGE PROVIDED BY | |
| --- | --- | --- |
| 315877 | Continental Casualty Company | |
| POLICY NUMBER | | AGENCY |
| DOX 287221440 | | 910 718055 |

| | NAMED ENTITY AND PRINCIPAL ADDRESS | AGENT |
| --- | --- | --- |
| Item 1. | IndyMac Bancorp, Inc.<br>888 East Walnut Street<br>Pasadena, CA 91101 | Marsh USA Inc.<br>Siobhan O'Brien<br>1166 Avenue of the Americas<br>New York, NY 10036 |
| Attn. | | |

**Item 2.** Policy Period:

| 3/1/2008 | To | 4/1/2009 |

12:01 A.M. Standard Time at the Principal Address stated in item 1.

**Item 3.** Limit of Liability (Inclusive of Defense Costs):

$10,000,000  Maximum aggregate Limit of Liability each Policy Period.

**Item 4.** Schedule of Underlying Insurance:
A. Primary Policy

| Name of Carrier | Policy No. | Limits | Ded/Ret. Amount |
| --- | --- | --- | --- |
| BRIT 2987/<br>London Underwriters | 3O509QAO11608 | $10,000,000 | $5,000,000 |

B. Underlying Excess Policy(ies):

**\*\*\* SEE ATTACHED SCHEDULE \*\*\***

**Item 5.** Policy Premium

$724,780

**Item 6.** Forms and Endorsements forming a part of this policy at inception:

| G-11713-A04 | Ed. 12/86 | State Provisions – California |
| --- | --- | --- |
| G-145126-A | Ed. 08/03 | Policyholder Notice – Economic and Trade Sanctions Conditions |
| G-145184-A | Ed. 06/02 | Economic and Trade Sanctions Condition |
| GSL2296XX | Ed. 10/06 | Structured Settlement Endorsement |
| GSL3458XX | Ed. 08/07 | Inapplicability of Primary Policy Coinsurance Provision Endorsement |
| G-144894-A | Ed. 01/03 | Policyholder Disclosure – Notice of Insurance Coverage for Acts of Terrorism |

These Declarations along with the completed and signed Application and the Excess Insurance Policy, shall constitute the contract between the Insureds, the Named Entity, and the Insurer.

Date: July 8, 2008

Secretary          Chairman of the Board          Authorized Representative

G-17728-A
(ED 04/92)

## SCHEDULE OF UNDERLYING INSURANCE

| NAME OF CARRIER: | POLICY NUMBER: | LIMITS: | DED/RET. AMOUNT |
|---|---|---|---|
| Zurich American Insurance Company | DOC 90351 34-01 | $10,000,000 | $N/A |
| Hartford — Twin City Fire Insurance Co. | 00 DA 0248886-08 | $10,000,000 | $N/A |

G-17728-A
(ED 04/92)



### EXCESS INSURANCE POLICY

In consideration of the payment of the premium and in reliance on all statements made and information furnished to Continental Casualty Company (hereinafter called the "Insurer"), and/or to the Insurers of the **Underlying Insurance**, including the statements made in the **Application** made a part hereof and subject to all of the provisions of this **Policy**, the insurer and the insureds agree as follows:

**I.    INSURING AGREEMENT**

The Insurer shall provide the **Insureds** with excess coverage over the **Underlying Insurance** as set forth in Item 4 of the Declarations during the **Policy Period** set forth in Item 2 of the Declarations. Coverage hereunder shall attach only after all such **Underlying Insurance** has been exhausted by payments for losses and shall then apply in conformance with the same provisions of the **Primary Policy** at its inception, except for premium, limit of liability and as otherwise specifically set forth in the provisions of this Policy.

**II.   POLICY DEFINITIONS**

**Application** shall mean the written application for this Policy, including any materials submitted therewith, which together shall be on file with the Insurer and deemed a part of and attached hereto as if physically attached to this Policy.

**Named Entity** means the organization named in Item 1 of the Declarations.

**Insureds** means those persons or organization(s) insured under the **Primary Policy**, at its inception.

**Policy Period** means the period from the effective date and hour of this Policy as set forth in Item 2 of the Declarations, to the Policy expiration date and hour set forth in Item 2 of the Declarations, or its earlier cancellation date or termination date, if any.

**Primary Policy** means the Policy scheduled in Item 4 (a) of the Declarations.

**Underlying Insurance** means all those Policies scheduled in Item 4 of the Declarations and any Policies replacing them.

**III.   MAINTENANCE OF UNDERLYING INSURANCE**

All of the **Underlying Insurance** scheduled in Item 4 of the Declarations shall be maintained during the Policy Period in full effect, except for any reduction of the aggregate limit(s) of liability available under the **Underlying Insurance** solely by reason of payment of losses thereunder. Failure to comply with the foregoing shall not invalidate this Policy but the Insurer shall not be liable to a greater extent than if this condition had been complied with. To the extent that any **Underlying Insurance** is not maintained in full effect during the currency of this **Policy Period**, then the insureds shall be deemed to have retained any loss for the amount of the limit of liability of any **Underlying Insurance** which is not maintained as set forth above.

In the event of any actual or alleged (a) failure by the **Insureds** to give notice or to exercise any extensions under any **Underlying Insurance** or (b) misrepresentation or breach of warranties by any of the **insureds** with respect to any **Underlying Insurance**, the Insurer shall not be liable hereunder to a greater extent than it would have been in the absence of such actual or alleged failure, misrepresentation or breach.

It is further a condition of this Policy that the **Insurer** shall be notified in writing, as soon as practicable of cancellation and/or alteration of any provisions of any of the policies of **Underlying Insurance**.

**IV.   LIMIT OF LIABILITY**

The amount set forth in Item 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer for the **Policy Period.**

Costs of defense shall be part of and not in addition to the Limit of Liability in Item 3 of the Declarations, and such costs of defense shall reduce the Limit of Liability stated in Item 3 of the Declarations.

G-17729-A (ED. 04/92)                                                                                    Page 1 of 4

**V.     DEPLETION OF UNDERLYING LIMIT(S)**

In the event of the depletion of the limit(s) of liability of the Underlying Insurance solely as the result of actual payment of losses thereunder by the applicable insurers, this Policy shall, subject to the Insurer's Limit of Liability and to the other terms of this Policy, continue to apply to losses as Excess Insurance over the amount of insurance remaining under such Underlying Insurance. In the event of the exhaustion of all of the limit(s) of liability of such Underlying Insurance solely as a result of payment of losses thereunder, the remaining limits available under this Policy shall, subject to the Insurer's Limit of Liability and to the other provisions of this Policy, continue for subsequent losses as primary insurance and any retention specified in the Primary Policy shall be imposed under this Policy as to each claim made; otherwise no retention shall be imposed under this Policy.

This Policy only provides coverage excess of the Underlying Insurance. This Policy does not provide coverage for any loss not covered by the Underlying Insurance except and to the extent that such loss is not paid under the Underlying Insurance solely by reason of the reduction or exhaustion of the available Underlying Insurance through payments of loss thereunder. In the event the Insurer of one or more of the Underlying Insurance policies fails to pay loss in connection with any claim covered under the Underlying Insurance as a result of the insolvency, bankruptcy, or liquidation of said insurer, then the Insureds hereunder shall be deemed to have retained any loss for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

If any Underlying Insurance bears an effective date which is prior to the effective date of this Policy and if any such Insurance becomes exhausted or impaired by payment of loss with respect to any claim which, shall be deemed to be made prior to the effective date of this Policy, then with respect to any claim made after the effective date of this Policy, the Insureds shall be deemed to have retained any loss for the amount of any such Underlying Insurance which is exhausted or impaired by payment of loss with respect to such claim made prior to the effective date of this Policy.

**VI.     CLAIM PARTICIPATION**

The Insured shall not admit liability, consent to any judgment against them, or agree to any settlement which is reasonably likely to involve the Limit of Liability of this Policy without the Insurer's consent, such consent not to be unreasonably withheld.

The Insurer may, at its sole discretion, elect to participate in the investigation, settlement or defense of any claim against any of the Insureds for matters covered by this Policy even if the Underlying Insurance has not been exhausted.

All provisions of the Underlying Insurance are considered as part of this Policy except that it shall be the duty of the Insureds and not the duty of the Insurer to defend any claims against any of the Insureds.

**VII.     SUBROGATION - RECOVERIES**

In that this Policy is "Excess Coverage", the Insureds and the Insurer's right of recovery against any person or other entity may not be exclusively subrogated. Despite the foregoing, in the event of any payment under this Policy, the Insurer shall be subrogated to all the Insured's rights of recovery against any person or organization, and the Insureds shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

Any amounts recovered after payment of loss hereunder shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries.

**VIII.     NOTICE**

The Insurer shall be given notice in writing as soon as is practicable in the event of (a) the cancellation of any Underlying Insurance and (b) any additional or return premiums charged or allowed in connection with any Underlying Insurance. Notice regarding (a) and (b) above shall be given to Manager, Directors and Officers Liability Underwriting, CNA Insurance Companies, CNA Plaza, Chicago, Illinois 60685.

G-17729-A (ED. 04/92)                                                                                                  Page 2 of 4

The Insurer shall be given notice as soon as practicable of any notice of claim or any situation that could give rise to a claim under any **Underlying Insurance**.  Notice of any claim to the Insurer shall be given in writing to Manager, Professional Liability Claims, CNA Insurance Companies, CNA Plaza, Chicago, Illinois 60685.

**IX.    COMPANY AUTHORIZATION CLAUSE**

By acceptance of this Policy, the **Named Entity** named in item 1 of the Declarations agrees to act on behalf of all the **Insureds** with respect to the giving and receiving of notice of claim or cancellations, the payment of premiums and the receiving of any return premiums that may become due under this Policy; and the **Insureds** agree that the **Named Entity** shall in all cases be authorized to act on their behalf.

**X.    ALTERATION**

No change in or modification of this Policy shall be effective except when made by endorsement signed by an authorized employee of the Insurer or any of its agents relating to this Policy.

**XI.    POLICY CANCELLATION**

This Policy may be cancelled by the **Named Entity** at any time by written notice or by surrender of this Policy to the Insurer.  This Policy may also be cancelled by or on behalf of the Insurer by delivery to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified or other first class mail, at the address shown in item 1 of the Declarations, written notice stating when, not less than thirty (30) days thereafter, the cancellation shall become effective.  The mailing of such notice as aforesaid shall be sufficient proof of notice and this Policy shall cancel at the date and hour specified in such notice

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

The Insurer shall refund the unearned premium computed at less than pro-rata if the Policy is cancelled in its entirety by the **Named Entity**.  Under any other circumstances the refund shall be computed pro-rata.

**XII.    EXCLUSIONS**

Notwithstanding any provisions of the **Underlying Insurance**, the Insurer shall not be liable to make payment for loss in connection with any claim based upon, arising out of, relating to, directly or indirectly resulting from, or in consequence of, or in any way involving:

1.    nuclear reaction, radiation, or contamination regardless of causes;

2    pollutants, including but not limited to loss arising out of any:

   a.    request, demand or order that any of the **Insureds** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants, or

   b.    claim by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.