# EXHIBIT 6

COPY



# Lloyd's Policy

**We, Underwriting Members** of the Syndicates whose definitive numbers and proportions are shown in the Table attached hereto (hereinafter referred to as 'the Underwriters'), hereby agree, in consideration of the payment to Us by or on behalf of the Assured of the Premium specified in the Schedule, to insure against loss, including but not limited to associated expenses specified herein, if any, to the extent and in the manner provided in this Policy.

**The Underwriters** hereby bind themselves severally and not jointly, each for his own part and not one for another, and therefore each of the Underwriters (and his Executors and Administrators) shall be liable only for his own share of his Syndicate's proportion of any such Loss and of any such Expenses. The identity of each of the Underwriters and the amount of his share may be ascertained by the Assured or the Assured's representative on application to Lloyd's Policy Signing Office, quoting the Lloyd's Policy Signing Office number and date or reference shown in the Table.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**In Witness** whereof the General Manager of Lloyd's Policy Signing Office has signed this Policy on behalf of each of Us.

*R.C. Thomas*



LLOYD'S POLICY SIGNING OFFICE
General Manager

J(A)  NMA2421 (3/1/95)  Form approved by Lloyd's Market Association

## NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER.  ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST.

5. FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE, AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357.

6. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

12/04
LSW1147A





THE ASSURED IS REQUESTED TO **READ THIS POLICY.** IF IT IS INCORRECT, PLEASE RETURN IT IMMEDIATELY TO YOUR BROKER OR AGENT FOR ALTERATION.

**IN ALL COMMUNICATIONS** THE POLICY NUMBER APPEARING OVERLEAF SHOULD BE QUOTED

## DECLARATIONS

## DIRECTORS, OFFICERS AND COMPANY
## LIABILITY POLICY

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY **CLAIM** FIRST MADE DURING THE **POLICY PERIOD** PROVIDED SUCH **CLAIM** IS REPORTED TO UNDERWRITERS AS SOON AS PRACTICABLE AFTER THE INSURANCE RISK MANAGER OF THE PARENT COMPANY FIRST BECOMES AWARE OF SUCH CLAIM BUT IN NO EVENT LATER THAN 60 DAYS AFTER THE END OF THE **POLICY PERIOD**. AMOUNTS INCURRED AS **COSTS, CHARGES AND EXPENSES** SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY UNDERWRITERS TO DEFEND ANY OF THE **ASSUREDS**.

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Assureds** and Underwriters.

**Policy No:**     509/QA006807

**Item A.   Parent Company:**

INDYMAC BANCORP INC., AND ITS PREDECESSOR COMPANY, INDYMAC MORTGAGE HOLDINGS, INC.

**Principal Address:**

888 East Walnut Street
Pasadena
California 91101
U.S.A.

**State of Incorporation:**

Delaware

**Item B.   Policy Period:**

**From:**     1st March 2007 **To:** 1st March, 2008

Both days at 12.01 a.m. local standard time at the Principal Address stated in Item A.

**Item C.   Limit of Liability:**

USD10,000,000 in the aggregate for the **Policy Period**.



**Item D.   Retentions:**

USD Nil           each of the **Directors and Officers** each **Claim** but in no event exceeding

USD Nil           in the aggregate each **Claim** all **Directors and Officers** under Insuring Clause I.A.

USD2,500,000     each **Claim** under Insuring Clause I.B.

USD2,500,000     each **Claim** under Insuring Clause I.B and/or I.C. with respect to a **Securities Law Violation.**

**Item E.   Insured Percentage:**

100% of **Loss** in excess of retention under Insuring Clause I.A.
100% of **Loss** in excess of retention under Insuring Clause I.B.
100% of **Loss** in excess of retention under Insuring Clause I.C.

**Item F.   Premium:**

USD495,000 including TRIA, hereon 75% thereof

**Item G.**    1.    Premium for **Optional Extension Period**:   175% of the total premium as provided in Clause VIII.

            2.    Length of **Optional Extension Period**:  365 days.

**Item H.   Notification pursuant to Clause VI. shall be given to:**

For the attention of Theodore A. Boundas
Boundas, Skarzynski, Walsh & Black LLC,
200 East Randolph Drive,
Suite No 7200,
Chicago, Illinois 60601.

**Item I.   Outside Entities:**

Lydia Kennard:
•     Unihealth Foundation
•     University of Southern California
•     Polytechnic School
Stuart Gabriel:
•     Genesis Los Angeles Economic Growth Corporation

**Item J.   Service of process in any suit shall be made upon:**

Mendes and Mount
445 South Figueroa Street
38th Floor
Los Angeles,
California 90017.

**Dated in London:**   9th March 2007



### DIRECTORS, OFFICERS AND COMPANY
### LIABILITY POLICY

In consideration of the payment of the premium, in reliance on the **Application** and subject to all of the provisions of this Policy, Underwriters and the **Assureds** agree as follows:

I.   **INSURING CLAUSES**

    A.    Underwriters shall pay on behalf of the **Directors and Officers Loss** resulting from any **Claim** first made against the **Directors and Officers** during the **Policy Period** for an **Individual Act.**

    B.    Underwriters shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Directors and Officers** resulting from any **Claim** first made against the **Directors and Officers** during the **Policy Period** for an **Individual Act.**

    C.    Underwriters shall pay on behalf of the **Company Loss** resulting from any **Claim** first made against the **Company** during the **Policy Period** for a **Corporate Act.**

II.   **DEFINITIONS**

The following terms whenever used in this Policy in boldface type shall have the meanings indicated.

    A.    **"Application"** means:

        1.    the application for this Policy or any policy issued in the last three years of which this Policy is a renewal; and

        2.    any materials submitted therewith, which shall be retained on file by Underwriters and shall be deemed attached hereto, as if physically attached hereto.

    B.    **"Assureds"** means the **Company** and the **Directors and Officers.**

    C.    **"Bail Bond and Civil Bond Expenses"** means the reasonable premium (but not collateral) for a bond or other financial instrument to guarantee for up to 12 months a **Director's** or **Officer's** contingent obligation for a specified amount required by a court hearing a **Claim** for any **Wrongful Act.**

    D.    **"Claim"** means:

        1.    any written demand for damages or other relief against any of the **Assureds,**

        2.    any civil, criminal, administrative or regulatory proceeding initiated against any of the **Assureds,** including

            (a)    any appeal therefrom;

            (b)    any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body with jurisdiction over any **Employment Practice Violation;** or

    (c)    any formal investigatory proceeding commenced by the service or entry of a formal order of investigation

E.    **"Company"** means:

    1.    the **Parent Company;** and

    2.    any **Subsidiary**.

In the event a bankruptcy proceeding shall be instituted by or against the **Parent Company** or a **Subsidiary**, the term **Company** shall include a resulting debtor-in-possession, if any.

F.    **"Corporate Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the **Company** involving a **Securities Law Violation**.

G.    **"Corporate Takeover"** means:

    1.    the acquisition by any person or entity of more than 50% of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

    2.    the merger of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

H.    **"Costs, Charges and Expenses"** means reasonable and necessary legal fees and expenses incurred by the **Assureds** in defense of any **Claim** and cost of attachment or similar bonds, but shall not include

    1.    salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the **Company**; or.

    2.    any amounts incurred in defense of any **Claim** for which any other Directors and Officers Liability or Employment Practices Liability insurer has a duty to defend.

I.    **"Directors and Officers"** means:

    1.    all persons who were, now are, or shall be directors or officers of the **Company** and all persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    2.    all persons who were, now are, or shall be employees of the **Company,** to the extent any **Claim** is for an **Employment Practice Violation** or when named as a co-defendant with any person set forth in II. Definition I. (1) or (3),

    3.    all persons who were, now are, or shall be managers of any limited liability companies as defined in Clause II.T. or any person serving in a functionally equivalent role for such limited liability company operating or incorporated outside the United States, and



4. the lawful spouse, or domestic partner of any of the persons set forth in the above provisions of this definition, but only to the extent the spouse or domestic partner is a party to any **Claim** solely in the capacity as spouse or domestic partner of any such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and the spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner,

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

J. **"Employment Practice Violation"** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment whether actual or constructive;

2. employment related misrepresentations;

3. violation of any federal, state or local law concerning employment or discrimination in employment, including the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Law of 1964 (as amended), the Pregnancy Discrimination Act of 1978, the Civil Rights Act of 1866, the Family and Medical Leave Act of 1993, the Older Workers Benefit Protection Act of 1990, the Fifth and Fourteenth Amendments of the United States Constitution, or any rule or regulation promulgated thereunder;

4. sexual or other harassment in the workplace;

5. wrongful deprivation of career opportunity, employment or promotion;

6. wrongful discipline or evaluation; or

7. failure to adopt adequate employment or workplace policies and procedures, or

8. **Retaliation**.

K. **"Individual Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by any of the **Directors and Officers**, while acting in their capacity as:

1. a director or officer of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

2. a director, officer, trustee, governor, executive director of any not-for-profit organization where such **Directors and Officers** serve with such not-for-profit organization where such service is with the knowledge and consent of the **Company**;

3. a director or officer of any of the entities specified in Item I. of the Declarations; or



    4.     an employee of the **Company** but only if the **Claim** is for an **Employment Practice Violation** or a **Securities Law Violation**.

**Individual Act** also means any **Claim** against any of the **Directors and Officers** solely by reason of their status as a person referenced in items 1, 2, or 3 above.

L.    **"Interrelated Wrongful Acts"** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

M.    **"Judicial Order"** means:

    (i)    an interim or interlocutory judicial order; or

    (ii)    with respect to any proceeding concerning the deportation or extradition of any **Director** or **Officer**, any judicial order;

entered against a **Director** or **Officer** in connection with a **Claim** against such **Director** or **Officer** that is covered under any insurance cover of this Policy. **Judicial Order** shall not include a final order made in the disposition or adjudication of such **Claim**.

N.    **"Loss"** means damages, judgments, settlements and **Costs, Charges and Expenses** incurred by any of the **Directors and Officers**, but shall not include:

    1.     punitive or exemplary damages where applicable law expressly prohibits coverage for punitive or exemplary damages;

    2.     that portion of any multiplied damages award which exceeds the amount multiplied where applicable law expressly prohibits coverage for multiplied damages;

    3.     taxes, criminal or civil fines or penalties imposed by law;

    4.     matters deemed uninsurable under the law pursuant to which this Policy shall be construed; or

    5.     any wages, salary or benefits owed pursuant to the terms of any employment contract.

With respect to any coverage for punitive or exemplary damages and multiplied damages in any **Claim,** the law of the jurisdiction most favourable to the insurability of those damages shall control for the purpose of resolving any dispute between the Underwriters and the **Assured** regarding whether such damages are insurable, provided that such jurisdiction is where:

    (1)    those damages were awarded or imposed,
    (2)    any **Wrongful Act** occurred for which such damages were awarded or imposed,
    (3)    any **Parent Company** is incorporated or has its principal place of business,
    (4)    the **Director or Officer** who is subject to such damages resides.

O.    **"Official Detention"** means confinement of a **Director** or **Officer** in secure custodial premises, operated by or on behalf of a governmental or judicial agency in connection with a **Claim** against such **Director** or **Officer** and either without charge or without a judicial finding of culpability or liability in that **Claim**.

Exhibit 6, Page 142

P. **"Optional Extension Period"** means the period described in Clause VIII.A.

Q. **"Parent Company"** means the entity named in Item A. of the Declarations.

R. **"Policy Period"** means the period from the effective date and hour of this Policy to the Policy expiration date and hour as set forth in Item B. of the Declarations, or its earlier cancellation date and hour, if any, or the end of the **Optional Extension Period**, if purchased.

S. **"Prosecution Costs"** means reasonable and necessary legal fees and expenses, incurred by a **Director** or **Officer** with the prior written consent of the Underwriters, to bring legal proceedings.

T. **"Public Relations Consultant"** means the person or entity retained by the **Director** or **Officer**, subject to the prior approval of the Underwriters, to mitigate the adverse effect on that **Director's** or **Officer's** reputation from a **Claim** first made during the **Policy Period** for any **Wrongful Act**, by disseminating findings made in a final judicial disposition of that **Claim** which exonerates the **Director** or **Officer** from fault, liability or culpability.

U. **"Public Relations Expenses"** means reasonable and necessary fees and expenses of the **Public Relations Consultant**.

V. **"Retaliation"** means an **"Employment Practice Violation"** by an **Assured** relating to or alleged to be in response to any of the following activities:

 1. the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency or authority, of any act by an **Assured** which act is alleged to be a violation of the law, common or statutory, of any state, territory, jurisdiction, or political subdivision thereof;

 2. the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any law relating to **Employee** rights;

 3. the filing of any claim under the Federal False Claim Act or any other federal, state, local or foreign "whistle-blower" law.

W. **"Securities Law Violation"** means any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission under either or both Acts, similar securities laws or regulations of any state or equivalent laws or regulations in any applicable countries world-wide, or any common law relating to any transaction arising out of, involving, or relating to the purchase or sale of or offer to purchase or sell any securities of the **Company**, whether on the open market or through a public or private offering.

X. **"Subsidiary"** means any entity including but not limited to any limited liability company, including but not limited to any limited liability corporation, while more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company** directly or indirectly, if such entity:

 1. was so owned prior to the inception date of this Policy and was insured under a policy issued by Underwriters of which this Policy is a renewal;

LPSO P.J.

2.    was so owned on the inception date of this Policy;

3.    becomes so owned after the inception date of this Policy provided the assets of the entity do not exceed 10% of the consolidated assets of the **Company** as set forth in the latest quarterly financials released by the **Parent Company**; or

4.    becomes so owned after the inception date of this Policy provided that if the assets of the entity exceed 10% of the consolidated assets of the **Company** as set forth in the latest quarterly financials released by the **Parent Company**, the provisions of Clause VII.B. must be fulfilled.

Y.    **"Wrongful Act"** means any **Corporate Act** or **Individual Act.**

III.    **EXCLUSIONS**

Underwriters shall not be liable to make any payment in connection with any **Claim**:

A.    for actual or alleged sickness, disease, death, false arrest, false imprisonment, damage to or destruction of tangible property (including loss of use thereof) or, except to the extent the **Claim** is for an **Employment Practice Violation**, for bodily injury, assault, battery, invasion of privacy, mental anguish, emotional distress, libel, slander or defamation;

B.    based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.    any **Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given prior to the **Policy Period** under any other Directors' and Officers' or Employment Practices Liability policy, or

2.    any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**;

C.    to the extent it is insured under any other existing valid Directors and Officers Liability or Employment Practices Liability policy, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, other than insurance expressly written to be excess of this Policy; provided, however, this exclusion shall not apply to the amount of **Loss** which is in excess of the amount of **Loss** paid by such other policy where such **Claim** is otherwise covered by this Policy;

D.    based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving, actual or alleged seepage, pollution or contamination of any kind; provided, however, this exclusion shall not apply to the coverage afforded under Insuring Clause I.A.

E.    for violation of the Employee Retirement Income Security Act of 1974 as amended (or any regulations promulgated thereunder) or similar provisions of any federal, state or local law;



Exhibit 6, Page 144

F.    by, on behalf of, or at the direction of any of the **Assureds** within the United States of America, except and to the extent such **Claim**:

1.    is brought by a security holder of the **Company** acting in their capacity as such who, when such **Claim** is first made, is acting independently of all of the **Assureds**, or

2.    is brought by any of the **Assureds** in the form of a crossclaim, third party claim or otherwise for contribution or indemnity which results directly from a **Claim** not otherwise excluded by the terms of this Policy, or

3.    is brought by any of the **Directors and Officers** for an **Employment Practice Violation**;

4.    is brought or maintained by a bankruptcy trustee, examiner, rehabilitator, liquidator, receiver or administrative receiver, creditors' committee or similar person(s) or assignees thereof under the laws of any other jurisdiction, either directly or derivatively on behalf of the **Company** without the solicitation or active participation of any **Assureds** or the **Company**;

5.    is brought by a former **Director or Officer** of the **Company** who has not been a **Director or Officer** of the **Company** or working as a consultant to the **Company** for 2 years or more

6.    is brought by any protected whistleblower under 18 USC 1514A;

G.    brought about or contributed to by:

1.    any deliberately dishonest, fraudulent or criminal act or omission by any of the **Assureds**, or

2.    any personal profit or advantage gained by any of the **Directors and Officers** to which they were not legally entitled;

as determined by a final adjudication adverse to such **Assureds** in the underlying action or in a separate action or proceeding;

H.    for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company**, which payment without such previous approval shall be held by the court to be in violation of the law;

I.    against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving

1.    any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**, or

2.    any **Wrongful Act** occurring while such entity was a **Subsidiary** which together with a **Wrongful Act** occurring prior to the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts** except in respect of coverage under Insuring Clause I.A;

J.      based upon, arising out of, directly or indirectly, resulting from or in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Corporate Takeover**;

K.      based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving, service as a director, officer, trustee, employee, governor, executive director or in a functionally equivalent position with any entity other than the **Company**; provided, however, this exclusion shall not apply to:

    (a)    **Loss** resulting from any **Claim** to the extent that such **Claim** is based on the service of one of the **Directors and Officers** as

        1.    a director, officer, trustee, governor or executive director of any not-for-profit organization where such service is with the knowledge and consent of the **Company** and such **Loss** is not indemnified by such not-for-profit organization or any of its insurers, or

        2.    a director or officer of any of the entities specified in Item I. of the Declarations if the **Loss** resulting from the **Claim** is not indemnified by the specified entity or any of its insurers;

    (b)    any **Claim** brought by a security holder of the **Company** acting in their capacity as such.

L.      based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission in connection with the performance of any professional services by or on behalf of the **Company** for the benefit of any other entity or person, however, this exclusion shall not apply to any **Claim** brought by a security holder of the **Company** alleging failure to supervise those who performed or failed to perform such professional services;

M.      Solely with respect to IndyMac, Inc. and **Directors and Officers** thereof:

    based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving

        1.    any **Wrongful Act** actually or allegedly committed prior to 12.01 a.m. Local Standard Time on 1ˢᵗ July, 2000, or

        2.    any other **Wrongful Act** occurring on or subsequent to 12.01 a.m. Local Time on 1ˢᵗ July, 2000 which, together with a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts**.

For the purpose of determining the applicability of any of the Exclusions, no **Wrongful Act** shall be imputed to any other natural person, and solely with respect to the coverage available under Clause I. INSURING CLAUSES C., only the **Wrongful Acts** of any past, present or future, president, chairman, chief executive officer or chief financial officer of the **Parent Company** shall be imputed to the **Company**.

IV.     **LIMIT OF LIABILITY, RETENTIONS AND ORDER OF PAYMENTS**

A.      Underwriters shall be liable to pay the percentage of **Loss** set forth in Item E. of the Declarations in excess of the amount of the applicable Retention up to the Limit of Liability, it being warranted that the remaining percentage of **Loss** shall be uninsured.   The Retention applicable to Insuring Clause I.B. shall apply to **Loss** payable under Insuring Clause I.A. if indemnification by the **Company** is required by

P.J.

law or is legally permissible to the fullest extent permitted by law, regardless of whether or not actual indemnification is made, unless the **Company** is unable to make such actual indemnification by reason of its insolvency

B.  The amount shown in Item C. of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters under the Policy.

C.  More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times:

  1.  the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

  2.  the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause VI.B.

D.  In the event more than one of the Insuring Clauses set forth in Clause I. are applicable to a **Claim** the Retentions set forth in Item D. of the Declarations shall be applied separately to that part of the **Loss** resulting from such **Claim** covered by each Insuring Clause. The sum of the Retentions so applied shall constitute the Retention applicable to such **Claim**. The total Retention as finally determined shall in no event exceed the largest of the Retentions applicable to Insuring Clauses that are applicable to such **Claim**.

E.  Payments of **Loss** by Underwriters shall reduce the Limit of Liability. Underwriters shall pay **Loss** in the order in which **Loss** is incurred. However, if **Loss** payable under Insuring Clause I.A. and one or more of the other Insuring Clauses is incurred contemporaneously, Underwriters first shall pay **Loss** payable under Insuring Clause I.A. After such **Loss** has been paid, if the Limit of Liability has not been exhausted, Underwriters shall then pay **Loss** payable under Insuring Clause I.B. After such **Loss** has been paid, if the Limit of Liability has not been exhausted, Underwriters shall then pay **Loss** payable under Insuring Clause I.C. Underwriters shall have no obligation to pay **Loss** after exhaustion of the Limit of Liability.

F.  Underwriters shall pay **Costs, Charges and Expenses** at least once every 90 days.

## V.   SETTLEMENTS AND DEFENSE

A.  No settlement shall be made and no **Costs, Charges and Expenses** shall be incurred without Underwriters' consent, such consent not to be unreasonably withheld.

B.  It shall be the duty of the **Assureds** and not the duty of the Underwriters to defend **Claims**.

## VI.   NOTIFICATION

A.  The **Assureds** shall, as a condition precedent to their rights to payment under this Policy, give to Underwriters notice in writing of any **Claim** as soon as practicable after the Insurance Risk Manager, of the **Parent Company** first becomes aware of a **Claim** but in no event later than 60 days after the end of the **Policy Period**.

B.  If during the **Policy Period** or the Optional Extension Period, if applicable, the **Assureds** first become aware of circumstances that might give rise to a **Claim**, and if the **Assureds** during the **Policy Period** or the Optional Extension Period, if applicable, give written notice to Underwriters of:

1.  the specific circumstances and the anticipated **Wrongful Act** allegations;

2.  the consequences which have resulted or may result therefrom; and

3.  the circumstances by which the **Assureds** first became aware thereof,

then any **Claim** made subsequently arising out of such circumstances or **Wrongful Act** shall be deemed for the purposes of this Policy to have been made at the time such notice was first given.

A notice of such a circumstance must describe as precisely as possible all facts and details including the reasons for anticipating a **Claim** with full particulars as to dates and persons involved and an estimate of quantum.

C.  Notice to Underwriters provided for in Clause VI. shall be given to the firm shown under Item H. of the Declarations.

## VII.   GENERAL CONDITIONS

A.  Warranty Clause

It is warranted that the particulars and statements contained in the **Application** are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy the **Assureds** agree that:

1.  the statements in the **Application** are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by Underwriters under this Policy and that this Policy is issued in reliance upon the truth of such representations;

2.  no knowledge possessed by the **Company** or any of the **Directors and Officers** shall be imputed to any other **Director and Officers;**

3.  in the event that the **Application** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy, this Policy shall not afford coverage with respect to those **Assureds** who had knowledge of such misrepresentations

4.  this Policy shall not afford any coverage under Insuring Clause I.C. if any of the following **Assureds** had knowledge of the misrepresentations set forth in Clause VII.A.3.: the Chief Executive Officer, Chief Financial Officer, General Counsel, President, or Chairperson of the **Parent Company;** and

5.  except as provided in Clauses VII.A.3., VII.A.4., this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with each of the **Assureds**.

P.J.

6.    notwithstanding the foregoing, this Policy shall be non-rescindable with respect to the coverage afforded under Insuring Clause I.A.

B.    Adjustment Clause

1.    This Policy is issued and the premium computed on the basis of the information submitted to Underwriters as part of the **Application**. In the event the **Company** acquires any other entity or acquires substantially all of the assets of another entity, or merges with another entity such that the **Company** is the surviving entity and where such assets acquired exceed 10% of the consolidated assets of the **Company** as set forth in the latest quarterly financials released by the **Parent Company** or creates or acquires a **Subsidiary** as defined in Clause II.X.3. after the inception of this Policy, coverage shall be afforded for a period of 90 days for any **Loss** in any way involving the assets acquired or the assets, liabilities, directors, officers or employees of the entity acquired or merged with, or such **Subsidiary**. Coverage beyond such 90 day period shall only be available if:

(a)    written notice of such transaction or event is given to Underwriters by the **Parent Company**;

(b)    the **Parent Company** provides Underwriters with such information in connection therewith as Underwriters may deem necessary;

(c)    the **Assureds** accept any special terms, conditions, exclusions or additional premium charge as may be required by Underwriters; and

(d)    Underwriters, at their sole discretion, agree to provide such coverage.

2.    In the event any entity ceased to be a **Subsidiary** as defined herein after the inception date of this Policy, or of any policy issued by Underwriters of which this Policy is a renewal or replacement, this Policy, subject to its terms, shall continue to apply to any of the **Directors and Officers** who were covered under this Policy because of their service with such entity and to such **Subsidiary** but only with respect to any **Wrongful Act** committed or allegedly committed prior to the time such entity ceased to be a **Subsidiary**.

3.    In the event of a **Corporate Takeover** after the inception date of this Policy or of any policy issued by Underwriters of which this Policy is a renewal or replacement, this Policy, subject to its terms, shall continue to apply to the **Directors and Officers** and to the **Company** but only with respect to any **Wrongful Act** committed or allegedly committed prior to the **Corporate Takeover**.

C.    Cancellation Clause

1.    By acceptance of this Policy, the **Assureds** hereby confer the exclusive power and authority to cancel this Policy on their behalf to the **Parent Company**. Such entity may cancel this Policy by surrender thereof to Underwriters, or by mailing to Underwriters written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the



notice shall become the end of the **Policy Period**. Delivery of such written notice shall be equivalent to mailing.

2.  Underwriters may cancel this Policy only for non-payment of premium by mailing to the **Parent Company** written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by Underwriters shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then such period shall be amended to afford the minimum notice period permitted thereunder.

3.  If this Policy is cancelled pursuant to 1. hereinabove, Underwriters shall retain the customary short rate proportion of the premium hereon. If this Policy is cancelled pursuant to 2. hereinabove, Underwriters shall retain the pro rata proportion of the premium hereon. Payment or tender of any unearned premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.

D.  Company Authorization Clause

By acceptance of this Policy the **Assureds** agree that the **Parent Company** will act on their behalf with respect to the giving of all notices to Underwriters, the receiving of notices from Underwriters, the payment of the premium and the receipt of any return premium.

Notwithstanding the foregoing, in the event that the **Parent Company** becomes insolvent the **Directors and Officers** are authorized to file notice of a **Claim** directly with Underwriters.

## VIII.   OPTIONAL EXTENSION PERIOD

A.  If this Policy is not renewed by the **Parent Company** or by Underwriters, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item G.1. of the Declarations of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any **Claim** or circumstance which might give rise to a **Claim** first made during the period of time set forth in Item G.2. of the Declarations after the Policy expiration date, but only with respect to any **Wrongful Act** committed before such date.

B.  As a condition precedent to the right to purchase the **Optional Extension Period**, the total premium for this Policy must have been paid. The right to purchase the **Optional Extension Period** shall terminate unless written notice together with full payment of the premium for the **Optional Extension Period** is given to Underwriters within 30 days after the Policy expiration date. If such notice and premium payment is not so given to Underwriters, there shall be no right to purchase the **Optional Extension Period**.

C.  In the event of the purchase of the **Optional Extension Period**, the entire premium therefor shall be deemed earned at its commencement.



D.   In the event the **Optional Extension Period** is purchased, it shall terminate forthwith on the effective date of any contract of insurance or indemnity which replaces the coverage afforded by this Policy through the **Optional Extension Period** either in whole or in part, and in the event the **Optional Extension Period** is so terminated, Underwriters shall refund pro rata any unearned premium for the unexpired period of such extension.

E.   The exercise of the **Optional Extension Period** shall not in any way increase the Limit of Liability of Underwriters.

## IX.   ASSISTANCE, COOPERATION AND SUBROGATION

The **Assureds** agree to provide Underwriters with such information, assistance and cooperation as Underwriters or their counsel may reasonably request, and they further agree that they shall not take any action which in any way increases Underwriters' exposure under this Policy.

In the event of any payment under this Policy, Underwriters shall be subrogated to the **Assureds'** rights of recovery therefor against any person or entity.  The **Assureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights including the execution of such documents as are necessary to enable Underwriters effectively to bring suit in their name, and shall provide all other assistance and cooperation which Underwriters may reasonably require.  In no event however, shall Underwriters exercise their rights of subrogation against an individual **Assured** under this Policy unless such **Assured** has been convicted of a deliberate criminal act, or been determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such **Assured** was not legally entitled.

## X.   ASSIGNMENTS AND ACTION AGAINST UNDERWRITERS

No action shall lie against Underwriters unless, as a condition precedent thereto, the **Assureds** shall have fully complied with all of the terms of this Policy, nor until the amount of the **Assureds'** obligation to pay shall have been  determined either by judgment against them or by written agreement between them, the claimant and Underwriters.  Nothing contained herein shall give any person or organization any right to join Underwriters as a party to any **Claim** against the **Assureds** to determine their liability, nor shall Underwriters be impleaded by the **Assureds** or their legal representative in any **Claim**.  Assignment of interest under this Policy shall not bind Underwriters unless their consent is endorsed hereon.

## XI.   ENTIRE AGREEMENT

By acceptance of this Policy, the **Assureds** agree that this Policy embodies all agreements existing between them and Underwriters or any of their agents relating to this Insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Underwriters shall not effect a waiver or a change in any part of this Policy or estop Underwriters from asserting any right under the terms of this Policy, nor shall the terms be waived or changed except by written endorsement or rider issued by Underwriters to form a part of this Policy.

## XII.   CHOICE OF LAW AND JURSDICTION

This Policy shall be subject to the laws of the State of California.

It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters at the request of any person or entity insured hereunder will



Exhibit 6, Page 151

submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon the firm shown under Item J. of the Declarations, and that in such suit instituted against any one of the Underwriters upon this Policy, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The firm shown under Item J. of the Declarations is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of any person or entity insured hereunder to give a written undertaking to such person or entity that it will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to the statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officers specified for that purpose in the statute, or any of their successors in office, as their true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate the firm shown in Item J. of the Declaration as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

NMA1998

## XIII.   ASSETS AND LIBERTY COSTS EXTENSION

### (i)   Prosecution Costs

The Underwriters will pay, where permitted by law, the **Prosecution Costs** of each **Director** or **Officer** to obtain the discharge or revocation of a **Judicial Order** entered during the **Policy Period** imposing:

(a)   confiscation, assumption of ownership and control, suspension or freezing of rights of ownership of real property or personal assets of such **Director** or **Officer**;

(b)   a charge over real property or personal assets of such **Director** or **Officer**;

(c)   a temporary or permanent prohibition on such **Director** or **Officer** from holding the office of or performing the function of a **Director and Officer**;

(d)   restriction of such **Director's** or **Officer's** liberty to a specified domestic residence or an **Official Detention**;

(e)   deportation of a **Director** or **Officer** following revocation of otherwise proper, current and valid immigration status for any reason other than such **Director's** or **Officer's** conviction of a crime; or

(f)   extradition of such **Director** or **Officer**.



(ii)     **Bail Bond and Civil Bond Expenses**

The Underwriters will pay **Bail Bond and Civil Bond Expenses** of each **Director** or **Officer** incurred directly in connection with a **Claim** covered under any insurance cover of this Policy during the **Policy Period**.

(iii)    Damage to Reputation

The Underwriters will pay the **Public Relations Expenses** of each **Director** or **Officer**.

The Underwriters' total aggregate liability for cover under this Clause XIII. shall be a part of not in addition to the limit of liability stated in Item C. of the Declarations.

01/99
LSW1037 (Amended)



<u>U.S.A.</u>

### NEW SHORT RATE CANCELLATION TABLE ENDORSEMENT

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this insurance is written it is agreed that in the event of cancellation thereof by the Assured the earned premium shall be computed as follows:-

A. For Insurance written for one year:

| Days Insurance in Force | Per Cent of One Year Premium | Days Insurance in Force | Per Cent of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154-156 | 53 |
| 2 | 6 | 157-160 | 54 |
| 3- 4 | 7 | 161-164 | 55 |
| 5- 6 | 8 | 165-167 | 56 |
| 7- 8 | 9 | 168-171 | 57 |
| 9- 10 | 10 | 172-175 | 58 |
| 11- 12 | 11 | 176-178 | 59 |
| 13- 14 | 12 | 179-182 (6 months) | 60 |
| 15- 16 | 13 | 183-187 | 61 |
| 17- 18 | 14 | 188-191 | 62 |
| 19- 20 | 15 | 192-196 | 63 |
| 21- 22 | 16 | 197-200 | 64 |
| 23- 25 | 17 | 201-205 | 65 |
| 26- 29 | 18 | 206-209 | 66 |
| 30- 32 (1 month) | 19 | 210-214 (7 months) | 67 |
| 33- 36 | 20 | 215-218 | 68 |
| 37- 40 | 21 | 219-223 | 69 |
| 41- 43 | 22 | 224-229 | 70 |
| 44- 47 | 23 | 229-232 | 71 |
| 48- 51 | 24 | 233-237 | 72 |
| 52- 54 | 25 | 238-241 | 73 |
| 55- 58 | 26 | 242-246 (8 months) | 74 |
| 59- 62 (2 months) | 27 | 247-250 | 75 |
| 63- 65 | 28 | 251-255 | 76 |
| 66- 69 | 29 | 256-260 | 77 |
| 70- 73 | 30 | 261-264 | 78 |
| 74- 76 | 31 | 265-269 | 79 |
| 77- 80 | 32 | 270-273 (9 months) | 80 |
| 81- 83 | 33 | 274-278 | 81 |
| 84- 87 | 34 | 279-282 | 82 |
| 88- 91 (3 months) | 35 | 283-287 | 83 |
| 92- 94 | 36 | 288-291 | 84 |
| 95- 98 | 37 | 292-296 | 85 |
| 99-102 | 38 | 297-301 | 86 |
| 103-105 | 39 | 302-305 (10 months) | 87 |
| 106-109 | 40 | 306-310 | 88 |
| 111-113 | 41 | 311-314 | 89 |
| 114-116 | 42 | 315-319 | 90 |
| 117-120 | 43 | 320-323 | 91 |
| 121-124 (4 months) | 44 | 324-328 | 92 |
| 125-127 | 45 | 329-332 | 93 |
| 128-131 | 46 | 333-337 (11 months) | 94 |
| 132-135 | 47 | 338-342 | 95 |
| 136-138 | 48 | 343-346 | 96 |

P.J.

Exhibit 6, Page 154

| | | | | |
|---|---|---|---|---|
| 139-142.............................49 | | 347-351......................... 97 |
| 143-146.............................50 | | 325-355.......................... 98 |
| 147-149.............................51 | | 326-360.......................... 99 |
| 150-153 (5 months)...........52 | | 361-365 (12 months).....100 |

B.For Insurances written for more or less than one year:-

1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2. If insurance has been in force for more than 12 months;

    a. Determine full annual premium as for an insurance written for a term of one year.

    b. Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written

    c. Add premium produced in accordance with items (a) and (b) to obtain earned premium during full period insurance has been in force.

**N.M.A. 45**

U.S.A.

**NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT (BROAD)**
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:-

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause - Liability - Direct (Limited) applies.

This Policy*
does not apply:-

1.     Under any Liability Coverage, to injury, sickness, disease, death or destruction

   (a)     with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (b)     resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.     Under any medical Payments Coverage, or under any Supplementary Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

3.     Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

   (a)     the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf, of an insured or (2) has been discharged or dispersed therefrom;

   (b)     the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   (c)     the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.



4.    As used in this endorsement:

"**hazardous properties**" include radioactive, toxic or explosive properties; "**nuclear material**" means source material, special nuclear material or byproduct material; "**source material**", "**special nuclear material**", and "**byproduct material**" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "**spent fuel**" means any fuel element of fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "**waste**" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "**nuclear facility**" means

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "**nuclear reactor**" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "**injury**" or "**destruction**" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:- As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60

**N.M.A. 1256**



**U.S.A.**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE - LIABILITY - DIRECT

(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause - Liability - Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A. its Territories or Possessions, Puerto Rico or the Central Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
**N.M.A. 1477**

**U.S.A.**

## SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of US$2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

**N.M.A. 1168**



Exhibit 6, Page 158

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.    war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.    any act of terrorism.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918



Exhibit 6, Page 159

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### New & Renewal Business Endorsement

*This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

In consideration of an additional premium of 1% of the Policy Premium paid, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "insured loss" directly resulting from any "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002" as amended ("TRIA").

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA. The coverage provided by this Endorsement shall expire at 12.00 midnight December 31, 2007, the date on which the TRIA Program is scheduled to terminate or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates. The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject. All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.

**LMA5052**
**22/12/05**
**Form approved by Lloyd's Market Association**

## SPECIAL CANCELLATION CLAUSE

In the event that an Underwriter:

a)   ceases underwriting; or

b)   is the subject of an order or resolution for winding up or formally proposes a scheme of arrangement; or

c)   has its authority to carry on insurance business withdrawn,

the Assured may terminate that Underwriter's participation on this risk forthwith by giving notice and the premium payable to that Underwriter shall be pro rata to the time on risk. In the event there are any notified, reserved or paid losses or circumstances, premium shall be deemed fully earned. Any return of premium shall also be subject to a written full release of liability from the Assured.

**NMA2975**
**30/05/03**
Form approved by Lloyd's Market Association [Non-Marine]

### PREMIUM PAYMENT WARRANTY

The Premium must be paid to and received by Underwriters on or before 24.00hrs on 16th April 2007.  If this warranty is not complied with, then this Insurance shall be cancelled ab initio.

### LINES CLAUSE

This Insurance, being signed for 75%, insures only that proportion of any loss, whether total or partial, including but not limited to that proportion of associated expenses, if any, to the extent and in the manner provided in this Insurance.

The percentages signed in the Table are percentages of 100% of the amount(s) of Insurance stated herein.

### SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions.  The subscribing insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

LSW 1001 (Insurance)





The Table of Syndicates referred to on the face of this Policy follows:

**BUREAU REFERENCE**   61011 25/04/07          **BROKER NUMBER**   0509

**BUREAU REFERENCE**   61012 25/04/07          **BROKER NUMBER**   0509

| PROPORTION % | SYNDICATE | UNDERWRITER'S REFERENCE |
|---|---|---|
| 50.00 | 2987 | TS011A07A000 |
| 25.00 | 4000 | 02144G07AA |

**TOTAL LINE**      **No. OF SYNDICATES**
75.00                          2

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 2007
YEAR OF ACCOUNT

BUREAU USE ONLY
USL1  55    6987

Page  1 of  1

Exhibit 6, Page 162



# COMPANY POLICY

**IN CONSIDERATION** of the Insured named in the Schedule hereto having paid the premium set forth in the said Schedule to the Insurers who have hereunto subscribed their Names (herein after referred to as "the Insurers")

**THE INSURERS HEREBY AGREE** for the proportion set forth herein to indemnify the Insured's Executors, Administrators and Assigns against Loss, as more fully set forth in the policy detailed in the said Schedule covering the identical subject matter and risk (hereinafter called the "Co-insuring Policy") during the period of Insurance stated in the said Schedule or during any subsequent period as may be mutually agreed upon between the Insured and the Insurers.

PROVIDED that:-

> (1)    the liability of the Insurers shall not exceed the limits of liability expressed in the said Schedule or such other limits of liability as may be substituted therefor by memorandum hereon or attached hereto signed by or on behalf of the Insurers.

> (2)    this policy shall be subject to the same terms, provisions, conditions and limitations as are contained in the Co-insuring Policy.

If the Insured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**IN WITNESS WHEREOF I**, being a representative of the Insurers and authorised by the said Insurers to sign this Policy on their behalf, have hereunto subscribed my name this 15th day of March    Two Thousand and Seven

**S.R.1**

**LEXINGTON INSURANCE COMPANY**

Exhibit 6, Page 164

| The Insurers | Proportion | Reference Numbers |
|---|---|---|
| Lexington Insurance Company | 25% | 1950178 |

### SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

**LSW1001 (Insurance) 08/94**



**Date**: 9th March 2007

**Policy No.** 509/QA006807

## THE SCHEDULE

| | |
|---|---|
| **The Insured** | INDYMAC BANCORP INC and others as more fully set forth in the Co-insuring Policy |
| **Premium** | USD495,000 including 2.5% of Policy Premium in respect of Terrorism Risk Insurance Act |
| **Limit of Liability** | USD 10,000,000 in the aggregate for the Policy Period |
| **Interest Insured** | Directors and Officers and Company Liability Insurance as more fully set forth in the Co-insuring Policy |
| **Hereon** | 25% of the Premium and Limit of Liability |
| **Period of Insurance** | From    1st March 2007<br>To       1st March 2008<br>Both days as expressed in the Co-insuring Policy and for such further period or periods as may be mutually agreed upon. |

**Co-insuring Policy No.**  509/QA006807      **Issued by:** Lloyd's Policy Signing Office