# Exhibit 23

FILED

2010 FEB 16   PH 4: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1   Ramzi Abadou (Bar No. 222567)
    rabadou@btkmc.com
2   Erik D. Peterson (Bar No. 257098)
    epeterson@btkmc.com
3   BARROWAY TOPAZ KESSLER
     MELTZER & CHECK, LLP
4   580 California Street, Suite 1750
    San Francisco, CA 94104
5   Tel: (415) 400-3000
    Fax: (415) 400-3001
6
7   *Lead Counsel for Plaintiffs*
    *Additional counsel listed on signature page*
8
9
10              UNITED STATES DISTRICT COURT
11              CENTRAL DISTRICT OF CALIFORNIA
12              WESTERN DIVISION
13   WAYMAN TRIPP and SVEN          | Case No. 07-CV-1635-GW (VBK)
14   MOSSBERG, Individually and on  |
     Behalf of all Others Similarly Situated, | **SIXTH AMENDED CLASS**
15                                   | **ACTION COMPLAINT FOR**
16                        Plaintiffs, | **VIOLATIONS OF SECTIONS 10(b)**
                                      | **AND 20(a) OF THE SECURITIES**
17        v.                          | **EXCHANGE ACT OF 1934**
     INDYMAC BANCORP, INC. and       |
18   MICHAEL W. PERRY,               |
                                      | **JURY TRIAL DEMANDED**
19                                   |
                        Defendants.   |
20
21
22
23
24
25
26
27
28

SIXTH AMENDED CLASS ACTION COMPLAINT

1773082.1

Exhibit E, Page 121

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 848

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 3 of 108   Page ID
#:8452
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 2 of 29   Page ID
#:152

● ●

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................... 1

II.     JURISDICTION AND VENUE ................................................................ 7

III.    PARTIES .................................................................................................. 8

IV.     THE COMPANY'S UNDERWRITING CONTROLS WERE
        INADEQUATE OR UNDERMINED BY DEFENDANT PERRY,
        RENDERING DEFENDANTS' PUBLIC STATEMENTS FALSE ............ 8

        A.    Underwriting Background ............................................................. 9

        B.    Facts Supporting a Strong Inference that IndyMac Regularly Overrode
              its Stated Underwriting Practices on a Companywide Basis During the
              Class Period and that Perry was Either Aware of, or Caused,
              the Same ...................................................................................... 11

        C.    Examples of Conduit-Generated 80/20 Piggyback Loans that Suffered
              Early Payment Defaults and Contributed to IndyMac's 2006 Fourth
              Quarter Losses and Losses that Should Have Been Incurred Earlier in
              2005 and 2006 ............................................................................. 24

              1.    Silver State Toxic Loan Pool .............................................. 24

              2.    Lancaster Toxic Loan Pool ................................................. 29

              3.    Geneva Toxic Loan Pool ..................................................... 32

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS ....................................................................................... 37

        A.    2005 Annual Report on Form 10-K ............................................ 37

        B.    2006 First Quarter Form 10-Q ................................................... 39

        C.    April 25, 2006 Conference Call ................................................. 41

        D.    2006 Second Quarter Form 10-Q ............................................... 42

        E.    September 13, 2006 Lehman Brothers Presentation .................... 43

        F.    September 21, 2006 RBC Financial Institutions Conference ....... 49

i

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 849

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 4 of 108   Page ID
#:8452
Case 2:11-cv-02078-RGK-JCG   Document 153   Filed 03/10/11   Page 3 of 29   Page ID
#:153

|  |  |  |  |
|---|---|---|---|
| | G. | 2006 Third Quarter Form 10-Q | 51 |
| | H. | November 2, 2006 Conference Call | 51 |
| VI. | | LOSS CAUSATION/ECONOMIC LOSS | 52 |
| | A. | The Truth About the Company's True Condition Begins to Emerge as Defendants Disclose that Indymac had Saddled Itself with Toxic Loans as a Result of its Poor Underwriting Practices Thereby Causing Substantial Charges and Increased Loan Loss Reserves | 54 |
| | B. | The Truth Continues to Emerge as the Market Learns that Indymac's Loosening of Underwriting Guidelines Caused Indymac's Abysmal Performance | 57 |
| | C. | The Market Learns the Truth About Indymac's Deficient Underwriting Guidelines and Risk Management | 66 |
| VII. | | POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE INSPECTOR GENERAL'S AUDIT REPORT | 66 |
| VIII. | | ADDITIONAL FACTS SUPPORTING DEFENDANTS' SCIENTER | 69 |
| | A. | Perry's Certifications | 69 |
| | B. | Perry's Financial Incentive | 71 |
| IX. | | APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE | 72 |
| X. | | NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS | 73 |
| XI. | | CLASS ACTION ALLEGATIONS | 73 |
| XII. | | FIRST CLAIM: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants | 75 |
| XIII. | | SECOND CLAIM: Violations of Section 20(a) of the Exchange Act Against Perry | 77 |
| XIV. | | PRAYER FOR RELIEF | 77 |
| XV. | | JURY TRIAL DEMANDED | 78 |

ii

1773862.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 850

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 5 of 108  Page ID
#:8454
Case 2:11-cv-02078-RGK -JCG  Document 174  Filed 03/10/11  Page 4 of 29  Page ID
#:154

1        Lead Plaintiffs, Wayman Tripp and Sven Mossberg (collectively,

2   "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly

3   situated, by and through their attorneys, allege the following based upon personal

4   knowledge as to themselves, and information and belief as to all other matters,

5   including an investigation conducted by Plaintiffs' counsel. This investigation

6   included a review and analysis of all filings made with the Securities and Exchange

7   Commission ("SEC") by IndyMac Bancorp, Inc. ("IndyMac" or the "Company")

8   during the relevant time period, as well as securities analyst reports, press releases,

9   media reports and other publications issued by and through the Company and

10  interviews with numerous former employees of IndyMac. Attached as Exhibit "A"

11  is a redlined version of the Fifth Amended Class Action Complaint for Violations

12  of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 showing the

13  substantive changes between it and the Sixth Amended Class Action Complaint for

14  Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

15

16  I.    NATURE OF THE ACTION

17      1.    This is a class action brought by Lead Plaintiffs on behalf of all

18  persons and entities who purchased and/or otherwise acquired common stock of

19  IndyMac from March 1, 2006 through March 1, 2007, inclusive (the "Class

20  Period") and were damaged thereby (the "Class"). Lead Plaintiffs seek to pursue

21  remedies under the Securities Exchange Act of 1934, 15 U.S.C.S. § 78 *et seq.* (the

22  "Exchange Act").

23      2.    Defendant IndyMac is the holding company for IndyMac Bank

24  F.S.B., which operates as a hybrid thrift/mortgage banker (collectively, "IndyMac"

25  or the "Company").

26      3.    From 2001 until 2006, the United States experienced a "bubble" in the

27  housing market resulting in inflated home valuations, and a related refinancing

28

SIXTH AMENDED CLASS ACTION COMPLAINT

1

1773862.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 6 of 108   Page ID
#:8455
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 5 of 29   Page ID
#:155

1   boom. This "bubble" was driven by ever-loosening underwriting standards by

2   mortgage lenders and securitizers such as IndyMac. During this period, IndyMac

3   grew by focusing on utilizing Alt-A, negative/interest only amortizing loans, and

4   other high risk loans. By the third quarter of 2006, IndyMac was a top Alt-A lender

5   with over approximately $49 billion in Alt-A production which represented 77.5%

6   of IndyMac's total origination volume. *See* Zelman Credit Suisse Analyst Report,

7   "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

8       4.    The booming real estate market opened up new opportunities for the

9   Company to deal in higher-risk loans. IndyMac's mortgage production during this

10  time was focused on the adjustable rate mortgage and 80/20 piggyback product

11  mix. Indeed, during the fourth quarter of 2006, IndyMac produced approximately

12  $5 billion of 80/20 piggyback loans, despite the fact that these loans were

13  becoming increasingly risky during this time period. IndyMac was also generating

14  a significant percentage of its loan production from low/no documentation loans

15  (stated income Alt-A loans) now generically referred to as "liars' loans" because

16  they were subject to widespread fraud during the real estate boom.

17      5.    By August, 2006, however, the median price of new homes had

18  dropped by almost 3%, existing home inventories were 39% higher than one year

19  before and sales were down by 10% from the prior year. *See The No Money Down*

20  *Disaster*, Barron's, August 21, 2006. In addition, a significant number of subprime

21  lenders began to close shop during 2006, causing dislocation in the housing

22  market.

23      6.    Notwithstanding the downturn in the real estate market, Defendants

24  portrayed IndyMac as a stable and growing company that would not only weather

25  the bad times facing the mortgage industry, but would emerge from troubling times

26  even stronger. Indeed, even given the negative news hammering the rest of the

SIXTH AMENDED CLASS ACTION COMPLAINT

2

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 7 of 108   Page ID
#:8452
Case 2:11-cv-02078-RGK -JCG   Document 152   Filed 03/10/11   Page 6 of 29   Page ID
#:156

1   mortgage industry, IndyMac boldly touted its operating performance.

2      7.   Defendant Michael W. Perry ("Perry") recognized that in order for

3   IndyMac to continue to grow in difficult times (which he thought 2006 would be),

4   the Company would have to loosen underwriting standards and quickly dispose of

5   risky mortgage loans before borrowers defaulted, by selling them outright or

6   securitizing them and selling them.  The market, however, was unaware of the

7   extent to which Perry had manipulated the Company's underwriting controls, and

8   the exposure it faced from its obligations to buy back bad loans.  Perry's plan, for a

9   time, worked, and by the beginning of the Class Period the Company had a new

10   market share high of 2.5% in the fourth quarter of 2005, and its compound annual

11   growth in mortgage production since the first quarter of 1999 was an astounding

12   44% compared to a mortgage industry average of 8% to 16% for the top five

13   mortgage loan lenders.  Perry and the Company are, collectively, "Defendants."

14      8.   At the same time, Defendants issued numerous materially false and

15   misleading statements concerning, *inter alia*, IndyMac's growth and stability,

16   resulting from the quality and success of the Company's strong internal/operational

17   controls and underwriting.

18      9.   In reality, however, IndyMac's internal/operational controls were

19   grossly deficient.  According to several former IndyMac employees, the

20   Company's management, including Perry, exploited internal/operational control

21   weaknesses or simply overrode controls to drive loan originations and sales

22   growth.  For example, a former IndyMac vice-president states Perry sought to

23   make his short term goals for the Company "at all costs."  To this end, Perry put

24   immense pressure on subordinates to "push loans through," even if it meant

25   consistently making "exceptions" to the Company's guidelines and policies (at the

26   expense of the Company's future).

SIXTH AMENDED CLASS ACTION COMPLAINT

3

1773652.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 853

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 8 of 108   Page ID
#:8454
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 7 of 29   Page ID
#:157

10. Other confidential witnesses ("CWs") – former employees of IndyMac before and during the Class Period – report an atmosphere of "organized chaos" at the Company where loan closings were done on an "anything goes" basis. According to these witnesses, the following practices, which were contrary to stated Company policies, were employed to close loans: (a) intentionally manipulating software used to compute loan eligibility; (b) violating stated rate lock protocols and controls; and (c) disregarding underwriting guidelines generally. Instead, the focus was on growing loans without the required documentation, while reporting fraud or concerns with transactions was *discouraged*. These witnesses, whose statements are detailed below, state that all this occurred with the knowledge and direction of senior management.

11. For a period of time, the Company was able to play "hot potato" with these poor quality loans, selling them off quickly through the securitization market before the borrowers defaulted. However, IndyMac's ability to pass off these "hot potato" loans began to dramatically decline near the end of the Class Period as the secondary market became less liquid and information about IndyMac's lax credit quality practices began to seep into the marketplace. Many of the companies IndyMac sold these loans to promptly returned them to IndyMac pursuant to warranty provisions contained in the respective sale contracts. Thus, IndyMac was stuck with a substantial portion of loans that defaulted quickly and which IndyMac was unable to resell to the secondary market.

12. On January 16, 2007, news began to trickle out from the Company about the adverse impact that Defendants' actions had on IndyMac. On January 16, 2007, IndyMac issued a press release forewarning of a substantial earnings shortfall caused by credit losses and increases in provisions for loss reserves as a result of the Company's impaired loans. As a result, and for the first time, the

SIXTH AMENDED CLASS ACTION COMPLAINT

4

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 854

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 9 of 108   Page ID
#:8459
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 8 of 29   Page ID
#:158



public began to understand the precarious condition of IndyMac's operations as
evidenced by, for example, an analyst downgrading IndyMac shortly after the
January 16, 2007 Press Release.

13.   IndyMac's January 16, 2007 partial disclosure caused its stock to
tumble to $40.50 at close, down from $43.55 at close on January 12, 2007 (the
prior trading day).

14.   On January 25, 2007, Defendants issued a press release (the "January
25, 2007 Press Release"), which informed the market that the Company had not
met its forecasted results for the fourth quarter of 2006, primarily because the
Company doubled its credit reserves from the previous quarter to cover the
massive number of defaults on the loans it had underwritten.

15.   Also on January 25, 2007, the Company revealed that several of the
business areas Defendants had touted as its strongest virtues were, in actuality,
profoundly weakened and impaired, and that the Company experienced a
substantial negative financial impact as a result of losses from bad/uncollectible
loans held by the Company.  Specifically, IndyMac admitted that "Higher credit
mark-to-market losses in Q4 06 were concentrated in the prime 80/20 and
subprime products."  As described fully below, IndyMac purchased a significant
amount of 80/20 piggyback loans from third-party brokers through its Conduit
Division that suffered a severe rate of early payment defaults before and during the
Class Period (see discussion of Silver State-, Geneva- and Lancaster-originated
loans, at ¶¶85-115).  In addition, the OIG Audit Report severely criticized
IndyMac's reckless interactions with conduit lenders and underwriting of 80/20
piggyback loans.  (See ¶¶35-42, 204-208 below.)

16.   Perry added that IndyMac's supposedly superior internal/operational
controls were insufficient in a conference call with investors that coincided with

SIXTH AMENDED CLASS ACTION COMPLAINT

5

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 855

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 10 of 108   Page ID
#:8459
Case 2:11-cv-02078-RGK -JCG   Document 19-4   Filed 03/10/11   Page 9 of 29   Page ID
#:159

1   the January 25, 2007 disclosures. For example, Perry admitted that, "[o]ur
2   provision for loan losses is increasing. . . Credit quality generally is deteriorating
3   so I would say that's something we have to do a better job forecasting, and clearly
4   we want to be a little more conservative as it relates to that... This is something we
5   should have done a better job forecasting on. This is something that we probably
6   could have seen better if we had more precise models . . ."

7      17.   IndyMac's January 25, 2007 partial disclosure caused its stock to
8   tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

9      18.   The full truth regarding the Company's condition and Defendants'
10  Class Period statements was revealed on March 1, 2007, when Defendants issued a
11  press release entitled "IndyMac Issues 2006 Annual Shareholder Letter, Updating
12  2007 Forecast" (the "March 1, 2007 Press Release"). In the March 1, 2007 Press
13  Release, Perry *admitted that the Company had "loosened its lending standards"*
14  during 2006, and promised that the Company would be, going forward, "smart and
15  prudent" in managing its underwriting guidelines and risk.
16
17     19.   IndyMac's March 1, 2007 corrective disclosure, which disclosed the
18  Company's true condition, caused its stock price to fall to $32.16 at close, down
19  from $34.33 on February 28, 2007 and a far cry from the Class Period high of
20  $50.11 on May 8, 2006.

21     20.   On July 8, 2008, the FDIC seized IndyMac and subsequently fired
22  Perry and the Company's other senior management. As a result, the FDIC will
23  have suffered losses of approximately $10.7 *billion* dollars.

24     21.   On February 26, 2009, the Office of Inspector General ("OIG"),
25  Department of the Treasury announced the results of its investigation of IndyMac's
26
27
28

SIXTH AMENDED CLASS ACTION COMPLAINT

6

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 11 of 108   Page ID
#:8460
Case 2:11-cv-02078-RGK -JCG   Document 104   Filed 03/10/11   Page 10 of 29   Page ID
#:160

1  demise in an Audit Report (the "Audit Report"),[1] finding, *inter alia*, that the

2  "underlying cause of [the Company's] failure was the unsafe and unsound manner

3  in which the thrift was operated" and that the Company was well aware of material

4  deficiencies in the Company's underwriting controls before, during, and after the

5  Class Period.

6

7  II.      JURISDICTION AND VENUE

8          22.     The claims asserted herein arise under and pursuant to Sections 10(b)

9  and 20(a) of the Exchange Act (15 U.S.C. §§ 78(j)(b) and 78(t)), and Rule 10b-5

10  promulgated there-under (17 C.F.R. § 240.10b-5).

11         23.     This Court has jurisdiction over the subject matter of this action

12  pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331(b).

13         24.     Venue is proper in this Judicial District pursuant to § 27 of the

14  Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and

15  transactions alleged herein, including the preparation and dissemination of

16  materially false and misleading information, occurred in substantial part in this

17  Judicial District.  Additionally, the Company maintains its principal executive

18  office in this Judicial District.

19         25.     In connection with the acts, conduct and other wrongs alleged in this

20  Complaint, Defendants, directly or indirectly, used the means and instrumentalities

21  of interstate commerce, including but not limited to, the United States mails,

22  interstate telephone communications and the facilities of the national securities

23  exchange.

24

25

26  _____

27  [1] Plaintiffs filed a true and correct copy of the Audit Report with the Court on
March 3, 2009 as Exhibit A to the Declaration of Andy Sohrn in Support of
28  Plaintiffs' Opposition to Defendant Perry's Supplemental Motion to Strike
Allegations in the Third Amended Complaint.  (Dkt. Item No. 149)

SIXTH AMENDED CLASS ACTION COMPLAINT

7

1773662.1

Exhibit E, Page 130

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 857

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 12 of 108   Page ID
#:8461
Case 2:11-cv-02078-RGK -JCG   Document 1-4    Filed 03/10/11   Page 11 of 29   Page ID
#:161

## III.       PARTIES

**Plaintiffs**

26.     Lead Plaintiffs, as set forth in their certifications previously filed with
the Court and incorporated by reference herein, purchased IndyMac stock at
artificially inflated prices during the Class Period and have suffered damages as a
result of the wrongful acts of Defendants as alleged herein.

**Defendants**

27.     IndyMac was, at all relevant times, the seventh largest savings and
loan and the second largest independent mortgage lender in the nation, maintaining
its principal executive offices at 888 East Walnut Street, Pasadena, California,
91101.  As of December 31, 2006, IndyMac reported total assets of over $29
billion and a market capitalization of $3.2 billion.

28.     Perry was, at all relevant times, Chairman of IndyMac's Board of
Directors and Chief Executive Officer of IndyMac.  Perry is a Master Certified
Mortgage Banker, as designated by the Mortgage Bankers Association, and is a
Certified Public Accountant.  Prior to working in the mortgage industry, Perry
spent four years as an auditor with KPMG Peat Marwick.  Perry reviewed,
approved and signed IndyMac's false and misleading SEC filings, including the
2005 Form 10-K and all 2006 Form 10-Qs, and issued numerous other false and
misleading public statements during the Class Period.

## IV.      THE COMPANY'S UNDERWRITING CONTROLS WERE INADEQUATE OR UNDERMINED BY DEFENDANT PERRY, RENDERING DEFENDANTS' PUBLIC STATEMENTS FALSE

29.     During the Class Period, the Company, directed by defendant Perry,
engaged in a pattern and practice of overriding and abandoning its own loan
underwriting guidelines, approving substantial numbers of high-risk loans for the
purpose of increasing reported loan volume.  IndyMac's significant departure from

SIXTH AMENDED CLASS ACTION COMPLAINT

8

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 858

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 13 of 108   Page ID
#:8462
Case 2:11-cv-02078-RGK -JCG   Document 194   Filed 03/10/11   Page 12 of 29   Page ID
#:162

1  its own loan underwriting guidelines was facilitated by the Company's grossly

2  deficient underwriting and auditing controls, exposing the Company to a vast

3  amount of undisclosed risk – a risk further enhanced by IndyMac's practice of

4  approving these loans with little or no documentation from borrowers ("stated

5  loans" or "liars' loans").  Defendants failed to disclose the true condition of the

6  Company's business, and misled the public with regard to the rigor of IndyMac's

7  loan origination process and the quality of its loans.

8      30.    As a result of the foregoing problems, Plaintiffs allege that the

9  Company's Class Period statements regarding internal/operational controls and

10  underwriting practices were false when made.  Plaintiffs further allege that Perry

11  either knew of, or was reckless in not knowing of, the foregoing problems *or*

12  actually caused those problems, himself.

13

14      A.    **Underwriting Background**

15      31.    Before discussing Perry's conduct and knowledge, it is first necessary

16  to discuss underwriting in general, how/where IndyMac acquired the loans it

17  underwrote, and how the Company underwrote those loans.

18      32.    Underwriting in the context of mortgage lending should consist of a

19  detailed analysis of a borrower's creditworthiness.  When underwriting a mortgage

20  loan, an issuer should analyze credit information furnished by the potential

21  borrower (such as employment and salary information) in conjunction with

22  information provided from outside sources (such as agency credit reports and

23  scores).  IndyMac uses a software program called "e-MITS" to assist in this

24  process, which computes interest rates based on information such as the above (as

25  entered).

26      33.    Accurate underwriting is essential to the success of any business

27  extending loans, including mortgage companies such as IndyMac because, without

28

SIXTH AMENDED CLASS ACTION COMPLAINT

9

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 859

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 14 of 108   Page ID
#:8463
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 13 of 29   Page ID
#:163

1  accurate underwriting, a company cannot (i) evaluate how likely a loan is to be

2  repaid; (ii) attach a particular interest rate to a loan based on creditworthiness; or

3  (iii) accurately price the loan for sale in the secondary market.

4      34.    IndyMac acquired mortgages principally through four channels:

5  mortgage professionals, consumer direct, correspondents and conduits.

6          (a)    Mortgage professionals include mortgage brokers, mortgage

7  bankers, financial institutions, and homebuilders who have taken applications

8  from prospective borrowers and submitted them to IndyMac. Eighty-six percent

9  of IndyMac's loans were derived from mortgage professionals in 2006. IndyMac

10  2006 Form 10-K filed on March 1, 2007 (the "2006 10-K") at 7.

11          (b)    Correspondent channel loans are obtained through mortgage

12  brokers, mortgage bankers, financial institutions, and homebuilders who sell

13  previously funded mortgage loans to IndyMac. They are a sub-section of the

14  mortgage professional channel of loans, as disclosed in IndyMac's 2006 10-K.

15  Eleven percent of IndyMac's mortgage loan business came from this channel.

16  Derived from 2006 10-K at 40.

17          (c)    Conduit procurement is where IndyMac acquires pools of

18  mortgage loans in negotiated transactions either with the original mortgagee or an

19  intermediate owner of mortgage loans.[2] They are a sub-section of the mortgage

20  professional channel of loans, as disclosed in IndyMac's 2006 10-K. Thirty-three

21  percent of IndyMac's mortgage loan business came from this channel. Derived

22  from 2006 10-K at 40.

23

24

---

25     [2] IndyMac approved each of the above-described mortgage loan sellers prior to
26  the initial transaction on the basis of the seller's financial and management
   strength, reputation and prior experience. According to IndyMac, sellers were
27  periodically reviewed and if their performance, as measured by compliance with
   the applicable loan sale agreement, was unsatisfactory, IndyMac would cease
28  doing business with them.

SIXTH AMENDED CLASS ACTION COMPLAINT

10

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 860



1    (d)    Consumer direct involves mortgage loans initiated through

2  direct contact with the borrower. This contact may arise from Internet advertising

3  and IndyMac web site traffic, affinity relationships, company referral programs,

4  realtors and retail banking branches, located mostly in Southern California. Only

5  2% of IndyMac's mortgage loan business was derived from this channel. Derived

6  from 2006 10-K at 40.

7

8    **B.    Facts Supporting a Strong Inference that IndyMac Regularly**
        **Overrode its Stated Underwriting Practices on a Companywide**

9    **Basis During the Class Period and that Perry was Either Aware**
        **of, or Caused, the Same**

10

11    35.    IndyMac's undisclosed loosening of its underwriting guidelines

12  saddled the Company with substantial amounts of high-risk loans, such as 80/20

13  piggyback and conduit channel loans.

14    36.    As confirmed in the OIG Audit Report at page 2: "IndyMac's

15  business model was to offer loan products to fit the borrower's needs, using an

16  extensive array of risky...subprime loans, 80/20 loans, and other nontraditional

17  products. Ultimately, loans were made to many borrowers who simply could not

18  afford to make their payments." As detailed in the Audit Report at page 12, the

19  risks associated with 80/20 piggyback loans were further compounded by

20  IndyMac's deficient appraisal process by which IndyMac assigned inflated values

21  to the underlying properties.

22    37.    Further, "[t]o increase loan production, IndyMac relied heavily on

23  outside mortgage brokers to originate loans." (Audit Report at 21) "This became

24  such a large part of IndyMac's operations that a separate unit, the Conduit

25  Division, was set up to purchase loans in bulk from other loan originators" (*Id.*)

26    38.    IndyMac's Conduit Division grew significantly and quickly, from

27  generating under $3 billion in loans in 2003, to generating *nearly $30 billion* in

28

SIXTH AMENDED CLASS ACTION COMPLAINT

11

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 861



1   loans at its peak in 2006.  (Audit Report at 22)

2       39.    However, reliance on outside mortgage brokers carried with it higher

3   credit risks as conduit channel loans were particularly prone to underwriting

4   deficiencies.  IndyMac was aware of such problems as early as 2005, when

5   IndyMac's internal audit group reported problems with the Conduit Division.

6   [Audit Report at 22]  "Specifically, because of concerns the [audit] group had in

7   the [conduit] division's loan approval and underwriting process, it recommended

8   that the division increase investment in infrastructure and personnel."

9       40.    Indeed, in 2006, IndyMac's independent auditor also expressed

10  concerns with the Conduit Division being "a financial reporting control

11  deficiency."  The independent auditor also recommended that the conduit division

12  "strengthen controls."

13      41.    Ultimately, IndyMac's problematic Conduit Division and the deficient

14  loans originated thereby led to the Office of Thrift Supervision ("OTS") citing

15  "major weaknesses" in its review on January 8, 2007.  (Audit Report at 23, 67-68)

16  The OTS specifically stated that IndyMac must, *inter alia*, "[e]nsure the Conduit

17  Division corrects the internal audit findings…and ensure the Division is operating

18  in a strong internal controls environment… [and have] the Division [] develop

19  more robust, transparent management reports"; and "[e]stablish a policy and

20  related procedures for the identification and classification of troubled collateral

21  dependent loans."  (*Id.* at 67)

22      42.    Shortly after the OTS review, IndyMac belatedly recognized that

23  losses were occurring from the Conduit Division and closed it.  (*Id.* at 23)

24      43.    Confidential Witness Number 1 ("CW 1") is a former Vice President

25  of the Company's Central Banking Group.  CW 1 reported directly to Ashwin

26  Adarkar ("Adarkar"), Executive Vice President, Chief Executive Officer, New

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

12

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 862

1  Business Incubation, Organizational Effectiveness and Mergers and Acquisitions.
2  As such, Adarkar's duties included "operating new or underperforming
3  businesses." March 23, 2007 Proxy at 6.  Adarkar reported directly to defendant
4  Perry. CW 1 was employed at IndyMac from October, 2004 through March, 2006.
5  CW 1 was directly involved in supervising many aspects of the Company's
6  underwriting activities, and had regular contact with the most senior managers and
7  officers of the Company.  CW 1 described in detail the many problems in the
8  Company's underwriting guidelines, policies, and controls.
9      44.  According to CW 1, Adarkar was directly pressured by his/her
10 superiors, including Perry, to "push loans through" regardless of whether they
11 satisfied the Company's underwriting guidelines.  Adarkar passed on these orders
12 to CW 1, and his/her subordinates, who were actually instructed to abandon
13 approval guidelines and "push all loans through for approval which came in the
14 door."
15
16     45.  CW 1 explained that in pushing the loans through, the Company did
17 not officially "change" the Company's underwriting guidelines and policies, but
18 rather, institutionalized "exceptions to the rules" that allowed the Company to
19 approve loans that should have been denied under the actual guidelines.  According
20 to CW 1, the exceptions were made across the board, for all classes of loans
21 (prime, Alt-A, and sub-prime, as discussed in detail, below).  CW 1 stated that
22 most of the exceptions were made in reporting the borrower's stated income/assets.
23     46.  Confirming the statements of other CW's, CW 1 explained that many
24 of the exceptions occurred despite the Company's much vaunted e-MITS system
25 (described above at ¶32), which was supposed to prevent gaming of the
26 Company's underwriting guidelines.  The problem, however, was that e-MITS was
27 a "junk-in, junk-out" system that was only as good as the information it was
28

SIXTH AMENDED CLASS ACTION COMPLAINT

13

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 863

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 18 of 108  Page ID
#:8467
Case 2:11-cv-02078-RGK -JCG   Document 194   Filed 03/10/11  Page 17 of 29  Page ID
#:167

1   provided.  That is, if underwriters wanted approval for a loan that did not satisfy
2   the Company's underwriting guidelines, they would simply need to input
3   information that was not reflective of the borrower's true characteristics and e-
4   MITS would provide approval based on the false information entered by the
5   underwriter.  As noted, above, this conduct was engaged in at the direction of
6   Adarkar, who passed along the orders of defendant Perry and other senior
7   managers.
8       47.    In addition to violating the Company's underwriting guidelines, CW 1
9   stated that the Company's Central Banking Group regularly and as a matter of
10  course violated the Company's controls over loan production by prematurely (and
11  improperly) funding loans to meet production and revenue goals.  CW 1 raised this
12  issue with Adarkar, and the Central Banking Group was "written up" by the
13  Company's Compliance Department, to no avail.
14      48.    Similarly, according to CW 1, defendant Perry directed Adarkar (and
15  thus, the Central Banking Group) to engage in violations of the Company's "rate
16  lock" protocols and controls.  Essentially, a rate lock is a commitment by a lender
17  guaranteeing a specified interest rate for a specified period of time.  Here, once a
18  rate-lock expired rather than re-pricing the terms of a loan to account for
19  fluctuations in the credit market, the Company allowed the loans to proceed on the
20  now-expired prior terms.  As a result, the customer was able to capture the gains
21  associated with the prior (lower) rate to the detriment of the Company.  This was a
22  problem because it drastically impacted the profitability of loans on the back-end
23  *but appeared to have no impact on the front end.*  Thus, the Company was able to
24  achieve revenue and volume targets in the short-run, while exposing itself to
25  tremendous losses on the back end of the loan.
26      49.    According to CW 1, the Company engaged in these practices at the

SIXTH AMENDED CLASS ACTION COMPLAINT

14

1773862.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 19 of 108   Page ID
#:8468
Case 2:11-cv-02078-RGK -JCG   Document 194   Filed 03/10/11   Page 18 of 29   Page ID
#:168

 

1   express behest of defendant Perry (again through Adarkar) so that the Company

2   could make its short term goals "at all costs."

3       50.   Finally, CW 1 stated that direct fraud and "lying" by loan sales

4   representatives was rampant at IndyMac. Specifically, loan sales representatives

5   solicited "fraudulent" letters from CPAs in connection with the purported

6   verification of customer income. CW 1 stated that it was obvious that the letters

7   were fraudulent, and that he/she repeatedly reported the fraud to Adarkar and that

8   though upper management, including defendant Perry, was aware of this fraud (and

9   the other underwriting fraud), they nonetheless continued to pressure employees to

10  "close loans at all costs."

11      51.   According to CW 1, every time he/she complained about the fraud, or

12  attempted to institute a review committee to control the fraud, his/her efforts were

13  rebuffed by upper management.

14      52.   Confidential Witness Two ("CW 2") was an underwriter for IndyMac

15

16  from March, 2005 until June 30, 2007. In this position, CW 2 was responsible for

17  writing and reviewing loan applications.

18      53.   According to CW 2, loan originations increased significantly during

19  his/her tenure at the Company. CW 2 directly attributed this increase to relaxed

20  underwriting guidelines and the closing of "questionable deals."

21      54.   CW 2 stated that when he/she first started at IndyMac, there was a

22  very strict environment regarding loan originations; however, toward the end of

23  his/her employment, this had evolved into "organized chaos" that was little more

24  than a "free-for-all" where "anything goes" to get a loan closed.

25      55.   These changes were expressly mandated by IndyMac's senior

26  management to drive loan origination volume. CW 2 stated underwriters were

27  encouraged by management to "push through loans" that normally would not be

28

SIXTH AMENDED CLASS ACTION COMPLAINT

15

1773962.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 865



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 19 of 170   Page ID #:12973

1    closed.  During the origination process, all loans that were not closed and

2    processed because of borrower qualification issues had to be reported to

3    management.  Management was consistently giving the "green light" on loans that

4    CW 2 would not have closed.  For example, if a loan was submitted based on

5    income, and income could not be verified, managers would look to verify bank

6    account balances.  Even if the source of funding for the balance in the bank

7    account could not be verified, managers would try to use unsubstantiated bank

8    account balances as verification of income.  CW 2 also noted that appraisal values

9    were adjusted in order to "make the loan work."

10       56.    CW 2 stated that, in several instances, management overturned his/her

11   decision to not approve a loan, which CW 2 documented in his/her "working

12   notepad field" in e-MITS.

13       57.    According to CW 2, as a result of lax underwriting guidelines and bad

14   loan push-throughs, loan delinquencies had increased significantly at IndyMac by

15   mid-2006.

16       58.    Further according to CW 2, the increases in bad loans and push

17   throughs is not surprising, as the Company directly rewarded underwriters and

18   managers with bonuses for reaching loan origination targets.  That is, underwriters

19   were issued bonuses one month after loan targets were reached without regard to

20   whether the loans ultimately ended in default.  This Company policy incentivized

21   the issuance of loans without regard to quality or the creditworthiness and

22   encouraged "making deals work" that should not have worked, according to CW 2.

23       59.    Confidential Witness Number Three ("CW 3") is a former Vice

24   President and Director of Financial Institutions, Correspondent Lending, in

25   IndyMac's Mortgage Banking Segment.  CW 3 was employed by IndyMac from

26   July, 2003 until January, 2006, and was directly responsible for (i) designing and

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

16

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 21 of 108   Page ID
#:8470
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 20 of 29   Page ID
#:170



1   implementing sales and marketing for IndyMac's business loan division; and (ii)

2   overseeing loan production and acquisition for the Company's Correspondent

3   Lending Department.  Although CW 3 left IndyMac at or about the beginning of

4   the Class Period, his/her statements are particularly germane, in that they detail the

5   many problems that were, by the beginning of the Class Period, already impairing

6   the Company's ability to underwrite its loans effectively.

7        60.    According to CW 3, by the beginning of the Class Period, due to its

8   desire to keep up with the rest of the players in the industry, IndyMac had been

9   forced to become extremely aggressive with its underwriting guidelines.

10  Specifically, to keep pace with competitors in terms of loan origination volume, by

11  the time CW 3 left IndyMac in January 2006, the Company had greatly loosened

12  its underwriting guidelines in order to drive volume and bring in more loan sales

13  (as noted by the other CWs).

14

15       61.    Additional witnesses confirm the change in the Company's focus,

16  explain how the Company "loosened" its underwriting quality guidelines, and

17  expound on the impact thereof.

18       62.    Confidential Witness Four ("CW 4") is a former IndyMac Senior

19  Auditor, Post Purchase Quality Control, Central Mortgage Operations, who

20  worked for the Company from December 1, 2003, through July 19, 2007.  CW 4

21  was responsible for reviewing loan delinquencies for fraud or misrepresentations in

22  the documents, and determining whether the loan's underwriting comported with

23  IndyMac's guidelines, policies and procedures.  Prior to being promoted to Senior

24  Auditor, CW 4 was a Senior Underwriter with IndyMac, and is intimately familiar

25  with all aspects of the Company's loan underwriting.

26       63.    According to CW 4, throughout the Class Period, CW 4 saw an

27  increasing number of loans that appeared to have been issued only through

28

SIXTH AMENDED CLASS ACTION COMPLAINT

17

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 867



1  fraudulent or misrepresented documentation. He/she also saw a substantial
2  increase in the number of loan delinquencies. CW 4 stated that this increase
3  represented an increase in the number of defaults attributable to misrepresentations
4  and fraud in the loan applications, not in the number of "straight default" cases
5  (which are typically caused by a change in circumstance, such as divorce or change
6  in employment status). CW 4 stated that the increase of loans in default because of
7  misrepresentations in the origination process was due to relaxed underwriting
8  guidelines, and approvals of borderline loans on the front end. That is, loans were
9  being approved to individuals with insufficient or false documentation for the loans
10 that they were seeking *because* the underwriting guidelines had been relaxed.
11      64.    This is confirmed by Confidential Witness Five ("CW 5"), who was
12 an Investigator, Fraud Investigation Department, Post Purchase Quality Control,
13 Central Mortgage Operations, at IndyMac from December 2004 until July 17,
14 2007. In this position, CW 5 investigated loans suspected of being delinquent due
15 to fraud and reported his/her findings to management.
16      65.    According to CW 5, during the Class Period, the quality of the loans
17 originated became a running joke within the Company. In particular, certain loans
18 with deficient documentation or that were issued to borrowers unable to pay them
19 back became known as "Disneyland Loans." These loans were called Disneyland
20 Loans, referring to a loan issued to a Disneyland *cashier* who claimed in his/her
21 application that he/she earned $90,000 per year – a proposition that, on its face,
22 belies logic and even common sense given prevailing wage rates for retail cashier
23 operators. As another example of a particularly egregious "Disneyland Loan," CW
24 5 related the story of a $500,000 loan that was issued for "swamp lands" in Florida,
25 to a 26 year old first time home buyer with a reported income of $26,000 per year
26 and $15.00 in a bank account.
27
28

SIXTH AMENDED CLASS ACTION COMPLAINT

18

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 868



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 22 of 170   Page ID #:12976

66.   Stated income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had the Company so desired. IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506T. When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided the Company with IRS Form 4506T, Perry was evasive and non-responsive. Indeed, studies have confirmed that upwards of 90% of stated income loan buyers inflated their purported income by 5% or more, and as much as 60% of stated income buyers exaggerated their stated income by over 50%. *See* "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April, 2006.

67.   As a result of the loosened underwriting guidelines, the Company's default rates skyrocketed during the Class Period. Confidential Witness Six ("CW 6"), was a Senior Loan Processor, Investigation Unit, Post Purchase Quality Control, Central Mortgage Operations at IndyMac from August 10, 2003 until October, 2006, and responsible for researching loan transactions.

68.   According to CW 6, the number of loans being examined by the Company increased by 1500% from 2003 to mid-2006. Specifically, according to CW 6, his/her department was responsible for reviewing 10% of the loans originated by IndyMac each month. In 2003, this translated to approximately 60 loans per month. By October, 2006, CW 6's department was reviewing approximately 900 loans per month.

69.   The drastic increase in defaulted loans was at its worst during the Class Period. CW 6 stated the number of delinquent loans at IndyMac tripled by October, 2006. According to CW 6, this increase was the result of misrepresentations and fraud that were occurring at the "front end" of the loan

SIXTH AMENDED CLASS ACTION COMPLAINT

19

1773062.1

Exhibit E, Page 142

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 869

 

1  originations. Thus, had the Company's underwriting guidelines been stricter, this
2  drastic increase would not have occurred.

3      70.    The above problems were exacerbated by IndyMac management.  In
4  particular, the number of unqualified loans increased so drastically (as a direct
5  result of management's direction) that underwriters began "pushing through"
6  unqualified loans to maintain origination volume.  The Company's policy of
7  "pushing through" unqualified loans evidences a Company-wide knowledge of
8  IndyMac's underwriting problems. *See supra* ¶¶44-45, 55.

9      71.    In addition to the above direct evidence of the origination of bad loans
10  and loose underwriting guidelines, and defendant Perry's actual knowledge
11  thereof, IndyMac (as discussed below) was forced, under warranty agreements, to
12  repurchase substantially increased numbers of loans (now in default) that it had
13  previously sold on the secondary market.  The repurchases resulted in a
14  corresponding decrease in net income as the Company was, in effect, giving back
15  revenue.
16
17      72.    By way of background, according to CW 4, once a loan was
18  originated, it was immediately packaged with other loans and sold on the
19  secondary market. For example, during the second quarter of 2006, IndyMac sold
20  97% of the mortgage loans it produced.  During that quarter, IndyMac had
21  mortgage production of $20.06 billion and sold off $19.415 billion of those loans.
22  By contrast, in the third quarter of 2006, IndyMac was suddenly only able to sell
23  81% of its mortgage production.  During that quarter, IndyMac had mortgage
24  production of $23.968 billion and sold $19.508 billion of those loans. According to
25  Perry, IndyMac makes representations and warranties on all loans sold into the
26  secondary market, "just like a manufacturer of an automobile would make
27  warranty reps on a car," *See* April 25, 2006 Conference Call at 11.  When a loan
28

SIXTH AMENDED CLASS ACTION COMPLAINT

20

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 870

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 25 of 108  Page ID
#:8474
Case 2:11-cv-02078-RGK -JCG   Document 174   Filed 03/10/11   Page 24 of 29   Page ID
#:174



1  that it has sold is deficient, IndyMac repurchases it.  These repurchases are called
2  "kickbacks."
3      73.    According to CW 2, during his/her employment, the number of
4  "kickbacks" from the secondary market increased drastically.  In an effort to
5  "cushion the blow" of these kickbacks, IndyMac initiated a "special project" on the
6  weekends in 2006.  According to CW 2, underwriters would receive a list of loans
7  that IndyMac had to repurchase after the loan had been previously sold on the
8  secondary market. Underwriters would then have to rework the loan and "make it
9  work" so that it could be bundled and sold again in the secondary market.  The
10  underwriters involved in the "special project" aggressively did what they could to
11  make the loans "work," according to CW 2.  For example, in instances where the
12
13  loan had defaulted and been kicked back because of lack of income verification,
14  underwriters would go to a website provided by IndyMac, such as
15  www.salary.com, and try to obtain a more favorable "average national salary" for
16  the borrower based on the data found on such websites for those positions.
17      74.    Further, underwriters were receiving loans that already had been
18  closed by other underwriters at the Company; therefore, the underwriter trying to
19  fix particular loans was not familiar with their details.  Additionally, when
20  underwriters received loan data, they did not receive the entire loan application;
21  only the portions that were deficient.  Therefore, there was no documentation
22  pertaining to the other data provided by the borrower – eliminating underwriters'
23  ability to cross-check borrower reported information.
24      75.    CW 5 confirms the Company's "special projects." According to CW
25  5, some of the loans rewritten by the underwriters were resold, and the remaining
26  loans were channeled to his/her department, so those employees could also try to
27  "make [them] work."
28

SIXTH AMENDED CLASS ACTION COMPLAINT

21

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 26 of 108   Page ID
#:8475
Case 2:11-cv-02078-RGK -JCG   Document 14   Filed 03/10/11   Page 25 of 29   Page ID
#:175





76.    Defendants knew or were deliberately reckless in not knowing about these problems. The implications on the company were devastating. During 2005, IndyMac was forced to repurchase $106 million worth of kicked-back deficient loans from the secondary market. In 2006, the value of kicked-back loans climbed to $167 million – an increase of over 50% in less than a year. Most striking, however, is that during the *first quarter* of 2007 IndyMac repurchased $224 million worth of loans from the secondary market – clear evidence that the loans issued during the Class Period were grossly deficient as a result of the Company's decision to grossly loosen its underwriting guidelines and controls.

77.    In addition to the problems with the Company's underwriting controls, the Company's controls over the accuracy of financial reporting were also deeply flawed.

78.    For example, CW 5 states that even the Company's former Vice President of the Fraud Investigation Department, Michelle Leigh, was pressured by upper management not to report fraud. According to CW 5, Leigh's superior, Michelle Minier, in one case, expressly requested that Leigh make changes to a monthly report that Leigh felt did not accurately depict the loan pipeline. Despite Leigh's protest, the report was subsequently sanitized. Michelle Minier is Executive Vice President, Chief Executive Officer and Vice Chairman of Financial Freedom, wholly-owned by IndyMac. As such, she reports to defendant Perry.

79.    As was the case with the bonus structure for managers and underwriting, IndyMac's auditors' bonus structure also dissuaded the detection of fraud. Auditor bonuses were based on the number of loans reviewed, not the number of fraudulent findings found. Thus, according to CW 5, IndyMac rewarded more work, but not the detection of fraud. This, of course, encouraged workers to simply review, in a cursory fashion, potentially fraudulent loans.

SIXTH AMENDED CLASS ACTION COMPLAINT

22

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 872

80.   Confidential Witness Number Seven ("CW 7") is a former Business Development Manager, Broker & Emerging Banker at IndyMac. CW 7 was employed by IndyMac from 2004 through the beginning of 2008, and *had direct contact with Perry*.

81.   CW 7 confirms the statements of the other confidential witnesses regarding the problems with IndyMac's underwriting controls. CW 7 also offered additional detail regarding the nature of the violations of the Company's underwriting guidelines. In particular, CW 7 stated that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs. This statement stands in stark contrast to those of defendant Perry who, as noted at ¶166, expressly and publicly stated during the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call that "typically on full doc borrowers we ask them to provide W-2s and pay stubs."

82.   CW 7's statement demonstrating the falsity in Perry's statement that "typically on full doc borrowers we ask them to provide W-2s and pay stubs" is further confirmed by an internal Indymac document entitled "NonPrime Lending, Indymac Nonprime...Offering Unique Mortgage Solutions for Everyday Situations," last updated on February 13, 2006, which states: **"Indymac NonPrime will accept a Verification of Employment for a full documentation loan with no pay stubs or W2s needed!"** (Bold in original.)

83.   As described in ¶¶204-209 below, the 2009 Audit Report from the Office of Inspector General, Department of the Treasury, confirms the testimony of the CWs noted above.

84.   In addition to the statements of the confidential witnesses, a number of lawsuits filed by (and against) reveal the Company's knowledge that loans it had

SIXTH AMENDED CLASS ACTION COMPLAINT

23

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 873

underwritten were defaulting at rates as high as 97% in 2006, and 90% in 2005. In particular, shortly before, during and after the Class Period, IndyMac was involved in litigation with mortgage bankers, appraisers, and others that alerted Defendants to the weaknesses in the Company's loan underwriting practices and internal/operational controls. This litigation and/or the underlying facts thereto were red flags to Defendants of IndyMac's vulnerability to widespread loan origination and appraisal fraud, as well as strong warnings that IndyMac needed to tighten its credit quality control practices.

C. **Examples of Conduit-Generated 80/20 Piggyback Loans that Suffered Early Payment Defaults and Contributed to IndyMac's 2006 Fourth Quarter Losses and Losses that Should Have Been Incurred Earlier in 2005 and 2006**

1. **Silver State Toxic Loan Pool**

85. As one dramatic example, IndyMac Bank sued a mortgage broker, Silver State Mortgage ("Silver State"), alleging that Silver State breached its warranties and obligations to IndyMac concerning 35 out of a pool of 36 loans sold to IndyMac in 2005 and 2006. This action is styled *IndyMac Bank, F.S.B. v. Silver State Mortgage*, No. 07-CV-00405 (D. Nev. Mar. 29, 2007)(complaint filed).

86. Pursuant to the *Silver State* complaint, as alleged by IndyMac, thirty-five (35) of those borrowers either "*did not make their first payment* after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Silver State loans"). *Id.*, at ¶12 (emphasis added). As such, Silver State was obligated under its agreement with IndyMac to repurchase each such distressed loan within *thirty* (30) days of receiving IndyMac's notice of default. *Id.* at ¶7.

87. Mortgage companies typically use such early payment default ("EPD") by delinquent borrowers as a proxy for fraud. Industry trade associations

SIXTH AMENDED CLASS ACTION COMPLAINT

24

**Exhibit E, Page 147**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 874

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 29 of 108   Page ID
#:8478
Case 2:11-cv-02078-RGK -JCG   Document 1-4   Filed 03/10/11   Page 28 of 29   Page ID
#:178

1    and regulators have examined early payment default statistics to ascertain the type
2    and extent of mortgage fraud.  The Mortgage Bankers Association ("MBA") has
3    utilized the Mortgage Asset Research Institute, Inc. ("MARI") to analyze and
4    compile data regarding mortgage fraud.  For instance, the Sixth Periodic Report to
5    the MBA noted that early payment default indicates possible fraud, and compiled
6    statistical data on early payment default by state and metropolitan area (available at
7    www.mari-inc.com/pdfs/mba/MBA6thCaseRpt.pdf).  William Matthews, MARI's
8    vice president and general manager, reiterated this in his testimony before the
9    United States House of Representatives Subcommittee on Housing and
10   Community Opportunity (available at www.financialservices.house.gov/media/
11   pdf/100704wm.pdf).
12
13        88.    Early payment defaults are telling indicators of double selling, equity
14   skimming and/or straw borrowers.  One of the easiest mechanisms to track the
15   performance and credibility of brokers is to monitor first payment and early
16   payment default.  The presence of early payment defaults should be taken as a red
17   flag that brokers/correspondents are not underwriting in a careful manner and may
18   be potentially falsifying information themselves.
19        89.    Nonetheless, according to the *Silver State* complaint, it was not until
20   August 30, 2006 – *i.e.*, well into Q3 2006 – that IndyMac first demanded that
21   Silver State make good on its repurchase obligations.  *Id.*, at ¶13.  Silver State,
22   however, breached its obligations and refused to repurchase the early defaulting
23   Silver State loans.  *Id.*
24        90.    The available public data surrounding the early defaulting Silver State
25   loans (the "Silver State public data") reflects that certain of these loans originated
26   no later than November 2005.  Yet, IndyMac turned a "blind eye" to these "red
27   flags" and, per the *Silver State* complaint, waited as much as one year, *i.e.*, until
28

SIXTH AMENDED CLASS ACTION COMPLAINT
25

1773862.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 30 of 108   Page ID
Case 2:11-cv-02078-RGK -JCG   Document 474   Filed 03/10/11   Page 29 of 29   Page ID
#:179

1  August 2006, till it posed its repurchase demand to Silver State (*id.*) and even

2  longer, until late March 2007 until it commenced its lawsuit.

3      91.    Indeed, the Silver State public data reflects that a substantial number

4  of other early defaulting loans originated in the months preceding August 30, 2006

5  – by which time IndyMac, upon its own judicial admission, had certainly become

6  aware of the collectability problems besetting the distressed Silver State loan pool.

7      92.    Most strikingly, as reflected in the forthcoming chart, most of the

8  EPD loans complained of in *Silver State* consisted of especially toxic "80-20

9  Piggyback loans" or other piggyback combinations.  A "piggyback loan" is a home

10  financing option in which a property is purchased using more than one mortgage

11  from two or more lenders. Piggyback mortgages are second mortgages that close

12  simultaneously with the first mortgage and provide extended financing behind a

13  first mortgage lien. Typically, this is effectuated with an 80/20 split where the

14  borrower puts no money down:  80% financing through a first mortgage and 20%

15  financing through a second mortgage.  However, 80/15/5 and 80/10/10 piggybacks

16  (where the borrower finances 5% or 10% of the transaction) and other

17  configurations are also available.[3]

18      93.    Piggyback loans are of extremely high risk because they are the last to

19  be repaid in the event of a foreclosure.  According to Standard & Poor's credit

20  analyst Kyle Beauchamp, as described in a July 8, 2006 Washington Post article

21  entitled "Piggybacking Onto Trouble," "an exhaustive study of piggyback loans

22  found them anywhere from 43% to 50% more likely to go into default than

23  comparable stand-alone first-lien purchase transactions" (available at

___

[3] As defined in the OIG Audit Report, an 80/20 piggyback loan "[r]equires no
borrower down payment or mortgage insurance for this fully financed loan, which
is written as two separate loans of 80 percent and 20 percent."  Audit Report at 46.

SIXTH AMENDED CLASS ACTION COMPLAINT

26

● ●

1   www.Washingtonpost. com/wp-dyn/

2   content/article/2006/07/07/AR2006070700013.html).  Among the reasons for this

3   dramatic spike, according to the article, is that "[s]ignificant numbers of

4   piggybacks have been made to buyers who were financially stretched to begin with

5   and had marginal credit scores."

6        94.  As reflected in the following chart, the Silver State public data reveals

7   that at least 26 of the 35 EPDS complained of involved either 80/20 Piggybacks, or

8   in four instances, other piggyback configurations.  The aggregated principal

9   amount of these 26 loans comes to approximately $6.46 million.  Evidencing

10   IndyMac's laggard conduct with respect to these especially toxic loans, 19 of these

11   risky piggybacks involved Silver State itself as the lender for both the primary and

12   piggyback loans.  Moreover, the data reflects that IndyMac would have been aware

13   of its exposure to these loans before or by early into the fourth quarter of 2006.

14   Thus, 5 of these 26 Piggyback EPDs involve loans which Silver State originated as

15   early as 2005, 20 of these 26 Piggyback EPDs involve loans which Silver State

16   originated by the end of August 2006, and 25 of these 26 Piggyback EPDs involve

17   loans which Silver State originated by the close of the third quarter of 2006.

18

19   **Chronological Chart of the 80/20 and Other Piggyback Configurations**

20   **Resulting in Early Payment Defaults, Derived from the *Silver State* Complaint**

21

| | Mortgage Transaction or Recording Date | Paragraph Source from the Silver State Complaint ("S.S."), Filed 3/29/07 | Last Name (Sourced from the S.S. Complaint) | Principal Amount of Delinquent Loan (Sourced from the S.S. Complaint) | First Mortgage Amount on Subject Property | Lender ID | Second Mortgage Amount on Subject Property | Lender ID | Total Sale Price of Subject Property | Type of Piggy-back |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/17/2005 | 13(k) | Dau | $340,000.00 | $340,000 | S.S. | $85,000 | S.S. | $425,000 | 80/20 |
| 2 | 9/23/2005 | 13(j) | Contreras | $235,200.00 | $235,200 | S.S. | $44,100 | S.S. | $294,036 | 80/10 |
| 3 | 9/28/2005 | 13(y) | Rhude | $776,000.00 | $776,000 | S.S. | $194,000 | S.S. | $970,000 | 80/20 |
| 4 | 10/24/2005 | 13(e) | Rivera | $315,900.00 | $315,900 | S.S. | $78,950 | S.S. | $395,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

27

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 877

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 32 of 108   Page ID
#:8481
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 2 of 28   Page ID
#:181

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 11/7/2005 | 13(g) | Bower | $213,600.00 | $213,600 | S.S. | $53,400 | S.S. | $267,004 | 80/20 |
| 6 | 4/26/2006 | 13(a) | Ambartsumian | $59,200.00 | $236,800 | S.S. | $59,200 | S.S. | $296,000 | 80/20 |
| 7 | 6/9/2006 | 13(r) | Liuzza | $423,900.00 | $423,900 | S.S. | $105,950 | S.S. | $529,900 | 80/20 |
| 8 | 6/9/2006 | 13(v) | Ocum | $650,000 | $650,000 | S.S. | $176,500 | n/a | $870,000 | 70/20 |
| 9 | 7/3/2006 | 13(gg) | Tibby | $196,000.00 | $196,000 | S.S. | $15,200 | n/a | $245,000 | 80/10 |
| 10 | 7/19/2006 | 13(i) | Caputo | $160,000.00 | $160,000 | S.S. | $20,000 | SS | $200,000 | 80/10 |
| 11 | 7/21/2006 | 13(m) | Dayao | $200,000.00 | $200,000 | S.S. | $50,000 | n/a | $250,000 | 80/20 |
| 12 | 7/21/2006 | 13(cc) | Sanders | $248,000.00 | $248,000 | S.S. | $62,000 | S.S. | $310,000 | 80/20 |
| 13 | 7/26/2006 | 13(h) | Caberto | $361,600.00 | $361,600 | S.S. | $90,400 | n/a | $452,000 | 80/20 |
| 14 | 7/28/2006 | 13(ii) | Vongchanh | $420,550.00 | $420,550 | S.S. | $105,100 | n/a | $526,000 | 80/20 |
| 15 | 7/29/2006 | 13(w) | Petersen | $308,000.00 | $308,000 | S.S. | $77,000 | S.S. | $385,000 | 80/20 |
| 16 | 8/1/2006 | 13(c) | Bautista | $162,700.00 | $162,700 | S.S. | $40,650 | S.S. | $203,400 | 80/20 |
| 17 | 8/2/2006 | 13(o) | Elumba | $352,000.00 | $352,000 | S.S. | $88,000 | S.S. | $440,000 | 80/20 |
| 18 | 8/14/2006 | 13(aa) | Russ | $130,000.00 | $520,000 | S.S. | $130,000 | n/a | $650,000 | 80/20 |
| 19 | 8/17/2006 | 13(e) | Blue | $190,200.00 | $760,800 | S.S. | $190,200 | S.S. | $951,000 | 80/20 |
| 20 | 8/31/2006 | 13(u) | Duran | $46,000.00 | $184,000 | S.S. | $46,000 | S.S. | $230,000 | 80/20 |
| 21 | 9/1/2006 | 13(c) | Bermudez | $83,000.00 | $332,000 | S.S. | $83,000 | S.S. | $415,000 | 80/20 |
| 22 | 9/5/2006 | 13(u) | McCall | $103,650.00 | $414,150 | S.S. | $103,650 | S.S. | $518,446 | 80/20 |
| 23 | 9/11/2006 | 13(t) | Madrigal | $40,600.00 | $162,400 | S.S. | $40,600 | S.S. | $203,000 | 80/20 |
| 24 | 9/13/2006 | 13(l) | Davenport | $65,800.00 | $263,200 | S.S. | $65,800 | S.S. | $329,000 | 80/20 |
| 25 | 9/27/2006 | 13(bb) | Ryan | $51,150.00 | $204,750 | S.S. | $51,150 | S.S. | $255,990 | 80/20 |
| 26 | 12/8/2006 | 13(jj) | Willis | $323,000.00 | $323,000 | S.S. | $80,750 | n/a | $403,770 | 80/20 |
| | | | Total: $6,465,050 | | | | | | | |

95.   Thus, overall, many of the loans originated by Silver State
experienced early payment defaults by no later than the end of the third quarter or
during the fourth quarter of 2006.  These recklessly underwritten loans contributed

SIXTH AMENDED CLASS ACTION COMPLAINT

28

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 878

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 33 of 108   Page ID
Case 2:11-cv-02078-RGK -JCG   Document 5944-3   Filed 03/10/11   Page 3 of 28   Page ID
#:182

to the Company's fourth quarter 2006 losses.

96.    At the same time, the Silver State public data reflect that in the aftermath of IndyMac's August 2006 demand and despite its bad loss experience with Silver State, the Company continued to purchase a significant amount of the early defaulting loans from Silver State.

### 2.    Lancaster Toxic Loan Pool

97.    Confirmation of this *modus operandi* emerges from IndyMac's lawsuit against another mortgage broker, Lancaster Mortgage Bankers, LLC ("Lancaster"), alleging that Lancaster breached its warranties and obligations to IndyMac concerning a pool of forty-nine (49) loans.  This action is styled *IndyMac Bank, F.S.B. v. Lancaster Mortgage Bankers, LLC*, No. CV07-00270-DDP (C.D. Cal. Jan. 10, 2007) (complaint filed).

98.    Pursuant to the *Lancaster* complaint, as alleged by IndyMac, forty-four (44) of the borrowers on the distressed Lancaster loans either "did not make their first payment after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase  (the "early defaulting Lancaster loans"). *Id.*, at ¶11 (emphasis added).

99.    Each of these borrower failures amounted to an "Early Payment Default" as defined by the Purchase Agreement governing the subject loans which had been entered into by the parties, on or about June 24, 2004. *Id.*, at ¶¶5-6.  As such, Lancaster was obligated under its agreement with IndyMac to repurchase each such distressed loan within *thirty* (30) days of receiving IndyMac's notice of default. *Id.*, at ¶6.

100.    According to the *Lancaster* complaint, IndyMac first demanded that Lancaster make good on its repurchase obligations on some unspecified date in 2005. *Id.*, at ¶17.  Lancaster, however, breached its obligations and refused to

1773662.1

**Exhibit E, Page 152**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 879

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 34 of 108   Page ID
#:8483
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 4 of 28   Page ID
#:183

1    repurchase the early defaulting Lancaster loans. *Id.*

2    101.   The available public data surrounding the early defaulting Lancaster

3    loans (the "Lancaster public data") reflects that a substantial portion of the early

4    defaulting Lancaster loans originated in 2005 and that certain others originated in

5    the first third of the year 2006. Yet, despite the "red flags," IndyMac held off on

6    commencing litigation against Lancaster until January 2007 – *i.e.*, at least one year

7    after it had made its year 2005 demand against Lancaster and well after the close of

8    its Q3 2006 reporting period.

9    102.   As reflected in the following chart, the Lancaster public data reveals

10   that at least 29 of the 44 EPDS complained of involved either 80/20 Piggybacks, or

11   in nine instances, other piggyback configurations.  The aggregated principal

12   amount of these 26 loans is approximately $7.9 million.  Evidencing IndyMac's

13   laggard conduct with respect to these especially toxic loans, 12 of these risky

14   piggybacks involved Lancaster itself as the lender for both the primary and

15   piggyback loans.  Moreover, the data reflect that IndyMac would have had to been

16   aware of its exposure to these loans well before the fourth quarter of 2006. Thus,

17   24 of these 29 Piggyback EPDS involve loans which Lancaster originated as early

18   as 2005 and all 29 of these Piggyback EPDS involve loans which Lancaster

19   originated by the first week of May 2006.

20

21   **Chronological Chart of the 80/20 and Other Piggyback Configurations**

22   **Resulting in Early Payment Defaults, Derived From the *Lancaster* Complaint**

23

| Mortgage Transaction or Recording Date | Paragraph Source from the Lancaster Complaint ("L"), filed 1/10/07 | Last Name (Sourced from the L. Complaint) | Principal Amount of Delinquent Loan (Sourced from the L. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Type of Piggyback |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/12/2005 | ¶2(q) | Lopez | $116,000 | $116,000 | L | $29,000 | n/a | $145,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

30

1773002.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 880

| 2 | 9/16/2005 | 12(nn) | Williams | $424,800 | $424,800 | L. | $106,200 | L. | $531,000 | 80/20 |
| 3 | 9/21/2005 | 12(d) | Chraun | $416,000 | $416,000 | L. | 178,000 | L. | $520,000 | 80/15 |
| 4 | 9/23/2005 | 12(pp) | Philemond | $345,000 | $345,000 | L. | $115,000 | L. | $460,000 | 80/20 |
| 5 | 9/26/2005 | 12(h) | Godfrey | $195,200 | $195,200 | L. | $48,800 | L. | $244,000 | 80/20 |
| 6 | 9/29/2005 | 12(r) | Loyula | $284,000 | $284,000 | L. | $71,000 | n/a | $355,000 | 80/20 |
| 7 | 9/29/2005 | 12(ee) | Samuels | $140,000 | $140,000 | L. | $35,000 | n/a | $175,000 | 80/20 |
| 8 | 10/11/2005 | 12(u) | Lester | $192,000 | $192,000 | L. | $48,000 | n/a | $240,000 | 75/25 |
| 9 | 10/14/2005 | 12(gg) | Sheikh | $61,500 | $61,500 | L. | $20,500 | L. | $82,000 | 80/20 |
| 10 | 10/17/2005 | 12(hh) | Tinglin | $240,000 | $240,000 | L. | $60,000 | L. | $300,000 | 80/20 |
| 11 | 10/17/2005 | 12(jj) | Viutti | $384,000 | $384,000 | L. | $96,000 | L. | $480,000 | 75/25 |
| 12 | 10/21/2005 | 12(oo) | Fabunun | $127,495 | $127,495 | L. | $41,495 | n/a | $169,999 | 80/20 |
| 13 | 10/31/2005 | 12(e) | Charles | $358,400 | $358,400 | L. | $89,800 | L. | $450,000 | 80/20 |
| 14 | 11/2/2005 | 12(tt) | Weston | $236,000 | $236,000 | L. | $59,000 | n/a | $295,000 | 80/20 |
| 15 | 11/10/2005 | 12(ll) | Williams | $390,080 | $390,080 | L. | $97,520 | L. | $487,600 | 80/20 |
| 16 | 11/14/2005 | 12(mm) | Williams | $320,000 | $320,000 | L. | $80,000 | n/a | $400,000 | 70/30 |
| 17 | 11/17/2005 | 12(u) | Mattei | $337,400 | $337,400 | L. | $144,600 | L. | $482,000 | 80/20 |
| 18 | 11/20/2005 | 12(l) | James | $348,000 | $348,000 | L. | $87,000 | n/a | $435,000 | 75/25 |
| 19 | 12/7/2005 | 12(a) | Benitz | $285,000 | $285,000 | L. | $95,000 | n/a | $380,000 | 75/25 |
| 20 | 12/12/2005 | 12(ff) | Rebecca Mendez | $262,500 | $262,500 | L. | $87,500 | n/a | $350,000 | 80/20 |
| 21 | 12/20/2005 | 12(ss) | Uelthrop | $88,000 | $88,000 | L. | $22,000 | n/a | $110,000 | 70/30 |
| 22 | 12/20/2005 | 12(qq) | Smithvard | $378,000 | $378,000 | L. | $162,000 | n/a | $540,000 | 70/30 |
| 23 | 12/22/2005 | 12(cc) | Pinder | $182,000 | $182,000 | L. | $78,000 | n/a | $260,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

31

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 881

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 36 of 108  Page ID
#:8485
Case 2:11-cv-02078-RGK -JCG  Document 1-5  Filed 03/10/11  Page 6 of 28  Page ID
#:185

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 24 | 12/29/2005 | 12(z) | Pettiford | $181,280 | $181,280 | L. | $45,320 | L. | $226,600 | 80/20 |
| 25 | 2/21/2006 | 12(g) | Del Socorro | $372,000 | $372,000 | L. | $93,000 | L. | $465,000 | 80/20 |
| 26 | 2/24/2006 | 12(y) | Palleija | $332,000 | $332,000 | L. | $83,000 | n/a | $415,000 | 80/20 |
| 27 | 4/7/2006 | 12(k) | Jackson | $511,200 | $511,200 | L. | $127,800 | n/a | $639,000 | 70/10 |
| 28 | 4/28/2006 | 12(aa) | Pinedo | $265,930 | $265,930 | L. | $113,970 | L. | $379,900 | 80/20 |
| 29 | 5/5/2006 | 12(t) | Martins | $172,800 | $172,800 | L. | $43,200 | n/a | $217,000 | 80/20 |
| | | | Total: | $7,946,385 | | | | | |

103.   As was the case with Silver State, IndyMac's lengthy delay in pursuing its rights against Lancaster with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-increasing loan production growth during the Class Period.

### 3.   Geneva Toxic Loan Pool

104.   Further confirmation of this *modus operandi* emerges from IndyMac's lawsuit against yet another mortgage broker, Geneva Mortgage Corp. ("Geneva"), alleging that Geneva breached its warranties and obligations to IndyMac concerning a pool of eighteen (18) loans.  This action is styled *IndyMac Bank, F.S.B. v. Geneva Mortgage Bankers, LLC*, No. CV07-01914-ER (C.D. Cal. March 22, 2007) (complaint filed).

105.   Pursuant to the *Geneva* complaint, as alleged by IndyMac, sixteen (16) of the borrowers on these Geneva loans either "*did not make their first payment* after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Geneva loans"). *Id.*, at ¶12 (emphasis added).

106.   Each of these borrower failures amounted to an "Early Payment

Exhibit E, Page 155

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 882

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 37 of 108   Page ID
#:8486
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 7 of 28   Page ID
#:186

1   Default" as defined by the Purchase Agreement governing the subject loans which

2   had been entered into by the parties, on or about April 9, 2003. *Id.*, at ¶¶5-6. As

3   such, Geneva was obligated under that agreement to repurchase each such

4   distressed loan within *thirty* (30) days of receiving IndyMac's notice of default.

5   *Id.*, at ¶6.

6      107.   According to the *Geneva* complaint, "on or about December 2003,"

7   IndyMac first demanded that Geneva make good on its repurchase obligations as to

8   two (2) of the early defaulting Geneva loans but to no avail. *Id.*, at ¶18.

9   "Commencing on or about 2006," IndyMac made such demand on Geneva as to

10  the remaining such loans. *Id.* Geneva, however, breached its obligations and

11  refused to repurchase the early defaulting loans. *Id.*

12     108.   The available public data surrounding the early defaulting Geneva

13  loans (the "Geneva public data") reflects that two of those loans originated in the

14  year 2003, more than half originated in the year 2005 and the remaining ones

15  originated in the year 2006. Yet, despite these "red flags," IndyMac held off on

16  commencing litigation against Geneva until late March 2007 -- *i.e.*, no earlier than

17  approximately fifteen (15) months from the cutoff point by which the majority of

18  the early defaulting Geneva loans had already originated.

19     109.   As reflected in the following chart, the Geneva public data reveals that

20  at least 9 of the 16 EPDS complained of involved either 80/20 Piggybacks, or in

21  two instances, a virtual 80/20 configuration. The aggregated principal amount of

22  these 9 loans comes to approximately $2.62 million. Evidencing IndyMac's

23  laggard conduct with respect to these especially toxic loans, 8 of these risky

24  piggybacks involved Geneva itself as the lender for both the primary and

25  piggyback loans -- and, in these instances, IndyMac was exposed to the very same

26  borrowers on both loans. Moreover, the data reflects that IndyMac would have had

27

28

<div align="center">

SIXTH AMENDED CLASS ACTION COMPLAINT

33

</div>

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 883

● ●

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 37 of 170   Page ID #:12991

1  to been aware of its exposure to these loans well before the fourth quarter of 2006.

2  Thus, 6 of these 9 Piggyback EPDS involve loans which Geneva originated as

3  early as 2005 and all 9 of these Piggyback EPDS involve loans which Geneva

4  originated by the end of July 2006.

**Chronological Chart of the 80/20 and Other Piggyback Configurations Resulting in Early Payment Defaults, Derived From the *Geneva* Complaint**

| Mortgage Transaction or Recording Date | Paragraph Source from the Geneva Complaint ("U."), Complaint Filed 3/22/07 | Last Name (Sourced from the G. Complaint) | Principal Amount of Delinquent Loan (Sourced from the G. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Piggyback Type |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/16/2005 | 13(o) | Rivera | $368,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 2 | 9/16/2005 | 13(p) | Rivera | $92,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 3 | 11/3/2005 | 13(j) | Pratt | $327,200 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 4 | 11/3/2005 | 13(k) | Pratt | $81,800 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 5 | 12/16/2005 | 13(l) | Clarke | $240,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 6 | 12/16/2005 | 13(d) | Clarke | $55,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 7 | 5/25/2006 | 13(n) | Reyes | $344,000 | $344,000 | G. | $86,000 | n/a | $430,000 | 80/20 |
| 8 | 7/26/2006 | 13(l) | Puckett | $204,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| 9 | 7/26/2006 | 13(m) | Puckett | $51,000 | $204,000 | G. | $51,800 | G. | $255,000 | 80/20 |
| | | Total | $2,672,000 | | | | | | |

    110.   As was the case with Silver State and Lancaster, IndyMac's lengthy delay in pursuing its rights against Geneva with respect to these numerous distressed loans bespeaks IndyMac's knowing or, at least, deliberately reckless

SIXTH AMENDED CLASS ACTION COMPLAINT

34

**Exhibit E, Page 157**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 884

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 39 of 108   Page ID
#:8488
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 9 of 28   Page ID
#:188

1   desperation to maintain the facade of ever-growing loan production growth during

2   the Class Period.[4]

3       111.   In addition to the foregoing lawsuits filed by IndyMac, a lawsuit filed

4   against the Company confirms the allegations of CW 2, who stated that the

5   Company violated its underwriting guidelines by artificially inflating the appraised

6   values of properties.

7       112.   In *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK)

8   (S.D.N.Y.), the plaintiff, a residential home mortgage borrower, sued IndyMac and

9   alleged that it had improperly and systematically selected and coerced various

10  appraisal professionals so as to generate greater loan volumes.  These appraisers

11  would perform faulty and defective appraisal services which inflated the value of

12  residential properties and thereby allowed Defendants to complete more real estate

13  transactions and obtain greater profits.

14

15      113.   *Cedeno*, in her Amended Class Action Complaint (filed on July 20,

16  2007), alleged, based on confidential witnesses, that "IndyMac threatened and

17  retaliated against appraisers and management firms that failed to give in to

18

19  _____

    [4]  The *Silver State, Lancaster*, and *Geneva* actions are representative of the
20  plethora of litigation IndyMac initiated in connection with distressed loans, many
    of which were 80/20 piggyback loans that suffered early payment defaults in 2005
21  and 2006.  For example, IndyMac has been involved in, *inter alia*:  *IndyMac Bank,
    F.S.B. v. Weststar Mortgage, Inc.*, No. 08-cv-00748 (C.D. Cal., complaint filed
22  Feb. 4, 2008); *IndyMac Bank, F.S.B. v. Cameron Financial Group, Inc.*, No.
    BC376578 (Los Angeles Superior Court, complaint filed Aug. 27, 2007); *IndyMac
23  Bank, F.S.B. v. Just Mortgage, Inc.*, No. BC384487 (Los Angeles Superior Court,
    complaint filed Jan. 28, 2008); *IndyMac Bank, F.S.B. v. Kay-Co Investments, Inc.*,
24  No. BC375931 (Los Angeles Superior Court, complaint filed Aug. 14, 2007);
    *IndyMac Bank, F.S.B. v. Fidelity & Trust Mortgage, Inc.*, No. BC374417 (Los
25  Angeles Superior Court, complaint filed July 18, 2007); and *IndyMac v. Solutions
    Funding, Inc.*, No. BC369971 (Los Angeles Superior Court, complaint filed Apr.
26  23, 2007).

27

28

                  SIXTH AMENDED CLASS ACTION COMPLAINT

                                  35

Exhibit E, Page 158

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 885

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 40 of 108   Page ID
#:8489
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 10 of 28   Page ID
#:189



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 39 of 170   Page ID
#:12993

1   pressure to meet the target appraisal values by IndyMac and to inflate the appraisal

2   values."

3      114.   The practice of encouraging inflated appraisal values resulted in

4   borrowers incurring more mortgage debt than necessary and/or more mortgage

5   debt than the borrower could afford. All this was to meet loan origination targets

6   set by IndyMac's senior management.

7

8      115.   In order to accomplish this subterfuge, IndyMac had to override

9   stated lending practices and internal/operational controls:

10      . . . Specifically, Defendants allowed Production
        Personnel to improperly influence Credit\Valuation
11      Personnel. Production Personnel threatened and
        intimidated Credit\Valuation Personnel to approve
12      inflated appraisals received from outside appraisal
        companies or appraisal management firms. Contrary to
13      Defendants' representations to Plaintiff and members of
        the Class, Defendants failed to provide the necessary
14      insulation and separation between Production Personnel
        and Credit/Valuation Personnel;
15
        According to a confidential witness, IndyMac executives,
16      including the Chief Appraiser, were aware and allowed
        the improper influence Production Personnel placed on
17      their own Credit\Valuation Personnel to choose
        appraisers and to approve appraisers obtained from third
18      party appraisal companies or appraisal management firms
        willing to supply IndyMac with inflated appraisals;
19
        Indeed according to this confidential witness,
20      Credit/Valuation Personnel at IndyMac were told not to
        reject inflated or otherwise improper appraisals and were
21      threatened or told by Production Personnel that they
        would be terminated if they failed to do so;
22
        According to another confidential witness, IndyMac was
23      in fact operating its appraisal review department under
        pressure to make the values that IndyMac's loan officers
24      and processing department were pushing. This
        confidential witness further stated that employees of
25      IndyMac exerted pressure to make sure loans would be
        approved regardless of accurate appraisal values.
26

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

36

1773862.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 886

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 41 of 108   Page ID
#:8490
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 11 of 28   Page ID
#:190



## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

116.   During the Class Period, Defendants issued numerous materially false and misleading statements. Each of those statements is set forth below, including detail regarding (i) the date of the statement; (ii) the speaker; (iii) the nature of the statement (oral or written); (iv) to whom the statement was made; (v) the location/context of the statement; (vi) why the statement was materially false and misleading; and (vii) facts giving rise to a strong inference that the particular defendant who made (or caused to be made) the statement had the requisite state of mind. The facts that provide the basis for the foregoing allegations, including a full recitation of the statements of numerous confidential witnesses and various lawsuits in which the Company is engaged, are set forth at ¶¶121, 144, 169, 209, *supra*.

### A.   2005 Annual Report on Form 10-K

117.   On March 1, 2006, the Company filed its Annual Report for the year ended December 31, 2005 with the SEC on Form 10-K (the "2005 10-K"). Because Perry signed the 2005 10-K, all statements contained therein were made by him and the Company.

**Statement One:**

118.   The 2005 10-K stated:

*By closely monitoring key factors such as product type, origination channels, progress or "status" of transactions, as well as changes in market interest rates since IndyMac committed a rate to the borrower ("rate lock commitments"), the Company seeks to quantify the optional component of each rate lock, and in turn, the aggregate rate lock pipeline. By accurately evaluating these factors, the Company has been able to minimize the purchase of options and also stabilize gain on sale margins over different rate environments. [2005 10-K at p. 41-42].*

119.   These statements are material because quantifying (and adhering to) rate locks and monitoring key factors related to loan underwriting drastically

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 42 of 108   Page ID
#:8491
Case 2:11-cv-02078-RGK -JCG   Document 195   Filed 03/10/11   Page 12 of 28   Page ID
#:191



1  impact the bottom-line profitability (or not) of a lender, like IndyMac. *See supra*

2  at ¶¶32-34, 48. A reasonable investor would therefore view IndyMac's monitoring

3  of such "key" factors as important because loan quality (or the absence thereof)

4  would have a serious impact on IndyMac's balance sheet.

5      120.   The foregoing statement was false and misleading because the

6  Company's "rate lock commitments" were no commitments at all. This is so

7  because the "rate lock commitments" were regularly violated by and at the

8  direction of defendant Perry, which rendered them meaningless as a risk control

9  device.

10      121.   Plaintiffs rely on the following facts in support of their allegation that

11  the foregoing statement (at ¶118) was materially false and misleading and that

12  Perry knew it: CW 1 stated that defendant Perry directed the Executive Vice

13  President and CEO, Ashwin Adarkar (and thus, the Central Banking Group) to

14  engage in violations of the Company's "rate lock" protocols and controls. ¶¶43-

15  49.

16

17  **Statement Two:**

18      122.   The 2005 10-K also stated:

19  *We hedge the risks associated with our mortgage commitments to*
    *purchase mortgage loans ("rate locks")* and funded mortgage loans
20  that will be sold in the secondary market. The risk associated with the
    rate locks and funded mortgage loans is that interest rates will
21  fluctuate between the time we commit to purchase a loan at a pre-
    determined price, or the customer locks in the interest rate on a loan,
22  and the time we sell or commit to sell the mortgage loan. [2005 10-K
    at 78]. (Emphasis added)
23

24      123.   These statements are material because hedging risk associated with

25  mortgage commitments to purchase mortgage loans correlates to overall loan

26  quality (and hence, the underlying underwriting practices) which affects a

27  mortgage lender's balance sheet and profitability. *See supra* at ¶¶32-34. There is a

28  substantial likelihood that a reasonable investor would view such facts as

SIXTH AMENDED CLASS ACTION COMPLAINT

38

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 888

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 43 of 108   Page ID
#:8492
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 13 of 28   Page ID
#:192

important.

124.   The foregoing statement was false and misleading because the Company regularly violated, at the direction of defendant Perry, the "rate locks," rendering them meaningless as a risk control device. This allowed the Company to achieve revenue and volume targets in the short-run, while exposing itself to losses on the back end of the loan.

125.   Plaintiffs rely on the following facts in support of their allegation that the foregoing statement (at ¶122) was materially false and misleading and that Perry knew it: CW 1 stated that defendant Perry directed Adarkar (and thus, the Central Banking Group) to engage in violations of the Company's "rate lock" protocols and controls. ¶¶43-49.

**B.   2006 First Quarter Form 10-Q**

126.   On April 25, 2006, the Company filed its Report on Form 10-Q for the quarter ended March 31, 2006 with the SEC (the "2006 First Quarter 10Q"). Because Perry signed the 2006 First Quarter 10-Q, all statements therein were made by him and the Company.

127.   The 2006 First Quarter 10-Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, *effects of any changes in risk selection and underwriting standards*, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 48. (Emphasis added)

128.   The statements regarding the Company's "risk selection" and "underwriting standards" are material. As a mortgage lender, IndyMac's underwriting practices are among the most important information looked to by

SIXTH AMENDED CLASS ACTION COMPLAINT

39

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 889

1  investors in exercising their investment judgment. In addition, the frequency with

2  which Perry emphasized the Company's underwriting policies in press releases and

3  other public statements, as well as the fact that analysts frequently repeated and

4  commented on Defendants' statements regarding the Company's standards, further

5  supports the materiality of these statements.

6      129.   The statement set forth at ¶127 was false and misleading when made

7  as IndyMac's loan loss reserves did not consider the "effects of any changes in risk

8  selection and underwriting standards, other changes in lending policies,

9  procedures, and practices, and national and local economic trends and conditions."

10  This is so because the Company's "underwriting standards" were wholly

11  ineffective (and violated by or caused to be violated by Perry, *see e.g.* ¶¶43-51),

12  and thus, meaningless as a factor in the calculation of the Company's loan loss

13  reserves.

14

15      130.   Perry knew or was reckless in not knowing of the violations of the

16  Company's underwriting controls and standards (rendering the statement at ¶127

17  materially false and misleading) for the following reasons. First, Perry directed

18  employees to (i) "push loans through" regardless of whether they satisfied the

19  Company's underwriting guidelines; (ii) input false information into the

20  Company's e-MITS underwriting control system, to cause the approval of loans

21  that would normally be rejected; and (iii) engage in violations of the Company's

22  "rate lock" protocols and controls.  ¶¶43-49. Second, Perry was aware that

23  rampant fraud and lying by loan sales representatives was taking place, yet he

24  continued to push employees to close loans "at all costs." ¶50. Third, the wide-

25  ranging and management-directed violations of the Company's underwriting

26  guidelines and controls evidences a culture of fraud at the Company. ¶¶50-51.

27  Fourth, the number of fraudulent loans discovered at the Company increased by

28

SIXTH AMENDED CLASS ACTION COMPLAINT

40

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 890

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 45 of 108  Page ID
#:8494
Case 2:11-cv-02078-RGK -JCG  Document 175  Filed 03/10/11  Page 15 of 28  Page ID
#:194

Case 2:07-cv-01635-GW -VBK  Document 227  Filed 02/16/10  Page 44 of 170  Page ID
#:12998

1   1500% from 2003 to mid-2006, rendering the lack of control over underwriting

2   facially obvious.  ¶¶67-70.  Fifth, the massive increase in bad loan "kickbacks"

3   requiring repurchase by the Company resulted in the initiation of a "special

4   project" at the Company to rehabilitate those loans.  ¶¶73-75.  Finally, the

5   numerous lawsuits filed by the Company show that it knew that certain pools of

6   loans that it had underwritten were defaulting at rates as high as 90% (in 2005),

7   and 97% (in 2006), rendering the inadequacy of the Company's underwriting

8   controls facially obvious to Perry and the Company.  *See* ¶84.

9
    **C.   April 25, 2006 Conference Call**

10      131.   On April 25, 2006, defendant Perry spoke to analysts and the

11  investing public on behalf of the Company during a public earnings conference

12  telephone call (the "Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

13
        132.   During this Q1 2006 IndyMac Bancorp, Inc. Earnings Conference

14  Call, Perry stated:

15
        *[W]e have the best quality control function of any thrift out there*
16      because we sell 95% of our production in the secondary market.  Who
        does their own due diligence and if we have problems with it, if we
17      have mispricing like we did with the home equity business, right, *it*
        *immediately gets reflected in our numbers and we fix it.*  Do you see
18      what I'm saying?  That's a big quality control function, the fact that
        we turn our loans on average, this quarter was about 50 days, 55 days
19      and in 55 days we know if we priced them right and we know if the
        investor is willing to buy them.… Tr. at 13 (emphasis added).
20
        133.   Defendants' statements regarding the Company's underwriting
21
    standards and quality controls are material.  As a mortgage lender, IndyMac's
22
    underwriting practices are among the most important information looked to by
23
    investors as illustrated by the frequency with which Perry emphasized the
24
    Company's underwriting policies in press releases and other public statements, as
25
    well as the fact that analysts frequently repeated and commented on Defendants'
26
    statements regarding the Company's standards.  Moreover, for a mortgage lender,
27

28

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 46 of 108  Page ID
#:8495
Case 2:11-cv-02078-RGK -JCG  Document 195  Filed 03/10/11  Page 16 of 28  Page ID
#:195



1 | like IndyMac, statements touting "the best quality control of *any* thrift out there"

2 | goes to the fundamentals of *any* mortgage company and corresponding ability to

3 | generate reliable streams of revenue.  There is a substantial likelihood that a

4 | reasonable investor would consider such facts important.

5 |    134.   The foregoing statements were false and misleading because

6 | IndyMac's quality control, both pre-purchase and post-purchase were so recklessly

7 | deficient that IndyMac was unable to monitor, let alone "fix," its early payment

8 | defaults and representations and warranties related to its loans.  Indeed, IndyMac

9 | permitted intentionally and grossly exaggerated stated income loans to be

10 | processed without appropriate due diligence in the pre-funding quality control

11 | process.  For instance, IndyMac should have and could have verified loan

12 | applicants' income as reported to the IRS by utilizing Form 4506T.  IndyMac

13 | recklessly, if not willfully, turned a blind eye to false, inflated stated incomes.

14 | Incredibly, IndyMac actually marketed to brokers its willingness to ignore most

15 | stated income deficiencies.  *See* IndyMac Presentation *Here We Grow* at 14

16 | ("Required Form: 4506T (will not be pulled unless income is outrageous).").

17 | Furthermore, IndyMac's post-funding quality control audits were conducted on an

18 | untimely basis as IndyMac's post-funding quality control department was

19 | significantly understaffed.  The Solutions Funding post-funding quality control

20 | audits were performed months after the loans were in early payment default,

21 | significantly undermining their utility.

22 |

23 |    D.    2006 Second Quarter Form 10-Q

24 |    135.   On July 27, 2006, the Company filed its Report on Form 10-Q for the

25 | quarter ended June 30, 2006 with the SEC (the "2006 Second Quarter 10Q").

26 | Because Perry signed the 2006 Second Quarter 10-Q, all statements therein were

27 | made by him and the Company.

28 |

SIXTH AMENDED CLASS ACTION COMPLAINT

42

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 892

11/23/11



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 46 of 170   Page ID #:13000.

136.  The 2006 Second Quarter 10-Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to *levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards,* other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 45.  (Emphasis added)

137.  The foregoing statements were material and knowingly or recklessly false and misleading for the same reasons that the same statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading. *See* ¶¶132-33 (discussing same).

E.  <u>September 13, 2006 Lehman Brothers Presentation</u>

138.  On or about September 13, 2006, Michael Perry participated at Lehman Brothers' 2006 Financial Services Conference.  IndyMac's presentation was filed with the SEC in an 8-K on September 13, 2006.  A table entitled, "Risk Management Functions Are Also Performed at Business-Unit Level," catalogs the following systemic safeguards in place in connection with IndyMac's SFR Mortgage Production:

1. Thorough sellers/3rd party approval and monitoring;
2. Pre-funding quality control reviews;
3. Sound underwriting guidelines;
4. Rigorous in-house appraisal reviews;
5. Post-funding quality control audits; and
6. Loss mitigation/fraud recovery management.

Presentation at 23.

<u>Statement One:</u>

139.  The statement regarding the systemic safeguard in place for the Company's underwriting practices is material because, as a mortgage lender, IndyMac's underwriting practices – including its purported "thorough" third party

SIXTH AMENDED CLASS ACTION COMPLAINT

43

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 893

1  approval and monitoring – are among the most important information looked to by

2  investors in exercising their investment judgment.  The frequency with which

3  Perry emphasized the Company's underwriting policies in press releases and other

4  public statements, as well as the fact that analysts frequently repeated and

5  commented on Defendants' statements regarding the Company's standards,

6  confirms the materiality of this statement.

7     140.   Defendants' statement that they conducted "thorough sellers/3rd party

8  approval and monitoring" was materially false and misleading.  IndyMac's

9  seller/3rd party approval and monitoring were severely deficient.  As reflected in

10  the litigation between IndyMac and its various brokers, such as Lancaster, Silver

11  State and Geneva, IndyMac recklessly continued to conduct business with sellers

12  who experienced massive early payment defaults and significant representation and

13  warranty deficiencies.

14

15     141.   Plaintiffs allege that defendant Perry knew or was reckless in not

16  knowing that the foregoing statement (at ¶138) was materially false and misleading

17  because IndyMac, by its own judicial admission, was aware, at least as early as

18  2005, of significant early payment defaults and representation and warranty

19  deficiencies plaguing loans obtained through sellers.

20  **Statement Two:**

21     142.   The statement regarding the systemic safeguard in place for the

22  Company's underwriting practices is material because, as a mortgage lender,

23  IndyMac's underwriting practices – including "pre-funding quality control

24  reviews" – are among the most important information looked to by investors.  The

25  frequency with which Perry emphasized the Company's underwriting policies in

26  press releases and other public statements, as well as the fact that analysts

27  frequently repeated and commented on Defendants' statements regarding the

28

SIXTH AMENDED CLASS ACTION COMPLAINT

44

02/23/11

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 894

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 49 of 108   Page ID
#:8498
Case 2:11-cv-02078-RGK -JCG   Document 175   Filed 03/10/11   Page 19 of 28   Page ID
#:198

1  Company's standards, confirms the importance of these statements to investors.

2  143.  IndyMac's statement that it conducted "pre-funding quality control

3  reviews" was false and misleading.  IndyMac's pre-funding quality control reviews

4  were grossly inadequate.  Indeed, IndyMac permitted intentionally and grossly

5  exaggerated stated income loans to be processed without appropriate due diligence

6  in the pre-funding quality control process.  For instance, IndyMac should have and

7  could have verified loan applicants' income as reported to the IRS by utilizing

8  Form 4506T.  IndyMac recklessly, if not willfully, turned a blind eye to false,

9  inflated stated incomes.  Incredibly, IndyMac actually marketed to brokers its

10  willingness to ignore most stated income deficiencies.  *See* IndyMac Presentation

11  *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is

12  outrageous).").

13

14  144.  Plaintiffs allege that defendant Perry knew or was reckless in not

15  knowing that the foregoing statement (at ¶138) was materially false and misleading

16  because (i) Perry directed IndyMac employees to "push loans through" without

17  regard to approval guidelines, as attested to by the CWs, evidenced in, *inter alia*,

18  "Disneyland Loans"; (ii) Perry and other senior managers encouraged the

19  manipulation of the e-MITS system; (iii) loan sales representatives solicited

20  fraudulent letters in connection with purported verification of customer income,

21  which was reported to upper management; (iv) as stated by CW4, during the Class

22  Period IndyMac experienced and was aware of a substantial increase in defaults

23  attributable to misrepresentations and fraud in the loan applications facilitated by

24  the Company's relaxing of underwriting guidelines; and (v) IndyMac instituted

25  auditor bonus structures that dissuaded the detection of fraud.

26  **Statement Three:**

27  145.  The statement regarding the Company's systemic safeguards in place

28

SIXTH AMENDED CLASS ACTION COMPLAINT

45

1773662.1

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 50 of 108  Page ID
#:8499
Case 2:11-cv-02078-RGK -JCG  Document 195  Filed 03/10/11  Page 20 of 28  Page ID
#:199



1  for its underwriting guidelines is material because, for a mortgage lender, "sound

2  underwriting guidelines" are among the most important information looked to by

3  investors in exercising their investment judgment.  The frequency with which

4  Perry emphasized the Company's "sound" underwriting policies in press releases

5  and other public statements, as well as the fact that analysts frequently repeated

6  and commented on Defendants' statements regarding the Company's standards,

7  confirms the importance of such statements to investors.

8      146.   IndyMac's statement that it had "sound underwriting guidelines" was

9  false and misleading.  IndyMac routinely approved high-risk loans that departed

10  significantly from the Company's established underwriting guidelines.  As

11  described fully at ¶¶43-51 herein, IndyMac, and defendant Perry in particular,

12  created a company-wide culture and practice of ignoring and intentionally

13  overriding the Company's underwriting guidelines for the singular, myopic goal of

14  generating loan volume.  Combined with IndyMac's substantial reliance on high-

15  risk loans, the actual practice at IndyMac to ignore and intentionally override the

16  Company's stated underwriting guidelines placed the Company's business in the

17  precarious condition of relying on a flimsy base of significantly risky loans –

18  unbeknownst to the public.  In short, IndyMac had in place, and adhered to,

19  anything but "sound underwriting guidelines."

20      147.   Plaintiffs allege that defendant Perry knew or was reckless in not

21  knowing that the foregoing statement (at ¶138) was materially false and misleading

22  because Perry himself created a company-wide pattern of abandoning underwriting

23  guidelines, directing IndyMac employees to "push loans through" without regard

24  to approval guidelines.  As attested to by various confidential witnesses, the

25  company-wide environment had become an "organized chaos" focused on the

26  singular goal of increasing reported loan volume, regardless of loan quality.

27

28

<div align="center">SIXTH AMENDED CLASS ACTION COMPLAINT</div>

<div align="center">46</div>

03/23/11

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 896

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 51 of 108  Page ID
#:8500
Case 2:11-cv-02078-RGK -JCG  Document 109  Filed 03/10/11  Page 21 of 28  Page ID
#:200

Case 2:07-cv-01635-GW -VBK  Document 227  Filed 02/16/10  Page 50 of 170  Page ID
#:13004

**Statement Four:**

148.   The statement regarding the Company's "rigorous" in-house appraisal reviews is material because, as a mortgage lender, IndyMac's underwriting practices – including purportedly conducting "rigorous" appraisal reviews – are among the most important information investors look to in deciding whether to invest in a mortgage lending company's stock.  The frequency with which Perry emphasized such underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

149.   IndyMac's statement that it conducted "rigorous in-house appraisal reviews" was false and misleading.  IndyMac's appraisal reviews were limited and recklessly deficient.

150.   Plaintiffs allege that Perry and IndyMac knew or were reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because IndyMac's appraisal reviews were performed under only limited circumstances, as reflected in the deposition transcripts of Nicholas Nyland and Ignacio Gomez in the *Indymac Bank v. Chandler Appraisal Services* litigation.

**Statement Five:**

151.   The statement regarding the Company's underwriting quality control is material.  High quality loans could be expected by reasonable investors to generate reliable streams of revenue at IndyMac.  In contrast, loans that perform poorly would have a negative impact on IndyMac's balance sheet.  As a mortgage lender, IndyMac's underwriting practices – including "post-funding quality control audits" – are therefore among the most important information looked to by investors.  Moreover, the frequency with which Perry emphasized such

SIXTH AMENDED CLASS ACTION COMPLAINT

47

1773662.1

**Exhibit E, Page 170**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 897

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 52 of 108   Page ID
#:8501
Case 2:11-cv-02078-RGK -JCG   Document 75   Filed 03/10/11   Page 22 of 28   Page ID
#:201

1  underwriting practices in press releases and other public statements, as well as the
2  fact that analysts frequently repeated and commented on Defendants' statements
3  regarding the Company's standards, confirms the importance of such statements to
4  investors.

5     152.   IndyMac's statement that it conducted "post-funding quality control
6  audits" was false and misleading.  IndyMac's post-funding quality control audits
7  were conducted on an untimely basis as IndyMac's post-funding quality control
8  department was significantly understaffed.  The Solutions Funding post-funding
9  quality control audits were performed months after the loans were in early payment
10  default, significantly undermining their utility.

11    153.   Plaintiffs allege that defendant Perry knew or was reckless in not
12  knowing that the foregoing statement (at ¶138) was materially false and misleading
13  because these audits were not being done on a timely basis, *i.e.*, quarterly.  Instead,
14  IndyMac and Perry recklessly permitted delays far in excess of a quarter before
15  post-funding quality control audits were performed.  Even after the post-funding
16  quality control reports were completed, IndyMac's procedures permitted
17  substantial delays before repurchase requests were even sent to sellers.

18    **Statement Six:**

19    154.   The Company's "loss mitigation and fraud recovery management"
20  statements are also material.  For a mortgage lender, like IndyMac, such
21  underwriting practices are among the most important information looked to by
22  investors.  The frequency with which Perry emphasized the Company's
23  underwriting policies in press releases and other public statements, as well as the
24  fact that analysts frequently repeated and commented on Defendants' statements
25  regarding the Company's standards, further demonstrates materiality.

26    155.   IndyMac's statement that it purportedly had adequate "loss

SIXTH AMENDED CLASS ACTION COMPLAINT

48

1773662.1

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 52 of 170   Page ID #:13006

1    mitigation/fraud recovery management" was false and misleading.  IndyMac's
2    seller pursuit department was patently ineffective as a result of its inadequate
3    staffing and resources causing inordinate delay in its attempts to recover from
4    recidivist sellers.  As such, IndyMac frequently only pursued litigation years after
5    problems with a seller became apparent, with limited success.
6         156.   Plaintiffs allege that defendant Perry knew or was reckless in not
7    knowing that the foregoing statement (at ¶138) was materially false and misleading
8    because IndyMac failed to pursue delinquent loan sellers for excessive time
9    periods.  IndyMac's legal department was acutely aware of the inordinate delays
10   that occurred with respect to seller pursuit litigation.  Moreover, IndyMac
11   recklessly purchased loans from sellers who had failed to cure repurchase requests.
12
13   F.    **September 21, 2006 RBC Financial Institutions Conference**
14        157.   Scott Keys, Executive Vice President and Chief Financial Officer of
15   IndyMac, on behalf of IndyMac, made the following statement at an RBC
16   Financial Institutions Conference on September 21, 2006:
17
18       I joke with Mike Perry, our CEO, that if we did a slide for every
19       negative article that comes out in the mortgage -- kind of about
         mortgages, Jim, I'd need the rest of the day for the presentation. *But
20       we wanted to spend the bulk of the presentation trying to dispel some
         myths about the industry, and also some myths about the Company,
21       where we think people are lumping us in with -- maybe with issues
         that don't really exist.* So, I'm going to spend the bulk of time the
22       time on enterprise risk management today.

                            *      *      *

24       One of the other things that we have the ability to do is we do a fair
         amount of our purchases in our conduit business. And there we're
25       dealing with larger financial institutions, and we have a pretty high
         success rate. *If we end up having to repurchase a loan, we are able
26       to turn around and put that repurchase back to the seller. To us it's
         probably about a 90% effectiveness rate there. So, -- so, a lot of
27       the risk where we may repurchase (indiscernible) we can turn
         around and pass that back to the seller.*
28   (Emphasis added.)

                SIXTH AMENDED CLASS ACTION COMPLAINT
                              49

1773662.1

**Exhibit E, Page 172**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 899

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 54 of 108   Page ID
#:8503
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 24 of 28   Page ID
#:203



158. The statements regarding the Company's ability to effectively defray potential repurchase losses are material because the inability to do so would have a serious impact on IndyMac's balance sheet. As a mortgage lender, IndyMac's ability (or not) to "put" *90%* of repurchases on sellers is the type of information looked to by investors in deciding whether to invest in the stock of a mortgage lender. Facts that directly implicate the fundamentals of a company's core operations are important to reasonable investors in exercising their investment judgment.

159. The statement regarding the effectiveness of IndyMac's success rate in obtaining seller repurchases was false and misleading because IndyMac's routine practice of delaying repurchase requests limited IndyMac's ability to gauge this important metric. As reflected in IndyMac's seller litigation (described above), IndyMac was frequently unable to successfully force recidivist sellers to repurchase the substantial quantity of early payment defaults and representation and warranty claims and knew or was reckless in not knowing this fact.

160. Defendant Perry is liable for this statement because, while it was actually uttered by Mr. Keys, Mr. Keys references defendant Perry as a joint participant in the preparation of the statement. Accordingly, when Mr. Keys uttered this statement on behalf of the Company, defendant Perry had a duty to correct it as he knew, or was severely reckless in not knowing, of the statement's material falsity.

161. Scienter is attributable to the Company and defendant Perry because IndyMac, by its own judicial admission, was on notice as early as 2005 that IndyMac was frequently unable to successfully force recidivist sellers to repurchase the loans with early payment defaults and representation and warranty claims.

SIXTH AMENDED CLASS ACTION COMPLAINT

50

1773682.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 900

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 55 of 108   Page ID
#:8504
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 25 of 28   Page ID
#:204

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 54 of 170   Page ID
#:13008

G.   2006 Third Quarter Form 10-Q

1

2        162.   On November 2, 2006, the Company filed its Report on Form 10-Q

3    for the quarter ended September 30, 2006 with the SEC (the "2006 Third Quarter

4    10Q").   Because Perry signed the 2006 Third Quarter 10-Q, all statements therein

5    were made by him and the Company.

6        163.   The 2006 Third Quarter 10Q stated:

7

8        A component of the overall allowance for loan losses is not
         specifically allocated to the loan portfolios ("unallocated
9        component"). The unallocated component reflects management's
         assessment of various factors that create inherent imprecision in the
10       methods used to determine the specific portfolio allocations. Those
         factors include, but are not limited to levels of and trends in
11       delinquencies and impaired loans, charge-offs and recoveries, volume
         and terms of the loans, *effects of any changes in risk selection and*
12       *underwriting standards*, other changes in lending policies,
         procedures, and practices, and national and local economic trends and
13       conditions. *Id.* at 52. (Emphasis added).

14

15       164.   The information contained in the foregoing statement was material to

16   investors when made for the reasons set forth at ¶128.  The foregoing statement

17   was knowingly or recklessly false and misleading for the same reasons that the

18   identical statement, set forth in the Company's 2006 First Quarter 10-Q, was

19   knowingly or recklessly materially false and misleading.  *See* ¶¶129-130

20   (discussing same).

21       H.   November 2, 2006 Conference Call

22       165.   On November 2, 2006, defendant Perry spoke to analysts and the

23   investing public on behalf of the Company during a public earnings conference

24   telephone call (the "Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

25       166.   During the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call

26   Perry stated, regarding the documentation required before a Company underwrites

27   a loan that "typically on full doc borrowers we ask them to provide W-2s and pay

28

SIXTH AMENDED CLASS ACTION COMPLAINT

51

1773662.1

**Exhibit E, Page 174**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 901

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 56 of 108   Page ID
#:8505
Case 2:11-cv-02078-RGK -JCG   Document 1-5   Filed 03/10/11   Page 26 of 28   Page ID
#:205

stubs." Tr. at 14.

167.   The statement regarding certain of the Company's underwriting practices was material.  As a mortgage lender, IndyMac's underwriting practices – including the creditworthiness of its borrowers – is among the most important information looked to by investors for the same reasons set forth in ¶128.

168.   This statement was materially false and misleading because the Company's internal policies *did not* require W-2s and pay stubs as verification of income for "full doc" loans.

169.   Plaintiffs rely on the following facts in support of their allegation that the foregoing statement was materially false and misleading.  CW 7 states that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs.  CW 7 further provided documentation in the form of the "IndyMac Bank NonPrime Program Matrix" confirming the same.

170.   Plaintiffs allege that defendant Perry and the Company knew or were reckless in not knowing that the foregoing statement (at ¶166) was materially false and misleading because Perry's statement facially contradicts the Company's official, written internal policies.

**VI.     LOSS CAUSATION/ECONOMIC LOSS**

171.   As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and artificially inflate IndyMac's securities prices, which scheme operated as a fraud or deceit on Class Period purchasers of IndyMac securities.  In particular, Defendants misrepresented the Company's underwriting standards, risk management policies, and the adequacy of its loan loss reserves.  Later, however, when Defendants' misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market (or, in the alternative,

SIXTH AMENDED CLASS ACTION COMPLAINT

52

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 902

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 57 of 108   Page ID
#:8506
Case 2:11-cv-02078-RGK -JCG   Document 193   Filed 03/10/11   Page 27 of 28   Page ID
#:206

 

1   when the risks concealed by Defendants' misrepresentations materialized),

2   IndyMac stock fell as the artificial inflation came out of the Company's stock

3   price.

4       172.   Specifically, during the Class Period, Defendants misrepresented: (i)

5   IndyMac's underwriting guidelines and controls and their compliance therewith;

6   (ii) IndyMac's risk management policies; and (iii) the adequacy of IndyMac's loan

7   loss reserves.  These misrepresentations concealed, *inter alia*, that the Company's

8   loan portfolio was severely impaired as a result of Defendants' repeated violations

9   of the Company's internal/operational controls over underwriting.  Defendants'

10  false and misleading statements had their intended effect and caused IndyMac's

11  common stock to trade at artificially inflated levels throughout the Class Period,

12  reaching as high as $50.11 per share on May 8, 2006.

13      173.   Starting on January 16, 2007, and through March 1, 2007, investors

14  began to learn the truth through a number of partial disclosures, including

15  Defendants' own admissions.  The series of disclosures revealed, among other

16  things that: (1) the Company faced a substantial earnings shortfall caused by credit

17  losses and increases in provisions for loan loss reserves as a result of the

18  Company's impaired loans; (2) the Company would not meet its forecasted results

19  for the fourth quarter of 2006, primarily because the Company doubled its credit

20  reserves from the previous quarter to cover the massive number of defaults on the

21  loans it had underwritten; (3) several of the Company's business areas (*e.g.* its

22  80/20 loan portfolio) that Defendants had touted as its strongest virtues were, in

23  actuality, profoundly weakened and impaired; (4) the Company experienced a

24  substantial negative financial impact as a result of losses from bad/uncollectible

25  loans held by the Company; and (5) the Company had "loosened its lending

26  standards" during 2006, and that, going forward, the Company would correct this

SIXTH AMENDED CLASS ACTION COMPLAINT

53

Exhibit E, Page 176

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 903

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 58 of 108   Page ID
Case 2:11-cv-02078-RGK -JCG   Document 850 5   Filed 03/10/11   Page 28 of 28   Page ID
#:207

1   by being "smart and prudent" in managing its underwriting guidelines and risk.

2       174.   As a direct result of these disclosures IndyMac's stock price dropped

3   from a close of $43.55 per share on January 12, 2007 (the last trading day before

4   Defendants' disclosures began) to $32.16 on March 1, 2007 (the day of

5   Defendants' last corrective disclosure).  Together, these drops removed the

6   inflation from IndyMac's stock price, causing real economic loss to Indymac

7   investors.  In sum, as the truth was revealed, the Company's stock price

8   plummeted, the artificial inflation came out of the stock, and Plaintiffs and other

9   members of the Class were damaged.

10

11       175.   The decline in IndyMac's stock price during the Class Period was a

12  direct result of Defendants' earlier misrepresentations finally being revealed to

13  investors and the market. The timing and magnitude of IndyMac's stock price

14  declines negate any inference that the loss suffered by Plaintiffs and other Class

15  members was caused by changed market conditions, macroeconomic or industry

16  factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

17  The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the

18  Class was a direct result of Defendants' fraudulent scheme to artificially inflate

19  IndyMac's securities prices and the subsequent significant decline in the value of

20  IndyMac's securities when the truth was revealed through a series of partial

21  disclosures.

22      A.   <u>The Truth About the Company's True Condition Begins to
23           Emerge as Defendants Disclose that Indymac had Saddled Itself
             with Toxic Loans as a Result of its Poor Underwriting Practices
24           Thereby Causing Substantial Charges and Increased Loan Loss
25           Reserves</u>

26      176.   On January 16, 2007, the Company issued a written press release to

27  the public on its website and to various media outlets (the "January 16, 2007 Press

28

SIXTH AMENDED CLASS ACTION COMPLAINT

54

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 904

Case 2:11-cv-02078-RGK-JCG Document 193-23 Filed 11/23/11 Page 59 of 108 Page ID
Case 2:11-cv-02078-RGK-JCG Document 85-97 Filed 03/10/11 Page 1 of 28 Page ID
#:236

Case 2:07-cv-01635-GW-VBK Document 227 Filed 02/16/10 Page 33 of 170 Page ID
#:12987

1    repurchase the early defaulting Lancaster loans. *Id.*

2        101.   The available public data surrounding the early defaulting Lancaster

3    loans (the "Lancaster public data") reflects that a substantial portion of the early

4    defaulting Lancaster loans originated in 2005 and that certain others originated in

5    the first third of the year 2006. Yet, despite the "red flags," IndyMac held off on

6    commencing litigation against Lancaster until January 2007 – *i.e.*, at least one year

7    after it had made its year 2005 demand against Lancaster and well after the close of

8    its Q3 2006 reporting period.

9        102.   As reflected in the following chart, the Lancaster public data reveals

10   that at least 29 of the 44 EPDS complained of involved either 80/20 Piggybacks, or

11   in nine instances, other piggyback configurations. The aggregated principal

12   amount of these 26 loans is approximately $7.9 million. Evidencing IndyMac's

13   laggard conduct with respect to these especially toxic loans, 12 of these risky

14   piggybacks involved Lancaster itself as the lender for both the primary and

15   piggyback loans. Moreover, the data reflect that IndyMac would have had to been

16   aware of its exposure to these loans well before the fourth quarter of 2006. Thus,

17   24 of these 29 Piggyback EPDS involve loans which Lancaster originated as early

18   as 2005 and all 29 of these Piggyback EPDS involve loans which Lancaster

19   originated by the first week of May 2006.

20

21       **Chronological Chart of the 80/20 and Other Piggyback Configurations**

22       **Resulting in Early Payment Defaults, Derived From the *Lancaster* Complaint**

23

| Mortgage Transaction or Recording Date | Paragraph Source from the Lancaster Complaint ("L."), filed 1/10/07 | Last Name (Sourced from the L. Complaint) | Principal Amount of Delinquent Loan (Sourced from the L. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Type of Piggyback |
|---|---|---|---|---|---|---|---|---|---|
| 1  9/12/2005 | 12(q) | Lopez | $116,000 | $116,000 | L | $29,000 | n/a | $145,000 | 80/20 |

24

25

26

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

30

1773062.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 905

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 60 of 108   Page ID
#:8509
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 2 of 28   Page ID
#:237

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 34 of 170   Page ID
#:12988

| 2 | 9/16/2005 | 12(nn) | Williams | $424,800 | $424,800 | L. | $106,200 | L. | $531,000 | 80/20 |
| 3 | 9/21/2005 | 12(d) | Choson | $416,000 | $416,000 | L. | $78,000 | L. | $520,000 | 80/15 |
| 4 | 9/23/2005 | 12(pp) | Philemond | $345,000 | $345,000 | L. | $115,000 | L. | $460,000 | 80/20 |
| 5 | 9/26/2005 | 12(h) | Godfrey | $195,200 | $195,200 | L. | $48,800 | L. | $244,000 | 80/20 |
| 6 | 9/29/2005 | 12(r) | Luyola | $284,000 | $284,000 | L | $71,000 | n/a | $355,000 | 80/20 |
| 7 | 9/29/2005 | 12(ee) | Samuels | $140,000 | $140,000 | L. | $35,000 | n/a | $175,000 | 80/20 |
| 8 | 10/11/2005 | 12(u) | Lauter | $192,000 | $192,000 | L. | $48,000 | n/a | $240,000 | 75/25 |
| 9 | 10/14/2005 | 12(gg) | Sheikh | $61,500 | $61,500 | L. | $20,500 | L. | $82,000 | 80/20 |
| 10 | 10/17/2005 | 12(hh) | Tinglin | $240,000 | $240,000 | L. | $60,000 | n/a | $300,000 | 80/20 |
| 11 | 10/17/2005 | 12(jj) | Viotti | $384,000 | $384,000 | L. | $96,000 | L. | $480,000 | 75/25 |
| 12 | 10/21/2005 | 12(oo) | Fabunan | $127,495 | $127,495 | L. | $41,495 | n/a | $169,599 | 80/20 |
| 13 | 10/31/2005 | 12(e) | Charles | $358,400 | $358,400 | L. | $89,600 | L. | $450,000 | 80/20 |
| 14 | 11/2/2005 | 12(rr) | Warton | $236,000 | $236,000 | L. | $59,000 | n/a | $295,000 | 80/20 |
| 15 | 11/10/2005 | 12(ll) | Williams | $390,080 | $390,080 | L. | $97,520 | n/a | $467,600 | 80/20 |
| 16 | 11/14/2005 | 12(mm) | Williams | $320,000 | $320,000 | L. | $80,000 | n/a | $400,000 | 70/30 |
| 17 | 11/17/2005 | 12(a) | Masei | $337,400 | $337,400 | L. | $144,600 | n/a | $482,000 | 80/20 |
| 18 | 11/30/2005 | 12(l) | James | $348,000 | $348,000 | L. | $87,000 | n/a | $435,000 | 75/25 |
| 19 | 12/7/2005 | 12(a) | Ucoka | $285,000 | $285,000 | L. | $95,000 | n/a | $380,000 | 75/25 |
| 20 | 12/12/2005 | 12(ff) | Solsona Mendez | $262,500 | $262,500 | L. | $87,500 | n/a | $350,000 | 80/20 |
| 21 | 12/20/2005 | 12(xx) | Uchhrup | $88,000 | $88,000 | L. | $22,000 | n/a | $110,000 | 70/30 |
| 22 | 12/20/2005 | 12(qq) | Smithward | $378,000 | $378,000 | L. | $162,000 | n/a | $540,000 | 70/30 |
| 23 | 12/22/2005 | 12(vv) | Pinder | $182,000 | $182,000 | L. | $78,000 | n/a | $260,000 | 80/20 |

SIXTH AMENDED CLASS ACTION COMPLAINT

31

1773662.1

02/23/11

**Exhibit E, Page 154**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 906

Case 2:07-cv-01635-GW -VBK    Document 227    Filed 02/16/10    Page 35 of 170    Page ID #:12989

| 24 | 12/28/2005 | 12(z) | Pentford | $181,280 | $181,280 | L. | $45,320 | L. | $226,600 | 80/20 |
| 25 | 2/21/2006 | 12(g) | Del Socorro | $372,000 | $372,000 | L. | $93,000 | L. | $465,000 | 80/20 |
| 26 | 2/24/2006 | 12(y) | Palleija | $332,000 | $332,000 | L. | $83,000 | n/a | $415,000 | 80/20 |
| 27 | 4/7/2006 | 12(k) | Jackson | $511,200 | $511,200 | L. | $127,800 | n/a | $639,000 | 70/30 |
| 28 | 4/28/2006 | 12(aa) | Picardo | $265,930 | $265,930 | L. | $113,970 | L. | $379,900 | 80/20 |
| 29 | 5/5/2006 | 12(t) | Martins | $172,800 | $172,800 | L. | $43,200 | n/a | $217,000 | 80/20 |
|  |  |  | Total: | $7,940,585 |  |  |  |  |  |  |

103.    As was the case with Silver State, IndyMac's lengthy delay in pursuing its rights against Lancaster with respect to these numerous distressed loans bespeak IndyMac's knowing or, at least, deliberately reckless desperation to maintain the facade of ever-increasing loan production growth during the Class Period.

### 3.    Geneva Toxic Loan Pool

104.    Further confirmation of this *modus operandi* emerges from IndyMac's lawsuit against yet another mortgage broker, Geneva Mortgage Corp. ("Geneva"), alleging that Geneva breached its warranties and obligations to IndyMac concerning a pool of eighteen (18) loans.  This action is styled *IndyMac Bank, F.S.B. v. Geneva Mortgage Bankers, LLC*, No. CV07-01914-ER (C.D. Cal. March 22, 2007) (complaint filed).

105.    Pursuant to the *Geneva* complaint, as alleged by IndyMac, sixteen (16) of the borrowers on these Geneva loans either "*did not make their first payment* after IndyMac's purchase of the loan, or failed to make a timely payment as to anyone of the first three months after" such purchase (the "early defaulting Geneva loans").  *Id.*, at ¶12 (emphasis added).

106.    Each of these borrower failures amounted to an "Early Payment

SIXTH AMENDED CLASS ACTION COMPLAINT

32

1773652.1

**Exhibit E, Page 155**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 907

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 62 of 108   Page ID
#:8511
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 4 of 28   Page ID
#:239

1   Default" as defined by the Purchase Agreement governing the subject loans which
2   had been entered into by the parties, on or about April 9, 2003. *Id.*, at ¶¶5-6. As
3   such, Geneva was obligated under that agreement to repurchase each such
4   distressed loan within *thirty* (30) days of receiving IndyMac's notice of default.
5   *Id.*, at ¶6.
6       107.   According to the *Geneva* complaint, "on or about December 2003,"
7   IndyMac first demanded that Geneva make good on its repurchase obligations as to
8   two (2) of the early defaulting Geneva loans but to no avail. *Id.*, at ¶18.
9   "Commencing on or about 2006," IndyMac made such demand on Geneva as to
10  the remaining such loans. *Id.* Geneva, however, breached its obligations and
11  refused to repurchase the early defaulting loans. *Id.*
12      108.   The available public data surrounding the early defaulting Geneva
13  loans (the "Geneva public data") reflects that two of those loans originated in the
14  year 2003, more than half originated in the year 2005 and the remaining ones
15  originated in the year 2006. Yet, despite these "red flags," IndyMac held off on
16  commencing litigation against Geneva until late March 2007 – *i.e.*, no earlier than
17  approximately fifteen (15) months from the cutoff point by which the majority of
18  the early defaulting Geneva loans had already originated.
19      109.   As reflected in the following chart, the Geneva public data reveals that
20  at least 9 of the 16 EPDS complained of involved either 80/20 Piggybacks, or in
21  two instances, a virtual 80/20 configuration. The aggregated principal amount of
22  these 9 loans comes to approximately $2.62 million. Evidencing IndyMac's
23  laggard conduct with respect to these especially toxic loans, 8 of these risky
24  piggybacks involved Geneva itself as the lender for both the primary and
25  piggyback loans – and, in these instances, IndyMac was exposed to the very same
26  borrowers on both loans. Moreover, the data reflects that IndyMac would have had
27
28

SIXTH AMENDED CLASS ACTION COMPLAINT

33

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 908

1  to been aware of its exposure to these loans well before the fourth quarter of 2006.

2  Thus, 6 of these 9 Piggyback EPDS involve loans which Geneva originated as

3  early as 2005 and all 9 of these Piggyback EPDS involve loans which Geneva

4  originated by the end of July 2006.

5  **Chronological Chart of the 80/20 and Other Piggyback Configurations**

6  **Resulting in Early Payment Defaults, Derived From the *Geneva* Complaint**

| | Mortgage Transaction or Recording Date | Paragraph Sourced from the Geneva Complaint ("G."), Filed 3/22/07 | Last Name (Sourced from the G. Complaint) | Principal Amount of Delinquent Loan (Sourced from the G. Complaint) | First Mortgage Amount on the Subject Property | Lender ID | Second Mortgage Amount on the Subject Property | Lender ID | Total Sale Price of the Subject Property | Piggyback Type |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/16/2005 | 13(o) | Rivera | $368,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 2 | 9/16/2005 | 13(p) | Rivera | $92,000 | $368,000 | G. | $92,000 | G. | $465,000 | 80/20 |
| 3 | 11/3/2005 | 13(j) | Pratt | $327,200 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 4 | 11/3/2005 | 13(k) | Pratt | $81,800 | $327,200 | G. | $81,800 | G. | $409,000 | 80/20 |
| 5 | 12/16/2005 | 13b | Clarke | $240,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 6 | 12/16/2005 | 13(d) | Clarke | $55,000 | $240,000 | G. | $55,000 | G. | $300,000 | 80/18 |
| 7 | 5/25/2006 | 13(n) | Reyes | $344,000 | $344,000 | G. | $86,000 | n/a | $430,000 | 80/20 |
| 8 | 7/26/2006 | 13(l) | Puckett | $204,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| 9 | 7/26/2006 | 13(m) | Puckett | $51,000 | $204,000 | G. | $51,000 | G. | $255,000 | 80/20 |
| | | | Total | $2,622,000 | | | | | | |

25  110.   As was the case with Silver State and Lancaster, IndyMac's lengthy

26  delay in pursuing its rights against Geneva with respect to these numerous

27  distressed loans bespeaks IndyMac's knowing or, at least, deliberately reckless

1773662.1

**Exhibit E, Page 157**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 909

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 64 of 108   Page ID
#:8513
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 6 of 28   Page ID
#:241

1  desperation to maintain the facade of ever-growing loan production growth during

2  the Class Period.[4]

3      111.   In addition to the foregoing lawsuits filed by IndyMac, a lawsuit filed

4  against the Company confirms the allegations of CW 2, who stated that the

5  Company violated its underwriting guidelines by artificially inflating the appraised

6  values of properties.

7      112.   In *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (JGK)

8  (S.D.N.Y.), the plaintiff, a residential home mortgage borrower, sued IndyMac and

9  alleged that it had improperly and systematically selected and coerced various

10  appraisal professionals so as to generate greater loan volumes.  These appraisers

11  would perform faulty and defective appraisal services which inflated the value of

12  residential properties and thereby allowed Defendants to complete more real estate

13  transactions and obtain greater profits.

14

15      113.   Cedeno, in her Amended Class Action Complaint (filed on July 20,

16  2007), alleged, based on confidential witnesses, that "IndyMac threatened and

17  retaliated against appraisers and management firms that failed to give in to

18

19  _____

[4]  The *Silver State, Lancaster,* and *Geneva* actions are representative of the
20  plethora of litigation IndyMac initiated in connection with distressed loans, many
21  of which were 80/20 piggyback loans that suffered early payment defaults in 2005
and 2006.  For example, IndyMac has been involved in, *inter alia: IndyMac Bank,*
22  *F.S.B. v. Weststar Mortgage, Inc.*, No. 08-cv-00748 (C.D. Cal., complaint filed
Feb. 4, 2008); *IndyMac Bank, F.S.B. v. Cameron Financial Group, Inc.*, No.
23  BC376578 (Los Angeles Superior Court, complaint filed Aug. 27, 2007); *IndyMac*
24  *Bank, F.S.B. v. Just Mortgage, Inc.*, No. BC384487 (Los Angeles Superior Court,
complaint filed Jan. 28, 2008); *IndyMac Bank, F.S.B. v. Kay-Co Investments, Inc.*,
25  No. BC375931 (Los Angeles Superior Court, complaint filed Aug. 14, 2007);
*IndyMac Bank, F.S.B. v. Fidelity & Trust Mortgage, Inc.*, No. BC374417 (Los
26  Angeles Superior Court, complaint filed July 18, 2007); and *IndyMac v. Solutions*
27  *Funding, Inc.*, No. BC369971 (Los Angeles Superior Court, complaint filed Apr.
23, 2007).

28

SIXTH AMENDED CLASS ACTION COMPLAINT

35

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 910

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 65 of 108   Page ID
#:8514
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 7 of 28   Page ID
#:242

1  pressure to meet the target appraisal values by IndyMac and to inflate the appraisal
2  values."
3      114.   The practice of encouraging inflated appraisal values resulted in
4  borrowers incurring more mortgage debt than necessary and/or more mortgage
5  debt than the borrower could afford. All this was to meet loan origination targets
6  set by IndyMac's senior management.
7
8      115.   In order to accomplish this subterfuge, IndyMac had to override
9  stated lending practices and internal/operational controls:
10          . . . Specifically, Defendants allowed Production
11     Personnel to improperly influence Credit\Valuation
       Personnel. Production Personnel threatened and
12     intimidated Credit\Valuation Personnel to approve
       inflated appraisals received from outside appraisal
13     companies or appraisal management firms. Contrary to
       Defendants' representations to Plaintiff and members of
14     the Class, Defendants failed to provide the necessary
       insulation and separation between Production Personnel
15     and Credit/Valuation Personnel;

16     According to a confidential witness, IndyMac executives,
       including the Chief Appraiser, were aware and allowed
17     the improper influence Production Personnel placed on
       their own Credit\Valuation Personnel to choose
18     appraisers and to approve appraisers obtained from third
       party appraisal companies or appraisal management firms
19     willing to supply IndyMac with inflated appraisals;

20     Indeed according to this confidential witness,
       Credit/Valuation Personnel at IndyMac were told not to
21     reject inflated or otherwise improper appraisals and were
       threatened or told by Production Personnel that they
22     would be terminated if they failed to do so;

23     According to another confidential witness, IndyMac was
       in fact operating its appraisal review department under
24     pressure to make the values that IndyMac's loan officers
       and processing department were pushing. This
25     confidential witness further stated that employees of
       IndyMac exerted pressure to make sure loans would be
26     approved regardless of accurate appraisal values.
27
28

1773882.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 911

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 66 of 108  Page ID
#:8515
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 8 of 28   Page ID
#:243

 

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

116.   During the Class Period, Defendants issued numerous materially false and misleading statements. Each of those statements is set forth below, including detail regarding (i) the date of the statement; (ii) the speaker; (iii) the nature of the statement (oral or written); (iv) to whom the statement was made; (v) the location/context of the statement; (vi) why the statement was materially false and misleading; and (vii) facts giving rise to a strong inference that the particular defendant who made (or caused to be made) the statement had the requisite state of mind. The facts that provide the basis for the foregoing allegations, including a full recitation of the statements of numerous confidential witnesses and various lawsuits in which the Company is engaged, are set forth at ¶¶121, 144, 169, 209, *supra.*

### A.    2005 Annual Report on Form 10-K

117.   On March 1, 2006, the Company filed its Annual Report for the year ended December 31, 2005 with the SEC on Form 10-K (the "2005 10-K"). Because Perry signed the 2005 10-K, all statements contained therein were made by him and the Company.

### Statement One:

118.   The 2005 10-K stated:

*By closely monitoring key factors such as product type, origination channels, progress or "status" of transactions, as well as changes in market interest rates since IndyMac committed a rate to the borrower ("rate lock commitments"), the Company seeks to quantify the optional component of each rate lock,* and in turn, the aggregate rate lock pipeline. By accurately evaluating these factors, the Company has been able to minimize the purchase of options and also stabilize gain on sale margins over different rate environments. [2005 10-K at p. 41-42].

119.   These statements are material because quantifying (and adhering to) rate locks and monitoring key factors related to loan underwriting drastically

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 912



1  impact the bottom-line profitability (or not) of a lender, like IndyMac. *See supra*

2  at ¶¶32-34, 48. A reasonable investor would therefore view IndyMac's monitoring

3  of such "key" factors as important because loan quality (or the absence thereof)

4  would have a serious impact on IndyMac's balance sheet.

5       120. The foregoing statement was false and misleading because the

6  Company's "rate lock commitments" were no commitments at all. This is so

7  because the "rate lock commitments" were regularly violated by and at the

8  direction of defendant Perry, which rendered them meaningless as a risk control

9  device.

10      121. Plaintiffs rely on the following facts in support of their allegation that

11  the foregoing statement (at ¶118) was materially false and misleading and that

12  Perry knew it: CW 1 stated that defendant Perry directed the Executive Vice

13  President and CEO, Ashwin Adarkar (and thus, the Central Banking Group) to

14  engage in violations of the Company's "rate lock" protocols and controls. ¶¶43-

15  49.

16

17  **Statement Two:**

18      122. The 2005 10-K also stated:

19       *We hedge the risks associated with our mortgage commitments to*
         *purchase mortgage loans ("rate locks")* and funded mortgage loans
20       that will be sold in the secondary market. The risk associated with the
         rate locks and funded mortgage loans is that interest rates will
21       fluctuate between the time we commit to purchase a loan at a pre-
         determined price, or the customer locks in the interest rate on a loan,
22       and the time we sell or commit to sell the mortgage loan. [2005 10-K
         at 78]. (Emphasis added)
23

24      123. These statements are material because hedging risk associated with

25  mortgage commitments to purchase mortgage loans correlates to overall loan

26  quality (and hence, the underlying underwriting practices) which affects a

27  mortgage lender's balance sheet and profitability. *See supra* at ¶¶32-34. There is a

28  substantial likelihood that a reasonable investor would view such facts as

SIXTH AMENDED CLASS ACTION COMPLAINT

38

**Exhibit E, Page 161**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 913

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 68 of 108   Page ID
#:8517
Case 2:11-cv-02078-RGK-JCG   Document 1-7   Filed 03/10/11   Page 10 of 28   Page ID
#:245

1   important.

2       124.   The foregoing statement was false and misleading because the

3   Company regularly violated, at the direction of defendant Perry, the "rate locks,"

4   rendering them meaningless as a risk control device. This allowed the Company to

5   achieve revenue and volume targets in the short-run, while exposing itself to losses

6   on the back end of the loan.

7       125.   Plaintiffs rely on the following facts in support of their allegation that

8   the foregoing statement (at ¶122) was materially false and misleading and that

9   Perry knew it: CW 1 stated that defendant Perry directed Adarkar (and thus, the

10  Central Banking Group) to engage in violations of the Company's "rate lock"

11  protocols and controls.  ¶¶43-49.

12

13    **B.**   **2006 First Quarter Form 10-Q**

14      126.   On April 25, 2006, the Company filed its Report on Form 10-Q for

15  the quarter ended March 31, 2006 with the SEC (the "2006 First Quarter 10Q").

16  Because Perry signed the 2006 First Quarter 10-Q, all statements therein were

17  made by him and the Company.

18      127.   The 2006 First Quarter 10-Q stated:

19      A component of the overall allowance for loan losses is not
        specifically allocated to the loan portfolios ("unallocated
20      component"). The unallocated component reflects management's
        assessment of various factors that create inherent imprecision in the
21      methods used to determine the specific portfolio allocations. Those
        factors include, but are not limited to levels of and trends in
22      delinquencies and impaired loans, charge-offs and recoveries, volume
        and terms of the loans, *effects of any changes in risk selection and*
23      *underwriting standards,* other changes in lending policies,
        procedures, and practices, and national and local economic trends and
24      conditions. *Id.* at 48. (Emphasis added)

25

26      128.   The statements regarding the Company's "risk selection" and

27  "underwriting standards" are material. As a mortgage lender, IndyMac's

28  underwriting practices are among the most important information looked to by

SIXTH AMENDED CLASS ACTION COMPLAINT

39

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 914

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 69 of 108   Page ID
#:8518
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 11 of 28   Page ID
#:246

1   investors in exercising their investment judgment. In addition, the frequency with

2   which Perry emphasized the Company's underwriting policies in press releases and

3   other public statements, as well as the fact that analysts frequently repeated and

4   commented on Defendants' statements regarding the Company's standards, further

5   supports the materiality of these statements.

6       129.   The statement set forth at ¶127 was false and misleading when made

7   as IndyMac's loan loss reserves did not consider the "effects of any changes in risk

8   selection and underwriting standards, other changes in lending policies,

9   procedures, and practices, and national and local economic trends and conditions."

10   This is so because the Company's "underwriting standards" were wholly

11   ineffective (and violated by or caused to be violated by Perry, *see e.g.* ¶¶43-51),

12   and thus, meaningless as a factor in the calculation of the Company's loan loss

13   reserves.

14

15       130.   Perry knew or was reckless in not knowing of the violations of the

16   Company's underwriting controls and standards (rendering the statement at ¶127

17   materially false and misleading) for the following reasons. First, Perry directed

18   employees to (i) "push loans through" regardless of whether they satisfied the

19   Company's underwriting guidelines; (ii) input false information into the

20   Company's e-MITS underwriting control system, to cause the approval of loans

21   that would normally be rejected; and (iii) engage in violations of the Company's

22   "rate lock" protocols and controls. ¶¶43-49. Second, Perry was aware that

23   rampant fraud and lying by loan sales representatives was taking place, yet he

24   continued to push employees to close loans "at all costs." ¶50. Third, the wide-

25   ranging and management-directed violations of the Company's underwriting

26   guidelines and controls evidences a culture of fraud at the Company. ¶¶50-51.

27   Fourth, the number of fraudulent loans discovered at the Company increased by

28

SIXTH AMENDED CLASS ACTION COMPLAINT

40

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 915

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 70 of 108   Page ID
#:8519
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 12 of 28   Page ID
#:247

●                            ●

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 44 of 170   Page ID
#:12998

1    1500% from 2003 to mid-2006, rendering the lack of control over underwriting

2    facially obvious. ¶¶67-70. Fifth, the massive increase in bad loan "kickbacks"

3    requiring repurchase by the Company resulted in the initiation of a "special

4    project" at the Company to rehabilitate those loans. ¶¶73-75. Finally, the

5    numerous lawsuits filed by the Company show that it knew that certain pools of

6    loans that it had underwritten were defaulting at rates as high as 90% (in 2005),

7    and 97% (in 2006), rendering the inadequacy of the Company's underwriting

8    controls facially obvious to Perry and the Company. *See* ¶84.

9
10       C.    **April 25, 2006 Conference Call**

11       131.   On April 25, 2006, defendant Perry spoke to analysts and the

12   investing public on behalf of the Company during a public earnings conference

13   telephone call (the "Q1 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

14       132.   During this Q1 2006 IndyMac Bancorp, Inc. Earnings Conference

15   Call, Perry stated:

16       *[W]e have the best quality control function of any thrift out there*
17       because we sell 95% of our production in the secondary market. Who
         does their own due diligence and if we have problems with it, if we
18       have mispricing like we did with the home equity business, right, *it*
         *immediately gets reflected in our numbers and we fix it.* Do you see
19       what I'm saying? That's a big quality control function, the fact that
         we turn our loans on average, this quarter was about 50 days, 55 days
20       and in 55 days we know if we priced them right and we know if the
         investor is willing to buy them.... Tr. at 13 (emphasis added).

21       133.   Defendants' statements regarding the Company's underwriting

22   standards and quality controls are material. As a mortgage lender, IndyMac's

23   underwriting practices are among the most important information looked to by

24   investors as illustrated by the frequency with which Perry emphasized the

25   Company's underwriting policies in press releases and other public statements, as

26   well as the fact that analysts frequently repeated and commented on Defendants'

27   statements regarding the Company's standards. Moreover, for a mortgage lender,

28

SIXTH AMENDED CLASS ACTION COMPLAINT

41

1773682.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 916

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 71 of 108   Page ID
#:8529
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 13 of 28   Page ID
#:248

 

1   like IndyMac, statements touting "the best quality control of *any* thrift out there"

2   goes to the fundamentals of *any* mortgage company and corresponding ability to

3   generate reliable streams of revenue.  There is a substantial likelihood that a

4   reasonable investor would consider such facts important.

5       134.  The foregoing statements were false and misleading because

6   IndyMac's quality control, both pre-purchase and post-purchase were so recklessly

7   deficient that IndyMac was unable to monitor, let alone "fix," its early payment

8   defaults and representations and warranties related to its loans.  Indeed, IndyMac

9   permitted intentionally and grossly exaggerated stated income loans to be

10  processed without appropriate due diligence in the pre-funding quality control

11  process.  For instance, IndyMac should have and could have verified loan

12  applicants' income as reported to the IRS by utilizing Form 4506T.  IndyMac

13  recklessly, if not willfully, turned a blind eye to false, inflated stated incomes.

14  Incredibly, IndyMac actually marketed to brokers its willingness to ignore most

15  stated income deficiencies.  *See* IndyMac Presentation *Here We Grow* at 14

16  ("Required Form: 4506T (will not be pulled unless income is outrageous).").

17  Furthermore, IndyMac's post-funding quality control audits were conducted on an

18  untimely basis as IndyMac's post-funding quality control department was

19  significantly understaffed.  The Solutions Funding post-funding quality control

20  audits were performed months after the loans were in early payment default,

21  significantly undermining their utility.

22

23      D.   2006 Second Quarter Form 10-Q

24      135.  On July 27, 2006, the Company filed its Report on Form 10-Q for the

25  quarter ended June 30, 2006 with the SEC (the "2006 Second Quarter 10Q").

26  Because Perry signed the 2006 Second Quarter 10-Q, all statements therein were

27  made by him and the Company.

28

SIXTH AMENDED CLASS ACTION COMPLAINT

42

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 917

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 72 of 108   Page ID
#:8521
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 14 of 28   Page ID
#:249

136.   The 2006 Second Quarter 10-Q stated:

A component of the overall allowance for loan losses is not specifically allocated to the loan portfolios ("unallocated component"). The unallocated component reflects management's assessment of various factors that create inherent imprecision in the methods used to determine the specific portfolio allocations. Those factors include, but are not limited to *levels of and trends in delinquencies and impaired loans, charge-offs and recoveries, volume and terms of the loans, effects of any changes in risk selection and underwriting standards*, other changes in lending policies, procedures, and practices, and national and local economic trends and conditions. *Id.* at 45.  (Emphasis added)

137.   The foregoing statements were material and knowingly or recklessly false and misleading for the same reasons that the same statement, set forth in the Company's 2006 First Quarter 10-Q, was knowingly or recklessly materially false and misleading. *See* ¶¶132-33 (discussing same).

E.   <u>September 13, 2006 Lehman Brothers Presentation</u>

138.   On or about September 13, 2006, Michael Perry participated at Lehman Brothers' 2006 Financial Services Conference. IndyMac's presentation was filed with the SEC in an 8-K on September 13, 2006.  A table entitled, "Risk Management Functions Are Also Performed at Business-Unit Level," catalogs the following systemic safeguards in place in connection with IndyMac's SFR Mortgage Production:

1. Thorough sellers/3rd party approval and monitoring;
2. Pre-funding quality control reviews;
3. Sound underwriting guidelines;
4. Rigorous in-house appraisal reviews;
5. Post-funding quality control audits; and
6. Loss mitigation/fraud recovery management.

Presentation at 23.

<u>Statement One:</u>

139.   The statement regarding the systemic safeguard in place for the Company's underwriting practices is material because, as a mortgage lender, IndyMac's underwriting practices – including its purported "thorough" third party

<div align="center">SIXTH AMENDED CLASS ACTION COMPLAINT</div>

<div align="center">43</div>

1773662.1

Exhibit E, Page 166

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 918

1 approval and monitoring – are among the most important information looked to by

2 investors in exercising their investment judgment. The frequency with which

3 Perry emphasized the Company's underwriting policies in press releases and other

4 public statements, as well as the fact that analysts frequently repeated and

5 commented on Defendants' statements regarding the Company's standards,

6 confirms the materiality of this statement.

7    140.   Defendants' statement that they conducted "thorough sellers/3rd party

8 approval and monitoring" was materially false and misleading.  IndyMac's

9 seller/3rd party approval and monitoring were severely deficient.  As reflected in

10 the litigation between IndyMac and its various brokers, such as Lancaster, Silver

11 State and Geneva, IndyMac recklessly continued to conduct business with sellers

12 who experienced massive early payment defaults and significant representation and

13 warranty deficiencies.

14
15    141.   Plaintiffs allege that defendant Perry knew or was reckless in not

16 knowing that the foregoing statement (at ¶138) was materially false and misleading

17 because IndyMac, by its own judicial admission, was aware, at least as early as

18 2005, of significant early payment defaults and representation and warranty

19 deficiencies plaguing loans obtained through sellers.

20    **Statement Two:**

21    142.   The statement regarding the systemic safeguard in place for the

22 Company's underwriting practices is material because, as a mortgage lender,

23 IndyMac's underwriting practices – including "pre-funding quality control

24 reviews" – are among the most important information looked to by investors.  The

25 frequency with which Perry emphasized the Company's underwriting policies in

26 press releases and other public statements, as well as the fact that analysts

27 frequently repeated and commented on Defendants' statements regarding the

28

SIXTH AMENDED CLASS ACTION COMPLAINT

44

1773662.1

**Exhibit E, Page 167**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 919

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 74 of 108   Page ID
#:8523
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 16 of 28   Page ID
#:251

1   Company's standards, confirms the importance of these statements to investors.

2       143.   IndyMac's statement that it conducted "pre-funding quality control

3   reviews" was false and misleading.  IndyMac's pre-funding quality control reviews

4   were grossly inadequate.  Indeed, IndyMac permitted intentionally and grossly

5   exaggerated stated income loans to be processed without appropriate due diligence

6   in the pre-funding quality control process.  For instance, IndyMac should have and

7   could have verified loan applicants' income as reported to the IRS by utilizing

8   Form 4506T.  IndyMac recklessly, if not willfully, turned a blind eye to false,

9   inflated stated incomes.  Incredibly, IndyMac actually marketed to brokers its

10   willingness to ignore most stated income deficiencies.  *See* IndyMac Presentation

11   *Here We Grow* at 14 ("Required Form: 4506T (will not be pulled unless income is

12   outrageous).").

13       144.   Plaintiffs allege that defendant Perry knew or was reckless in not

14   knowing that the foregoing statement (at ¶138) was materially false and misleading

15   because (i) Perry directed IndyMac employees to "push loans through" without

16   regard to approval guidelines, as attested to by the CWs, evidenced in, *inter alia*,

17   "Disneyland Loans"; (ii) Perry and other senior managers encouraged the

18   manipulation of the e-MITS system; (iii) loan sales representatives solicited

19   fraudulent letters in connection with purported verification of customer income,

20   which was reported to upper management; (iv) as stated by CW4, during the Class

21   Period IndyMac experienced and was aware of a substantial increase in defaults

22   attributable to misrepresentations and fraud in the loan applications facilitated by

23   the Company's relaxing of underwriting guidelines; and (v) IndyMac instituted

24   auditor bonus structures that dissuaded the detection of fraud.

25   **Statement Three:**

26       145.   The statement regarding the Company's systemic safeguards in place

SIXTH AMENDED CLASS ACTION COMPLAINT

45

1773662.1

for its underwriting guidelines is material because, for a mortgage lender, "sound underwriting guidelines" are among the most important information looked to by investors in exercising their investment judgment. The frequency with which Perry emphasized the Company's "sound" underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

146. IndyMac's statement that it had "sound underwriting guidelines" was false and misleading. IndyMac routinely approved high-risk loans that departed significantly from the Company's established underwriting guidelines. As described fully at ¶¶43-51 herein, IndyMac, and defendant Perry in particular, created a company-wide culture and practice of ignoring and intentionally overriding the Company's underwriting guidelines for the singular, myopic goal of generating loan volume. Combined with IndyMac's substantial reliance on high-risk loans, the actual practice at IndyMac to ignore and intentionally override the Company's stated underwriting guidelines placed the Company's business in the precarious condition of relying on a flimsy base of significantly risky loans – unbeknownst to the public. In short, IndyMac had in place, and adhered to, anything but "sound underwriting guidelines."

147. Plaintiffs allege that defendant Perry knew or was reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because Perry himself created a company-wide pattern of abandoning underwriting guidelines, directing IndyMac employees to "push loans through" without regard to approval guidelines. As attested to by various confidential witnesses, the company-wide environment had become an "organized chaos" focused on the singular goal of increasing reported loan volume, regardless of loan quality.

02/23/11

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 76 of 108   Page ID
#:8525
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 18 of 28   Page ID
#:253

**Statement Four:**

148.   The statement regarding the Company's "rigorous" in-house appraisal reviews is material because, as a mortgage lender, IndyMac's underwriting practices – including purportedly conducting "rigorous" appraisal reviews – are among the most important information investors look to in deciding whether to invest in a mortgage lending company's stock.  The frequency with which Perry emphasized such underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the Company's standards, confirms the importance of such statements to investors.

149.   IndyMac's statement that it conducted "rigorous in-house appraisal reviews" was false and misleading.  IndyMac's appraisal reviews were limited and recklessly deficient.

150.   Plaintiffs allege that Perry and IndyMac knew or were reckless in not knowing that the foregoing statement (at ¶138) was materially false and misleading because IndyMac's appraisal reviews were performed under only limited circumstances, as reflected in the deposition transcripts of Nicholas Nyland and Ignacio Gomez in the *Indymac Bank v. Chandler Appraisal Services* litigation.

**Statement Five:**

151.   The statement regarding the Company's underwriting quality control is material.  High quality loans could be expected by reasonable investors to generate reliable streams of revenue at IndyMac.  In contrast, loans that perform poorly would have a negative impact on IndyMac's balance sheet.  As a mortgage lender, IndyMac's underwriting practices – including "post-funding quality control audits" – are therefore among the most important information looked to by investors.  Moreover, the frequency with which Perry emphasized such

SIXTH AMENDED CLASS ACTION COMPLAINT

47

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 922

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 77 of 108  Page ID
#:8526
Case 2:11-cv-02078-RGK -JCG  Document 117  Filed 03/10/11  Page 19 of 28  Page ID
#:254

1    underwriting practices in press releases and other public statements, as well as the

2    fact that analysts frequently repeated and commented on Defendants' statements

3    regarding the Company's standards, confirms the importance of such statements to

4    investors.

5        152.   IndyMac's statement that it conducted "post-funding quality control

6    audits" was false and misleading.  IndyMac's post-funding quality control audits

7    were conducted on an untimely basis as IndyMac's post-funding quality control

8    department was significantly understaffed.  The Solutions Funding post-funding

9    quality control audits were performed months after the loans were in early payment

10   default, significantly undermining their utility.

11       153.   Plaintiffs allege that defendant Perry knew or was reckless in not

12
13   knowing that the foregoing statement (at ¶138) was materially false and misleading

14   because these audits were not being done on a timely basis, i.e., quarterly.  Instead,

15   IndyMac and Perry recklessly permitted delays far in excess of a quarter before

16   post-funding quality control audits were performed.  Even after the post-funding

17   quality control reports were completed, IndyMac's procedures permitted

18   substantial delays before repurchase requests were even sent to sellers.

19   **Statement Six:**

20       154.   The Company's "loss mitigation and fraud recovery management"

21   statements are also material.  For a mortgage lender, like IndyMac, such

22   underwriting practices are among the most important information looked to by

23   investors.  The frequency with which Perry emphasized the Company's

24   underwriting policies in press releases and other public statements, as well as the

25   fact that analysts frequently repeated and commented on Defendants' statements

26   regarding the Company's standards, further demonstrates materiality.

27       155.   IndyMac's statement that it purportedly had adequate "loss

28

SIXTH AMENDED CLASS ACTION COMPLAINT

48

1773862.1

Exhibit E, Page 171

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 923

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 78 of 108   Page ID
#:8527
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 20 of 28   Page ID
#:255

1   mitigation/fraud recovery management" was false and misleading.  IndyMac's

2   seller pursuit department was patently ineffective as a result of its inadequate

3   staffing and resources causing inordinate delay in its attempts to recover from

4   recidivist sellers.  As such, IndyMac frequently only pursued litigation years after

5   problems with a seller became apparent, with limited success.

6          156.   Plaintiffs allege that defendant Perry knew or was reckless in not

7   knowing that the foregoing statement (at ¶138) was materially false and misleading

8   because IndyMac failed to pursue delinquent loan sellers for excessive time

9   periods.  IndyMac's legal department was acutely aware of the inordinate delays

10  that occurred with respect to seller pursuit litigation.  Moreover, IndyMac

11  recklessly purchased loans from sellers who had failed to cure repurchase requests.

12

13  F.      **September 21, 2006 RBC Financial Institutions Conference**

14         157.   Scott Keys, Executive Vice President and Chief Financial Officer of

15  IndyMac, on behalf of IndyMac, made the following statement at an RBC

16  Financial Institutions Conference on September 21, 2006:

17

18         I joke with Mike Perry, our CEO, that if we did a slide for every
           negative article that comes out in the mortgage -- kind of about
19         mortgages, Jim, I'd need the rest of the day for the presentation. *But
           we wanted to spend the bulk of the presentation trying to dispel some*
20         *myths about the industry, and also some myths about the Company,*
           *where we think people are lumping us in with -- maybe with issues*
21         *that don't really exist.*  So, I'm going to spend the bulk of time the
           time on enterprise risk management today.
22
                                *       *       *
23
           One of the other things that we have the ability to do is we do a fair
24         amount of our purchases in our conduit business. And there we're
           dealing with larger financial institutions, and we have a pretty high
25         success rate. *If we end up having to repurchase a loan, we are able*
           *to turn around and put that repurchase back to the seller. To us it's*
26         *probably about a 90% effectiveness rate there. So, we -- so, a lot of*
           *the risk where we may repurchase (indiscernible) we can turn*
27         *around and pass that back to the seller.*

28  (Emphasis added.)

        SIXTH AMENDED CLASS ACTION COMPLAINT

                            49

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 924

Case 2:11-cv-02078-RGK-JCG Document 193-23 Filed 11/23/11 Page 79 of 108 Page ID
Case 2:11-cv-02078-RGK -JCG Document 85-23 Filed 03/10/11 Page 21 of 28 Page ID
#:256

Case 2:07-cv-01635-GW -VBK Document 227 Filed 02/16/10 Page 53 of 170 Page ID
#:13007

158. The statements regarding the Company's ability to effectively defray potential repurchase losses are material because the inability to do so would have a serious impact on IndyMac's balance sheet. As a mortgage lender, IndyMac's ability (or not) to "put" *90%* of repurchases on sellers is the type of information looked to by investors in deciding whether to invest in the stock of a mortgage lender. Facts that directly implicate the fundamentals of a company's core operations are important to reasonable investors in exercising their investment judgment.

159. The statement regarding the effectiveness of IndyMac's success rate in obtaining seller repurchases was false and misleading because IndyMac's routine practice of delaying repurchase requests limited IndyMac's ability to gauge this important metric. As reflected in IndyMac's seller litigation (described above), IndyMac was frequently unable to successfully force recidivist sellers to repurchase the substantial quantity of early payment defaults and representation and warranty claims and knew or was reckless in not knowing this fact.

160. Defendant Perry is liable for this statement because, while it was actually uttered by Mr. Keys, Mr. Keys references defendant Perry as a joint participant in the preparation of the statement. Accordingly, when Mr. Keys uttered this statement on behalf of the Company, defendant Perry had a duty to correct it as he knew, or was severely reckless in not knowing, of the statement's material falsity.

161. Scienter is attributable to the Company and defendant Perry because IndyMac, by its own judicial admission, was on notice as early as 2005 that IndyMac was frequently unable to successfully force recidivist sellers to repurchase the loans with early payment defaults and representation and warranty claims.

SIXTH AMENDED CLASS ACTION COMPLAINT

50

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 925

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 80 of 108   Page ID
Case 2:11-cv-02078-RGK -JCG   Document 52-9   Filed 03/10/11   Page 22 of 28   Page ID
#:257

1    **G.**    <u>2006 Third Quarter Form 10-Q</u>

2    162.   On November 2, 2006, the Company filed its Report on Form 10-Q

3 for the quarter ended September 30, 2006 with the SEC (the "2006 Third Quarter

4 10Q"). Because Perry signed the 2006 Third Quarter 10-Q, all statements therein

5 were made by him and the Company.

6    163.   The 2006 Third Quarter 10Q stated:

7

8     A component of the overall allowance for loan losses is not
specifically allocated to the loan portfolios ("unallocated

9     component"). The unallocated component reflects management's
assessment of various factors that create inherent imprecision in the

10     methods used to determine the specific portfolio allocations. Those
factors include, but are not limited to levels of and trends in

11     delinquencies and impaired loans, charge-offs and recoveries, volume
and terms of the loans, *effects of any changes in risk selection and*

12     *underwriting standards*, other changes in lending policies,
procedures, and practices, and national and local economic trends and

13     conditions. *Id.* at 52. (Emphasis added).

14

15    164.   The information contained in the foregoing statement was material to

16 investors when made for the reasons set forth at ¶128. The foregoing statement

17 was knowingly or recklessly false and misleading for the same reasons that the

18 identical statement, set forth in the Company's 2006 First Quarter 10-Q, was

19 knowingly or recklessly materially false and misleading. *See* ¶¶129-130

20 (discussing same).

21    **H.**    <u>November 2, 2006 Conference Call</u>

22    165.   On November 2, 2006, defendant Perry spoke to analysts and the

23 investing public on behalf of the Company during a public earnings conference

24 telephone call (the "Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call").

25    166.   During the Q3 2006 IndyMac Bancorp, Inc. Earnings Conference Call

26 Perry stated, regarding the documentation required before a Company underwrites

27

28 a loan that "typically on full doc borrowers we ask them to provide W-2s and pay

SIXTH AMENDED CLASS ACTION COMPLAINT

51

1773682.1

**Exhibit E, Page 174**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 926

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 81 of 108   Page ID
Case 2:11-cv-02078-RGK -JCG   Document 85-37   Filed 03/10/11   Page 23 of 28   Page ID
#:258

stubs." Tr. at 14.

167.   The statement regarding certain of the Company's underwriting practices was material.  As a mortgage lender, IndyMac's underwriting practices – including the creditworthiness of its borrowers – is among the most important information looked to by investors for the same reasons set forth in ¶128.

168.   This statement was materially false and misleading because the Company's internal policies *did not* require W-2s and pay stubs as verification of income for "full doc" loans.

169.   Plaintiffs rely on the following facts in support of their allegation that the foregoing statement was materially false and misleading.  CW 7 states that the vast majority of IndyMac purportedly "Full Doc" loans were underwritten merely based on a Verification of Employment ("VOE"), not on W-2s and pay stubs.  CW 7 further provided documentation in the form of the "IndyMac Bank NonPrime Program Matrix" confirming the same.

170.   Plaintiffs allege that defendant Perry and the Company knew or were reckless in not knowing that the foregoing statement (at ¶166) was materially false and misleading because Perry's statement facially contradicts the Company's official, written internal policies.

## VI.   LOSS CAUSATION/ECONOMIC LOSS

171.   As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and artificially inflate IndyMac's securities prices, which scheme operated as a fraud or deceit on Class Period purchasers of IndyMac securities.  In particular, Defendants misrepresented the Company's underwriting standards, risk management policies, and the adequacy of its loan loss reserves.  Later, however, when Defendants' misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market (or, in the alternative,

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 82 of 108   Page ID
Case 2:11-cv-02078-RGK -JCG   Document 193-23   Filed 03/10/11   Page 24 of 28   Page ID
#:259



1   when the risks concealed by Defendants' misrepresentations materialized),

2   IndyMac stock fell as the artificial inflation came out of the Company's stock

3   price.

4       172.   Specifically, during the Class Period, Defendants misrepresented: (i)

5   IndyMac's underwriting guidelines and controls and their compliance therewith;

6   (ii) IndyMac's risk management policies; and (iii) the adequacy of IndyMac's loan

7   loss reserves.  These misrepresentations concealed, *inter alia*, that the Company's

8   loan portfolio was severely impaired as a result of Defendants' repeated violations

9   of the Company's internal/operational controls over underwriting.  Defendants'

10  false and misleading statements had their intended effect and caused IndyMac's

11  common stock to trade at artificially inflated levels throughout the Class Period,

12  reaching as high as $50.11 per share on May 8, 2006.

13      173.   Starting on January 16, 2007, and through March 1, 2007, investors

14  began to learn the truth through a number of partial disclosures, including

15  Defendants' own admissions.  The series of disclosures revealed, among other

16  things that: (1) the Company faced a substantial earnings shortfall caused by credit

17  losses and increases in provisions for loan loss reserves as a result of the

18  Company's impaired loans; (2) the Company would not meet its forecasted results

19  for the fourth quarter of 2006, primarily because the Company doubled its credit

20  reserves from the previous quarter to cover the massive number of defaults on the

21  loans it had underwritten; (3) several of the Company's business areas (*e.g.* its

22  80/20 loan portfolio) that Defendants had touted as its strongest virtues were, in

23  actuality, profoundly weakened and impaired; (4) the Company experienced a

24  substantial negative financial impact as a result of losses from bad/uncollectible

25  loans held by the Company; and (5) the Company had "loosened its lending

26  standards" during 2006, and that, going forward, the Company would correct this

SIXTH AMENDED CLASS ACTION COMPLAINT

53

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 928

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 83 of 108   Page ID
#:8532
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 25 of 28   Page ID
#:260

1    by being "smart and prudent" in managing its underwriting guidelines and risk.

2        174.   As a direct result of these disclosures IndyMac's stock price dropped

3    from a close of $43.55 per share on January 12, 2007 (the last trading day before

4    Defendants' disclosures began) to $32.16 on March 1, 2007 (the day of

5    Defendants' last corrective disclosure).  Together, these drops removed the

6    inflation from IndyMac's stock price, causing real economic loss to Indymac

7    investors.  In sum, as the truth was revealed, the Company's stock price

8    plummeted, the artificial inflation came out of the stock, and Plaintiffs and other

9    members of the Class were damaged.

10       175.   The decline in IndyMac's stock price during the Class Period was a

11   direct result of Defendants' earlier misrepresentations finally being revealed to

12   investors and the market. The timing and magnitude of IndyMac's stock price

13   declines negate any inference that the loss suffered by Plaintiffs and other Class

14   members was caused by changed market conditions, macroeconomic or industry

15   factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

16   The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the

17   Class was a direct result of Defendants' fraudulent scheme to artificially inflate

18   IndyMac's securities prices and the subsequent significant decline in the value of

19   IndyMac's securities when the truth was revealed through a series of partial

20   disclosures.

21

22   **A.   The Truth About the Company's True Condition Begins to**
     **Emerge as Defendants Disclose that Indymac had Saddled Itself**
23   **with Toxic Loans as a Result of its Poor Underwriting Practices**
     **Thereby Causing Substantial Charges and Increased Loan Loss**
24   **Reserves**

25       176.   On January 16, 2007, the Company issued a written press release to

26   the public on its website and to various media outlets (the "January 16, 2007 Press

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

54

 

1   Release") in which it stated:

2       Unfortunately, we are starting the year off with some bad news.

3       Based on the earnings forecast we provided after the end of last
4       quarter, we anticipated that our EPS for the fourth quarter
        would be $1.35 (in a range of $1.30 to $1.40). However, last
5       week, as we began to complete our quarterly accounting "roll-
        up," it became clear that our Q4 earnings would be
6       substantially below our forecast. While our internal quarterly
        accounting certification process is not yet complete and
7       adjustments could still be made as we finalize our accounting,
        we now expect to report approximately $0.97 EPS for the
8       quarter when we release earnings as scheduled on January 25th.

9       ...While we have not yet completed our detailed analysis of all
        of the variances, our assessment as of today is that the main
10      differences between our prior forecast of $1.35 and what looks
        to be our earnings of $0.97 are the following:
11

12      *1. An increase in credit costs related to the loan loss*
        *provision, secondary market reserve, and marking-to-*
13      *market delinquent loans held-for-sale and residuals and*
        *non-investment grade securities;*
14
        *2. A reduction in net interest margin related to loans held-for-*
15      *sale and the thrift investment portfolio due to yield curve*
        *inversion and the fact that our loan production mix shifted*
16      *more toward fixed rate and intermediate term fixed rate loans*
        *...* (Emphasis added).
17

18      177.   The foregoing statements, while leaking portions of the truth

19   concealed during the Class Period, were still knowingly or recklessly materially

20   false and misleading because they failed to fully disclose weaknesses in IndyMac's

21   internal/operational controls, which enabled Defendants *inter alia,* improperly to

22   manipulate underwriting protocols, direct that unqualified loans be approved,

23   violate rate lock protocols, direct that loans returned from the secondary market be

24   rewritten to "work," and stifle/ignore reports of internal fraud (*see* ¶¶43-84).

25
26      178.   The market quickly began keying in on the import of IndyMac's

27   January 16, 2007 earnings miss warning, linking IndyMac's poor performance

28   with the Company's shoddy loan portfolio.

SIXTH AMENDED CLASS ACTION COMPLAINT

55

1773662.1

Exhibit E, Page 178

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 930



179.   For example, Manuel Ramirez, an analyst at Keefe, Bruyette & Woods, wrote in his analyst report dated January 17, 2007 that "Where There's Smoke, There Might Be Fire" and *downgraded* IndyMac to "underperform." Citing "credit quality deterioration" as the "most significant factor," Ramirez noted the concern with IndyMac's "volume driven model."  Ramirez specifically attributed the Company's poor performance to, *inter alia*: (a) "the deterioration in the quality of production (more correspondent and conduit volumes)…"; and (b) inadequate reserves for losses related to rep and warranty losses for loans sold on the secondary market.

180.   In the same report, Ramirez also described how the Company's poor performance was related to its need to boost reserves as a result of shoddy loans. "Secondary Market Reserve: Relates to rep and warranty losses for loans sold into the capital markets.  Management had strongly defended the adequacy of the [secondary market] reserve on the past two quarterly conference calls *despite the fact* that the reserve had looked light at only $30.2 million, or 2.8 basis points of loans sold.  Questions had arisen due to the rash of early payment defaults in the subprime market.  We assume the secondary market reserve will be bolstered by $8 million in the quarter, which is a contra to gain on sale income."

181.   A Foxx-Pitt, Kelton analyst report dated January 17, 2007 corroborated as much, attributing much of the Company's announced decline to "elevated instances of early payment defaults and other rep and warranty breaches."

182.   Notwithstanding that Defendants' partial disclosure failed to fully disclose Defendants' fraud, the revelation of the Company's earnings miss – a direct result of Defendants' conduct – caused the price of the Company's common stock to fall to $40.50 at close, down from $43.55 at close on January 12, 2007 (the

SIXTH AMENDED CLASS ACTION COMPLAINT

56

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 931

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 86 of 108   Page ID
#:8535
Case 2:11-cv-02078-RGK -JCG   Document 1-7   Filed 03/10/11   Page 28 of 28   Page ID
#:263



1   prior trading day).

2       183.   Analysts also expressed skepticism with IndyMac's belated

3   recognition of impairments to its shoddy loan portfolio. A Roth Capital Partners

4   report dated January 22, 2007 noted:

5       The issue, in our estimation, is the timing of the disclosures—or to be
6       more precise, the timing of increases in loan loss provisions, valuation
        allowances, repurchase provisions, and fair value adjustments, where
7       we believe most of the hike in credit costs and decline in servicing
        ROE will be reflected.
8

9   The report specifically questioned the timetable of the Company's

10  accounting for its toxic loan exposures:

11      The question that arises in our minds [sic] whether the increases in
12      provisions and fair value adjustments we are anticipating were
        necessitated by changes in actual loss experience and prepayment
13      speeds in the fourth quarter—or change in expectations that formed in
        the fourth quarter—*or should have been reflected in the company's*
14      *financial statements earlier in the year.* Many nonconforming
        lenders started reporting spikes in EPDs and repurchase requirements
15      in the middle of 2006. They also reported sharp increases in
        delinquencies and loans going into foreclosure in 2006 loan
16      production vintages.

17  (Emphasis added.)

18  **B.    The Truth Continues to Emerge as the Market Learns that**
19         **Indymac's Loosening of Underwriting Guidelines Caused**
           **Indymac's Abysmal Performance**
20

21      184.   On January 25, 2007, Defendants publicly disclosed that the Company

22  had been financially impaired, and would be unable to achieve the forecasted

23  results for the fourth quarter of 2006.

24      185.   On January 25, 2007, the Company issued a written press release to

25  the public on its website and to various media outlets (the "January 25, 2007 Press

26  Release") in which it stated:

27

28      PASADENA, Calif.--(BUSINESS WIRE)--Jan. 25,
        2007--IndyMac Bancorp, Inc. (NYSE:NDE)

        SIXTH AMENDED CLASS ACTION COMPLAINT

                        57

**Exhibit E, Page 180**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 932

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 87 of 108   Page ID
#:8536
Case 2:11-cv-02078-RGK -JCG    Document 1-8    Filed 03/10/11   Page 1 of 22   Page ID
#:264

1    ("IndyMac(R)" or the "Company"), the holding company
     for IndyMac Bank, F.S.B. ("IndyMac Bank(R)"), today
2    reported net earnings of $72 million, or $0.97 per share,
     for the fourth quarter of 2006, compared with net
3    earnings of $70 million, or $1.06 per share, in the fourth
     quarter of 2005, representing a 3 percent increase in net
4    earnings and an 8 percent decrease in earnings per share
     (EPS). . .
5
                    *            *            *
6
7    "However, I and the rest of IndyMac's management team
     are clearly disappointed with these results because they
8    were considerably below our normal earnings growth and
     ROE levels and fell far short of what we had forecasted
9    for the quarter. In response, I want to assure our
     shareholders that we are redoubling our efforts to both
10   improve our earnings and tighten up our forecasting
     processes.
11
12   "Tough times, like what we are now facing, are when
     companies like IndyMac can gain ground on the
13   competition - and that is exactly what we are doing. We
     had a strong quarter for loan production, with $26 billion
14   in total loans produced, up 8 percent over the prior
     quarter and 44 percent over Q4-05. With these
15   production gains, we grew our estimated market share(1)
     to 4.51 percent in the fourth quarter versus 3.83 percent
16   in the third quarter and 2.51 percent one year ago.
17
                    *            *            *
18
19   **Mortgage Production**
20   "While we achieved records for loan production and
     market share, we are not happy with the fact that earnings
21   from the mortgage production segment did not grow this
     quarter versus last," commented Richard Wohl, IndyMac
22   Bank's President. "Our mortgage banking revenue margin
     declined to 91 basis points during the fourth quarter from
23   103 basis points in the prior quarter and 110 basis points
     in Q4-05. Market conditions contributed to the margin
24   erosion in the form of a shift in our production mix from
     higher margin ARM loans to lower margin fixed rate
25   loans and increased credit costs related to marking-to-
     market delinquent loans held for sale and increasing our
26   secondary marketing loan repurchase reserve.
27
                    *            *            *
28

                SIXTH AMENDED CLASS ACTION COMPLAINT

                              58

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 933

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 88 of 108   Page ID
#:8537
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 2 of 22   Page ID
#:265

Looking ahead, there will likely be further erosion in
mortgage banking revenue margins and overall
profitability before the current down cycle eventually
turns up."

\*          \*          \*

**Residuals and Non-Investment Grade Securities**

"We are clearly not satisfied with the performance of
these portfolios during the quarter, but we feel that this
quarter's performance was an aberration that will likely
not recur in the future," continued Olinski. "Two main
factors drove the earnings decline. First, we implemented
a new, more refined prepayment model for our residual
securities that resulted in a one-time downward valuation
adjustment of $5 million. Going forward the new model
will enable us to hedge these assets more effectively,
improving our performance. Second, HELOC residual
securities from 2004 incurred a $6.5 million write-down
for credit impairment required by GAAP accounting that
we feel does not reflect the true economics of these
securities. These securities are callable over the next 4-24
months, and, accordingly, we expect to book gains during
this time period more than offsetting the fourth quarter
write-downs, such that we expect strong overall returns
on our 2004 HELOC residual securities over their lives.

\*          \*          \*

**Thrift Portfolio**

Net earnings for the thrift portfolio, which consists of
single-family residential mortgage loans (whole loans),
consumer and subdivision construction loans, and
mortgage backed securities (MBS), were $25 million,
down 30 percent from the third quarter and 23 percent
from one year ago. "Even though we increased our
average earning assets in the thrift investment portfolio,
our net interest margin declined substantially to 1.64
percent in the fourth quarter from 2.02 percent both in the
third quarter and one year ago," noted Blair Abernathy,
IndyMac's Chief Investment Officer. "The compression
in net interest margin was due primarily to an increased
cost of funds for our whole loan and MBS portfolios.
Longer term, fixed-rate funding for these portfolios of
approximately $1.5 billion at roughly a 2.95 percent cost
of funds matured during the quarter and was replaced at a
significantly higher funding cost. This has resulted in a
more permanent shift in our net interest margin, such that
the 1.64 percent margin realized during the quarter is
likely what we can expect going forward. In retrospect,

SIXTH AMENDED CLASS ACTION COMPLAINT

59

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 934

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 89 of 108   Page ID
#:8538
Case 2:11-cv-02078-RGK -JCG   Document 8   Filed 03/10/11   Page 3 of 22   Page ID
#:266

1  we should have more properly planned for this
happening.

2  "Net earnings for the fourth quarter were also negatively
3  impacted by a GAAP $6.5 million credit-related
valuation write-down on HELOC residual securities
(noted above) and an increase in the loan loss provision
4  to $9 million from $5 million in the prior quarter and
$1.6 million in Q4-05. As a result of the earnings decline,
5  the thrift portfolio produced an ROE of 14 percent, below
our expectations, versus 20 percent in the prior quarter
6  and 22 percent one year ago. Going forward, we believe
the ROE for this portfolio should be in a range of 15
7  percent to 20 percent. We are clearly not happy about the
fact that the fourth quarter's performance fell below this
8  range, and we will provide updates on steps we are taking
to improve performance as the year progresses."

9
10 Non-performing Assets and Charge-offs Increase from
Historic Low Levels
11
12 Non-performing assets to total assets increased to 63
basis points during the quarter from 51 basis points in the
13 third quarter and 34 basis points in Q4-05. Net charge-
offs increased to $7.6 million during the quarter from
14 $1.9 million both in the prior quarter and one year ago.
"We have previously noted that the historically low
15 NPAs and charge-offs we have experienced over the last
few years were unsustainable, and, indeed, we saw
16 erosion in our credit metrics during the fourth quarter. In
light of this, we are increasing our provision for loan
17 losses," commented Scott Keys, IndyMac's Chief
Financial Officer. "We expect current credit conditions to
18 worsen further in 2007 in connection with the housing
market cycle and therefore are planning for significant
19 increases in loan loss provisions and charge-offs in 2007
versus 2006.
20
21     186.   Notably, the Company further revealed some of the details of the
22 financial problems caused by Defendants' fraud:
23
24  •  increased credit costs related to marking-to-market delinquent loans
held for sale;
25
26  •  an increase in the Company's secondary marketing loan repurchase
reserve;
27
28  •  a nearly two-fold increase in the Company's loan loss provision to
$9 million from $5 million in the prior quarter and $1.6 million in
Q4-05; and

SIXTH AMENDED CLASS ACTION COMPLAINT

60

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 935

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 90 of 108   Page ID
#:8539
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 4 of 22   Page ID
#:267



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 64 of 170   Page ID
#:13018

- Non-performing assets to total assets increased to 63 basis points during the quarter from 51 basis points in the third quarter and 34 basis points in Q4-05. Net charge-offs increased approximately four-fold to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago.

187.   While Defendants were careful not to specifically admit fraud or misconduct in the January 25, 2007 statements, the statements further disclosed the impact of their fraud. That is, *inter alia*, but for Defendants' violations of the Company's internal/operational controls over underwriting (which resulted in the issuance of bad and/or uncollectible loans that never should have been underwritten or purchased in the first place) the Company would not have experienced an increase in its credit costs and an increase non-performing assets on its books or been forced to increase its loan repurchase reserve, each of which negatively impacted the Company's financial results.

188.   While Defendants' false and misleading statements during the Class Period were repeated (and not expressly repudiated) by Defendants, incident to and after the Company's January 17 & 25, 2007 disclosures, Defendants' partial revelations of the truth were sufficient for the market to discern the falsity of Defendants' prior misrepresentations. *See* ¶¶178-183 (discussing analyst statements).

189.   IndyMac's loosening of underwriting standards resulted in the Company's increasing reliance on high-risk 80/20 piggyback loans. This was a direct cause of the Company's dramatic increase in credit losses for the fourth quarter of 2006 and the Company's need to significantly increase its provisions for loan loss and secondary market reserves. During the Class Period, IndyMac began suffering credit losses as a result of a rash of EPDs on piggyback loans. IndyMac was therefore forced to hold these defective loans, and was either unable to sell them in the secondary market or was subject to repurchase demands from the securitizations thereof.

SIXTH AMENDED CLASS ACTION COMPLAINT

61

1773662.1

**Exhibit E, Page 184**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 936

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 91 of 108   Page ID
#:8540
Case 2:11-cv-02078-RGK -JCG   Document 178   Filed 03/10/11   Page 5 of 22   Page ID
#:268

1      190.   The underlying fraud, IndyMac's shoddy, camouflaged underwriting

2   practices, directly caused the losses that the Company announced -- and that

3   investors suffered -- at the end of the Class Period.  IndyMac's excuses for its

4   abysmal performance -- credit losses, increased provisions for loan loss reserves,

5   and mark downs on its impaired loan portfolio -- were the direct and natural

6   consequences of the Company's loosening of underwriting standards.  As it began

7   to rely precariously and heavily on high-risk 80/20 piggyback loans, the Company

8   was doomed to face more loan delinquencies and defaults, and thus suffer greater

9   credit losses, be required to increase its loan loss reserves and be forced to mark

10   down its impaired loans.

11      191.   IndyMac's increased credit losses were, in part, the direct result of

12   IndyMac's declining credit quality which was inextricably linked to the

13   Company's reliance on piggyback loans.  Perry discussed these issues during an

14   earnings conference call IndyMac held on January 25, 2007 (the "January 25, 2007

15   Earnings Conference Call").

16      192.   Perry admitted on the January 25, 2007 analyst Conference Call that

17   in connection with "[t]he increase [in credit costs] from the third to fourth quarter,

18   we are seeing some problems in certain pieces of 80/20 piggyback programs."  It

19   was further admitted in IndyMac's Earnings Presentation filed January 25, 2007

20   that "Higher credit mark-to-market losses in Q4 06 were concentrated in the prime

21   80/20 and subprime products."

22      193.   Indeed, the disproportionately-high tendency for piggyback loans to

23   default specifically manifested in the Company's credit losses recognized at the

24   end of the Class Period.  While about 20% of IndyMac's loan production for the

25   fourth quarter of 2006 – or $5 billion out of $25.9 billion – consisted of 80/20

26   piggyback loans, nearly *60%* of credit losses on loans held for sale during the

SIXTH AMENDED CLASS ACTION COMPLAINT

62

1773662.1

Exhibit E, Page 185

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 937

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 92 of 108   Page ID
#:8541
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 6 of 22   Page ID
#:269

1  fourth quarter of 2006 – or $10.27 million out of $17.66 million – were attributable

2  entirely to 80/20 piggyback loans.  As revealed in a press release issued by

3  IndyMac on March 15, 2007:

Appendix A
Recent Guideline Cutbacks(a)

| Product Group ($ in millions) | 4th Quarter Production | Production Eliminated | Percent of 4th Quarter Production Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $   4,980 | $   2,689.5 | 53.9% |
| Subprime | $   1,155 | $   444.7 | 38.5% |
| Alt-A and Prime | $   11,205 | $   586.5 | 5.2% |
| Option ARM | $   5,201 | $   211.3 | 4.1% |
| Second Liens (CES and HELOCs) | $   1,169 | $   201.7 | 17.3% |
| Consumer Construction | $   785 | $   1.2 | 0.2 % |
| Reverse Mortgages | $   1,441 | $   - | - % |
| Total | $   25,946 | $   4,134.9 | 15.9% |

| Product Group ($ in millions) | 4th Quarter Credit Losses on Loans Held for Sale (LHFS) | 4th Quarter Credit Losses on LHFS Related To Eliminated Production | Percent of 4th Quarter Credit Losses on LHFS Eliminated |
|---|---|---|---|
| 80/20 Piggybacks | $   10.27 | $   9.06 | 88.2% |
| Subprime | $   3.12 | $   2.64 | 84.4% |
| Alt-A and Prime | $   2.10 | $   0.01 | 0.3 % |
| Option ARM | $   1.42 | $   0.02 | 1.7% |
| Second Liens (CES and HELOCs) | $   0.41 | $   0.40 | 96.8% |
| Consumer Construction | $   0.34 | $   - | - % |

SIXTH AMENDED CLASS ACTION COMPLAINT

63

1773662.1

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 93 of 108  Page ID
#:8542
Case 2:11-cv-02078-RGK -JCG  Document 1-8  Filed 03/10/11  Page 7 of 22  Page ID
#:270

| Reverse Mortgages | $ | - | $ | - | - % |
| Total | $ | 17.66 | $ | 12.12 | 68.6% |

(a) Includes some guideline cutbacks that are scheduled to take place
on March 19, 2007.

194.  Indeed, the Company subsequently further *admitted* – beyond its
January 25, 2007 admissions – that its losses were heavily tied to its precarious
reliance on high-risk piggyback loans.  In the IndyMac Earnings Presentation dated
April 26, 2007 the Company stated that "The Credit M[ark to Market] Allowance
On Loans Held For Sale Has Increased Due To Poor Performance of 'Piggybacks'
And Subprime..." (April 26, 2007 Presentation Slide at page 24.)  The
presentation further stated that "Credit Losses In Our H[eld For Sale] Portfolio
Were Due Primarily To Higher Early Payment Defaults In Our Piggyback And
Higher LTV Subprime Programs."  (April 26, 2007 Presentation Slide at page 25.)

195.  Furthermore, in a UBS Conference Presentation, dated May 15, 2007,
the Company admitted "Yes, We Expanded Guidelines Too Far On Piggyback
And Subprime Loans..." which impacted the Company's earnings with "Estimated
abnormal credit costs of $30-35 million from 2006-Q2 07."  (May 15, 2007
Presentation Slide at page 11.)

196.  Indeed, early or first payment defaults on piggyback loans plagued
entire loan pools.  As detailed above in the section elaborating on the Silver State,
Lancaster and Geneva toxic loan pools, there is no doubt that a material portion of
IndyMac's fourth quarter 2006 credit losses (and need to increase loan loss
reserves) were a direct result of its growing reliance on piggyback loans stemming
from its shoddy underwriting practices during the Class Period.

197.  During the January 25, 2007 Earnings Conference Call, Perry
disclosed flaws in the Company's internal/operational controls and forecasting.

SIXTH AMENDED CLASS ACTION COMPLAINT

54

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 94 of 108   Page ID
#:8543
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 8 of 22   Page ID
#:271

1   For example, Perry admitted that "[o]ur provision for loan losses is increasing. . .

2   Credit quality generally is deteriorating so I would say that's something we have to

3   do a better job forecasting, and clearly we want to be a little more conservative as

4   it relates to that... This is something we should have done a better job forecasting

5   on. This is something that we probably could have seen better if we had more

6   precise models . . ." *Id.* at 4.

7       198.   On the January 25, 2007 Conference Call, analysts also focused on the

8   Company's need to substantially increase provisions for loan loss reserves. For

9   example, one concerned analyst, Manuel Ramirez, asked: "I was kind of doing the

10  math on the provision, given your charge-off guidance and your guidance for net-

11  loan growth, and ***it seems like the provision could be up pretty substantially year-***

12  ***over-year.***" (*Id.* at 15) (emphasis added).

13      199.   IndyMac's January 25, 2007 partial disclosure caused its stock to

14  tumble to $37.71 at close, down from $40.70 at close on January 24, 2007.

15      200.   The timing and magnitude of IndyMac's stock price decline negates

16  any inference that the loss suffered by Plaintiffs and other Class members was

17  caused by changed market conditions, macroeconomic or industry factors or

18  Company-specific facts unrelated to the Defendants' fraudulent conduct.

19      201.   This fact was confirmed by financial analysts covering IndyMac, who,

20  although aware of the tough real estate/mortgage market, were shocked by

21  IndyMac's January disclosures and questioned management's credibility as a

22  result. *See* January 26, 2007 Lehman Brothers IndyMac research report ("The

23  challenging environment was not surprising, but the extent of NDE's struggles

24  was"; January 26, 2007 FBR IndyMac research report ("With the disappointing

25  4Q06 earnings and significantly reduced FY07 outlook, we feel NDE's

26  management team lost some credibility.").

SIXTH AMENDED CLASS ACTION COMPLAINT

65

1773682.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 95 of 108   Page ID
#:8544
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 9 of 22   Page ID
#:272

● ●

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 69 of 170   Page ID
#:13023

1
2

    C.    **The Market Learns the Truth About Indymac's Deficient
Underwriting Guidelines and Risk Management**

3
4
5

    202.   On March 1, 2007, the Company issued a Press Release in which
Perry admitted that the Company had loosened its underwriting guidelines during
2006, and promised to mend its ways.  Specifically, Perry stated that:

6
7
8

> 2006 was a challenging year in the mortgage banking industry.
> Industry loan volumes of $2.5 trillion were 34 percent below
> 2003's historic high level and 17 percent lower than in 2005.

9
10

>       \*            \*            \*
>
> Given that reality, here is what we will do to improve
> performance for our shareholders right now:

11
12
13

> *1.  Manage our credit risks by being smart and prudent in
> adjusting our mortgage underwriting guidelines, setting our
> risk-based pricing, making decisions as to what assets go into
> our investment portfolio and/or distributing our risk into the
> secondary market, and executing on best in class loss
> prevention and loss mitigation practices.*

14

>       \*            \*            \*

15
16
17
18

> *Given the robust housing market and highly liquid secondary
> markets (for even the "riskiest loans") - both of which
> persisted for years longer than anticipated - and given strong
> competition in a declining overall mortgage market, IndyMac,
> in order to compete and grow, also loosened its lending
> standards, though in a much more responsible way.*
> [Emphasis added.]

19
20
21
22

    203.   As a result of the March 1, 2007 disclosure, IndyMac's share price
dropped even more, to $32.16 at close, down from $34.33 on February 28, 2007,
on large trading volume.

23
24

**VII.**    **POST CLASS PERIOD DISCLOSURES: THE OFFICE OF THE
INSPECTOR GENERAL'S AUDIT REPORT**

25
26
27

    204.   In the wake of IndyMac's failure and seizure by the FDIC, the Office
of the Inspector General, Department of the Treasury (the "OIG") conducted an
investigation to determine what went so wrong at the Company.

28

    205.   On February 26, 2009, the OIG issued a report setting forth its

<div align="center">SIXTH AMENDED CLASS ACTION COMPLAINT</div>

<div align="center">66</div>

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 941

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 96 of 108   Page ID
#:8545
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 10 of 22   Page ID
#:273



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 70 of 170   Page ID
#:13024

1  findings (the "Audit Report"), aptly summarized as follows: the "underlying cause

2  of [IndyMac's] failure was the unsafe and unsound manner in which the thrift was

3  operated." Audit Report at 3.

4     206.   Consistent with Plaintiffs' allegations concerning the Company's

5  "anything goes" attitude concerning underwriting (*see* ¶¶43-84), the Audit Report

6  confirms that the Company engaged in "unsound underwriting practices," stating:

8     • "IndyMac encouraged the use of nontraditional loans.
9        IndyMac's underwriting guidelines provided flexibility in
         determining whether, or how, loan applicants' employment,
10       income, and assets were documented or verified. . . . For the
         loans reviewed, we found little, if any, review of borrower
11       qualifications, including income, assets, and employment. We
         also found weaknesses with property appraisals obtained to
12       support the collateral on the loans. . . ." (*Id.* at 11); and

13    • "IndyMac's business model was to produce as many loans as
         possible and sell them on the secondary market.  To facilitate this
14       level of production. . . IndyMac often did not perform adequate
         underwriting" (*Id.* at 21).

15    207.   The Audit Report also confirms Plaintiffs' allegations concerning the

16  Company's inadequate loan loss reserves, stating:

18    • As early as 2004, IndyMac senior management began observing the
         probability of a downward trend in real estate values, which could
19       reduce the collateral supporting loans and result in possible loan
         losses. Regardless, IndyMac's ALLL [Allowance for Loan and
20       Lease Losses] decreased as a percentage of the thrift's total loans
         until 2007 when it finally increased its ALLL because it began to
21       experience losses in its loan portfolio.

22    208.   Additionally, the Audit Report criticized IndyMac's Conduit Division

23  which, as described at ¶¶84-110, was responsible for bulk purchases of loans from

24  brokers (such as Silver State and Lancaster), finding that:

26    • IndyMac's "internal audit group reported problems with the Conduit
27       Division as early as 2005" relating to its "loan approval and
         underwriting process" (*Id.* at 22);

SIXTH AMENDED CLASS ACTION COMPLAINT

67

1773662.1

Exhibit E, Page 190

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 97 of 108   Page ID
#:8546
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 11 of 22   Page ID
#:274



Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 71 of 170   Page ID
#:13025

- IndyMac's Conduit Division was reported as a "financial reporting control deficiency" by the Company's independent auditor in 2006 (*Id.*); and that

- Despite the above described warnings (over a period of two years), these "major weaknesses" continued until the Office of Thrift Supervision stepped in during 2007. *Id.* at 23. "Shortly after, IndyMac recognized losses were occurring from this division and closed it." *Id.*

209.   The above-cited statement from the Audit Report, along with others, corroborate the testimony of the CWs as follows:

| Audit Report Findings | Corroborates CW Testimony |
|---|---|
| "Appraisals obtained by IndyMac on underlying collateral were often questionable as well." (p.2)<br>"IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories." (p.2)<br>"IndyMac engaged in very high-risk activities over many years" (p.3)<br>"Many of [IndyMac's] nontraditional mortgages, however, came with an increased risk of borrower default." (p.8)<br>"These [IndyMac] loans proved to be even riskier because for the most part they were originated with less than full documentation." (p.8)<br>"For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment." (p.11)<br>"We also found weaknesses with property appraisals obtained to support the collateral on the loans." (p.12)<br>"Loan 3" -- $1.475 million stated income 80/20 piggyback loan; no borrower income verification; a peculiar "exception" to IndyMac underwriting guidelines; questionable appraisal; first payment default (pp.72-73) | CW1 testimony (¶¶45-46)<br>CW2 testimony (¶53)<br>CW4 testimony (¶63)<br>CW5 testimony (¶65)<br>CW7 testimony (¶81) |
| "IndyMac embarked on a path of aggressive growth." (p.6) IndyMac "generated about $10 billion in loans in 2000 to a high of $90 billion in 2006." (p.7)<br>"IndyMac's business model was to produce as many loans as possible and sell them in the secondary market. To | CW1 testimony (¶¶44-45) .<br>CW2 testimony (¶73)<br>CW3 testimony |

SIXTH AMENDED CLASS ACTION COMPLAINT

68

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 943

| | | |
|---|---|---|
| facilitate this level of production, we found that IndyMac often did not perform adequate underwriting." (p.21) | (¶60) CW5 testimony (¶65) | |
| "By May 2005, signs of borrower distress were evident." (p.9) "As early as 2004, IndyMac senior management began observing the probability of a downward trend in real estate values, which could reduced the collateral supporting loans and result in possible loan losses. Regardless, IndyMac's [Allowance for Loan and Lease Losses] decreased as a percentage of the thrift's total loans until 2007…" (p.10) | CW2 testimony (¶55) CW4 testimony (¶72) CW6 testimony (¶69) | |

**VIII.    ADDITIONAL FACTS SUPPORTING DEFENDANTS' SCIENTER**

**A.    Perry's Certifications**

210.   Throughout the Class Period, Perry repeatedly certified that he had reviewed and approved of the Company's internal controls and financial reporting, both of which have been demonstrated above to be false and misleading.

211.   For example, attached to the 2005 10-K, as Exhibit 31.1 and 32.1 were certifications required by SOX, and executed by Perry.  In his certifications attached to the 2005 Form 10-K, Perry stated that he had:

> designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.[5]

212.   Perry further stated, again in his written certifications attached to the 2005 Form 10-K that:

> I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

---

[5] Perry repeated this statement in each of the Company's filings with the SEC on Form 10-Q during the Class Period.

SIXTH AMENDED CLASS ACTION COMPLAINT

69

1773682.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 944

Case 2:11-cv-02078-RGK-JCG  Document 193-23  Filed 11/23/11  Page 99 of 108  Page ID
#:8548
Case 2:11-cv-02078-RGK -JCG  Document 1-8  Filed 03/10/11  Page 13 of 22  Page ID
#:276

● ●

Case 2:07-cv-01635-GW -VBK  Document 227  Filed 02/16/10  Page 73 of 170  Page ID
#:13027

auditors and the audit committee of the registrant's board of
directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in
the design or operation of internal control over financial
reporting which are reasonably likely to adversely affect
the registrant's ability to record, process, summarize and
report financial information; and

(b) any fraud, whether or not material, that involves
management or other employees who have a significant role in
the registrant's internal control over financial reporting.

213.   Perry's certification of the Company's internal/operational controls is
probative of his scienter.

214.   This is so because the Company's controls over underwriting were
wholly ineffective (and violated by or caused to be violated by Perry *see e.g.* ¶¶43-
51), resulting in the Company underwriting hundreds of millions of dollars worth
of loans for which it was "probable" and/or "reasonably possible" that the
Company would experience default.  Given that the Company did not adequately
reserve against these potential losses, the Company's presentation of its financial
results violated Statements of Financial Accounting Standards No. 5, Accounting
for Contingencies ("SFAS 5"), a core principle of Generally Accepted Accounting
Principles, rendering any statement that the Company had "reasonable assurance
regarding the reliability of financial reporting" utterly false.

215.   It is clear that defendant Perry knew or was reckless in not knowing of
the violations of the Company's underwriting controls and standards (rendering the
statements at ¶¶211-212 materially false and misleading) for the following reasons.
First, Perry directed employees to (i) "push loans through" regardless of whether
they satisfied the Company's underwriting guidelines; (ii) input false information
into the Company's e-MITS underwriting control system, to cause the approval of
loans that would normally be rejected; and (iii) engage in violations of the
Company's "rate lock" protocols and controls. *See* ¶¶43-49. Second, Perry was

SIXTH AMENDED CLASS ACTION COMPLAINT

70

1773062.;

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 74 of 170   Page ID #:13028

1   aware that rampant fraud and lying by loan sales representatives was taking place,

2   yet he continued to push employees to close loans "at all costs." *See* ¶50. Third,

3   the wide-ranging and management-directed violations of the Company's

4   underwriting guidelines and controls evidences a culture of fraud at the Company.

5   *See* ¶¶50-51. Fourth, the number of fraudulent loans discovered at the Company

6   increased by 1500% from 2003 to mid-2006, rendering the lack of control over

7   underwriting facially obvious. *See* ¶¶67-70. Fifth, the massive increase in bad

8   loan "kickbacks" requiring repurchase by the Company resulted in the initiation of

9   a large "special project" initiated by management to rehabilitate those loans. *See*

10   ¶¶73-75. Finally, the numerous lawsuits filed by the Company show that it knew

11   that certain pools of loans that it had purchased and underwritten from certain

12   sellers were defaulting at rates as high as 90% (in 2005), and 97% (in 2006),

13   rendering the inadequacy of the Company's underwriting controls facially obvious

14   to Perry and the Company. *See, e.g.,* ¶84.

15

16     **B.**   **Perry's Financial Incentive**

17     216.  In addition to the facts supporting the conclusion that Defendants

18   made false statements knowingly or with deliberate recklessness, defendant Perry

19   had a financial incentive to make such false statements.

20     217.  Defendant "Perry's 2006 Short-Term Cash Incentive was entirely

21   performance based, determined by IndyMac's 2006 EPS and ROE." 2006 Proxy at

22   39. The Proxy continued:

23

24        Thresholds of 2005's EPS and a 14 percent ROE were
           specified on an award matrix, growing to a $1 million

25        award when EPS grew 15 percent and ROE exceeded 19
           percent. Based on IndyMac's 2006 EPS of $4.82, and

26        8.8 percent growth, and a 19.1 percent ROE, the award
           matrix yielded a $791,300 payout. The MDC

27        ["IndyMac's Management Development and
           Compensation Committee"] retained the right to make a

28        potential downward adjustment to this amount if

<div align="center">SIXTH AMENDED CLASS ACTION COMPLAINT</div>

<div align="center">71</div>

1773662.1

Exhibit E, Page 194

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 946

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 101 of 108   Page ID
#:8550
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 15 of 22   Page ID
#:278

regulatory ratings worsened or if certain strategic criteria
were not met.  Based on 2006 results, the MDC made no
adjustments.

218.   Thus, defendant Perry had motive to inflate loan production during
the Class Period by directing that internal/operational controls be overridden.

IX.   **APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE**

219.   At all relevant times, the market for IndyMac common stock was an
efficient market for the following reasons, among others:

(a)   IndyMac stock met the requirement for listing, and was listed
and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, IndyMac filed periodic public reports
with the SEC and NYSE;

(c)   IndyMac regularly communicated with public investors via
established market communication mechanisms, including through regular
dissemination of press releases on the national circuits of major newswire
services and through other wide-ranging public disclosures, such as
communications with the financial press and other similar reporting
services; and

(d)   IndyMac was followed by several securities analysts
employed by major brokerage firms who wrote reports which were
distributed to the sales force and certain customers of their respective
brokerage firms.  Each of these reports was publicly available and entered
the public marketplace.

220.   As a result of the foregoing, the market for IndyMac common stock
promptly digested current information regarding IndyMac from all publicly-
available sources and reflected such information in IndyMac's stock price.  Under
these circumstances, all purchasers of IndyMac common stock during the Class

SIXTH AMENDED CLASS ACTION COMPLAINT

72

1773662.1

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 102 of 108   Page ID
#:8551
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 16 of 22   Page ID
#:279

Case 2:07-cv-01635-GW -VBK   Document 227   Filed 02/16/10   Page 76 of 170   Page ID
#:13030

1    Period suffered similar injury, and a presumption of reliance applies.

2    X.    **NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'**
3          **STATEMENTS**

4          221.   The statutory safe harbor provided for forward-looking statements
5    under certain circumstances does not apply to any of the false statements pleaded
6    in this complaint. The specific statements pleaded herein either were not identified
7    as "forward-looking statements" when made or were not accompanied by
8    meaningful cautionary statements identifying important factors that could cause
9    actual results to differ materially from those in the purportedly forward-looking
10   statements. To the extent that the statutory safe harbor does apply to any forward-
11   looking statements pleaded herein, Defendants are liable for those false forward-
12   looking statements because at the time each of those forward-looking statements
13   was made, the particular speaker knew that the particular forward-looking
14   statement was authorized and/or approved by an executive officer of IndyMac who
15   knew that those statements were false when made.

16

17   XI.   **CLASS ACTION ALLEGATIONS**

18         222.   Lead Plaintiffs bring this action as a class action pursuant to Federal
19   Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all
20   those who purchased or otherwise acquired the common stock of IndyMac from
21   January 26, 2006 through March 1, 2007, inclusive and who were damaged
22   thereby. Excluded from the Class are Defendants, the officers and directors of the
23   Company, at all relevant times, members of their immediate families and their
24   legal representatives, heirs, successors or assigns and any entity in which
25   Defendants have or had a controlling interest.
26         223.   The members of the Class are so numerous that joinder of all
27   members is impracticable. Throughout the Class Period, IndyMac's common

28

SIXTH AMENDED CLASS ACTION COMPLAINT

73

**Exhibit E, Page 196**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 948

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 103 of 108   Page ID
#:8552
Case 2:11-cv-02078-RGK -JCG   Document 1-8   Filed 03/10/11   Page 17 of 22   Page ID
#:280

1    stock was actively traded on the NYSE. While the exact number of Class members
2    is unknown to Plaintiffs at this time and can only be ascertained through
3    appropriate discovery, Plaintiffs believe that there are hundreds or thousands of
4    members in the proposed Class. Record owners and other members of the Class
5    may be identified from records maintained by IndyMac or its transfer agent and
6    may be notified of the pendency of this action by mail, using the form of notice
7    similar to that customarily used in securities class actions.

8         224.   Plaintiffs' claims are typical of the claims of the members of the Class
9    as all members of the Class are similarly affected by Defendants' wrongful
10   conduct in violation of federal law that is complained of herein.

11        225.   Plaintiffs will fairly and adequately protect the interests of the
12   members of the Class and they have retained counsel competent and experienced
13   in class and securities litigation.

14        226.   Common questions of law and fact exist as to all members of the
15   Class and predominate over any questions solely affecting individual members of
16   the Class. Among the questions of law and fact common to the Class are:

17             (a)    whether the federal securities laws were violated by
18   Defendants' acts as alleged herein;

19             (b)    whether statements made by Defendants to the investing
20   public during the Class Period misrepresented material facts about the
21   business, operations and management of IndyMac; and

22             (c)    to what extent the members of the Class have sustained
23   damages and the proper measure of damages.

24        227.   A class action is superior to all other available methods for the fair
25   and efficient adjudication of this controversy since joinder of all members is
26   impracticable. Furthermore, as the damages suffered by individual Class members

SIXTH AMENDED CLASS ACTION COMPLAINT

74

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 949

1773662.1



1  may be relatively small, the expense and burden of individual litigation make it

2  impossible for members of the Class individually to redress the wrongs done to

3  them.  There will be no difficulty in the management of this action as a class

4  action.

5  XII.    **FIRST CLAIM: VIOLATIONS OF SECTION 10(b) OF THE**

6  **EXCHANGE ACT AND RULE 10b-5 PROMULGATED**

7  **THEREUNDER AGAINST ALL DEFENDANTS**

8        228.   Plaintiffs repeat and reallege each and every allegation contained

9  above.

10       229.   Each of the Defendants: (a) knew or recklessly disregarded material

11 adverse nonpublic information about the Company's financial results and then

12 existing business conditions, which were not disclosed; and (b) participated in

13 drafting, reviewing and/or approving the misleading statements, releases, reports,

14 and other public representations of and about the Company.

15       230.   Defendant Perry was privy to adverse non-public information

16 concerning IndyMac's business, finances, products, markets and present and future

17 business prospects via access to internal corporate documents, conversations and

18 connections with other corporate officers and employees, attendance at

19 management and Board of Directors meetings and committees thereof, and via

20 reports and other information provided to him in connection therewith.  Because of

21 his possession of such information, Perry knew or recklessly disregarded that the

22 adverse facts specified herein had not been disclosed to, and were being concealed

23 from, the investing public.

24       231.   By virtue of his high-level positions with the Company, defendant

25 Perry directly participated in the management of the Company, was directly

26 involved in the day-to-day operations of the Company at the highest levels and was

27 privy to confidential proprietary information concerning the Company and its

28

SIXTH AMENDED CLASS ACTION COMPLAINT

75

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 950

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 105 of 108   Page ID
#:8554
Case 2:11-cv-02078-RGK -JCG   Document 118   Filed 03/10/11   Page 19 of 22   Page ID
#:282

1    business, operations, growth, financial statements, and financial condition, as

2    alleged herein. Perry was involved in drafting, producing, reviewing and/or

3    disseminating the false and misleading statements and information alleged herein,

4    was aware, or recklessly disregarded, that the false and misleading statements was

5    being issued regarding the Company, and approved or ratified these statements, in

6    violation of the federal securities laws.

7        232.   As an officer and director (as well as a controlling person) of a

8    publicly-held company whose common stock was, and is, registered with the SEC

9    pursuant to the Exchange Act, and was traded on the New York Stock Exchange

10   ("NYSE") and governed by the provisions of the federal securities laws, defendant

11   Perry had a duty to disseminate promptly, accurate and truthful information with

12   respect to the Company's financial condition and performance, growth, operations,

13   financial statements, business, markets, management, earnings and present and

14   future business prospects, and to correct any previously-issued statements that had

15   become materially false and/or misleading, so that the market price of the

16   Company's publicly-traded common stock would be based upon truthful and

17   accurate information. Defendants' misrepresentations and omissions during the

18   Class Period violated these specific requirements and obligations.

19       233.   During the Class Period, Defendants, with knowledge of or reckless

20   disregard for the truth, disseminated or approved the false statements specified

21   above, which were misleading in that they contained misrepresentations and failed

22   to disclose material facts necessary in order to make the statements made, in light

23   of the circumstances under which they were made, not misleading.

24       234.   Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5

25   promulgated thereunder in that they: (a) employed devices, schemes and artifices

26   to defraud; (b) made untrue statements of material facts or omitted to state material

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

76

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 951

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 106 of 108   Page ID
#:8555
Case 2:11-cv-02078-RGK -JCG   Document 88   Filed 03/10/11   Page 20 of 22   Page ID
#:283

1    facts necessary in order to make statements made, in light of the circumstances

2    under which they were made, not misleading; or (c) engaged in acts, practices and

3    a course of business that operated as a fraud or deceit upon the purchasers of

4    IndyMac stock during the Class Period.

5       235.   Plaintiffs and the Class have suffered damage in that, in reliance on

6    the integrity of the market, they paid artificially inflated prices for IndyMac stock.

7    Plaintiffs and the Class would not have purchased IndyMac stock at the prices they

8    paid, or at all, if they had been aware that the market prices had been artificially

9    and falsely inflated by Defendants' false and misleading statements.

10      236.   As a direct and proximate result of Defendants' wrongful conduct,

11   Plaintiffs and the Class suffered damages in connection with their respective

12   purchases of the Company's common stock during the Class Period.

13

14   **XIII.    SECOND CLAIM: VIOLATIONS OF SECTION 20(a) OF THE**

15   **EXCHANGE ACT AGAINST PERRY**

16      237.   Plaintiffs repeat and reallege each and every allegation contained

17   above.

18      238.   Perry acted as a controlling person of the Company within the

19   meaning of § 20(a) of the Exchange Act. By reason of his senior executive

20   positions, he had the power and authority to cause the Company to engage in the

21   wrongful conduct complained of herein.

22      239.   By reason of such wrongful conduct, Perry is liable pursuant to §

23   20(a) of the Exchange Act. As a direct and proximate result of his wrongful

24   conduct, Plaintiffs and the other members of the Class suffered damages in

25   connection with their purchases of IndyMac stock during the Class Period.

26

27   **XIV.    PRAYER FOR RELIEF**

28      WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

SIXTH AMENDED CLASS ACTION COMPLAINT

77

1773862.1

**Exhibit E, Page 200**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 952

A.   Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

XV.   **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: February 16, 2010                    Respectfully submitted,

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP

By: Ramzi Abadou by Erik Peterson
Ramzi Abadou
Erik D. Peterson
580 California Street, Suite 1750
San Francisco, California 94104
Phone: (415) 400-3000
Fax: (415) 400-3001
-and-
Christopher L. Nelson (*Pro Hac Vice*)
Lauren Wagner Pederson (*Pro Hac Vice*)
John J. Gross (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

*Lead Counsel for Plaintiffs*

GLANCY BINKOW & GOLDBERG, LLP
Lionel Z. Glancy (Bar No. 134180)
Peter A. Binkow (Bar No. 173848)

SIXTH AMENDED CLASS ACTION COMPLAINT

78

Case 2:11-cv-02078-RGK-JCG   Document 193-23   Filed 11/23/11   Page 108 of 108   Page ID
#:8557
Case 2:11-cv-02078-RGK -JCG   Document P8   Filed 03/10/11   Page 22 of 22   Page ID
#:285

1   Neal A. Dublinsky (Bar No. 135712)
    Andy Sohrn (Bar No. 241388)
2   1801 Avenue of the Stars
    Suite 311
3   Los Angeles, CA 90067
    (310) 201-9150
4   -and-
    Frederick W. Gerkens, III
5   1430 Broadway, Suite 1603
    New York, New York 10018
6   (212) 382-2221

7   *Liaison Counsel for Plaintiffs*

8   COHEN, MILSTEIN, SELLERS
      & TOLL, PLLC
9   Steven J. Toll
    Andrew N. Friedman
10  Matthew B. Kaplan
    1100 New York Avenue, N.W.
11  Suite 500, West Tower
    Washington, DC 20005
12  (202) 408-4600

13  *Additional Counsel for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIXTH AMENDED CLASS ACTION COMPLAINT

79

1773662.1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 23
Page 954