# Exhibit 34

# Exhibit 1

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2518











# Audit Report



OIG-09-032

SAFETY AND SOUNDNESS: Material Loss Review of IndyMac Bank, FSB

February 26, 2009

This report was reposted on March 4, 2009, to reflect a change in the text on page 24, since the original version was posted on February 26, 2009. The original version of the report incorrectly stated "IndyMac's internal review found several problems, including (1) a $517 million bridge loan for which an appraisal was not obtained...." The report should have stated $517,000 instead of $517 million. This correction does not affect any of the findings, conclusions, or recommendations contained herein.

# Office of
# Inspector General

## Department of the Treasury

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2519

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2520

# Contents

**Audit Report** ................................................................................... 1

    Results in Brief ............................................................. 2

    Causes of IndyMac's Failure ................................................... 6

        High Risk Business Strategy and Aggressive Growth ............................ 6
        Lack of Core Deposits ................................................. 9
        Inadequate Loss Reserves .............................................. 10
        Unsound Underwriting Practices ......................................... 11
        Impact of Senator Schumer's Letter on the Thrift .................................. 12

    OTS's Supervision of IndyMac .................................................. 14

        OTS Conducted Regular and Timely Examinations but Did Not
        Always Address Key Areas of the Thrift .................................. 15
        Concerns About Nontraditional Loans .................................... 18
        OTS Did Not Require Correction of IndyMac's Poor Loan
        Underwriting .......................................................... 21
        OTS Did Not Issue an Enforcement Action Until June 2008 ................... 26
        OTS Should Have Taken Prompt Corrective Action Earlier ...................... 29
        OTS's Lessons Learned Review ......................................... 30

    Concluding Remarks and Recommendations ................................. 33

**Appendices**

    Appendix 1:    Objectives, Scope, and Methodology ....................... 37
    Appendix 2:    Background .............................................. 40
    Appendix 3:    Glossary of Terms ....................................... 46
    Appendix 4:    Chronology of Events .................................... 55
    Appendix 5:    OTS InydMac Examinations and Enforcement Actions .............. 63
    Appendix 6:    Examples of Delinquent Loans and Underwriting Weaknesses .... 71
    Appendix 7:    Management Response ..................................... 75
    Appendix 8:    Major Contributors To This Report ........................ 78
    Appendix 9:    Report Distribution ..................................... 79

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2521

## Abbreviations

| | |
|---|---|
| ALLL | Allowance for Loan and Lease Losses |
| ARM | Adjustable Rate Mortgage |
| CEO | Chief Executive Officer |
| FDIC | Federal Deposit Insurance Corporation |
| FHLB | Federal Home Loan Bank |
| GSE | Government Sponsored Enterprise |
| HBD | Home Builders Division |
| HCL | Home Construction Lending |
| IndyMac | IndyMac Bank, FSB |
| IPA | Independent Public Accountant |
| LTV | Loan to Value |
| MOU | Memorandum of Understanding |
| MRBA | Matters Requiring Board Attention |
| OIG | Department of the Treasury Office of Inspector General |
| OTS | Office of Thrift Supervision |
| PCA | Prompt Corrective Action |
| ROE | Report of Examination |
| USPAP | Uniform Standard of Professional Appraisal Practice |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2522

# OIG

**Audit Report**

***The Department of the Treasury***
***Office of Inspector General***

February 26, 2009

John M. Reich, Director
Office of Thrift Supervision

This report presents the results of our review of the failure of IndyMac Bank, FSB (IndyMac) of Pasadena, California and the supervision of the institution by the Office of Thrift Supervision (OTS). Our review was mandated under section 38(k) of the Federal Deposit Insurance Act, as amended. OTS closed IndyMac on July 11, 2008 and named the Federal Deposit Insurance Corporation (FDIC) as conservator. As of December 31, 2008, FDIC estimated that IndyMac's failure would cost the Deposit Insurance Fund $10.7 billion.

Section 38(k) requires that we determine why IndyMac's problems resulted in a material loss to the insurance fund, review OTS's supervision of IndyMac, including implementation of the prompt corrective action (PCA) provisions of section 38, and make recommendations for preventing any such loss in the future. Section 38(k) also requires that we issue a report within 6 months from when the loss becomes apparent.

We also wish to note that we are performing a separate audit of the circumstances surrounding a questionable May 2008 capital infusion by IndyMac's holding company. We provided a status report of this audit to former Secretary Paulson in a memorandum dated December 18, 2008. We also informed the Department of the Treasury's congressional oversight committees about this matter.

We conducted our fieldwork from September 2008 through December 2008 at OTS's headquarters in Washington, DC; OTS's

regional office in Daly City, California; and IndyMac's headquarters in Pasadena, California. We reviewed the supervisory files and interviewed key officials involved in the regulatory, supervisory, and enforcement matters. Appendix 1 contains a more detailed description of our material loss review objectives, scope, and methodology. Appendix 2 contains background information on IndyMac and OTS's thrift supervision processes. We also provide a glossary of terms as appendix 3 (various terms when first used throughout the report are underlined and hyperlinked to the glossary). A chronology of significant events related to IndyMac and supervision of the thrift is provided in appendix 4. Appendix 5 shows OTS's IndyMac examinations and enforcement actions from 2001 through 2008. Appendix 6 contains examples of delinquent loans and underwriting weaknesses.

# Results in Brief

The primary causes of IndyMac's failure were largely associated with its business strategy of originating and securitizing Alt-A loans on a large scale. This strategy resulted in rapid growth and a high concentration of risky assets. From its inception as a savings association in 2000, IndyMac grew to the seventh largest savings and loan and ninth largest originator of mortgage loans in the United States. During 2006, IndyMac originated over $90 billion of mortgages.

IndyMac's aggressive growth strategy, use of Alt-A and other nontraditional loan products, insufficient underwriting, credit concentrations in residential real estate in the California and Florida markets, and heavy reliance on costly funds borrowed from the Federal Home Loan Bank (FHLB) and from brokered deposits, led to its demise when the mortgage market declined in 2007. IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well. As an Alt-A lender, IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky option-adjustable-rate-mortgages (option ARMs), subprime loans, 80/20 loans, and other nontraditional products. Ultimately, loans were made to many borrowers who simply could not afford to make their payments. Regardless, the

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2524

thrift remained profitable as long as it was able to sell those loans in the secondary mortgage market.

When home prices declined in the latter half of 2007 and the secondary mortgage market collapsed, IndyMac was forced to hold $10.7 billion of loans it could not sell in the secondary market. Its reduced liquidity was further exacerbated in late June 2008 when account holders withdrew $1.55 billion in deposits. This "run" on the thrift followed the public release of a letter from Senator Charles Schumer to the FDIC and OTS. The letter outlined the Senator's concerns with IndyMac. While the run was a contributing factor in the timing of IndyMac's demise, the underlying cause of the failure was the unsafe and unsound manner in which the thrift was operated.

Although OTS conducted timely and regular examinations of IndyMac and provided oversight through off-site monitoring, its supervision of the thrift failed to prevent a material loss to the Deposit Insurance Fund. The thrift's high-risk business strategy warranted more careful and much earlier attention.

OTS viewed growth and profitability as evidence that IndyMac management was capable. Accordingly OTS continued to give the thrift high composite CAMELS ratings right up until shortly before it failed in 2008. We found that OTS identified numerous problems and risks, including the quantity and poor quality of nontraditional mortgage products. However, OTS did not take aggressive action to stop those practices from continuing to proliferate. OTS had at times as many as 40 bank examiners involved in the supervision of IndyMac; however, the examination results did not reflect the serious risks associated with IndyMac's business model and practices. OTS examiners reported Matters Requiring Board Attention (MRBA) to the thrift, but did not ensure that the thrift took the necessary corrective actions. OTS also did not always report all problems found by the examiners, which were evident in the workpapers but not in the Reports of Examination (ROE). OTS relied on the cooperation of IndyMac management to obtain needed improvements. However, IndyMac had a long history of not sufficiently addressing OTS examiner findings. OTS did not issue any enforcement action, either informal or formal, until June 2008. In short, earlier enforcement action was warranted.

Our material loss review of IndyMac is the second such review we have performed of an OTS-regulated financial institution during the current financial crisis. In our first material loss review, of NetBank, FSB, we were critical of OTS for not taking stronger action when problems noted by examiners remained uncorrected through several examination cycles. We were also critical of OTS for delaying formal enforcement action after it had downgraded the thrift to a 3 in 2006. With IndyMac, OTS examiners reacted even slower in addressing issues that were more severe and with an institution that was nearly 10 times the size. IndyMac engaged in very high-risk activities over many years, yet OTS's examiners did not downgrade the thrift from its 2 rating until early 2008 (except for a brief downgrade in 2001), and only after IndyMac started to incur substantial losses from the risky, non-conforming loan products it could no longer sell on the secondary market. It is important to note that IndyMac did not even appear on OTS's problem thrift list provided to our office including the June 2008 list provided to us less than a month before the thrift was closed.

We believe that it is essential that OTS senior leadership reflect carefully on the supervision that was exercised over IndyMac and ensure that the correct lessons are taken away from this failure. In this regard, we recommend that the Director of OTS (1) ensure that action is taken on the lessons learned and recommendations from the OTS internal review of the IndyMac failure and (2) caution examiners that assigning composite CAMELS ratings of 1 or 2 to thrifts with high-risk, aggressive growth business strategies need to be supported with compelling, verified mitigating factors (such as thrift corporate governance, and risk management and underwriting controls) that are likely to be sustainable. OTS should examine and refine its guidance as appropriate.

OTS Management Response

In its management response, OTS agreed with our overall findings and recommendations and outlined a number of actions to address the identified shortcomings. OTS management also stated that the agency is committed to improve and strengthen its processes based on the lessons learned from the failure of IndyMac.

Among the actions planned by OTS is establishing a large savings association unit in Washington, DC, that will be responsible for reviewing and concurring with regional office actions for savings associations with total assets above $10 billion. To ensure consistent, timely, and appropriate initiation and resolution of corrective actions, OTS stated that it plans to implement newly developed, uniform standards for review and approval of enforcement actions by its existing Regional Office Enforcement Review Committees.

OTS also provided a chronological list of actions it is taking or plans to take to strengthen its supervisory process. These actions are more fully described in the agency's response to this report, see appendix 7.

Additionally, OTS stated that it plans to issue during the first quarter of 2009 (1) external guidance to thrifts on the appropriate documentation, notification, and Thrift Financial Reporting requirements for capital contributions and (2) internal guidance to re-emphasize to examiners the importance of problem correction which will highlight existing requirements for using OTS examination systems to document corrective actions and supervisory follow-up. During the second quarter of 2009, OTS plans to work with the other federal bank regulatory agencies to revise and reissue interagency guidance to address liquidity monitoring.

With respect to our first recommendation, OTS stated that it is dedicated to enact the recommendations in the lessons learned review and has developed or is developing revised policy guidance to address each one. It will also continue to monitor examination activity to ensure that staff members implement, and the industry complies, with the revised guidance. With respect to the second recommendation regarding composite ratings of thrifts with high-risk, aggressive growth business, OTS states that the enhancements described in its response combined with OTS guidance on assigning ratings and the lessons learned in the current financial crisis should ensure that assigned ratings are appropriate for each financial institution.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2527

The full text of the OTS management response is included as
appendix 7.

OIG Comment

OTS identified a number of significant actions that if implemented
as described should improve the timeliness and quality of its
supervisory response to thrift high risk activities, particularly those
by the largest thrifts. It will, however, take time to assess the
effectiveness of these actions and continuous senior management
attention will be crucial to their success.

# Causes of IndyMac's Failure

### High Risk Business Strategy and Aggressive Growth

From the time IndyMac Bank transformed from a <u>real estate
investment trust</u> into a savings and loan association in July 2000,
IndyMac embarked on a path of aggressive growth. From mid-2000
to the first quarter of 2008, IndyMac's assets grew from nearly
$5 billion to over $30 billion. Growth resulted from the business
strategy of the thrift's Chief Executive Officer (CEO) and board of
directors, which was to originate or buy loans and sell them in the
secondary market. Chart 1 below shows the thrift's growth in
assets during this period.

**Chart 1. IndyMac's Growth in Assets Since Inception (in billions)**



Source: IndyMac SEC Filings

As its primary business, IndyMac originated loans or bought loans from others, including from mortgage origination brokers, then it packaged them together in securities and sold them on the secondary market to other banks, thrifts, or Wall Street investment banks. IndyMac maintained mortgage servicing rights for the loans it sold. These loans were held in IndyMac's held for sale portfolio during the time they were packaged until they were sold to investors.

Chart 2 below shows the loan production for IndyMac from inception through 2008, during which time it generated about $10 billion in loans in 2000 to a high of $90 billion in 2006.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2529



Chart 2 IndyMac's Loan Production by Year (in billions)

Source: IndyMac 10-K and 10-Q reports

IndyMac offered an extensive array of nontraditional mortgage loan products. With these products, it could qualify a wide range of borrowers for a loan. Many of these nontraditional mortgages, however, came with an increased risk of borrower default. For example, IndyMac offered an option ARM where the required minimum payment would not fully cover the monthly interest. This could result in negative amortization of the principal balance if the borrower paid less than the fully amortizing payment. According to an Indymac official, in 2006, 75 percent of borrowers who took the option ARM were only making the minimum payment.

ARMs comprised nearly 3 of every 4 loans that IndyMac made during the years 2004 through 2006. IndyMac benefited from these loans because of the larger profit that could be made on these products. For example, in 2006, the profit on an ARM was 3 percent compared to 0.9 percent on conforming loans sold to Government Sponsored Enterprises (GSE). By mid-2007, however, the profit on option ARMs and subprime loans had dropped to zero.

These loans proved to be even riskier because for the most part they were originated with less than full documentation. For a "stated income" loan, for example, IndyMac did not require

**Material Loss Review of IndyMac Bank, FSB (OIG-09-032)**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2530

borrowers to provide documentation to support the income on the application.[1]

By May 2005, signs of borrower distress were evident. There was an increase in the demand for interest only loans, and an increasing number of borrowers were only making the minimum payments on option ARMs. At the same time, house prices in California were leveling off.

When the secondary market for loans collapsed in late 2007, IndyMac could no longer sell its non-conforming mortgage loans. Therefore, the thrift's $10.7 billion in loans "held for sale" in its warehouse were transferred to loans "held to maturity." These loans remained in the thrift's warehouse because there were no bids, no market, and the discount was unknown. By May 2008 non-conforming mortgage loans had grown to $11.2 billion and IndyMac's own data showed that 12.2 percent of these loans were 90 days or greater in delinquency.

**Lack of Core Deposits**

With only 33 retail branch locations (less than average for a financial institution of IndyMac's size), IndyMac had limited access to retail deposits. As a result, IndyMac came to depend on more costly FHLB borrowing (advances) and brokered deposits for funds.

As of September 2006, IndyMac had over $9 billion in outstanding FHLB advances. IndyMac also borrowed, though to a much lesser extent, from the Federal Reserve and a German bank. An FDIC examiner commented in examination workpapers that IndyMac's FHLB advances represented 34 percent of total assets, high in comparison to other similar size institutions. This examiner also wrote that IndyMac should be monitored closely. OTS's examiner responded that these were "eye-opening stats." In March 2008, FHLB advances remained high, at 32 percent of total assets.

---

[1] In some instances, borrowers provided some written documentation to support listed assets. In other instances, IndyMac performed a reasonableness test by comparing the borrower's employment position and income to information on websites such as salarys.com. There were other instances where IndyMac employees noted in the loan files that they had verbally verified the borrower's employment.

IndyMac increased its use of brokered deposits beginning in August 2007, when the market for the thrift's loans collapsed. During the period August 2007 through March 2008, brokered deposits increased from about $1.5 billion to $6.9 billion.

**Inadequate Loss Reserves**

OTS, consistent with generally accepted accounting principles, requires thrifts to set aside an adequate <u>Allowance for Loan and Lease Losses</u> (ALLL) for probable loan losses resulting from delinquencies. As early as 2004, IndyMac senior management began observing the probability of a downward trend in real estate values, which could reduce the collateral supporting loans and result in possible loan losses. Regardless, IndyMac's ALLL decreased as a percentage of the thrift's total loans until 2007 when it finally increased its ALLL because it began to experience losses in its loan portfolio. This is shown in chart 3 below.

**Chart 3. IndyMac's ALLL as a Percentage of Total Loans**



Source: FDIC statistics on depository institutions

During early 2008, IndyMac hired an independent public accountant (IPA) to review the ALLL compliance methodology. The IPA found weaknesses with the thrift's ALLL policy. Various business units were inconsistently calculating their own ALLL and senior management did not provide detailed guidance on how they

expected the divisions to develop historical losses, look-back periods, and baseline factors.

The ALLL is critical because of its impact on the thrift's capital levels. Based on OTS policy, when the ALLL exceeds 1.25 percent of risk-weighted assets, it must be excluded from the equation that measures risk based capital levels. As of March 31, 2008, this amounted to a decline of 0.57 percent in total risk based capital for the thrift, which was already low at 10.26 percent (if the threshold would fall below 10 percent, IndyMac would not have been considered "well capitalized" for regulatory purposes).

**Unsound Underwriting Practices**

IndyMac encouraged the use of nontraditional loans. IndyMac's underwriting guidelines provided flexibility in determining whether, or how, loan applicants' employment, income, and assets were documented or verified. The following procedures were used by the thrift:

- No doc: income, employment, and assets are not verified
- No income/no assets (NINA): income and assets are not verified; employment is verbally verified
- No ratio: no information about income is obtained; employment is verbally verified; assets are verified
- Stated income: income documentation is waived, employment is verbally verified, and assets are verified
- Fast forward: income documentation is sometimes waived, employment is verbally verified, and assets may or may not be verified

To explore the impact of thrift underwriting on loan performance, we reviewed 22 delinquent loans that represented a cross-section of the loan products in IndyMac's loans held to maturity portfolio. These loans were 90 days or more delinquent as of August 31, 2008. We reviewed the loan files and discussed the loans with IndyMac officials who were retained by FDIC in the conservatorship.

For the loans reviewed, we found little, if any, review of borrower qualifications, including income, assets, and employment. We also

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2533

found weaknesses with property appraisals obtained to support the collateral on the loans. For example, among other things, we noted instances where IndyMac officials accepted appraisals that were not in compliance with the <u>Uniform Standard of Professional Appraisal Practice</u> (USPAP). We also found instances where IndyMac obtained multiple appraisals on a property that had vastly different values. There was no evidence to support, or explain why different values were determined. In other instances, IndyMac allowed the borrowers to select the appraiser. As illustrative of these problems, the file for one 80/20, $1.5 million loan we reviewed contained several appraisals with values ranging between $639,000 and $1.5 million. There was no support to show why the higher value appraisal was the appropriate one to use for approving the loan.

We have included more detailed descriptions of four loans we reviewed in appendix 6, which illustrate examples of some of the weakest underwriting practices.

**Impact of Senator Schumer's Letter on the Thrift**

In an interview, OTS's Deputy Director, Examinations, Supervision and Consumer Protection, stated that IndyMac was a distressed institution with a high probability of failure, but the immediate cause of IndyMac's failure was a liquidity crisis resulting from deposit outflows of $1.55 billion (the deposit outflows occurred following the public release of a June 26, 2008, letter from Senator Charles Schumer). The Senator's letter described problems with the thrift that the regulators needed to be aware of and take actions to correct. The letter suggested the thrift was on the verge of failure.

According to the West Region Director, there were investors who were interested in investing in IndyMac around this time. However, he told us that this interest waned after the Senator's letter was published precipitating depositor withdrawals. The OTS official cited one investment firm in particular that had discussed with IndyMac's CEO the possibility of investing about $1 billion in the thrift. In our review of OTS e-mails related to its supervision of IndyMac, we found a June 18, 2008, e-mail from IndyMac's CEO to the West Region Director, the West Region Assistant Director,

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2534

and the examiner-in-charge for IndyMac which stated that the investment firm was very impressed with IndyMac's team and was interested in investing in the thrift. The e-mail further stated the firm had completed on-site due diligence with IndyMac's management team regarding the thrift's balance sheet, off-balance sheet, and business model prospects.

This is inconsistent with another e-mail we read from IndyMac's CEO dated May 21, 2008, to OTS's West Region Director, Assistant Director, and examiner-in-charge, that he thought that firms contemplating investing in IndyMac would need assurances from OTS and FDIC about what regulatory actions were being considered and the possible impact on the thrift.

With this information, we interviewed the managing principal of the investment firm to determine the firm's level of interest in investing in IndyMac. The managing principal said that the firm had explored investing in IndyMac, as part of its normal business process, but never reached a point of serious interest. Also, the principal clarified that the firm based its decision not to invest on its own analysis of IndyMac. Contrary to what OTS's West Region Director told us, the principal said that Senator Schumer's letter did not affect the firm's investment decision.

Furthermore, an analysis performed by FDIC identified the liquidity problem at IndyMac months before the letter came to light. Specifically, in a March 2008 liquidity analysis FDIC identified the need for an investment of $2 billion to $3.5 billion to keep the thrift from failing. Another FDIC analysis, prepared in April 2008, showed that IndyMac was at a high risk of being downgraded to "less than well capitalized." In that analysis FDIC described IndyMac's dependence on brokered deposits to pay off FHLB advances and increase liquidity (brokered deposits at that time totaled nearly $6.9 billion). The analysis also noted that while IndyMac had approximately $3.5 billion in its lines of credit with the FHLB and Federal Reserve, it also had $12 billion in certificates of deposits that would mature within 6 months and be subject to withdrawal.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2535

# OTS's Supervision of IndyMac

OTS's supervision of IndyMac failed to prevent a material loss to the Deposit Insurance Fund. Though OTS conducted regular examinations of the thrift, OTS examiners did not identify or sufficiently address the core weaknesses that ultimately caused the thrift to fail until it was too late -- causes such as aggressive growth without sufficient controls, poor loan underwriting, and reliance on volatile funding sources and FHLB advances. Even when examiners identified problems, OTS did not always report these to the thrift in the Reports of Examination (ROE).

In fact, from 2001 to 2007 OTS's composite CAMELS ratings of IndyMac consistently remained at 2.[2] It was not until 2008 that it dropped IndyMac's composite CAMELS rating to a 3 and then to a 5. According to OTS guidance, one of the principal objectives of the CAMELS rating process is to identify those institutions that pose a risk of failure and merit more than normal supervisory attention.[3] Furthermore, the CAMELS rating is to be a qualitative assessment based on a careful evaluation of component ratings, which evaluate, among other things, whether capital is adequate in relation to the risk profile and operations; asset quality reflects the extent of credit risk associated with the loan and investment portfolios; management has established appropriate policies, procedures, and practices regarding acceptable risk exposures; and the thrift's liquid assets are adequate. There were a number of concerns with IndyMac's capital levels, asset quality, management, and liquidity over the years. Had OTS taken these issues into account, we find it hard to understand how OTS consistently arrived at a satisfactory CAMELS composite rating of 2.

Furthermore, while OTS did report some MRBAs and other matters needing corrective action to the thrift in ROEs, it accepted assurances from IndyMac management that problems would be resolved. This was in spite of the fact that IndyMac management had a history of not taking corrective actions which OTS examiners recommended to improve the thrift. It should also be noted that

---

[2] In April 2001, OTS and FDIC performed an onsite review of IndyMac and 4 months later downgraded its original CAMELS composite rating of 2 to a 3. By the following year, the rating was elevated back to a 2.

[3] OTS, Examination Handbook, Section 070.6, November 2004.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2536

OTS waited until June 2008 to issue it first informal enforcement action against IndyMac, and until July 2008 to present its first formal enforcement action against the thrift (the same month the thrift was closed; the action was not executed).

When we asked OTS's West Region officials and examiners about their supervisory efforts, they believed their supervision was adequate. We disagree. The West Region Director, as well as the examiners, believed that the collapse of both the real estate market and the secondary market for mortgage backed securities were responsible for the failure of the thrift. OTS regional officials also attributed the failure to a liquidity crisis brought on by a letter from Senator Schumer questioning the financial health of the thrift. While these were factors, we believe IndyMac's business strategy of aggressive growth and high-risk products was fundamentally flawed. Also, the thrift was already on a course for probable failure by the time Senator Schumer's letter was made public.

**OTS Conducted Regular and Timely Examinations but Did Not Always Address Key Areas of the Thrift**

OTS conducted a full scope examination each year from 2001 through 2008. These examinations were staffed with between 12 to 40 examiners. Despite the regularity of the examinations and the resources OTS devoted to them, OTS did not always assess certain operational programs. For example, because OTS believed the thrift was operationally safe and sound, it did not annually review things like controls to manage aggressive growth or loan underwriting.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2537

Also indicative of OTS's supervisory weaknesses, we found that OTS took PCA on July 1, 2008, following classification of IndyMac from well capitalized to adequately capitalized on June 30. This is in conformance with PCA requirements. However, it should be noted that a separate review by our office found that OTS allowed IndyMac to record an $18 million capital infusion from the holding company, received in May 2008, as though it was available on March 31, 2008. This allowed IndyMac to inappropriately report that it was at the well capitalized level as of March 31. A separate review of this issue is ongoing. Additionally, we believe that OTS should have taken PCA in May 2008 based on information in IndyMac's 10-Q filing for the quarter ending March 31, 2008.

Table 1 below summarizes the results of OTS's safety and soundness examinations of IndyMac.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2538

## Table 1 Summary of OTS IndyMac Examinations and Enforcement Actions

| Date started | Assets (in millions) | CAMELS rating | Number of matters requiring board attention | Number of corrective actions | Enforcement actions |
|---|---|---|---|---|---|
| | | | **Safety and Soundness Examination Results** | | |
| 4/16/2001 | $5,732 | 2/233222 | 2 | 19 | None |
| 8/24/2001 | $7,425 | 3/233222 | N/A | Offsite Downgrade | N/A |
| 7/29/2002 | $7,112 | 2/232222 | 1 | 19 | None |
| 9/29/2003 | $10,611 | 2/222223 | 5 | 12 | None |
| 11/15/2004 | $15,005 | 2/222223 | 1 | 8 | None |
| 11/1/2005 | $18,274 | 2/222222 | 7 | 8 | None |
| 1/8/2007 | $26,501 | 2/222222 | 3 | 7 | None |
| 1/7/2008 | $31,293 | 5/454554 | 10 | 24 | • OTS and IndyMac enter into an MOU effective June 20, 2008<br>• On July 1, 2008, OTS designates IndyMac in troubled condition<br>• On July 1, 2008 letter, OTS directs IndyMac to revise its business plan and establish a reverse mortgage concentration limit. OTS also downgrades IndyMac's capital level to "adequately capitalized" |

Source: OIG Analysis of OTS data.

Notes: (1) At August 24, 2001, OTS and FDIC examiners jointly determined the composite rating to ensure it reflected IndyMac's overall risk profile.

(2) On January 17, 2008, based on interim findings of the examination started on January 7, 2008, OTS downgraded IndyMac's ratings to 3/242422, effective as of December 31, 2007.

Table 2 below shows the number of staff assigned to each examination from 2003 to 2008 and the number of hours charged to the assignment.

Table 2. Number of OTS Staff and Hours Spent on IndyMac Examinations

| Examination Start Date | Number of Staff Assigned | Number of Hours |
|---|---|---|
| 9/29/2003 | 18 | 2,264 |
| 11/15/2004 | 19 | 2,431 |
| 8/22/2005 | 7 | 372 |
| 11/7/2005 | 26 | 3,224 |
| 1/8/2007 | 40 | 4,614 |
| 1/7/2008 | 37 | 6,383 |
| 6/2/2008 | 12 | 1,118 |

Source: OTS Examination System
Notes: (1) The August 22, 2005, examination was a field visit to check progress on prior exam findings and gather information for the next full scope examination.
(2) The June 2, 2008, examination was a targeted examination to identify risks to capital. The purpose was to determine the amount of capital needed to cover credit losses, provide for operations until a new business model could be implemented, and maintain capital levels at well capitalized. This exam was not completed before IndyMac was closed.

The sections that follow discuss our findings with OTS's review of the use of nontraditional loan products, underwriting of loans, and the lack of forceful enforcement action.

**Concerns About Nontraditional Loans**

OTS identified a number of concerns over the years related to IndyMac's use of nontraditional loans. Several of these concerns affected the thrift's capital requirements – things like IndyMac's narrow definition of subprime loans, the impact of negative amortization associated with the thrift's nontraditional loans, and the thrift's failure to monitor its option ARM portfolio. Yet, in response to all of these concerns, OTS did not take forceful action.

<u>Subprime Loans Were Narrowly Defined</u>

OTS expressed concerns in the 2001 through 2005 ROEs about IndyMac's narrow definition of subprime loans, but only required the expansion of the definition after 2003. In its 2003 ROE, OTS reported that IndyMac had not changed its guidelines and expressed concern because IndyMac's subprime definition did not require the thrift to maintain a sufficient level of capital. In its 2004

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2540

ROE, however, OTS agreed to simplify matters for IndyMac, and gave the thrift permission to use its narrow definition of subprime loans. Had OTS taken action, the thrift would have had to maintain more capital. In 2007, although the thrift's operation had not changed and the real estate market was collapsing, OTS not only did not require the thrift to take action, but no longer even expressed concern about the issue.

This was very surprising to us because in the beginning of 2007 IndyMac's own CEO expressed concerns about the thrift's subprime portfolio in an e-mail message to his executives that discussed the secondary market disruption. His message stated that IndyMac needed to get ahead of the secondary market and trade as much as they could as fast as they could in small deal sizes. In this message, the CEO detailed liquidity problems in the subprime market and the thrift's efforts to pare back risk. Specifically, the CEO stated that the thrift's financial condition was suffering from the effects of its subprime loans and was in the process of structuring a transaction to sell approximately $1.1 billion of them. He went on to say that Wall Street had "pulled financing from investors." He said that the thrift also needed to revisit product guidelines in the high risk areas such as subprime, fully financed mortgages as well as the thrift's higher loan-to-value (LTV) products and make those products "considerably more conservative."[4]

Nonetheless, in its 2007 ROE, OTS said that IndyMac's subprime lending was within the thrift's policy and OTS guidelines. Despite this, the examination workpapers indicated that the OTS examiner was not totally comfortable with IndyMac's compliance with guidance, although he stated in the workpapers that he was satisfied with IndyMac's efforts and would work with the thrift to ensure compliance. These nontraditional loan products, which included ARMs, were being offered to subprime borrowers. The OTS examiner recommended in his workpapers that IndyMac monitor the competition to ensure its underwriting guidelines were not so loose as to pick up the "leftovers" after other institutions tightened standards.

---

[4] We obtained the CEO's e-mail from OTS. The West Region Director had forwarded it to West Region staff and several of the OTS examiners for IndyMac.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2541

## Impact of Negative Amortization

In its 2005 ROE, OTS did not show concern for IndyMac's use of option ARM and interest only loans because losses were minimal and capital was satisfactory. However, OTS stated that capital ratios continued to move lower because of significant asset growth, including growth in these high-risk loans, and were below the thrift's peers as we illustrate in Chart 4 below. OTS highlighted the risks associated with negative amortization that existed in IndyMac's nontraditional mortgage loan portfolio. IndyMac's total risk based capital, however, continued to decline, yet OTS took no action.

**Chart 4. Total Risk Based Capital for IndyMac and Thrifts with Over $10 billion in Assets**



Source: OIG analysis of FDIC Statistics on Depository Institutions

## Monitoring of Option ARMs

In examiner workpapers supporting OTS's 2008 examination, we found the examiner expressed concern over the fact that IndyMac's option ARMs, many of which were now in the loans held to maturity portfolio, would soon reset to higher rates of interest. OTS stated that 34 percent of the loans as of December 31, 2007, exceeded 106 percent of their original loan values due to negative amortization and would soon approach 110 percent. In this workpaper, the examiner recommended that the

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2542

thrift review reports that provided IndyMac management with a means for monitoring these loans. In the response attached to this finding, IndyMac provided copies of various reports it used to monitor performance of its option ARMs. The thrift asked OTS to provide examples of best practices report templates to implement this recommendation. We did not find that OTS reported this finding in the ROE or that the thrift took corrective action.

## OTS Did Not Require Correction of IndyMac's Poor Loan Underwriting

IndyMac's business model was to produce as many loans as possible and sell them in the secondary market. To facilitate this level of production, we found that IndyMac often did not perform adequate underwriting. OTS, however, did not require IndyMac to make improvements in underwriting until late 2007. By then, it was too late. The information that follows are underwriting concerns we identified in several significant areas of the thrift's operations. We obtained this information by reviewing OTS, FDIC, and thrift documentation and interviewing OTS, FDIC and thrift employees.

### IndyMac's Conduit Division Engaged in Risky Practices for Years Before OTS Identified Concerns

To increase loan production, IndyMac relied heavily on outside mortgage brokers to originate loans. This became such a large part of IndyMac's operations that a separate unit, the Conduit Division, was set up to purchase loans in bulk from other loan originators. IndyMac sold these loans to investors in the secondary market. We found that many of IndyMac's problem loans were purchased through this division. In February 2007, IndyMac management, based on its analysis of the thrift's fourth quarter 2006 position, identified the need to better manage credit risk in the Conduit Division by implementing tighter seller approval and underwriting standards. IndyMac ultimately closed the division in August 2007.

Using brokers to develop a community presence, attract customers, and underwrite loans, through the Conduit Division, allowed the thrift to grow rapidly and required only a minimal capital investment. The Conduit Division grew tremendously from

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2543

2002 through 2006, reporting production in 2006 of $31 billion.
Chart 5 below shows the loan growth of the Conduit Division from
2002 through 2007.

**Chart 5. Loan Growth in the Conduit Division from 2002 through 2007 (in billions)**



Source: Indymac's Security and Exchange Commission Filings
Note: IndyMac's Conduit Division was closed in August 2007.

We found that the thrift's internal audit group reported problems
with the Conduit Division as early as 2005. Specifically, because of
concerns the group had in the division's loan approval and
underwriting process, it recommended that the division increase
investment in infrastructure and personnel.

Furthermore, in 2006, IndyMac's independent auditor reported the
Conduit Division as a financial reporting control deficiency. The
independent auditor reported that the division did not have an
effective process or system in place to oversee the execution of its
trading activities or for monitoring the exposure to sellers which
increased credit risk. Similar to IndyMac's internal audit group, the
independent auditor recommended that the division strengthen
controls to ensure that adequate trading authority is obtained for
pool purchases and wire transfer approvals, controls surrounding
the trade reconciliation be strengthened, and controls be added for
the description of loan pool population between initial purchase by
IndyMac and final settlement dates.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2544

Despite the concerns raised by the thrift's internal and independent auditors as well as the Conduit Division's rapid growth, OTS did not examine the division until 2007. When OTS finally did review the division, it found major weaknesses. OTS made six recommendations to IndyMac to improve the safety and soundness of its Conduit Division. Shortly after, IndyMac recognized losses were occurring from this division and closed it.

An OTS examiner we talked to about the Conduit Division loans was concerned that OTS was assigning a CAMELS component 2 rating for asset quality and thought it should have been a 3. He was concerned about the underwriting of loans in the division but expressed some regret that he did not perform a more thorough examination of Conduit Division loans. Another examiner had similar concerns and stated that that the Conduit Division did not underwrite loans, and that IndyMac was not properly reviewing the stated income loans purchased from brokers and was not monitoring delinquency rates of these loans. However, OTS's examiner-in-charge told us that he was confident that the risk was manageable and thought the higher rating was appropriate.

<u>OTS Was Unaware of Underwriting Problems in IndyMac's Home Construction Lending Division Until 2007</u>

In our review of delinquent and troubled loans originated by IndyMac, we found that its Home Construction Lending (HCL) Division was responsible for many of them. Among other things, the HCL Division made home construction loans. It also originated speculative loans and made loans for land purchases. As of December 31, 2007, the HCL Division's loan portfolio was about $2.3 billion or 11 percent of IndyMac's entire loan portfolio.

It was not until its 2007 ROE that OTS reported concerns in the underwriting standards of the HCL Division construction-to-permanent loan portfolio. Among other things, the examiners could not verify that management had determined that sufficient funds existed to complete projects. Overall, the examiners noted a number of findings related to the HCL Division portfolio. It is interesting to note that one of the OTS examiners stated in an e-mail to another examiner, with regard to the HCL Division, that the "appreciation in the market during the last 4 to 5 years was a

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2545

wonderful deodorant to any sloppy or loose underwriting or fund control processes."

Except for some problems with the underwriters' documentation of appraisals in 2004, prior to 2007 OTS examinations had not expressed any significant concerns with regard to IndyMac's HCL Division.

Having said that, IndyMac was aware of potential problems with the HCL Division and in 2004 conducted its own review of the division. IndyMac's internal review found several problems, including (1) a $517,000 bridge loan for which an appraisal was not obtained to support collateral value, (2) loans with expired insurance policies, (3) 22 loans that did not have evidence of building permits in file, (4) 122 title endorsements checks for new liens or delinquent taxes recorded against property that could affect IndyMac's lien position, and (5) money provided to borrowers for 18 loans did not have supporting documentation for these amounts as required with such documents as invoices or contracts.

We interviewed OTS's examiner-in-charge on the 2005 examination and asked him about OTS's review of HCL. He stated that the HCL division was much smaller at the time, was not a major problem, and he could not recall specifics about the examination. In OTS's 2005 ROE we found no discussion of these issues above.

### OTS Identified Problems With IndyMac Appraisals in 2001 But Failed to Ensure the Problems Were Corrected

OTS identified problems with IndyMac appraisals early on. In its 2001 examination, OTS found that appraisals for the Home Builders Division (HBD) (1) violated policies and procedures, (2) violated OTS and Uniform Standards of Professional Appraisal Practice, (3) used inflated appraised values, (4) lacked market analysis and feasibility studies to support appraised value, (5) valued properties far in excess of the recent sale prices for the subject properties and (6) used retail values for subdivisions instead of prospective market value at the time of completion.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2546

OTS, however, did not report these issues in the ROE. Instead, the examination workpapers noted that OTS verbally explained the problems with IndyMac officials and prepared written findings memoranda addressed to the thrift's Chief Credit Officer and Chief Commercial Appraiser. In a limited examination later in the year, OTS followed up on the appraisal issues and concluded that additional attention was needed. However, while the appraisals did not meet standards, OTS concluded that existing appraisals and underwriting were sufficient to mitigate risk and did not issue an MBRA or other corrective action. The basis for OTS's conclusion was not clear.

In its 2002 ROE, OTS examiners stated that IndyMac had hired a new chief commercial appraiser who reviewed loan appraisals. OTS examiners also stated that he was cooperative in working with the OTS to revise policies, discuss appraisal methodology and techniques, and work on acceptable resolutions of appraisal issues. However, OTS did not comment on his effectiveness.

In its 2003 ROE, OTS reported that HBD appraisal policies, procedures, and practices were satisfactory and problem asset levels had declined. No specific comments were made about the efforts of the new chief commercial appraiser identified by OTS a year earlier. However, OTS reported concerns in the single family real estate appraisal function. OTS deemed this function satisfactory but said that improvements were needed.

In its 2004 ROE OTS reported that IndyMac had effective residential and commercial appraisal functions, but recommended corrective actions to enhance controls associated with residential appraisals. We could not locate the supporting workpaper documentation to determine what these actions were.

In its 2005 ROE, OTS did not report on IndyMac's appraisal function. We found that the examiner noted that in the prior year's examination, OTS recommended improvements in the appraisal review and oversight function, and that both the OTS appraiser and examiner reviewed for corrective actions and found the recommendation had been implemented satisfactorily. No further details were provided in the workpapers or the ROE.

In its 2007 ROE, OTS identified serious issues with IndyMac's appraisals. OTS found that the borrowers, rather than the mortgage originator, were paying the appraisers directly, which did not ensure appraiser independence. In several of the loan files, the OTS appraiser noted inadequate documentation. In the examiner workpapers, we noted that the examiner found appraisals where the property valuation was made without physical site inspection of the subject property or comparable properties, appraisals for which the appraiser was not located in the immediate area, appraisals where the valuations were based on public data sources, and appraisals in which no photos of the property or comparables were provided. Despite these serious weaknesses, OTS did not require action be taken.

In its 2008 examination of IndyMac, OTS found improvements in the appraisal function. OTS's ROE stated that to improve credit quality, management implemented more stringent underwriting guidelines, tightened appraisal standards, and re-focused quality control efforts to high risk areas. However, we did not find that OTS's examination workpapers supported these conclusions.

This was puzzling to us because in 2008 we found that IndyMac hired a firm to conduct an assessment of its appraisals. The primary finding of the firm, based on interviews with retail and wholesale underwriters, was that IndyMac underwriting was not centrally managed and instead was handled in remote branches and in IndyMac's Pasadena office. As a result, no consistency existed with appraisal underwriting. The firm recommended that policies and procedures be centralized and made consistent to ensure conformity to procedures. We did not see evidence of how OTS handled these findings and ensured IndyMac took the necessary corrective actions.

**OTS Did Not Issue an Enforcement Action Until June 2008**

When the thrift's business model was no longer viable, the thrift suffered enormous losses. These losses stemmed from single-family loans it held in its portfolio -- poorly underwritten, high-risk non-conforming loans.

**Material Loss Review of IndyMac Bank, FSB (OIG-09-032)** XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2548

**Page 26**

In January 17, 2008, based on interim findings of OTS's 2008 examination, OTS issued a letter to IndyMac's board of directors, chairman, and CEO that the bank's composite CAMELS rating was downgraded from a 2 to a 3, effective December 31, 2007. The Asset Quality and Earnings component ratings were adjusted from a 2 to a 4.

In accordance with OTS's own enforcement guidance, there is the presumption that formal enforcement action be taken for an institution with a composite rating of 3 for the latest safety and soundness examination, if conditions at the institution are rapidly deteriorating or uncertainty exists as to whether management and the board have the ability or willingness to take appropriate corrective action. The guidance also states that OTS may consider issuing an informal enforcement action for a 3 rated association with strong management and a generally positive assessment, if the institution takes immediate corrective actions to resolve the concerns.

In accordance with this guidance and especially since IndyMac's financial condition was rapidly deteriorating, OTS should have issued an enforcement action against IndyMac at the time it downgraded the composite CAMELS rating to a 3 in January 2008.

We believe that OTS should have taken enforcement action against IndyMac as early as 2005. In its 2005 ROE, OTS reported that IndyMac's capital ratios continued to move lower due to significant asset growth, including growth in higher risk asset categories. OTS was concerned with IndyMac's quarterly liquidity stress analysis. OTS also reported that IndyMac had several significant asset concentrations that warranted a higher level of capital in the current environment, such as nontraditional mortgage loans with negative amortization potential, Alt-A loans, and geographic concentration of loans in California and areas rated high-risk by several mortgage insurance companies. We found no evidence in the workpapers that enforcement action was considered.

In an April 2008 e-mail, OTS's examiner in charge for IndyMac contemplated enforcement action and raised it to the OTS's West Region Assistant Director. The examiner believed OTS officials should publicly disclose IndyMac's poor earnings position to

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2549

prevent any liability to investors who had the potential to lose money should the institution fail. At the same time, the examiner was also concerned that if OTS were to take a formal enforcement action, which is public, it would signal a problem with the institution and impact IndyMac's ability to raise capital. The West Region Assistant Director responded to the examiner that OTS officials had a responsibility to take the appropriate enforcement actions and this decision should not be made with the concern that it is public. Nonetheless, OTS did not take enforcement action until June 2008, 2 months later. Examiners said they did not believe enforcement action should have been taken sooner.

Issued June 11, 2008 and effective June 20, 2008, OTS entered into a memorandum of understanding (MOU) which directed IndyMac management and the board to implement a capital restoration plan. The MOU also required IndyMac to (1) take steps necessary and appropriate to ensure that its capital is commensurate with its risk profile, (2) continue to refine and implement its plan to reduce problem assets to acceptable levels, (3) continue to act to ensure its funding is diversified and there are contingency plans in place to have necessary funds available for various stress scenarios, (4) execute plans for improving core earnings and return to profitability, (5) provide bank plans to OTS and report on the progress in meeting targets established in the plans, and (6) make or pay no dividends or other capital distributions without OTS approval. IndyMac's board was directed to ensure compliance with the plan.

On July 1, 2008, OTS issued a follow on supervisory directive to IndyMac's chairman and CEO stating that OTS had reviewed the thrift's capital restoration plan and was now directing the institution to (1) finalize the plan in 20 days, report progress on a monthly basis, implement the plan by closing retail and wholesale forward mortgage lending units and no longer accept new rate locks in those units; (2) establish concentration limits for reverse mortgage loans and in the interim, limit aggregate reverse mortgage loans, to the greater of the amount held at June 30, 2008, or 100 percent of tier 1 capital, and (3) continue to comply with the MOU. In the directive, OTS also reclassified IndyMac's capital level as

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2550

adequately capitalized (from well capitalized) and informed the thrift that it was now subject to restrictions on brokered deposits.[5]

Also on July 1, 2008, OTS issued a Notice of Troubled Condition Designation to the board of directors and CEO that assigned the thrift a composite CAMELS rating of 5. The Notice placed additional restrictions on the thrift related to asset growth, changes in the board and management, golden parachutes, third party contracts, and capital distributions. On July 3, 2008, OTS presented to IndyMac management a cease and desist order, the first time OTS started the process to take a formal, public enforcement action against the thrift. However, OTS never executed the order and the thrift was closed 8 days later. The order would have required IndyMac to (1) retain tier 1 capital of 7 percent and total risk based capital of 13 percent at December 31, 2008; (2) accept no new loans in its retail and wholesale divisions; (3) within 20 days provide a business plan that returns the thrift to a safe and sound position; (4) execute a strategy that includes selling GSE reverse mortgages, retail banking operations, and mortgage servicing; (5) submit a liquidity plan; and (6) obtain approval from the Regional Director to issue dividends. The thrift was closed on July 11. We believe the formal enforcement action was too late.

**OTS Should Have Taken Prompt Corrective Action Earlier**

The purpose of PCA is to resolve the problems of insured depository institutions at the least possible long-term loss to the Deposit Insurance Fund.[6] PCA provides federal banking agencies with the authority to take certain actions when an institution's capital drops to certain levels. PCA also gives regulators flexibility to discipline institutions based on criteria other than capital to help reduce deposit insurance losses caused by unsafe and unsound practices.

As noted above, OTS implemented provisions under PCA through its supervisory directive dated July 1, 2008. This action was taken immediately after OTS issued its ROE on June 30, 2008,

---

[5] 12 CFR Section 337.6(b)(2)
[6] 12 USC § 1831o

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2551

concluding IndyMac's capital level had declined from well capitalized to adequately capitalized.

We believe, however, that OTS should have taken PCA in May 2008 based on information in IndyMac's 10-Q filing for the quarter ending March 31, 2008. In that 10-Q, IndyMac reported that its total risk-based capital was 10.26 percent at the end of the quarter, which was above the 10 percent threshold for well capitalized. However, IndyMac included a disclosure that during April 2008, <u>Moody's Investor Service</u> and <u>Standard & Poor's</u> downgraded the thrift's ratings on a significant number of mortgage backed securities including certain of those issued by IndyMac and for which IndyMac retained interest. IndyMac also stated that had the downgraded ratings been applied to the balance sheet as of March 31, 2008, its total risk based capital would have been reduced to 9.27 percent, which is below the 10 percent well capitalized threshold. OTS, therefore, could have used this information to downgrade the thrift to the lower capital level and implemented PCA.[7]

### OTS's Lessons Learned Review

OTS policy is to conduct an internal review after the failure of an institution by an OTS region other than the OTS region where the failure occurred. The purpose of the review is to examine causes of the thrift's failure, identify lessons learned for OTS staff, and provide recommendations based upon the review. While these reviews cannot be viewed as independent, we believe they are useful in providing OTS senior management additional insight into failures and needed supervisory improvement outside of and before the completion of material loss reviews by our office.

OTS initiated an internal failed bank review of IndyMac following its failure in July 2008. The scope of the review focused primarily on OTS's supervision from November 2005 until it failed. The review was completed in September 2008.

---

[7] 12 CFR Section 565.3(3)(c) provides for a savings association to be notified of its capital levels and its capital category as of the most recent date of an adjustment due to a material event that places the savings association in a lower capital category.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2552

The review, discussed in a 41-page report, found that the
immediate cause of IndyMac's failure was an inability to meet its
obligations due to insufficient liquidity. The report stated that the
public release of the June 26, 2008, letter from Senator Schumer
to OTS and FDIC and the resultant media attention precipitated
significant deposit withdrawals from IndyMac. The deposit
withdrawals, which occurred at a time when all other sources of
liquidity had been restricted or eliminated, caused a liquidity crisis
and resulted in OTS closing the thrift on July 11, 2008.

The review also found that IndyMac was in a distressed financial
condition. The secondary mortgage market collapse that occurred
in 2007 forced IndyMac to discontinue its primary line of business
and retain on its balance sheet a $10.7 billion portfolio of loans of
declining credit quality. Also, the composition and geographic
concentration of IndyMac's loan portfolio was vulnerable to the
downturn in the California housing market.

Further, the review concluded that IndyMac's risk from its loan
products, including option ARMs and stated income loans, was not
sufficiently offset by other underwriting parameters, primarily
higher FICO scores and lower LTV ratios.

The review identified several lessons learned for OTS as follows:

- Underwriting practices considered standard in the mortgage
  industry may become more lax over time due to competitive
  pressures. Regulators need to scrutinize these standards
  closely, especially for institutions with concentrations of
  loans originated under these standards.

- Loans held for sale are not assured of being sold on the
  secondary market. Institutions cannot presume investor
  demand will continue.

- Traditional sources of liquidity available under normal
  economic conditions may be severely curtailed for
  institutions experiencing a distressed financial condition. The
  FHLB and Federal Reserve Bank can restrict borrowing to
  troubled institutions. The FDIC may reject requests for

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2553

brokered deposit waivers to institutions falling below well-capitalized status.

- <u>Concentration risk</u> mitigation practices are essential regardless of current economic conditions. High-risk activities and concentration risks can be concealed by financial success during favorable economic conditions.

- Documented and timely enforcement action is essential to ensure supervisory expectations are communicated to the board of directors.

The OTS Midwest Region staff provided the following recommendations to the West Region:

- West Region management should closely evaluate the need to limit institutions' capital exposure to purchases and sales of loans with high-risk characteristics.

- OTS should enhance examiner guidance for liquidity monitoring. Institutions must have contingency plans in place to reposition assets in the event liquidity safety nets are eliminated or limited by the FHLB and the Federal Reserve Bank.

- West Region management should consider issuing further policy guidance outlining examiner's procedures for documenting supervisory follow-up to examination findings. Documentation should be maintained on all follow-up efforts and conclusions regarding compliance.

OTS provided our office with an update on the status of these recommendations on February 17, 2009. In this regard, OTS stated that it issued or planned to issue revised guidance to cover each recommendation.

OTS's lessons learned review on IndyMac reported on many of the same significant problems that we identified. However, we believe the review put too much emphasis on liquidity and not enough on the unsafe and unsound practices and business model of the thrift. The review did not address the aggressive business strategy that

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2554

placed loan production and growth ahead of underwriting controls.
This strategy ultimately caused the thrift to make a large number of
bad loans, resulting in credit losses that could not be overcome,
particularly when the real estate and secondary markets collapsed
in mid-2007 and loans had to be held to maturity. At this point, the
thrift's capital position was put in jeopardy and, combined with its
lack of retail deposits and reliance on brokered deposits and FHLB
advances, caused a liquidity crisis. We believe that OTS should
have done much more to ensure IndyMac tightened its loan
underwriting early on when the thrift was establishing its business
strategy.

## Concluding Remarks and Recommendations

Our material loss review of IndyMac is the second such review we
have performed of an OTS-regulated financial institution during the
current financial crisis. In our first material loss review, of NetBank,
FSB, we made 3 recommendations. Two of the recommendations
related to an internal assessment of the NetBank failure and the
need to strengthen the internal assessment process and ensure
that action was taken on the recommendations and lessons-learned
from the internal assessment. As the third recommendation, we
recommended that OTS re-emphasize to examiners that for 3-rated
thrifts, formal enforcement action is presumed warranted when
certain circumstances identified in the OTS Examination Handbook
are met. OTS concurred with the recommendation and provided
responsive planned actions.[8]

With NetBank, we were critical of OTS for not taking stronger
action when problems noted by examiners remained uncorrected
through several examination cycles. We were also critical of OTS
for delaying formal enforcement action after it had downgraded the
thrift to a 3 in 2006. With IndyMac, OTS examiners reacted even
slower in addressing issues that were more severe and with an
institution that was nearly 10 times the size. IndyMac engaged in
very high-risk activities over many years, yet OTS's examiners did
not downgrade the thrift from its 2 rating until early 2008 (except
for a brief downgrade in 2001), and only after IndyMac started to

---

[8] OIG, *Safety and Soundness: Material Loss Review of NetBank, FSB* (Report No. OIG-08-032; Apr. 23,
2008).

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2555

incur substantial losses from the risky, nontraditional loan products it could no longer sell on the secondary market. Furthermore, IndyMac did not even appear on OTS's problem thrift list provided to our office, including the June 2008 list provided to us less than a month before the thrift was closed.

We believe that it is essential that OTS senior leadership reflect carefully on the supervision that was exercised over IndyMac and ensure that the correct lessons are taken away from this failure. In this regard, we recommend that the Director of OTS:

1. Ensure that action is taken on the lessons learned and recommendations from the OTS internal review of the IndyMac failure.

   <u>Management Response</u>

   OTS stated that it is dedicated to enacting the recommendations and has developed or is developing revised policy guidance to address each one. OTS also communicated the changes to staff and the thrift industry during training, staff meetings, and outreach throughout 2008 and 2009. OTS will continue to monitor examination activity to ensure that staff members implement, and the industry complies, with the revised guidance.

   <u>OIG Comment</u>

   OTS's actions, taken and planned, address the intent of this recommendation. As indicated in OTS's response, all planned actions are to be in place by the second quarter of 2009.

2. Caution examiners that assigning composite CAMELS ratings of 1 or 2 to thrifts with high-risk, aggressive growth business strategies need to be supported with compelling, verified mitigating factors. Such mitigating factors should consider things such as the institution's corporate governance, risk management controls, ALLL methodologies, concentration limits, funding sources, underwriting standards, and capital levels and whether the mitigating factors are likely to be sustainable in the long-term. Another important factor that

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2556

should be considered is the extent the thrift offers nontraditional loan products (regardless of whether loans are sold or retained) that have not been stress tested in difficult financial environments, and whether the thrift can adequately manage the risks with such products. OTS should re-examine and refine as appropriate its guidance in this area.

<u>Management Response</u>

According to OTS, the OTS *Examination Handbook Section 070, Ratings: Developing, Assigning, and Presenting,* addresses the criteria under which an examiner should rate a financial institution. In this regard, examiners should base ratings on a careful evaluation of an institution's managerial, operational, financial, and compliance performance. The ratings should help identify associations that pose a risk of failure and merit more than normal supervisory attention. Additionally, senior managers routinely discuss the appropriateness of ratings based on examinations, off-site monitoring, and other supervisory activities. OTS is committed to ensuring that its examination ratings accurately reflect the condition of its regulated financial institutions.

OTS states that the enhancements described in its response combined with OTS guidance on assigning ratings and the lessons learned in the current financial crisis should ensure that assigned ratings are appropriate for each financial institution.

<u>OIG Comment</u>

As indicated in its response, OTS considers its current guidance to be adequate. OTS's commitment to ensure ratings are appropriate is noted. Collectively, the corrective actions described in its response have the potential to have major impact on its supervision of thrifts, including the assignment of ratings. However, it will take time to assess the effectiveness of these actions and continuous senior management attention will be crucial to their success.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2557

---

\* \* \* \* \*

We would like to extend our appreciation to OTS for the cooperation and courtesies extended to our staff during the audit. If you have any questions, please contact me at (617) 223-8640 or Sharon Torosian, Audit Manager, at (617) 223-8642. Major contributors to this report are listed in appendix 8.

Donald P. Benson
Audit Director

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2558

Appendix 1
Objectives, Scope, and Methodology

We conducted this material loss review of IndyMac Bank, FSB (IndyMac) in response to our mandate under section 38(k) of the Federal Deposit Insurance Act, as amended. [9] This section provides that if a Deposit Insurance Fund incurs a material loss with respect to an insured depository institution, the inspector general for the appropriate federal banking agency is to prepare a report to the agency, which shall

- ascertain why the institution's problems resulted in a material loss to the insurance fund,

- review the agency's supervision of the institution, and

- make recommendations for preventing any such loss in the future.

- assess implementation of prompt corrective action (PCA) provisions of section 38.

Section 38(k) defines a loss as material if it exceeds the greater of $25 million or 2 percent of the institution's total assets. The law also requires the inspector general to complete the report within 6 months after it becomes apparent that a material loss has been incurred.

We initiated a material loss review of IndyMac based on the loss estimate by the Federal Deposit Insurance Corporation (FDIC). As of December 31, 2008, FDIC's Deposit Insurance Fund had recorded an estimated loss of $10.7 billion.

To accomplish our review, we conducted fieldwork at the Office of Thrift Supervision (OTS) headquarters in Washington, DC and its regional office in Daly City, California. We also met with FDIC officials with its (1) supervisory office in San Francisco, California, and (2) Division of Resolutions and Receiverships on site at IndyMac headquarters in Pasadena, California. While in Pasadena we also interviewed and obtained documents from IndyMac employees.

---

[9] 12 USC § 1831o(g).

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2559

To assess the adequacy of OTS's supervision of IndyMac, we performed interviews and reviews to determine (1) when OTS first identified safety and soundness problems at the thrift, (2) the gravity of the problems, and (3) OTS's supervisory response to get the thrift to correct the problems. We also performed interviews and reviews to determine whether OTS (1) might have discovered problems earlier; (2) identified and reported all the problems; and (3) issued comprehensive, timely, and effective enforcement actions that dealt with any unsafe or unsound activities. Specifically, we did the following:

- We reviewed OTS supervisory files and records for IndyMac from 2000, the year it was chartered by OTS, through 2008. We analyzed examination reports, supporting workpapers, and related supervisory and enforcement correspondence. We performed these analyses to gain an understanding of the problems identified, the approach and methodology OTS used to assess the thrift's condition, and the regulatory action used by OTS to compel thrift management to address any deficient conditions. In assessing OTS's supervisory actions with respect to IndyMac, we considered internal OTS guidance and legislation provided by the Federal Deposit Insurance Corporation Improvement Act, 12 USC § 1820(d).

- We interviewed and discussed various aspects of the supervision of IndyMac with OTS management officials and examiners to obtain their perspective on the thrift's condition and the scope of the examinations.

- We interviewed FDIC officials and examiners who were responsible for monitoring IndyMac for federal deposit insurance purposes, FDIC officials who were assigned to the thrifts operations to run the conservatorship, and FDIC Division of Resolutions and Receiverships personnel who were involved in the receivership process.

- We interviewed current or former officials and employees of IndyMac's Enterprise Risk Management group and internal audit regarding the thrift's operations.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2560

Appendix 1
Objectives, Scope, and Methodology

---

- We selectively reviewed IndyMac documents that had been taken by FDIC and inventoried by FDIC Division of Resolutions and Receiverships personnel. The inventoried documents comprised over 500 boxes. We identified from FDIC's inventory list those documents for our review that were most likely to shed light on the reasons for the thrift's failure and OTS's supervision of the institution. We did not review each and every document in the 500 boxes.

- We judgmentally sampled 22 IndyMac loan files from a universe of delinquent loans in the thrift's held to maturity portfolio as of August 31, 2008. This universe included 63,935 loans totaling a little over $13 billion. The delinquency period for the loans was 90 or more days. Our sample included a cross-section of the thrift's loan products, such as adjustable rate mortgages, stated income loans, and subprime loans. The purpose of our review was to assess IndyMac's underwriting of these loans. We also discussed these loans with IndyMac officials who were still with the thrift after its take over by FDIC. We performed this review during our visits to IndyMac in September and November 2008. We conducted this review using IndyMac's computer system (MIPS), which contained pertinent loan information. The MIPS provided us with information such as the type of loan and the associated terms, borrower name, property location, interest rate, loan amount FICO scores and LTVs. Other information such as the broker, lender, and the debt-to-income ratio were not consistently found in MIPS. We were also able to review hard copy documentation loan files for 15 of the loans. For 7 of the loans, however, hard copy documentation had been sent to an offsite storage facility and was not available for our review.

We conducted our fieldwork from September 2008 through December 2008. We conducted this audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2561

Appendix 2
Background

---

**IndyMac Bank, FSB, History**

Since its inception, IndyMac Bank, FSB (IndyMac), and its predecessor entities focused on home mortgage lending. IndyMac Mortgage Holding, Inc. (IndyMac Mortgage), was established in 1985 as a real estate investment trust (REIT) by Countrywide Credit Industries. In 1993, IndyMac Mortgage transitioned its business model to become a mortgage lender. During the global liquidity crisis in late 1998, many non-regulated financial institutions, mortgage lenders, and mortgage REITs were adversely impacted or did not survive. In response to this, IndyMac Mortgage determined it would be advantageous to become a depository institution. This would provide significant advantages in the form of diversified financing sources, the retention of capital to support growth, and a strong platform for the origination of mortgages.

IndyMac Mortgage terminated its status as a REIT on January 1, 2000, and converted to a fully taxable entity. On July 1, 2000, the entity acquired SGV Bancorp, Inc., which then was the parent of First Federal Saving and Loan Association of San Gabriel Valley, California, a federal savings association. The entity contributed substantially all of its assets and operations to the savings association and was renamed IndyMac Bank, FSB. IndyMac commenced operations on July 1, 2000, with $5.1 billion total assets. IndyMac operated as a wholly owned subsidiary of the publicly traded holding company, IndyMac Bancorp, Incorporated.

As a chartered thrift, IndyMac had access to deposits and Federal Home Loan Bank borrowings to strengthen and diversify its funding base. Consistent with its predecessor entities, the thrift originated residential loans for sale and securitization, as well as to hold for its investment portfolio. Residential mortgage lending and mortgage banking activity remained its primary focus.

On July 16, 2004, IndyMac entered the reverse mortgage industry through the acquisition of nearly 94 percent of the outstanding common stock of Financial Freedom Holdings, Inc., the leading provider of reverse mortgages in the United States, and the related assets from Lehman Brothers Bank, FSB, and its affiliates. The remaining shares of common stock were purchased from Financial Freedom's chief executive officer in July 2006.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2562

Appendix 2
Background

From June 2005 to June 2007, IndyMac grew from $13 billion in
total assets to over $31 billion. The growth was mainly due to the
production pipeline consisting predominately of Alt-A loans.
Starting in the third quarter of 2007, IndyMac was unable to sell or
securitize its loan production. As a result, $10.7 billion of loans
that it intended to sell remained on its own books in its held to
maturity account. IndyMac recorded a $474 million adjustment in
the fourth quarter of 2007 to cover estimated future losses
associated with loans. At March 31, 2008, its loans held to
maturity account totaled $1.4 billion, a 51.4 percent increase since
2007. The majority of loans recorded to this account were those
that it was unable to sell or securitize.

On June 20, 2008, the Office of Thrift Supervision (OTS)
completed a comprehensive examination of IndyMac and assigned
a composite CAMELS rating of 5 to the institution. The composite
rating reflected the significant deterioration of the thrift from the
first quarter 2008 and the institution's viability was in question.

On June 26, 2008, Senator Charles Schumer publicly released a
letter to the Federal Deposit Insurance Corporation (FDIC) and OTS
outlining his concerns over IndyMac's viability and potential loss to
the Deposit Insurance Fund. A deposit run on the thrift began on
June 27, 2008, and continued through July 11, 2008, resulting in
net withdrawals totaling $1.55 billion. On July 11, 2008 OTS
placed IndyMac into receivership, formed a newly chartered thrift,
and named the FDIC as conservator for the new thrift, called
IndyMac Federal Bank, FSB. On Wednesday December 31, 2008,
FDIC signed a letter of intent to sell the banking operations of
IndyMac Federal Bank, FSB, to a thrift holding company controlled
by IMB Management Holdings LP, a limited partnership.

Appendix 4 contains a chronology of significant events regarding
IndyMac.

Appendix 2
Background

**Office of Thrift Supervision**

<u>Types of Examinations Conducted by OTS</u>

As required by law, OTS conducts full-scope, on-site examinations of insured depository institutions with assets over $500 million, as in the case of IndyMac, once a year.[10] OTS also conducts limited examinations under certain conditions which focus on high-risk areas. In addition, OTS conducts information technology examinations to evaluate the institution's compliance with applicable rules and policies of the OTS.

OTS uses the CAMELS rating system to evaluate a thrift's overall condition and performance by assessing six rating components. The six components are <u>C</u>apital Adequacy, <u>A</u>sset Quality, <u>M</u>anagement, <u>E</u>arnings, <u>L</u>iquidity, and <u>S</u>ensitivity to Market Risk. OTS then assigns each institution a composite rating based on the examiner's assessment of its overall condition and level of supervisory concern. Composite and component ratings are assigned based on a 1 to 5 numerical scale. A 1 indicates the highest rating, strongest performance and risk management practices, and least degree of supervisory concern, while a 5 indicates the lowest rating, weakest performance, inadequate risk management practices, and the highest degree of supervisory concern. A full-scope examination also looks at the thrift's compliance with fair lending, consumer protection, and other public interest laws and regulations, such as the Bank Secrecy Act.

The examination team prepares a Report of Examination (ROE) incorporating program findings and conclusions. OTS regional staff send the ROE to 1- and 2-rated thrifts within 30 days from completion of on-site examination activities, and to 3, 4, and 5 rated associations within 45 days from completion of on-site examination activities.

OTS provides FDIC information on and access to thrifts that represent a heightened risk to the Deposit Insurance Fund. OTS presumes heightened risk to be a thrift with a composite rating of 3, 4, or 5 or a thrift that is undercapitalized as defined under

---

[10] OTS is permitted to conduct examinations of thrifts with assets less than $500 million on an 18-month cycle if certain criteria are met.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2564

Prompt Corrective Action (PCA). FDIC may request participation in examinations when a thrift exhibits material deteriorating conditions that could result in the institution becoming troubled in the near future. In this regard, FDIC may need to develop contingency plans for a thrift's possible failure or begin the resolution process.

Types of Enforcement Actions Available to OTS

OTS uses informal and formal enforcement tools to carry out its supervisory and enforcement responsibilities; to address violations of laws and regulations, conditions imposed in writing and written agreement with the agency; and to address unsafe and unsound practices.

Informal Enforcement Actions

In accordance with OTS's enforcement handbook, when a thrift's overall condition is sound, but it is necessary to obtain strong commitment from the board of directors or management to ensure they will correct the identified problems and weaknesses, OTS may use informal enforcement actions. OTS commonly uses informal enforcement actions to address problems for well or adequately capitalized thrifts, thrifts with a composite rating of 1 or 2, or thrifts with a 3 rating but strong management. Informal enforcement actions are not made public.

Informal enforcement actions put the board and management on notice that OTS has identified problems in case a formal action is needed in the future. Informal actions may include:

- meetings with management and/or board of directors
- board of directors' resolutions
- supervisory letters and directives
- special examinations
- requests for voluntary management changes or reorganizations
- notice of deficiency and request for safety and soundness compliance plan
- individual minimum capital requirements

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2565

---

The effectiveness of informal actions depends on the willingness and ability of the thrift to correct deficiencies identified by OTS. If the thrift violates or refuses to comply, OTS cannot enforce compliance in federal court or assess civil money penalties. However, a thrift's unwillingness to comply is a significant factor in determining whether a formal enforcement action is appropriate.

Formal Enforcement Actions

A formal enforcement action is both written and enforceable. Formal actions are appropriate when a thrift has significant problems, especially when there is a threat of harm to the thrift, depositors, or the public. OTS uses formal enforcement actions when informal actions are inadequate, ineffective, or unlikely to correct safety and soundness or compliance problems. The most frequently used formal enforcement actions used by OTS are:

- formal written agreements (Supervisory Agreements)
- cease and desist orders
- civil money penalties
- PCA directives

OTS can assess civil money penalties against the thrift and individuals for noncompliance with a formal action. OTS can also request a federal court to issue an injunction requiring the thrift to comply with the order. Unlike informal actions, formal enforcement actions are public.

OTS Enforcement Guidelines

Considerations for determining whether to use an informal supervisory action or take a formal enforcement action include:

- the extent of actual or potential damage, harm, or loss to the thrift because of the action or inaction
- whether the thrift has repeated the illegal action or unsafe or unsound practice
- the likelihood the conduct may occur again

Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2566

Appendix 2
Background

- the thrift's record for taking corrective action in the past
- the capability, cooperation, integrity, and commitment of the thrift's management, board of directors, and ownership to correct identified problems
- the extent to which the identified problems were preventable and not solely the result of external factors
- the effect of the illegal, unsafe, or unsound conduct on other financial institutions, depositors, or the public
- the examination rating of the thrift
- whether the thrift's condition is improving or deteriorating
- the presence of unique circumstances

.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2567

Appendix 3
Glossary of Terms

| | |
|---|---|
| 10-K | An annual report filed by publicly-traded companies with the Securities and Exchange Commission presenting a financial overview of the company during the year. |
| 10-Q | A comprehensive report of a company's performance that must be submitted quarterly by all public companies to the Securities and Exchange Commission. In the 10-Q, firms are required to disclose relevant information regarding their financial position. |
| 80/20 loan | Requires no borrower down payment or mortgage insurance for this fully financed loan, which is written as two separate loans of 80 percent and 20 percent. |
| Asset/Liability Committee | Senior management committee in a bank or thrift institution, responsible for coordinating the institution's borrowing and lending strategy, and funds acquisition to meet profitability objectives as interest rates change. This committee also monitors actions by the Federal Reserve that may affect interest rates, such as a change in the Federal Reserve federal funds rate. |
| Allowance for loan and lease losses | A valuation reserve established and maintained by charges against the financial institution's operating income. As a valuation reserve, it is an estimate of uncollectible amounts that is used to reduce the book value of loans and leases to the amount that is expected to be collected. These valuation allowances are established to absorb unidentified losses inherent in the institution's overall loan and lease portfolio. |
| Alt-A loan | A mortgage made to a borrower that typically does not involve verification or documentation of income, assets, or employment. Instead, the approval of the loan is based primarily on the applicant's FICO score. |

Appendix 3
Glossary of Terms

| | |
|---|---|
| Baseline factor | Represents loss history and default possibilities that are established to calculate allowance for loan and lease losses (ALLL) and should reflect each segment of an institution's portfolio. |
| Brokered deposits | A deposit that is obtained, directly or indirectly, from a deposit broker. When a bank or thrift is less than well-capitalized, according to the "prompt corrective action" provisions of 12 CFR 6, the term "brokered deposits" may apply to any deposits it solicits by offering rates of interest that are significantly higher than the rates offered by other insured depository institutions in its normal market area. Under 12 USC 1831f and 12 CFR 337.6, the use of brokered deposits is limited to well-capitalized insured depository institutions and, with a waiver from the Federal Deposit Insurance Corporation (FDIC), to adequately capitalized institutions. Undercapitalized institutions are not permitted to accept brokered deposits |
| CAMELS | An acronym for the performance rating components: Capital adequacy, Asset quality, Management administration, Earnings, Liquidity, and Sensitivity to market risk. Numerical values range from 1 to 5, with 1 being the highest rating and 5 representing the worst-rated banks. |
| Capital restoration plan | A plan (CRP) submitted to the appropriate federal banking agency by any undercapitalized insured depository institution. A CRP specifies the steps the insured depository institution will take to become adequately capitalized, the levels of capital to be attained during each year in which the plan will be in effect, how the institution will comply with the restrictions or requirements then in effect, the types and levels of activities in which the institution will engage, and any other information that the federal banking agency may require. |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2569

Appendix 3
Glossary of Terms

| | |
|---|---|
| Concentration risk | Risk in a loan portfolio that arises when a disproportionate number of an institution's loans are concentrated in one or a small number of financial sectors, geographical areas, or borrowers. If loans are more broadly distributed, weaknesses confined to one or a small number of sectors, areas, or borrowers would pose a smaller risk to the institution's financial health. |
| Conditional prepayment rate | A loan prepayment rate that is equal to the proportion of the principal of a pool of loans that is assumed to be paid off prematurely in each period. The calculation of this estimate is based on a number of factors such as historical prepayment rates for previous loans that are similar to ones in the pool and on future economic outlooks. |
| Debt-to-income | Ratio of the borrower's monthly obligations compared with the borrower's gross income. According to Office of Thrift Supervision (OTS) Examination Handbook, Section 217, Asset Quality, lenders may establish relatively low maximum allowable ratios such as 40 percent, or a higher allowable ration such as 50 percent. An institution's board of directors should establish underwriting standards that include prudent ratios that are appropriate for products in the institution's lending area that does not expose the institution to inordinate levels of credit risk. |
| Federal Home Loan Bank | A government sponsored enterprise (GSE) chartered by Congress in 1932. Its purpose is to support residential mortgage lending and community investment at the local level by providing primary direct loans to its more than 8,000 member financial institutions (primarily banks and thrift institutions). Each member institution is a shareholder in 1 or more of 12 regional Federal Home Loan Banks (FHLB), which are privately capitalized, separate corporate entities. The system's Office of Finance is its centralized debt issuance facility. The funds obtained |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2570

Appendix 3
Glossary of Terms

---

|  |  |
|---|---|
|  | through debt issuance are used to support FHLB activities. |
| FICO score | Credit scores provided to lenders by credit reporting agencies to reflect information that each credit bureau keeps on file about the borrower and are produced from software developed by Fair Isaac and Company. The credit scores take into consideration borrower information such as (1) timeliness of payments; (2) the length of time credit has been established; (3) the amount of credit used versus the amount of credit available; (4) the length of time at present residence; and (5) negative credit information such as bankruptcies, charge-offs, and collections. The higher the credit score is, the lower the risk to the lender. |
| Government Sponsored Enterprise | Privately held corporations with public purposes created by the U.S. Congress to reduce the cost of capital for certain borrowing sectors of the economy. GSEs carry the implicit backing of the U.S. Government, but they are not direct obligations of the U.S. Government. Examples of GSEs include: Federal Home Loan Banks, Fannie Mae, Freddie Mac and the Federal Farm Credit Bank. |
| Home equity line of credit | A form of revolving credit, similar to a credit card, which is secured by your home, with a set maximum credit limit. The revolving line of credit offers the borrowers the flexibility to borrow funds when they need them up to the total line of credit amount. Home equity lines of credit are also commonly known as HELOC loans. |
| Loan to value | Ratio for a single loan and property calculated by dividing the total loan amount at origination by the market value of the property securing the credit plus any readily marketable collateral or other acceptable collateral. In accordance with Interagency Guidelines for Real Estate Lending Polices dated October 12, 1999, institutions' internal loan to value ratios should not exceed (1) 65 percent for raw land; (2) 75 percent |

Appendix 3
Glossary of Terms

---

|  |  |
|---|---|
|  | for land development; and (3) 80 percent for commercial, multifamily, and other non residential loans. The Guidelines do not require that institutions prescribe a limitation loans for owner-occupied one- to four-family properties and home equity loans. However, when loan-to-value (LTV) ratios exceed 90 percent at the time of origination, the Guidelines prescribe mortgage insurance or readily marketable collateral should be available. |
| Loan to one borrower | In accordance with 12 CFR section 560.93 regulations that impose lending limitations on thrifts to avoid the risk of concentrating too great of a portion of their assets in any single borrower who are related in a common enterprise. It limits the aggregate dollar amount of an association's loans to each borrower, but does not limit the number of loans to any one borrower with that aggregate dollar limitation. |
| Look-back periods | An approach to validate ALLL methodology by comparing actual losses to anticipated losses in an ALLL calculation. |
| Matter requiring board attention | A thrift practice noted during an OTS examination that deviates from sound governance, internal control, and risk management principles, and which may adversely impact the bank's earnings or capital, risk profile, or reputation, if not addressed; or result in substantive noncompliance with laws and regulations, internal policies or processes, OTS supervisory guidance, or conditions imposed in writing in connection with the approval of any application or other request by the institution. A matter requiring board attention (MRBA) is not a formal enforcement action per se. Nevertheless, OTS requires that thrifts address the matter and failure to do so may result in a formal enforcement action. |
| Moody's Investor Service | Used as a source for credit ratings, research and risk analysis. The service provides research data and |

Appendix 3
Glossary of Terms

---

|  | analytic tools for assessing credit risk, and publishes market-leading credit opinions. |
|---|---|
| Mortgage servicing rights | A contractual agreement where the rights to service an existing mortgage are sold by the original lender to another party who specializes in servicing mortgages. Common services rights included are the right to collect mortgage payments monthly, set aside taxes and insurance premiums in escrow, and forward interest and principle to the mortgage lender. |
| Negative amortization | A loan repayment schedule in which the outstanding principal balance of the loan increases, rather than amortizing, because the scheduled monthly payments do not cover the full amount required to amortize the loan. The unpaid interest is added to the outstanding principal, to be repaid later. |
| No Doc loan | Short for "no-documentation loan." A mortgage in which the applicant provides a minimum amount of information -- name, address, Social Security number (so credit reports can be pulled), and contact information for an employer, if there is one.  The underwriter decides on the loan based on the applicant's credit history, the appraised value of the house and size of down payment. |
| Non-conforming loans | Loans that do not have terms and conditions that follow the guidelines set forth by Fannie Mae and Freddie Mac. These two stockholder-owned corporations purchase mortgage loans complying with the guidelines from mortgage lending institutions, packages the mortgages into securities and sell the securities to investors. By doing so, Fannie Mae and Freddie Mac, like Ginnie Mae, provide a continuous flow of affordable funds for home financing that results in the availability of mortgage credit for Americans. Fannie Mae and Freddie Mac guidelines establish the maximum loan amount, borrower credit and income requirements, down payment, and suitable |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2573

Appendix 3
Glossary of Terms

---

|  | properties. Fannie Mae and Freddie Mac announce new loan limits every year. |
|---|---|
| Option ARM | A mortgage loan in which the interest rate is periodically adjusted based on a variety of indices. |
| Pipeline | Loans inventoried in an institution's held for sale portfolio to be sold to investors. |
| Prompt Corrective Action | Prompt Corrective Action (PCA) is a framework of supervisory actions, set forth in 12 USC § 1831, for insured depositary institutions that are not adequately capitalized. It was intended to ensure that action is taken when an institution becomes financially troubled in order to prevent a failure or minimize resulting losses. These actions become increasingly severe as the institution falls into lower capital categories. The capital categories are well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized. |
| Real Estate Investment Trust | A security that sells like a stock on the major exchanges and invests in real estate directly, either through properties or mortgages. |
| Reverse mortgage | A special type of home loan that lets a homeowner convert the equity in his or her home into cash. The equity built up over years of home mortgage payments can be paid to the homeowner in a lump sum, in a stream of payments, or as a supplement to Social Security or other retirement funds. But unlike a traditional home equity loan or second mortgage, no repayment is required until the borrowers no longer use the home as their principal residence. |
| Risk weighted assets | Used in terms of establishing the minimum amount of capital that is required within institutions that is based on a percentage of the assets, weighted by risk. Requires the institution to assess the risk associated with the loans in its portfolio, and those |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2574

Appendix 3
Glossary of Terms

---

|                              | that hold more risk would require more capital for the institution. |
|------------------------------|---------------------------------------------------------------------|
| Standard & Poor's            | World provider of independent credit ratings, indices, risk evaluation, investment research and data. |
| Subprime                     | Loans for borrowers with (1) FICO score of less than 620, (2) late mortgage payment in the last 12 months (3) bankruptcy in the last 24 months, and/or (4) foreclosure in the last 36 months. |
| Thrift Financial Report      | A financial report that thrifts are required to file quarterly with OTS. The report includes detailed information about the institution's operations and financial condition, and must be prepared in accordance with generally accepted accounting principles. The thrift financial report for thrifts is similar to the call report required of commercial banks. |
| Tier 1 capital               | Represents common shareholder's equity (common stock, surplus, and retained earnings), non-cumulative perpetual preferred stock, and minority interests in the equity accounts of consolidated subsidiaries. In accordance with Financial Institutions Reform, Recovery, and Enforcement Act of 1989, OTS requires Tier 1 core capital to represent 4 percent of total assets adjusted for investment in subsidiaries, gains and losses on available-for-sale securities, and certain hedges. (3 percent if the thrift's composite CAMELS rating is 1). |
| Tier 2 capital (supplementary) | Consists of subordinated debt, intermediate-term preferred stock, cumulative and long-term preferred stock, and a thrift's ALLL up to 1.25 percent or risk-weighted assets. Tier 2 may not exceed Tier 1 capital. |
| Total risk based capital     | The sum of Tier 1 and Tier 2 capital. In accordance with Financial Institutions Reform, Recovery, and Enforcement Act of 1989, OTS requires risk based capital to represent 8 percent of risk-weighted assets of the thrift. |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2575

Appendix 3
Glossary of Terms

Uniform Standard of
Professional Appraisal
Practice

Includes requirements of appraisers that are
established to maintain public trust in appraisal
practice. It reflects the current standards for the
appraisal profession that are established by the
Appraisal Foundation and required by OTS to be
followed.

Volatile funding source

Source of funds that may present a potential risk to
earnings and capital associated with brokered or other
rate-sensitive deposits that may be only temporarily
available or require premium rates to retain.

Wholesale lending

A lender's acquiring of loans from mortgage brokers.
The borrower pays a provider fee to the broker to
obtain the loan. Wholesale lenders may specialize in
different type of loans, such as subprime, reverse
mortgage, Alt-A, commercial and investment
properties.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2576

Appendix 4
Chronology of Events

The following chronology describes significant events in the history of IndyMac Bank, FSB (IndyMac), including examinations conducted and enforcement actions taken by the Office of Thrift Supervision (OTS).

7/1/2000        IndyMac Mortgage Holdings, Inc. (IndyMac Mortgage), which was established in 1985 as a real estate investment trust, completes the acquisition of SGV Bancorp and its thrift subsidiary, First Federal Savings and Loan Association of San Gabriel Valley (FFSGV). IndyMac Mortgage changed its name to IndyMac Bancorp and FFSGV changed its name to IndyMac. IndyMac is wholly owned by IndyMac Bancorp, and commenced operations with $5.1 billion in assets. Its operating strategy was essentially the same as that of IndyMac Mortgage before the acquisition, with the primary change being the expansion of funding sources to include Federal Deposit Insurance Corporation (FDIC)-insured deposits and Federal Home Loan Bank (FHLB) advances.

4/16/2001       OTS begins a comprehensive examination of IndyMac. The examination was completed on June 15, 2001, and assigned composite/individual CAMELS ratings of 2/23322. FDIC examiners participated in the examination.

8/24/2001       Due to continued asset quality and management concerns, OTS downgraded IndyMac's composite CAMELS rating from 2 to 3, and requested IndyMac to temper its growth until the deficiencies noted in the April 16, 2001, report of examination (ROE) had been satisfactorily addressed. OTS requested IndyMac management to meet monthly with the OTS Assistant Regional Director, West Region.

6/17/2002       OTS conducts a field visit to follow-up on previous examination and field visit concerns related to IndyMac's appraisal policies and procedures, appraisal review practices, and appraisal methodology. Several large loans originated by IndyMac's Home Builders Division (HBD) were also reviewed. The field visit report indicates a separate investigation of appraisal activities was conducted and concluded on December 10, 2002. OTS concluded that existing appraisals and underwriting were sufficient to mitigate risks that the supervisory LTV guidance is meant to address.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2577

Appendix 4
Chronology of Events

---

7/29/2002          OTS performs a comprehensive examination that was completed on November 1, 2002. The ROE assigned ratings of 2/232222. OTS noted that IndyMac hired a new chief commercial appraiser to assess the appraisal function at the thrift.

9/29/2003          OTS begins a comprehensive examination. The examination was completed on December 18, 2003, and assigned ratings of 2/222223.

7/16/2004          IndyMac Bancorp, the holding company, completed an equity offering that yielded net proceeds of approximately $100 million. The same day, the holding company acquires Financial Freedom Holdings, Inc., a reverse mortgage lender, for approximately $56 million.

11/15/2004        OTS begins a comprehensive examination. The examination was completed on January 27, 2005, and assigned ratings of 2/222223. The ROE noted OTS agreed to IndyMac's revised targeted core and total risk-based capital ratios of 7.0 and 11.25, percent after taking into consideration subprime loans, respectively, for the year ending December 31, 2005.

June 2005         IndyMac opens another branch office bringing its total number of branch offices to 22, an increase of 11 branch offices since June 2004 in an effort to strengthen core deposits.

8/22/2005         OTS conducts a field visit to review actions taken by IndyMac in response to the November 15, 2004, ROE. The scope included a review of risk management practices which OTS had directed the thrift to enhance. OTS concluded that management made progress in implementing an enhanced market risk management framework. OTS also concluded that management was aware that enhancements were needed in the development of net income modeling capability, and in the development of a Capital Plan/Policy for IndyMac Bancorp.

11/7/2005         OTS performs a comprehensive examination. The ROE was completed on January 20, 2006, and assigned ratings of 2/222222.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2578

Appendix 4
Chronology of Events

---

| | |
|---|---|
| 4Q2005 | IndyMac received a $165 million capital infusion from IndyMac Bancorp. |
| 1Q2006 | IndyMac increased it branch offices to 26. |
| 1/2007 | IndyMac revised its underwriting standards for 80/20 loans by eliminating stated income loans for borrowers with FICO scores of less than 660 to show it was making efforts to reduce risk in its portfolio. |
| 1/8/2007 | OTS begins a comprehensive examination. The examination was completed on March 21, 2007, and assigned ratings of 2/222222. |
| 2/26/2007 | IndyMac makes a number of underwriting changes and updates its internal guidance: (1) held-for-sale, 80/20, and subprime loan underwriting guidelines are tightened; (2) the Home Builders Division (HBD) cuts portfolio dollar limits on condominiums, and cuts the maximum loan size by 75 percent and relationship by 60 percent; and (3) the Home Construction Lending (HCL) division eliminated investor loans, required participating builders to have at least 5 years of experience, and increased borrower liquidity and FICO score requirements. IndyMac also announced that it would stop acquiring option ARM loans from mortgage brokers. This was in response to concerns that subprime problems would carry over into the rest of the real estate market. |
| 4/1/2007 | IndyMac Bancorp executed an agreement with New York Mortgage Trust, Incorporated, to purchase certain assets for approximately $13.4 million, which included an $8 million premium to the net book value of assets acquired. This was a $2 billion retail mortgage origination business with 32 office locations. |
| 7/19/2007 | IndyMac laid-off 400 employees, which IndyMac's CEO stated in an e-mail to employees, would save IndyMac $30 million a year after a third quarter 2007 pre-tax charge of $6.5 million for severance payments for these employees. |
| 8/14/2007 | IndyMac projects losses of $30 million for the third quarter, the first quarterly loss in its history. |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2579

Appendix 4
Chronology of Events

| | |
|---|---|
| 08/22/2007 | IndyMac initiated significant changes to their multi-channel, Alt-A mortgage banking business model and established a new business strategy of primarily being an originator of conforming loans (loans that are under Fannie Mae and Freddie Mac limits and meet their standards for purchase) and a reverse mortgages lender. IndyMac eliminated various product lines including: (1) subprime loans, except those saleable to Fannie and Freddie; (2) 80/20 loans and (3) option ARM loans. IndyMac stopped purchasing loans from mortgage brokers. |
| 8/29/2007 | IndyMac assumes the leases of 100 American Home Mortgage offices and hires 1,400 American Home staff in a continued effort to expand its retail lending operations and move away from purchasing loans originated by mortgage brokers. |
| 9/7/2007 | IndyMac announces plans to eliminate up to 1,000 jobs and make other strategic changes. |
| 11/6/2007 | IndyMac Bancorp reports a net loss of nearly $203 million for the third quarter. |
| 12/20/2007 | IndyMac projects fourth quarter 2007 and first quarter 2008 losses of $153 million and $21 million, respectively. It attributes the projected losses primarily to increased credit losses and securities losses, and write-downs on loans that it had intended to sell but transferred to the thrift's held to maturity portfolio when the secondary market dried up. |
| 12/20/2007 | OTS contacts FDIC to participate on the comprehensive examination to begin January 7, 2008, because of IndyMac's deteriorating condition. |
| 4Q2007 | IndyMac transfers $10.7 billion in loans it intends to sell to its held to maturity portfolio. |
| 1/7/2008 | OTS began a comprehensive examination of IndyMac. The examination is started 4 months ahead of schedule due to concerns noted from off-site monitoring and meetings with management. Three FDIC examiners participated on the exam. |

Appendix 4
Chronology of Events

---

| | |
|---|---|
| 1/15/2008 | IndyMac's Chief Executive Officer (CEO) announced a reduction in staff due to reduced loan originations. |
| 1/17/2008 | OTS downgraded IndyMac's CAMELS composite rating to 3 and lowered the asset quality and earnings component ratings to 4 based on results of off-site monitoring and initial findings of the examination started on January 7, 2008. |
| 1Q2008 | IndyMac Bancorp announced that it suspended common stock dividends. |
| 2/12/2008 | IndyMac Bancorp announces net loss of $509 million for the fourth quarter 2007. The loss included a $600 million write-down on the $10.7 billion of loans transferred to the held to maturity portfolio. |
| 04/04/2008 | OTS officials met with IndyMac's board of directors of the thrift in regards to dividend restrictions, the need for a capital cushion, and the need for the IndyMac Bancorp to build capital. |
| 5/27/2008 | FHLB San Francisco increases collateral requirements for IndyMac portfolios of held-for-sale loans and held to maturity loans. |
| 6/3/2008 | IndyMac, for the first time, projected its total risk based capital ratio will fall below the well-capitalized level as of June 30, 2008. |
| 6/11/2008 | OTS presented IndyMac with a memorandum Of understanding (MOU). IndyMac's board signed the MOU on June 26, 2008. |
| 6/20/2008 | OTS issued the ROE for the examination started on January 7, 2008. OTS downgraded IndyMac's rating to 5/454554. |
| 6/20/2008 | The MOU became effective and required management to (1) improve capital, (2) reduce problem assets, (3) build liquidity and improve contingency plans, and (4) build core earnings to attain profitability. The MOU also directs IndyMac to provide OTS with planning documents and reports. Additionally, the holding company and the thrift are prohibited from paying dividends without prior OTS approval. |
| 06/20/2008 | IndyMac's CEO states in a conference call with officials of OTS and FDIC that he now expects a second quarter 2008 loss of $120 |

Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2581

Appendix 4
Chronology of Events

---

million driven mostly by continued mortgage backed securities
downgrades from rating agencies. The CEO also states that a
potential investor, has hired an investment company to help
conduct due diligence.

6/25/2008    OTS met with IndyMac management and three of its board
members to review their capital raising efforts and contingency
plans in the event additional capital is not available.

6/25/2008    IndyMac projected that its second quarter 2008 Tier 1 core capital
would be 4.46 percent (adequately capitalized) and total risk based
capital would be 7.28 percent (under capitalized). IndyMac,
however, also projected that it would be profitable by the third
quarter 2009 but this forecast assumed there would be no
additional capital infusion and the thrift would close all single
family residential retail and wholesale lending operations and
reduce its work force by almost 3,000 employees.

6/25/2008    OTS and FDIC officials held the exit meeting on its January 2008
examination. IndyMac management was informed of the composite
5 rating assigned by the examination and the nature of the
enforcement actions OTS was considering, which was the MOU
(signed on June 26, 2008). At this meeting, IndyMac's CEO stated
that he expected a decision regarding the potential investor within
the next few days. The CEO also stated that an investment firm
had re-engaged 96 potential investors and that 20 of these
potential investors had expressed interest in IndyMac's reverse
mortgage operations.

6/26/2008    Negative press reports were published regarding the viability of
IndyMac. In the three days leading up to the reports, IndyMac
reported to OTS net deposit inflows of $7.3 million (on June 24,
2006), $23.1 million (on June 25, 2008), and $1.8 million (on
June 26, 2008).

6/26/2008    Senator Charles Schumer sends a letter to OTS and FDIC and
releases it to the public pointing out problems with the thrift that
the regulators need to be aware of and take actions to correct. The
letter identified problems with the thrift's loan holdings and that
the thrift had been dependent on brokered deposits. The letter
suggested the thrift was on the verge of failure.

Appendix 4
Chronology of Events

---

6/27/2008        IndyMac begins to provide hourly deposit outflow information and
                 daily cash flow reports to OTS. The daily cash flow reports show
                 the following net deposit outflows from June 27 to July 11, 2008
                 totaling $1.55 billion.

                        6/27/2008 (Friday)           $4.5 million
                        6/28/2008 (Saturday)         $78.2 million
                        6/29/2008 (Sunday)           $118,000
                        6/30/2008 (Monday)           $84.5 million
                        7/1/2008 (Tuesday)           $205.6 million
                        7/2/2008 (Wednesday)         $147.4 million
                        7/3/2008 (Thursday)          $128.7 million
                        7/4/2008 (Friday)            $238,000
                        7/5/2008 (Saturday)          $45.8 million
                        7/6/2008 (Sunday)            $132,000
                        7/7/2008 (Monday)            $97.5 million
                        7/8/2008 (Tuesday)           $185.1 million
                        7/9/2008 (Wednesday)         $209.2 million
                        7/10/2008 (Thursday)         $115.0 million
                        7/11/2008 (Friday)           $250.0 million (Date Closed)

7/1/2008         OTS sent a Troubled Condition Letter to IndyMac, which did the
                 following:

                 • restricted changes in management or the board composition;
                 • restricted transactions with affiliates
                 • established growth restrictions and dividend payments
                   restrictions
                 • restricted severance payments and other "golden parachute
                   payments"
                 • removed qualification for expedited treatment of applications
                   and notices filed with OTS and notified the thrift it was now
                   subject to higher assessments

7/1/2008         OTS issued a Supervisory Directive to IndyMac which required
                 IndyMac to:

                 • finalize a new operating plan and submit it for OTS
                   approval within 20 days
                 • report progress on meeting the approved plan

Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2583

Appendix 4
Chronology of Events

---

- effective July 7, 2008, close the retail and wholesale forward mortgage lending units and no longer accept new rate locks in those units
- establish a concentration limit acceptable to OTS for reverse mortgage loans
- continue to comply with all understandings contained in the MOU effective 6/20/2008
- no longer except brokered deposits which required a request for a waiver from the FDIC

7/1/2008          In a letter, Federal Reserve Bank informed IndyMac that it was no longer considered to be in sound condition. IndyMac was also informed that it was subject to higher borrowing rates.

7/2/2008          Federal Reserve Bank informed IndyMac that the thrift has no funds available to it and that the Federal Reserve Bank would hold the thrift's collateral (nearly $4 billion).

7/3/2008          OTS presented a Cease and Desist Order that was not executed. The Order required IndyMac to (1) retain tier 1 core capital of 7 percent and total risk based capital of 13 percent at December 31, 2008, (2) accept no new loans in its retail and wholesale divisions, (3) within 20 days provide a business plan that returns the thrift to a safe and sound position, (4) execute a strategy that includes selling GSE reverse mortgages, retail banking operations, and mortgage servicing, (5) submit a liquidity plan, and (6) obtain approval from the regional director to issue dividends.

7/10/2008        FHLB San Francisco reduces IndyMac's credit line by $80 million to $90 million.

7/10/2008        OTS's Senior Deputy Director signed the decision memorandum ("S Memo") to close IndyMac.

7/11/2008        IndyMac requested $750 million from Federal Reserve Bank and is granted $500 million.

7/11/2008        OTS closed IndyMac and FDIC was named as conservator.

7/14/2008        IndyMac Federal Bank, FSB, opened for business as an FDIC-operated institution.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2584

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| 4/16/2001 | 2/233222 | $5732 | **Matters requiring IndyMac Bank (IndyMac) board attention**<br>• Ensure that appropriate action is taken to address the deficiencies identified throughout the Report. Specific emphasis should be placed on: (1) implementing an effective internal asset review (IAR) system, (2) addressing underwriting concerns and ensuring appropriate appraisal functions for both Construction Lending Corporation of America, a division of IndyMac, and the Mortgage Bank, and (3) ensuring an adequate quality control function at the Mortgage Bank.<br>• Ensure that deficiencies related to the Asset Management Group's practices and processes are appropriately addressed. |
| Composite Downgrade 8/24/2001 | 3/233222 | $7425 | **Corrective actions to be taken by IndyMac**<br>• Pending further guidance by Office of Thrift Supervision (OTS), ensure that all "low doc and no doc" loans that are not sold within 6 months of origination, or are repurchased after being sold, are risk weighted at 100 percent for risk-based capital purposes.<br>• Review the entire land loan portfolio and ensure that the portions of land loans that exceed an 80.0 percent loan to value (LTV) ratio are appropriately deducted from risk-based capital.<br>• Ensure that all loans sold with recourse provisions as defined in the ROE are converted on balance sheet and properly risk weighted. Enhance internal systems to better identify recourse arrangement associated with asset sales.<br>• Adjust capital for assets considered impermissible real estate investments.<br>• Adjust capital as appropriate at June 30, 2001 for all items noted.<br>• Implement corrective action outline in memos provided to management during the examination.<br>• Ensure compliance with Interagency Uniform Retail Credit Classification and Account Management Policy.<br>• Divest acquisition, development, and construction loans determined to be impermissible at the Bank level. A divestiture plan should be included in the response, complete with a legal opinion to support that the plan complies with applicable regulations. Management should review the entire construction portfolio to ensure that all impermissible acquisition, development, and construction (ADC) loans have been removed from the Bank.<br>• Discontinue using aggregate retail value to determine LTV ratios; instead, ratios must be based on discounted appraised value per OTS regulations and Uniform Standard of Professional Appraisal Practice (USPAP) guidelines.<br>• Ensure the Post Purchase Quality Control maintains a timely review of single family residence (SFR) files and improves both the timeliness and accuracy of reviews.<br>• Provide a legal opinion to support that the Bank's loan commitment and cap structures comply with loans to one borrower regulations.<br>• Address the examination's concerns noted throughout the Report.<br>• Submit significant changes in the business plan to OTS for approval.<br>• Consider meeting more often than quarterly until all corrective actions have been implemented and verified effective.<br>• Correct deficiencies identified in the Asset Management Group and implement corrective actions provided in management's written |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2585

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | response dated June 14, 2001.  Ensure independent verification of methodologies and processes by a source not affiliated with the Bank's outside auditor. |
| | | | • Amend the Investment Policy to exclude purchases of non-investment grade securities and residuals.  Refrain from purchasing these securities unless OTS opines that they are permissible.  The Bank should provide a legal opinion that supports their position. |
| | | | • Enhance the Accounting Department's independent review of internal security and residual valuations by contracting with an independent pricing service, or obtaining prices from at least 3 securities dealers. |
| | | | • Amend the Pipeline Interest Rate Risk (IRR) policy limits to address net exposure, clarify the Benchmark exposure limit for adjustable rate mortgages (ARM), and assure that asset/liability committee (ALCO) monitoring reports are updated to reflect policy amendments. |
| | | | • Expand efforts to obtain market data and support for manufactured housing servicing asset assumptions. |
| 7/29/2002 | 2/232222 | $7,112 | **Matters requiring IndyMac board attention** |
| | | | • Ensure actions are implemented to address the "corrective actions" detailed in the report of examination (ROE).  If full corrections cannot be achieved by December 20, 2002, provide a detailed plan for attaining such corrections including targeted completion date. |
| | | | **Corrective actions to be taken by IndyMac** |
| | | | • Develop a capital plan that ensures that capital levels remain fully satisfactory in relation to the higher risk assets, operations, and planned growth.  This plan should be discussed with and submitted to OTS for review prior to implementation. |
| | | | • Strengthen Home Builder Division (HBD) infrastructure to ensure that the approval, underwriting, and portfolio monitoring documents provide accurate information for management to make sound lending decisions and provide for accountability of analysts, account officers, managers, and executive management.  Develop an action plan that provides timeframe for completing interim goals as well as the completion of the entire plan. |
| | | | • Enhance underwriting process to ensure that references to aggregate retail values are excluded, borrower and guarantor financial statements are analyzed completely, underwriting exceptions are identified along with mitigating factors, loan approval conditions are met, and loan underwriting phasing matches appraisal valuations. |
| | | | • Ensure that the appropriate enhancements are made to the IAR policies to reflect the changes in the structure, timely classification and charge-off of homogeneous loans, and other policy enhancements as outlined in the September 16, 2002 memorandum to management. |
| | | | • Continue the loan-by-loan review of the SFR portfolio to identify loans that are no longer bankable assets and should be charged-off.  Provide a list of the loans identified and the amount charged-off. |
| | | | • Provide more guidance in the lending policy for defining Comparable Market Area when determining compliance with policy loan-to-value requirements for tract projects. |
| | | | • Ensure that periodic training is provided to SFR and Home Construction Lending (HCL) underwriters. |
| | | | • Develop a specific/comprehensive loan policy that covers all aspects of |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2586

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | subprime lending.<br>• Develop a consistent methodology for categorizing quality control exceptions.<br>• Ensure that post-purchase quality control audits are completed in accordance with policy guidelines.<br>• Correct the SFR data integrity issues related to incorrect FICO scores and loan-to-value ratios.<br>• Ensure that all supporting allowance for loan and lease losses (ALLL) workpapers are readily available for review, the Board reviews the quarterly analysis, and that loans with specific reserves are included when calculating the loss factor as required in the interagency policy statement regarding ALLL.<br>• Address weaknesses in management performance as noted in other sections of the Report.<br>• Review and adjust the policy and procedure approval process so that the Board is appropriately involved in initial and periodic approval of key institution policies and procedures. Ensure that a clear audit trail of Board actions in this regard is maintained.<br>• Incorporate alternative interest rate scenarios in the budget/strategic planning process by December 31, 2002.<br>• Ensure the independent risk management function is improved and provides effective oversight of all subjectively valued assets.<br>• Ensure that the modeling techniques are appropriate and adequate documentation is maintained for subjectively valued assets. Option adjusted spread used to construct discount rates should be documented using observable prices from market transactions including the bank's own securitizations. Market convention should be used when deriving values for all illiquid investments such as the interest only commercial mortgage backed securities where the use of 100.0 percent conditional prepayment rate at the end of lockout or yield maintenance period is appropriate.<br>• Consult with the OTS Regional Accountant regarding the appropriate number of impairment traunches to be used.<br>• Enhance the usefulness of the finalized IRR results with institution specific deposit analysis and conduct analysis at more frequent intervals. |
| 9/29/2003 | 2/222223 | $10,611 | **Matters requiring IndyMac board attention**<br>• At a minimum, maintain capital ratios at the year-end 2004 Strategic Plan projections (core capital 7.37 percent, Tier 2 capital 11.62 percent and Risk-Based capital 12.27 percent).<br>• Provide an update on management's progress in implementing a revised capital planning process.<br>• Ensure the Audit Committee regularly reviews the status of audits, ensures that high risk audits are completed on schedule, and ensures that the 2004 audit plan is met.<br>• Prepare a revised strategic plan reflecting current and projected operations and submit for OTS review.<br>• Ensure actions are taken to address and correct the findings contained in the three memorandums noted in the "Corrective Actions" section of the Sensitivity comment. If full correction cannot be achieved by March 31, 2004, provide a detailed plan for attaining such corrections including |

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | target completion date(s). |
| | | | **Corrective actions to be taken by IndyMac** |
| | | | • At a minimum, maintain capital ratios at the year-end 2004 Strategic Plan projections (core capital 7.37 percent, Tier 2 capital 11.62 percent and Risk-Based capital 12.27 percent). |
| | | | • Provide OTS with an update on management's progress in implementing the revised capital planning process by February 27, 2004. |
| | | | • Continue the underwriting training. Emphasize asset, income, and employment documentation, and continue to monitor the effectiveness of the internal training through the post purchase quality control function. |
| | | | • Implement controls in the underwriting and appraisal review process to ensure improved appraisal quality. In addition, frequent appraisal errors should be communicated to IndyMac's major appraisal providers. |
| | | | • Properly document broker due diligence files to support the approval process and allow a third party reviewer to understand the rationale for approving the broker, particularly when the approval is outside of the established guidelines. |
| | | | • By February 27, 2004, provide the Assistant Regional Director a report detailing the actions taken or planned to address all the Corrective Actions and findings memorandums that were provided to management during the examination. |
| | | | • Continue the refinement and evolution of the Enterprise Risk Management process so that it can be relied upon in all areas, most importantly the oversight of the variable cash flow instrument (VCI) assets and hedging functions. |
| | | | • On a regular basis, ensure the audit committee reviews the status of audits, ensures that high risk audits are completed on schedule, and that the 2004 audit plan is met. |
| | | | • Prepare a revised strategic plan reflecting IndyMac's current and projected operations and submit that plan to the Assistant Regional Director for review by March 31, 2004. |
| | | | • Promptly address the recommendations as detailed in the memoranda provided during the examination that included (1) VCI Assessment and Compliance with Interagency Advisory on Mortgage Banking dated November 20, 2003, (2) Mortgage Servicing Rights and Interest Only Hedge Effectiveness and Performance dated November 21, 2003, and (3) Reconciliation of OTS and QRM Model Results dated November 19, 2003. |
| 11/15/2004 | 2/222223 | $15,005 | **Matters requiring IndyMac board attention** |
| | | | • Provide OTS with corrective and follow-up information with regard to Market Risk Framework, the Board ALCO Hedge reporting, income modeling, prior examination findings, and home equity lines of credit securitizations, as outlined in various memorandums provided to management. |
| | | | **Corrective actions to be taken by IndyMac** |
| | | | • Provide management's attention to the ROE that discusses numerous recommendations made in Examiner Findings Memoranda that require management's continuing attention to fully address. |
| | | | • Continue the ongoing efforts to address the Compliance concerns of Financial Freedom to ensure correction of all violations and exceptions. |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2588

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | • Promptly address the recommendations as detailed in the following memorandums provided during the examination: (1) Market Risk Framework, dated January 3, 2005; (2).Board ALCO Hedge Reporting, dated January 4, 2005; (3) Income Modeling, dated January 4, 2005; (4) Prior Year Examination Findings, dated January 4, 2005; (5) Home Equity Line of Credit Securitizations, dated January 12, 2005; and (6) Reverse Mortgage Lending, dated January 12, 2005. |
| 11/7/2005 | 2/222222 | $18,274 | **Matters requiring IndyMac board attention**<br>• Refine limits on certain asset concentrations relative to core capital.<br>• Submit revised 2006 financial projections.<br>• Provide Board assurance that the corrective actions planned to resolve audit and compliance issues at Financial Freedom (reverse mortgage) will be effectively overseen.<br>• Implement recommendations relative to the quarterly liquidity stress analysis.<br>• Provide assurances for the company-wide build-out of the thrift's market risk framework as described in the IRR Master Policy.<br>• Implement a periodic net income stress analysis.<br>• Establish a risk management trigger for basis risk using stress scenarios.<br>**Corrective actions to be taken by IndyMac**<br>• Submit to OTS for review the recast 2006 financial projections, including projected core and risk-based capital ratios.<br>• Establish more refined exposure limits relative to core capital for nontraditional mortgage loans, Alt-A mortgage loans, and certain geographic loan concentrations.<br>• Request management and the Board's assurance that the continued and planned corrective action to address all deficiencies noted in the internal audit reports, to improve operations, and to enhance the compliance program of Financial Freedom (reverse mortgages) will be effectively overseen and implemented.<br>• Request that management provide regular reviews of progress in addressing these items at the quarterly regulatory update meetings.<br>• Implement recommendations pertaining to the quarterly Liquidity Stress Analysis.<br>• Continue the build-out of the Bank's market risk framework. OTS expectation is for the risk measures to be applied in aggregate at the Bank-wide level and sub-allocated, as appropriate at the individual business unit level as described in the IRR Master policy.<br>• Develop and implement a periodic net income stress analysis.<br>• Establish a risk management trigger for basis risk using stress scenarios. |
| 1/8/2007 | 2/222222 | $26,501 | **Matters requiring IndyMac board attention**<br>• For the Conduit Division, provide actions taken (1) to address the internal audit findings noted in the 2006 and 2007 internal audits, (2) to improve the internal control environment, and (3) to ensure the Division develops more robust, transparent management reports.<br>• Ensure management re-evaluate senior management employment contracts and ensure that the incentive compensation component is weighed in accordance with the employee's responsibilities.<br>• Ensure the new forecasting process is implemented. |

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | **Corrective actions to be taken by IndyMac**<br>• Ensure the Conduit Division corrects the internal audit findings noted in the last report and ensure the Division is operating in a strong internal controls environment. In addition, the Division must develop more robust, transparent management reports.<br>• Establish a policy and related procedures for the identification and classification of troubled collateral dependent loans.<br>• Refine current ALLL practices or introduce new methodologies to take advantage of more robust data and improve forecasts.<br>• Ensure that the Board and management re-evaluate senior management employment contracts and ensure that the incentive compensation component addresses all significant aspects of the employee's responsibilities.<br>• Ensure the new earnings forecasting process is implemented.<br>• Revise the liquidity policy to reflect Treasury meetings as acceptable substitutes for capital funding and liquidity committee meetings.<br>• Develop and implement thrift-wide risk measures and sub-allocate, as appropriate, to all individual business units. |
| 1/7/2008 | 5/454554 | $31,293 | **Matters requiring IndyMac board attention**<br>• Return the Bank's capital ratios to a level that supports its risk profile.<br>• Provide the OTS with a forecast that includes a range of capital necessary to achieve and maintain sufficient capital ratios until implementation of the new strategic plan can provide income at a level that will support the Bank operations.<br>• Ensure that liquidity strategies are in place to manage the Bank's inability to access high-rate brokered deposits, and if additional restrictions are placed on Federal Home Loan Bank Board (FHLB) and Federal Reserve Bank (FRB) borrowing limits.<br>• Develop a clear strategy including scripts for media and customer inquiries to minimize effects of public disclosure of capital position and potential run on deposits.<br>• Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values.<br>• Provide the OTS with a detailed plan for reducing the level of classified and non-performing assets.<br>• Provide OTS with a detailed business plan and budget supporting the new Government Sponsored Enterprise oriented business model, or any alternative business strategy. The pro-forma plan should include monthly income and expense items demonstrating that sufficient income can be generated to provide sufficient returns on capital to ensure viable operations.<br>• Provide monthly variance reports to the OTS on the above plan on a monthly basis.<br>• Ensure that all significant risks are identified, quantified, monitored and controlled to preserve the safety and soundness of the institution.<br>• Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report.<br>**Corrective actions to be taken by IndyMac**<br>• Augment capital to ensure that it supports the Bank's risk profile. |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2590

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | • Provide forecast that includes a range of capital necessary to achieve and maintain sufficient capital ratios until implementation of the new strategic plan can provide income at a level that will support the Bank operations.<br>• Implement additional controls in Thrift Financial Report reporting to strengthen the quarterly compilation process.<br>• Develop a formal plan for reducing the level of classified assets, including the level and concentration of problem HBD loans.<br>• Ensure that timely valuations are obtained for problem loans and that sufficient adjustment is made to address declining real estate values.<br>• Ensure independent IAR audits of HCL and HBD are conducted at least quarterly by internal IAR staff or through third party review.<br>• Ensure resource sufficiency to conduct thorough internal asset reviews.<br>• Revise the HCL scoring matrix to ensure that all modified loans are evaluated for review and classification purposes in a timely manner.<br>• Ensure concentration limits are consistent with current business objectives and portfolio risks.<br>• Ensure that all significant risks are identified, quantified, monitored and controlled to preserve the safety and soundness of the institution.<br>• Ensure adequate resources are available to provide support and documentation for assumptions used in risk management models, valuation models, and information submitted to OTS for the Thrift Financial Report.<br>• Enhance the forecasting process to include worst case scenarios and contingency plans.<br>• Within 90 days, develop a one year-and a three-year strategic plan that provides for a detailed outline of the goals and objectives of the Bank and how it will meet those goals and objectives. The plan must include detailed financial projections for the period of the plan. In addition to a base scenario, the plan should include alternative scenarios that reflect best- and worst-case scenarios, including a scenario that projects continued contraction of the housing market for the next several years.<br>• By August 1, 2008, develop monthly financial projections for the remainder of 2008. The Bank will submit monthly variance reports to the OTS within 30 days of month end. Any adverse variance in excess of 5 percent of the projected amount shall be explained in writing. All changes to the monthly projections must receive the written approval of the Regional Director.<br>• By September 15, 2008, develop quarterly financial projections for 2009 and submit quarterly variance reports within 25 days of quarter end. As with the variance reports for 2008, any adverse variance in excess of five percent of the projected amount shall be explained in writing and any changes to the projections must be approved by the Regional Director, in writing.<br>• Develop a contingency plan to ensure uninterrupted funding should the Bank become unable to access broker deposits.<br>• Develop plans for responding to media and customer inquiries regarding the Bank's ability to meet funding obligations.<br>• Conduct a review of existing documentation for all high risk models by September 30, 2008, and require updates from model owners, as needed.<br>• Maintain, on an ongoing basis, a value at risk white paper that lays out the current model theory and methodology, as well as key assumptions. |

Appendix 5
OTS IndyMac Examinations and Enforcement Actions

| Date examination started | CAMELS rating | Assets (in millions) | Significant safety and soundness corrective actions cited in Reports of Examination 2001 - 2008 |
|---|---|---|---|
| | | | • Seek confirmation from other model owners that adequate documentation will be maintained on an ongoing basis. <br> • Require Business Unit owners to certify that model documentation is up-to-date and complies with the Model Review Policy. <br> • Improve data transparency and access, which will improve the Asset Liability Management Group's ability to provide greater levels of details and facilitate more detailed analysis. <br> • Increase pricing and valuation cohorts used in the Bank's IRR model (management migrated most of its loan portfolios to PolyPaths thereby increasing pricing and valuation cohorts). <br> • Grant review and approval authority over the cohorts to CIRRG's Model Research and Review Group to provide independent confirmation that the cohorts accurately capture the characteristics of the portfolio. |

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2592

Appendix 6
Examples of Delinquent Loans and Underwriting Weaknesses

---

This appendix includes a detailed discussion of four IndyMac-
originated loans that we reviewed. These loans illustrate the
weakest underwriting practices we observed in the sample of 22
loans we reviewed. The reviewed loans were delinquent 90 days or
more as of August 31, 2008.

<u>Loan 1</u>

On May 2, 2007, IndyMac approved a $926,000 stated income
loan for the borrower, which was secured by a one acre lot in
Delray Beach, Florida. The loan was an adjustable rate mortgage
with a 5-year term and a beginning interest rate of 5.875 percent,
which was subject to change monthly. The purpose of the loan
was to pay off a loan the borrower obtained from another lender to
acquire the property and also to provide funds to build a house.
The amount owed on the prior loan was approximately $919,000.

As a stated income loan, IndyMac performed no verification of the
borrower's self-employment income of $50,000 a month
($600,000 annually). IndyMac also did not verify the borrower's
assets. The loan file contained a copy of a signed request by the
borrower to the Internal Revenue Service (IRS) for copies of past
tax returns, but we found no evidence that IndyMac ever obtained
the tax returns. According to an IndyMac official,[11] IndyMac had
borrowers sign such requests as a "scare tactic," assuming that
they would be more forthcoming on their stated income. In
practice, however, we were told that IndyMac seldom forwarded
the signed requests on to the IRS.

The loan file contained an appraisal which indicated that the
property value was $1.43 million. This value was based on
comparable properties that had been improved with single family
residences. However, the comparable properties were located
closer to the ocean and bay, and their values were based on listing
price instead of the actual selling price. The appraised value also
did not take in consideration a slowdown in the real estate market.

---

[11] The IndyMac official we interviewed about this loan and the other loans discussed in the appendix
held the title of First Vice President, Quality Control – Enterprise Risk Management. At the time of our
interview, the official held a similar position with IndyMac Federal Bank, FSB, the successor institution
being operated by the Federal Deposit Insurance Corporation as conservator.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2593

Appendix 6
Examples of Delinquent Loans and Underwriting Weaknesses

We saw no evidence in the loan file that IndyMac resolved these and other anomalies with the appraisal.

The borrower made payments totaling $5,389 before defaulting on the loan. The unpaid principal and interest at the time of foreclosure totaled approximately $1.01 million. At the time of our review, the property was listed for sale for an asking price of $599,000.

## Loan 2

In November 2007, IndyMac approved a $3 million stated income loan, secured by the borrower's primary residence in Scottsdale, Arizona. The loan proceeds were used to refinance the primary residence which the borrower had owned for 11 years and reported its value as $4.9 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported self-employment income of $57,000 a month ($684,000 annually). Contrary to IndyMac policy, the borrower selected the appraiser who appraised the property at $4.9 million. Notes in the loan file indicated that the borrower had listed the property for sale in November 2006, first at a price of $4.9 million that was later reduced to $4.5 million before the borrower pulled the property off the market. Despite this, the appraiser concluded that the value of $4.9 million appeared to be reasonable. IndyMac accepted the appraiser's value based on a review of online sale and public records. It did not physically inspect the property.

The borrower made no payments on the loan before default. The total delinquent loan amount as of November 2008 was $3,015,625. According to the IndyMac official, the property sold in October 2008 for $2.0 million.

## Loan 3

In February 2007, IndyMac provided the borrower a stated income, 80/20 loan, for a combined total of $1.475 million, to purchase a property in Marco Island, Florida. The combined loan equaled the appraised value of the property.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2594

Appendix 6
Examples of Delinquent Loans and Underwriting Weaknesses

As a stated income loan, IndyMac performed no verification of the borrower's reported income of $28,500 a month ($342,000 annually). For 80/20 loans, IndyMac allowed an $800,000/$200,000 maximum loan amount and a maximum combined loan amount of $1 million. This loan was an exception to IndyMac policy as the combined loan amount of $1,475,000 exceeded the maximum combined loan amount. The loan exception was approved anyway.

Various appraisals in the loan file contained significant differences with no indication of how they were resolved by IndyMac. A January 2007 appraisal valued the property at $1.48 million. A valuation analysis prepared by an IndyMac employee on January 25, 2007, stated that the skill level of the appraiser was unacceptable—the appraiser had not provided accurate comparable properties to the subject property and did not accurately consider the location of the property. The IndyMac employee estimated the property value at $1 million and recommended that another appraisal be obtained. Another note in the loan indicated that the IndyMac official overruled the employee's recommendation and the appraisal was accepted. The IndyMac official, however, adjusted the appraised value approximately 10 percent lower, to $1.33 million, citing as a justification that a property on the same street had sold for $1.97 million.

The borrower made no payments before defaulting on the combined $1.48 million loans. According to the IndyMac official, the borrower deeded the property to the thrift in lieu of foreclosure. The IndyMac official estimated in November 2008 that the property was worth about $700,000.

Loan 4

As illustrated by this example, IndyMac was originating high-risk loans early in its existence. According to an IndyMac official, this is perhaps IndyMac's largest loss from a single loan, estimated to be as large as $2.3 million.

In April 2002, IndyMac approved the borrower for a stated income home equity line of credit of $550,000. This line of credit was in addition to a 80/20 loan for $3 million that the borrower already

had with IndyMac. The borrower reported that the property was worth $5.2 million.

As a stated income loan, IndyMac performed no verification of the borrower's reported gross income of $95,000 a month ($1.14 million annually) as the owner/manager of a limited liability corporation. The loan notes history did not indicate how IndyMac resolved negative information revealed in credit reports on the borrower. Two credit reports obtained in March 2002 listed serious and frequent delinquencies. An earlier credit report had noted a discrepancy with the borrower's social security number.

Various appraisals in the loan file also contained significant discrepancies with no indication of how they were resolved by IndyMac. Specifically, the appraisal for the original 80/20 loan, dated in October 2001, valued the property which the appraisal described as new construction at $5.2 million. This same value was reported by a second appraisal dated in March 2002. A third appraisal, dated in April 2002, placed the market value of the home at $508,500. The appraisal stated that the home was less than ½ mile from a hazardous waste facility. A fourth appraisal, also prepared in April 2002, valued the property at $730,000, with the lowest reasonable value at $590,000 and the highest reasonable at $900,000. This appraiser also reported that the home was built in 1959.

The borrower made payments totaling about $11,000 before defaulting on the $550,000 home equity line of credit loan. According to the IndyMac official, the thrift was able to recover approximately $600,000 on both loans. Funds were recovered in part from the title company and in part from two different appraisers.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2596

Appendix 7
Management Response



**Office of Thrift Supervision**
Department of the Treasury                                    *John M. Reich, Director*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6590

February 25, 2009

MEMORANDUM FOR:    Donald P. Benson
                   Audit Director
                   Office of Inspector General
                   U.S. Department of the Treasury

FROM:              John M. Reich            /s/
                   Director

                   Scott M. Polakoff        /s/
                   Senior Deputy Director and Chief Operating Officer

SUBJECT:           Draft Audit Report on the Material Loss Review of
                   IndyMac Bank, FSB

Thank you for the opportunity to comment on your draft audit report entitled "Safety and Soundness:
Material Loss Review of IndyMac Bank, FSB." The report focuses on the causes of the failure of
IndyMac Bank, FSB (IndyMac) and the oversight responsibility of the Office of Thrift Supervision
(OTS) for IndyMac. OTS agrees with the overall findings and recommendations and has taken
aggressive action to address the identified issues. The agency is committed to improve and strengthen its
processes based on the lessons learned from the failure of IndyMac.

To enhance the quality of its supervisory functions, OTS is establishing a large bank unit in Washington,
DC that will be responsible for reviewing and concurring with Regional office actions for savings
associations with total assets above $10.0 billion. To ensure consistent, timely, and appropriate initiation
and resolution of corrective actions, OTS is implementing newly developed standards for review and
approval of enforcement actions by its existing Regional Office Enforcement Review Committees.

The following chronological list of OTS actions demonstrates the agency's commitment to strengthen its
supervisory process. Beginning with your Material Loss Review of NetBank, FSB, published on April 23,
2008 (less than 90 days before the failure of IndyMac), and through both OTS's internal review and your
Material Loss Review of IndyMac, OTS has been responsive to recommendations and lessons learned.

   1)  **May 29, 2008** – OTS issued *New Directions Bulletin 08-05, Lessons Learned – Failed Thrift
       Institution Review.* This internal guidance to Examination and Supervision staff highlights
       the recommendations of the Material Loss Review of NetBank, FSB. It also established an
       independent, internal failed bank review process for OTS to assess and identify lessons
       learned and recommended actions from each failure of a financial institution.

   2)  **July 18, 2008** – OTS reissued external guidance in *Examination Handbook Section 080,
       Enforcement Actions.* The revised guidance clarified expectations on enforcement actions

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2597

Appendix 7
Management Response

---

Page 2

and incorporated the Memorandum of Understanding as a written, informal enforcement tool.

3) **August 11, 2008** – OTS issued *New Directions Bulletin 08-08, Examination and Supervision of Mortgage Banking Activity*. OTS developed this internal guidance following a nationwide horizontal review of the examination and supervision of mortgage banking activity by OTS. It discusses liquidity, funds management, and contingency planning related to mortgage banking. It also highlights the affect of declining economic conditions on liquidity.

4) **September 17, 2008** – OTS issued *Chief Executive Officer (CEO) Memo #280, Documentation and Underwriting Standards*. The CEO Memo is external guidance that discusses documentation and underwriting standards regarding single-family residential loans with high-risk characteristics. It also addresses standards for managing concentration risk in mortgage loan origination. Our experience with IndyMac demonstrated that exposure from mortgage loans originated for sale can constitute a concentration risk that management should identify, measure, monitor, control, and report to the Board of Directors. The Board approved loan policy should establish a limit for aggregate pipeline, warehouse, and credit-enhancing repurchase exposure. A savings association will receive closer supervisory review of its concentration risk when the exposure exceeds Tier 1 capital.

5) **September 17, 2008** – OTS reissued examination guidance in *Examination Handbook Section 212, One- to Four-Family Residential Real Estate Lending*. The revisions to this handbook section address pipeline risk in relation to capital exposure.

6) **September 2008** – OTS distributed the Basel Committee on Banking Supervision guidance titled, *Principles for Sound Liquidity Risk Management and Supervision*, to Regional Management and will formally issue to Examination and Supervision staff by the end of the first quarter 2009.

7) **January 23, 2009** – OTS issued internal guidance as *New Directions Bulletin 09-04, Recognition of Capital Contributions in the Form of Cash or Notes*. This guidance outlines appropriate documentation and timing related to capital contributions.

8) **First Quarter 2009** – OTS will issue external guidance as a CEO Memo titled *Recognition of Capital Contributions in the Form of Cash or Notes*. This CEO Memo will outline appropriate documentation, notification, and Thrift Financial Report presentation requirements for capital contributions.

9) **First Quarter 2009** – OTS will issue internal guidance as a New Directions Bulletin, titled *Reminder: Required Follow-up on Examination Findings, Matters Requiring Board Attention or Savings Association Action*. The bulletin will re-emphasize the importance of problem correction and will highlight existing requirements for using OTS examination systems to document corrective actions and supervisory follow-up.

10) **Second Quarter 2009** – OTS is working with the other federal banking regulatory agencies to revise and reissue the *Interagency Liquidity Guidance* to address liquidity monitoring.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2598

Appendix 7
Management Response

Page 3

The Office of Inspector General report on IndyMac contains two recommended actions. **OTS has taken action to implement both recommendations.**

*Recommendation #1 - Ensure that action is taken on the lessons learned and recommendations from the OTS internal review of the IndyMac failure.*

    **OTS Response**:  On February 17, 2009, OTS provided a summary to the Office of the Inspector General regarding the agency's actions to address the internal review recommendations.  As outlined above, OTS is dedicated to enact the recommendations and has developed or is developing revised policy guidance to address each one.  OTS has also communicated the changes to staff and the thrift industry during training, staff meetings, and outreach in 2008 and 2009.  The agency will continue to monitor examination activity to ensure that staff members implement, and the industry complies, with the revised guidance.

*Recommendation #2 - Caution examiners that assigning composite CAMELS ratings of 1 or 2 to thrifts with high-risk, aggressive growth business strategies need to be supported with compelling verified mitigating factors.  Such mitigating factors should consider things such as the institution's corporate governance, risk management controls, ALLL methodologies, concentration limits, funding sources, underwriting standards, and capital levels and whether the mitigating factors are likely to be sustainable in the long-term.  Another important factor that should be considered is the extent the thrift offers non-traditional loan products (regardless of whether loans are sold or retained) that have not been stress tested in difficult financial environments, and whether the thrift can adequately manage the risks with such products.  OTS should re-examine and refine as appropriate its guidance in this area.*

    **OTS Response:**  OTS *Examination Handbook Section 070, Ratings: Developing, Assigning, and Presenting,* addresses the criteria under which an examiner should rate a financial institution.  Examiners should base ratings on a careful evaluation of an institution's managerial, operational, financial, and compliance performance.  The ratings should help identify associations that pose a risk of failure and merit more than normal supervisory attention.  Senior managers routinely discuss the appropriateness of ratings based on examinations, off-site monitoring, and other supervisory activities.  OTS is committed to ensuring that its examination ratings accurately reflect the condition of its regulated financial institutions.  The enhancements described in this letter combined with OTS guidance on assigning ratings and the lessons learned in the current financial crisis will ensure that assigned ratings are appropriate for each financial institution.

Thank you again for the opportunity to review and respond to your draft report.  We appreciated the professionalism and courtesies provided by the staff of the Office of Inspector General.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2599

Appendix 8
Major Contributors to this Report

---

**Department of the Treasury, Office of Inspector General**

<u>Boston Audit Office</u>

Sharon Torosian, Audit Manager
Maryann Costello, Auditor-In-Charge
Timothy Cargill, Auditor
Jeanne Degagne, Auditor
Jason Madden, Auditor

<u>Washington, DC</u>

Cynthia Milanez, Referencer

**Federal Deposit Insurance Corporation, Office of Inspector General**

John Colantoni, Senior Audit Specialist
Titus Simmons, Senior Audit Specialist

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2600

Appendix 9
Report Distribution

_____

**Department of the Treasury**

Office of Strategic Planning and Performance Management
Office of Accounting and Internal Control

**Office of Thrift Supervision**

Office of Thrift Supervision
Liaison Officer

**Office of Management and Budget**

OIG Budget Examiner

**Federal Deposit Insurance Corporation**

Chairman

**United States Senate**

Chairman and Ranking Member
Committee on Banking, Housing, and Urban Affairs

**U.S. House of Representatives**

Chairman and Ranking Member
Committee on Financial Services

**Comptroller General of the United States**

Acting Comptroller General

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 34
Page 2601