# Exhibit 39

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2748

FILED

DONALD W. SEARLES, Cal. Bar No. 135705
*E-mail: searlesd@sec.gov*
NICHOLAS S. CHUNG, Cal. Bar No. 192784
*E-mail: chungni@sec.gov*

11 FEB 11 AM 11: 38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
John M. McCoy III, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV11 01309 GHK (JCx)

SECURITIES AND EXCHANGE
COMMISSION,

         Plaintiff,

     vs.

MICHAEL W. PERRY and A. SCOTT
KEYS,

         Defendants.

Case No.

**COMPLAINT**

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2749

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), 20(e), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), 77t(e), and 77v(a), and Sections 21(d)(1), 21(d)(2), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e) & 78aa. Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants reside and transact business within this district and certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws alleged in this Complaint occurred within this district.

## SUMMARY

3.     This action involves securities offering fraud and reporting violations committed by Michael W. Perry ("Perry"), the former Chief Executive Officer and Chairman of the Board of IndyMac Bancorp, Inc. ("IndyMac"), and A. Scott Keys ("Keys"), the former Executive Vice President and Chief Financial Officer of IndyMac. Perry and Keys are collectively referred to herein as "Defendants."

4.     IndyMac through its main subsidiary – IndyMac Bank, F.S.B. ("IndyMac Bank" or "the Bank") – primarily made, purchased, and sold residential mortgage loans. In July 2008, IndyMac Bank was placed under Federal Deposit

///

1

1  Insurance Corporation ("FDIC") receivership and IndyMac filed for bankruptcy

2  protection.

3         5.     In 2008, Defendants knowingly or recklessly participated in

4  IndyMac's filing of false and misleading disclosures of its financial condition in

5  Forms 10-K, 10-Q, and/or 8-K, as well as in offering documents for $100 million

6  in stock sales.  During that time period, Defendants regularly received information

7  regarding IndyMac's rapidly deteriorating financial condition.  Despite receiving

8  this information, Defendants participated in the filing of IndyMac's periodic

9  reports and stock offering disclosures that made false and materially misleading

10  statements and omissions regarding:  (1) IndyMac's liquidity; (2) IndyMac's

11  capital raising needs and activities; and (3) IndyMac Bank's capital ratio, a key

12  regulatory metric of a bank's safety and soundness.  Among other things, as

13  discussed below, Defendants signed a false and misleading Form 10-K issued on

14  February 29, 2008 and authorized the filing of one or more false and misleading

15  prospectuses.  In addition, Perry signed false and misleading Forms 10-Q and 8-K

16  and made a false and misleading statement during an earnings call relating to

17  IndyMac's Q1 2008 results.  Shortly after IndyMac partially disclosed its dire

18  liquidity problems in reports for its first quarter 2008 filed on May 12, 2008,

19  IndyMac Bank was put into FDIC receivership and IndyMac declared bankruptcy.

20         6.     Based on their conduct, Defendants violated and/or aided and abetted

21  violations of the antifraud and reporting provisions of the federal securities laws.

22  The Commission seeks an order enjoining Defendants from future violations of the

23  securities laws, requiring Defendants to disgorge their ill-gotten gains with

24  prejudgment interest, ordering Defendants to pay civil monetary penalties, barring

25  Defendants from serving as an officer or director of a public company, and

26  providing other appropriate relief.

27  ///

28  ///

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2751

## THE DEFENDANTS

7.     Michael W. Perry is a resident of San Marino, California.  He was
IndyMac's Chief Executive Officer since 1998 and Chairman of the Board of
Directors since 2003.  Perry was licensed as a CPA in California until his license
was cancelled in 1997.

8.     A. Scott Keys is a resident of La Cañada Flintridge, California.  He
was IndyMac's Executive Vice President and Chief Financial Officer from March
2002 until April 25, 2008, when he took a medical leave of absence.  Keys is
licensed as a CPA in California.

## RELATED PARTIES

9.     IndyMac was a Delaware corporation with principal executive offices
in Pasadena, California.  Its common stock was registered with the Commission
pursuant to Section 12(b) of the Exchange Act and traded on the NYSE until
August 18, 2008, when it was delisted and withdrawn from registration pursuant to
Rule 12d2-2(b) of the Exchange Act.  Its common stock is currently quoted on the
Pink Sheets operated by OTC Markets Group, Inc.  IndyMac filed for Chapter 7
bankruptcy on July 31, 2008.

10.    IndyMac Bank was a federally-chartered thrift institution regulated by
the Office of Thrift Supervision ("OTS") and headquartered in Pasadena,
California.  On July 11, 2008, the OTS closed IndyMac Bank and placed it under
FDIC receivership.

## FACTS

### A.    Background

11.    At the end of 2007, IndyMac was a publicly-traded company whose
primary operating subsidiary was IndyMac Bank.  As a thrift, IndyMac Bank was
subject to regulatory capital requirements that measure a bank's safety and
soundness.  One such measurement, the total risk-based capital ratio (the "capital
ratio"), is calculated by dividing a thrift's total risk-based capital (*e.g.*, shareholder

3

1   equity) by total risk-weighted assets (*i.e.*, the greater the presumed risk of an asset,

2   the greater the risk weighting and the reserved capital needed to support the asset).

3       12.    Under the OTS's regulations and 2000 order approving IndyMac's

4   acquisition of IndyMac Bank, IndyMac Bank was required to maintain a capital

5   ratio of 10% or more to be considered "well-capitalized."  IndyMac Bank would

6   suffer significant regulatory consequences if its capital ratio fell below the 10%

7   well-capitalized threshold, including:

8           a.    An inability to accept (without a waiver from the FDIC)

9                 brokered deposits (*i.e.*, funds deposited by brokers for third

10                parties that receive higher interest rates), which would likely

11                curtail IndyMac Bank's lending business;

12          b.    Potentially increased costs, including borrowing costs from the

13                Federal Home Loan Bank, insurance premiums to the FDIC,

14                and payments to the OTS; and

15          c.    The OTS and FDIC could impose various restrictions or

16                remedial requirements.

17      13.    As the CFO, Keys supervised the two IndyMac departments that

18  forecasted IndyMac's financial results, including IndyMac Bank's capital ratio.

19  Perry and Keys received frequent and, by March 2008, daily forecasts of the

20  Bank's capital ratio by e-mail and in meetings.  Keys also supervised IndyMac's

21  investor relations department, which managed IndyMac's Direct Stock Purchase

22  Plan ("DSPP").  Under the DSPP, investors could purchase $10,000 or more of

23  IndyMac's common stock at a 1% to 2.5% discount to market price.  Perry and

24  Keys received regular reports on capital raising through the DSPP.

25  ///

26  ///

27  ///

28  ///

4

**B.** **Material Omissions and Misstatements in IndyMac's 2007 Annual Report and 2008 Stock Sales**

    **1.** **IndyMac's Negative 2007 Results and Positive 2008 Forecast**

        14.    On February 12, 2008, IndyMac reported its 2007 results of operations and financial condition in a Form 8-K ("2007 Earnings 8-K"), which included as exhibits an earnings press release (the "2007 Press Release"), a shareholder letter (the "2007 Shareholder Letter") and a presentation entitled "IndyMac Bancorp, Inc. Fourth Quarter Review" (the "2007 Presentation").  Perry and Keys signed IndyMac's 2007 Earnings 8-K, and Perry signed the 2007 Shareholder Letter.  Although IndyMac acknowledged in the 2007 Earnings 8-K that IndyMac had a "terrible" 2007 and had lost $509 million in the fourth quarter and $615 million during fiscal 2007, the 2007 Press Release assured investors that IndyMac had finished the quarter in a "solid overall financial position" and had a "game plan" that gave it a "realistic shot" at a $13 million profit in 2008.  IndyMac further assured investors that even if its 2008 forecast was wrong, "we have the capital … to absorb nearly triple our presently forecasted 2008 credit costs and fight our way through until the housing and mortgage markets do stabilize."

        15.    The 2007 Earnings 8-K also made positive statements and forecasts regarding IndyMac's Bank's capital ratio.  In the 2007 Earnings 8-K, IndyMac stated that IndyMac Bank's capital ratio was 10.50% at the end of 2007, and was thus above the 10% well-capitalized threshold.  IndyMac went on to state that "[w]e believe that, under current regulations, the bank will continue to meet its 'well-capitalized' minimum capital requirements in the foreseeable future," and that "[w]e are currently forecasting that our balance sheet size will decline and our capital ratios will increase over the course of 2008 as we execute our revised business model of primarily GSE ["Government Sponsored Enterprise"] lending."  IndyMac's 2007 Presentation similarly had positive forecasts for IndyMac Bank's capital ratio, including a projected 10.59% capital ratio at March 31, 2008.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2754

16.    In addition, the 2007 Shareholder Letter stated that the "only good news" is that, even with its significant annual and quarterly losses, IndyMac remained in a "fundamentally sound financial position" and that IndyMac Bank's "capital levels continue to exceed the levels defined as 'well capitalized' by our regulators." The 2007 Shareholder Letter assured IndyMac's investors that "based on our new business model ... we are forecasting a small profit in 2008 ... as we believe we can maintain our 'well-capitalized' capital ratios even under worsening industry conditions."

17.    IndyMac's 2007 Earnings 8-K also informed investors that given its strong levels of capital and liquidity, IndyMac did not intend to raise capital in 2008. IndyMac's 2007 Shareholder Letter stated that "we want to try and avoid raising capital externally right now given our current stock price relative to book value per share, as any capital raised would be highly dilutive to existing shareholders." Similarly, IndyMac's 2007 Presentation stated that "due to our low stock price to book value per share, our 2008 plan does not rely on the capital markets for raising capital; instead we plan to eliminate the dividend [on common shares] and shrink the balance sheet," thereby improving IndyMac's capital position by $318 million. The 2007 Presentation also forecasted that the number of diluted shares outstanding would not increase, thereby further emphasizing that IndyMac did not expect to raise capital through stock sales.

18.    The 2007 Earnings 8-K also touted IndyMac's liquidity, including its cash position, stating in the 2007 Presentation that IndyMac had:

      a.    $64 million in cash at year end 2007 to pay future preferred dividends of $7.3 million per quarter;

      b.    "enough cash to pay [preferred dividends] for over 2 years without any dividends from the Bank or additional debt or equity raised"; and

///

6

c.  "the right to defer dividend payments on [preferred securities] for up to five years; [but it did] not expect to have to exercise this right."

2.  **IndyMac's Fraudulent DSPP Sales to Protect IndyMac Bank's Capital Ratio and Pay Preferred Dividends**

19.  IndyMac's capital and liquidity levels and its "realistic" plan to return to profitability in 2008 began to unravel just one week after it filed its 2007 Earnings 8-K. On or about February 19, 2008, Keys informed Perry and other IndyMac executives that a significant one-day rise in interest rates caused IndyMac Bank's forecasted capital ratio at March 31 to be right at or slightly under 10%. In response, Perry sent Keys and other IndyMac executives an e-mail stating that IndyMac would raise up to $50 million by selling stock through the DSPP. In his e-mail, Perry wrote that IndyMac would use DSPP sales proceeds to (1) keep the Bank's capital ratio above 10% by contributing $25 to $50 million to IndyMac Bank and (2) pay future preferred dividends.

a)  **IndyMac's False and Misleading DSPP Sales through the October 11, 2007 Prospectus**

20.  On February 26, 2008, IndyMac began selling its common shares through the DSPP pursuant to a June 30, 2006 Form S-3 automatic shelf registration statement and an October 11, 2007 prospectus. Perry and Keys signed IndyMac's June 30, 2006 Form S-3. As a member of IndyMac's board of directors, Perry had authorized the offer and sale of stock through the October 11 DSPP prospectus, while Keys authorized the filing of that prospectus. In those offering documents, IndyMac represented that it "intend[ed] to use the net proceeds from sales of common stock … for general corporate purposes, including investment in [its] subsidiaries." Pursuant to Item 504 of Regulation S-K of the Securities Act, 17 C.F.R. § 229.504, the DSPP prospectus was required to disclose "the principal purposes for which the net proceeds to the registrant from the

7

1  securities to be offered are intended to be used and the approximate amount

2  intended to be used for each such purpose." IndyMac's DSPP prospectus did not

3  disclose that it planned to use $25 to $50 million of net offering proceeds for a

4  capital contribution to IndyMac Bank and to use the remaining proceeds to pay

5  future preferred dividends.

6      21.  IndyMac's June 30, 2006 Form S-3 registration statement and each

7  prospectus filed pursuant to that registration statement incorporated by reference,

8  among other things, all of IndyMac's future filings with the Commission until the

9  offering terminated. As such, IndyMac's registration statement and October 11,

10  2007 prospectus incorporated by reference its 2007 Earnings 8-K, which, as

11  alleged above, contained representations regarding IndyMac's strong capital and

12  liquidity positions.

13      22.  Perry and Keys knowingly or recklessly failed to disclose (either

14  through a new prospectus, an amendment to the October 11, 2007 prospectus, or a

15  Form 8-K) that, contrary to the 2007 Earnings 8-K, IndyMac's capital and liquidity

16  levels were rapidly deteriorating and that IndyMac was selling stock to raise

17  capital for the purpose of protecting IndyMac Bank's capital ratio and paying

18  preferred dividends. Such information would have been material to reasonable

19  investors, who would have viewed the precarious state of IndyMac's capital and

20  liquidity levels and the true reasons for IndyMac's stock sales as important to their

21  assessment of their risk of loss and the price they would be willing to pay for

22  IndyMac's common stock.

23      23.  From February 26 through 29, 2008, when it filed its 2007

24  Form 10-K, IndyMac raised approximately $11.3 million through the DSPP.

25      **b)  IndyMac's False and Misleading 2007 Form 10-K and**

26          **Resulting Fraudulent DSPP Sales**

27      24.  On February 29, 2008, IndyMac filed its 2007 Form 10-K, which was

28  signed by Perry and Keys. IndyMac's 2007 Form 10-K repeated many of the

8

positive statements in its 2007 Earnings 8-K, including: "We have a solid and a
realistic plan that we believe will return IndyMac to profitability in 2008." The
2007 Form 10-K also made positive disclosures regarding IndyMac's current
liquidity and capital needs:

    a.    "We currently believe our liquidity level is sufficient to satisfy
our operating requirements and meet our obligations and
commitments in a timely and cost effective manner";

    b.    "As a result of our … strong capital and liquidity positions, we
were not forced to sell assets at liquidation prices and our [loan]
funding capacity was not materially impacted";

    c.    While the Bank "currently [has] regulatory capital ratios in
excess of the 'well capitalized' requirement and [has]
implemented a plan to … increase our capital ratios, there can
be no assurance that [the Bank] will not suffer material losses
or that [IndyMac's] plans … will succeed. In those
circumstances, [IndyMac] may be required to seek additional
regulatory capital to maintain our capital ratios at the 'well
capitalized' level"; and

    d.    IndyMac "may be required to raise capital at terms that are
materially adverse to shareholders."

    25.    These statements about IndyMac's capital raising activity were false
and misleading when IndyMac filed its 2007 Form 10-K. As Perry and Keys
knew, IndyMac's capital position was not "strong" because IndyMac Bank's
capital ratio was projected to be right at or slightly below 10%. In addition,
Defendants knew that the statement in IndyMac's Form 10-K that "*may*" raise
capital at terms that are materially adverse to shareholders was false and
misleading, as IndyMac already had begun raising new capital on February 26,
2008 at a price (average $6.93 per share) that was highly dilutive relative to book

9

1   value ($16 per share) as a result of IndyMac's plan to raise up to $50 million

2   through the DSPP.  Furthermore, Defendants knew that IndyMac's liquidity

3   position was weakening and it needed to raise new capital to protect its well-

4   capitalized regulatory status and to pay preferred dividends in future quarters.

5        26.    Pursuant to the terms of IndyMac's June 30, 2006 Form S-3

6   registration statement and October 11, 2007 prospectus, the above false and

7   misleading statements in the 2007 Form 10-K were also incorporated by reference

8   into the DSPP prospectus dated October 11, 2007.

9        27.    Perry and Keys knowingly or recklessly failed to disclose (either

10  through a new prospectus, an amendment to the October 11, 2007 prospectus, or a

11  Form 8-K) that, contrary to the 2007 Form 10-K, IndyMac's capital and liquidity

12  levels were rapidly deteriorating and that IndyMac was in fact selling stock to raise

13  capital for the purpose of protecting IndyMac Bank's capital ratio and paying

14  preferred dividends.  The omitted information would have been material to

15  reasonable investors, as they would have viewed IndyMac's declining capital and

16  liquidity levels and the true reasons for IndyMac's stock sales as important to their

17  assessment of their risk of loss and the price they would be willing to pay for

18  IndyMac's common stock.

19       28.    From March 10 through April 3, 2008, when it filed a new DSPP

20  prospectus, IndyMac raised approximately $36.3 million through the DSPP.

21            c)    **IndyMac's False and Misleading April 3, 2008 Prospectus**

22       29.    On March 20, 2008, Keys recommended to Perry that IndyMac

23  contribute $75 million to IndyMac Bank on March 31, 2008 for the principal

24  purpose of protecting IndyMac Bank's capital ratio.  Keys believed that $75

25  million was the most that could be contributed to IndyMac Bank while leaving

26  IndyMac with enough money to meet its cash flow needs.  Based on a $75 million

27  contribution at March 31, Perry and Keys knew that IndyMac would be left with

28  only $16 million in cash, which was enough to pay only two quarters of future

10

1  preferred dividends. Perry and Keys agreed to reduce IndyMac's capital

2  contribution from $75 million to $70 million after IndyMac's treasurer raised

3  concerns about IndyMac's dwindling cash.

4      30.    After the $70 million capital contribution on March 31, 2008, Perry

5  and Keys knew that IndyMac was left with about $21 million in cash, which was

6  enough to pay only three quarters of preferred dividends without raising additional

7  capital or receiving dividends from IndyMac Bank.

8      31.    On April 3, 2008, IndyMac filed a prospectus registering the offer of

9  an additional ten million common shares through the DSPP. As a member of

10  IndyMac's board of directors, Perry authorized the offer and sale of additional

11  stock through the DSPP. Keys authorized the filing of the April 3 prospectus,

12  which was the first public disclosure that IndyMac was raising capital in 2008.

13  The prospectus contained the same generic disclosure that IndyMac "intend[ed] to

14  use the net proceeds from [the offering] for general corporate purposes, including

15  investment in our subsidiaries" and incorporated disclosures in the 2007 Earnings

16  8-K and 2007 Form 10-K regarding IndyMac's strong capital and liquidity

17  positions.

18      32.    As Perry and Keys knew, or were reckless in not knowing, the generic

19  disclosures in IndyMac's April 3, 2008 prospectus were false and misleading. By

20  incorporating IndyMac's 2007 Earnings 8-K and 2007 Form 10-K, the prospectus

21  repeated the false and misleading disclosures regarding IndyMac's strong capital

22  and liquidity positions that were contained in those earlier filings. Indeed, by the

23  time IndyMac filed its April 3 prospectus, its liquidity position had deteriorated

24  even further as a result of having contributed $70 million of its $91 million in cash

25  to IndyMac Bank to protect the Bank's capital ratio. Defendants also knew, or

26  were reckless in not knowing, that IndyMac's generic disclosure concerning the

27  use of proceeds from DSSP sales was false and misleading, as IndyMac failed to

28  disclose that it was forced to raise new cash for the purpose of protecting IndyMac

1   Bank's capital ratio and paying future preferred dividends.  As alleged above,

2   reasonable investors would have found the above information material in that it

3   would have been important to their investment decision.

4        33.     From April 4 through April 24, IndyMac raised approximately $30.5

5   million through the DSPP.

6            **d)     IndyMac Bond Rating Downgrades and Keys' Departure**

7                    **from IndyMac**

8        34.     IndyMac's capital and liquidity positions deteriorated even further in

9   late April 2008, when Moody's Investors Service downgraded 165 mortgage-

10  backed securities ("MBS") sponsored by IndyMac Bank on April 23, and Standard

11  & Poor's downgraded 251 IndyMac Bank-sponsored MBS on April 28.  IndyMac

12  Bank held on its balance sheet $160 million in downgraded bonds as of March 31,

13  2008 and recorded a $9.5 million write-down expense during the quarter ended

14  March 31, thereby lowering IndyMac Bank's first quarter 2008 capital ratio.  Perry

15  and Keys knew, or were reckless in not knowing, that the bond downgrades would

16  negatively impact IndyMac Bank's capital ratio in future quarters because

17  additional capital would be required to support the downgraded, and hence riskier,

18  MBS.

19       35.     On April 24, 2008, the day after Moody's ratings downgrade, Keys

20  left IndyMac on medical leave.  By that date, IndyMac had raised a total of $78.1

21  million through the DSPP since sales began on February 26, 2008.

22           **e)     IndyMac's False and Misleading DSPP Sales through the**

23                   **April 3, 2008 Prospectus after Bond Downgrades**

24       36.     After the bond downgrades, Perry knew, or was reckless in not

25  knowing, that IndyMac had no choice but to suspend preferred dividends as a way

26  to conserve cash.  It was also clear that the downgrades could drive IndyMac

27  Bank's capital ratio below 10% at March 31, and that IndyMac would not have

28  ///

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2761

1  sufficient cash to both keep IndyMac Bank's capital ratio above 10% and pay

2  future preferred dividends.

3       37.   Perry knowingly or recklessly failed to disclose (either through a new

4  prospectus, an amendment to the April 3, 2008 prospectus, or a Form 8-K) that the

5  April bond rating downgrades jeopardized IndyMac Bank's "well-capitalized"

6  status such that IndyMac would need to conserve cash by suspending future

7  preferred dividends.  The impact of the bond rating downgrades to IndyMac's

8  capital and liquidity would have been material information to reasonable investors'

9  assessment of their risk of loss and the price they would be willing to pay for

10 IndyMac's common stock through the DSPP.

11      38.   From April 24 through May 2, 2008, when it filed a new DSPP

12 prospectus, IndyMac raised approximately $15 million through the DSPP.

13      **f)    IndyMac's False and Misleading May 2, 2008 Prospectus**

14      39.   By no later than May 2, 2008, Perry knew, or was reckless in not

15 knowing, that based on internal forecasts, IndyMac would have to suspend future

16 preferred dividend payments as a result of the continuing decline in IndyMac's

17 liquidity and capital positions.

18      40.   On May 2, 2008, IndyMac filed with the Commission a new

19 prospectus registering the offer of another ten million common shares.  As a

20 member of IndyMac's board of directors, Perry authorized the offer and sale of

21 additional stock through the DSPP.  This prospectus again stated that IndyMac

22 "intend[ed] to use the net proceeds from [the offering] for general corporate

23 purposes, including investment in our subsidiaries."  By incorporating by reference

24 the 2007 Earnings 8-K and 2007 Form 10-K, the May 2 prospectus repeated those

25 earlier filings' statements regarding IndyMac's strong capital and liquidity

26 positions, its cash holdings being sufficient to pay future preferred dividends for

27 over two years, and its positive forecasts for the Bank's capital ratio.  From May 3

28 through May 9, 2008, IndyMac raised $9.4 million through the DSPP.  May 9 was

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2762

1   the last trading day before May 12, when IndyMac filed its Form 10-Q for the

2   quarter ended March 31, 2008 and all DSPP sales ended.

3       41.    The May 2 prospectus failed to disclose that the DSPP offering's

4   specific purpose was to raise capital to protect IndyMac Bank's capital ratio.

5   IndyMac needed the additional capital to protect IndyMac Bank's capital ratio,

6   which was close to the 10% "well-capitalized" threshold as a result of the April

7   bond rating downgrades.  In addition, contrary to the disclosures in the 2007

8   Earnings 8-K and 2007 Form 10-K, which were incorporated by reference in the

9   May 2 prospectus, IndyMac's liquidity position had deteriorated as a result of

10  IndyMac's $70 million cash contribution to the Bank on March 31, such that

11  IndyMac would have to suspend future preferred dividend payments.

12      42.    Perry knowingly or recklessly failed to disclose (either through a new

13  prospectus, an amendment to the April 3, 2008 prospectus, or a Form 8-K) this

14  information to investors until May 12, 2008, when IndyMac's Form 10-Q and 8-K

15  disclosed, among other things, the suspension of future preferred dividends and

16  that IndyMac Bank's capital ratio would have been 9.27% if the risk-weighting

17  impact of the April bond downgrades had been required to have been recorded as

18  of March 31.  Such information would have been material to investors, as they

19  would have viewed the true reasons for IndyMac's stock sales and its declining

20  capital and liquidity levels as important to their assessment of their risk of loss and

21  the price they would be willing to pay for IndyMac's common stock.  When

22  IndyMac partially disclosed its deteriorating capital and liquidity positions on May

23  12, 2008, IndyMac's common stock price closed at $3.06, an 11% drop from its

24  prior close of $3.43, on volume of 4.8 million shares.  On May 13, IndyMac's

25  stock price fell an additional 24%, closing at $2.32 on volume of 14.9 million

26  shares.

27  ///

28  ///

14

**C.**   **IndyMac's False and Misleading Q1 2008 Forms 10-Q and 8-K and Earnings Call**

43.   Before the market opened on May 12, 2008, IndyMac filed its Form 10-Q for the quarter ended March 31, 2008 ("Q1 Form 10-Q") and a Form 8-K with the quarter's earnings release and presentation and shareholder letter ("Q1 Earnings 8-K"). These filings disclosed:

   a.   IndyMac's suspension of future preferred dividends;

   b.   IndyMac Bank's capital ratio was 10.26% at March 31, exceeding "the levels defined as 'well capitalized' by [IndyMac Bank's] regulators";

   c.   IndyMac Bank's capital ratio would have been 9.27% if IndyMac Bank had recorded the risk-weighting impact of the April 2008 bond downgrades at March 31 (Q1 Form 10-Q only);

   d.   IndyMac Bank's capital ratio would have been 11.36% but for two regulations relating to the risk-weighting of mortgage servicing rights and allowance for loan losses; and

   e.   IndyMac "contributed $88 million to ... Bank during Q1 08" (Q1 Earnings 8-K only).

44.   During IndyMac's Q1 2008 earnings conference call on May 12, 2008, Perry stated that IndyMac "contribute[d] $88 million ... to [IndyMac B]ank during the first quarter to remain well capitalized."

45.   IndyMac's statements regarding IndyMac Bank's capital ratio and capital contributions in the May 12 filings and earnings conference call were materially false and misleading. As discussed below, IndyMac Bank's capital ratio would have been 9.86%, below the 10% the well-capitalized threshold, but for the fact that IndyMac had:

///

15

a.     changed how it calculated IndyMac Bank's risk-based capital ratio so that IndyMac Bank needed less capital to support its subprime loan holdings; and

b.     backdated an $18 million capital contribution to IndyMac Bank made on May 9 (over five weeks after quarter end) to March 31 (quarter end).

### 1.     The Change in the Calculation of IndyMac Bank's Capital Ratio

46.     In a February 19, 2008 e-mail, Perry informed Keys and other IndyMac executives that to keep IndyMac Bank's capital ratio above 10% at March 31, he planned to request relief from three OTS requirements for the calculation of IndyMac Bank's capital ratio, which Perry calculated would collectively add an additional 1.48% to the Bank's capital ratio. One of the regulatory requirements from which Perry wanted relief was the requirement that subprime loans be double risk-weighted as compared to non-subprime loans. In calculating IndyMac Bank's capital ratio, subprime loans required $1 of capital for every $1 of subprime loan, compared to only $.50 of capital required for every $1 of non-subprime loan. Perry wrote that relief from the subprime double risk-weighting requirement would improve IndyMac Bank's capital ratio by 0.31%.

47.     Perry and Keys purportedly obtained relief from the requirement to double risk-weight subprime loans during a telephone call with an OTS official on February 26, 2008. The effect of this relief was to reduce the amount of capital that IndyMac Bank needed to meet the 10% well-capitalized threshold. With the benefit of this relief, Perry and Keys expected IndyMac Bank's capital ratio to stay at or above 10% at March 31, 2008. Indeed, had IndyMac not made this undisclosed change, IndyMac Bank's risk-based capital ratio at March 31 would have been below the 10% well-capitalized threshold at 9.86% (or 9.96% with the $18 million backdated capital contribution discussed below).

///

16

1    48.    Perry knew, or was reckless in not knowing, that IndyMac's Q1 Form

2    10-Q, and Q1 Earnings 8-K were false and misleading in that they failed to

3    disclose that IndyMac Bank's well-capitalized status was based, in part, on the

4    change in the method by which IndyMac calculated its capital ratio, so that it was

5    no longer based on the double risk-weighting of subprime loan assets.

6        **2.    IndyMac's Backdated Capital Contribution**

7    49.    In early May 2008, Perry learned that $15.7 million in unrecorded

8    profit and loss review differences compiled by IndyMac's outside auditing firm

9    (the "Auditors") were material because, if booked, they would have caused

10   IndyMac Bank's capital ratio to fall to 9.98%, below the 10% well-capitalized

11   threshold.  After IndyMac failed to persuade the Auditors that the unrecorded

12   review differences should not be booked, IndyMac was faced with the choice of

13   either delaying its Q1 Form 10-Q filing on May 12, 2008 or filing a Q1 Form 10-Q

14   that reported a capital ratio below 10%.  To avoid that dilemma, on May 9, 2008,

15   Perry authorized IndyMac to contribute to IndyMac Bank $18 million (which was

16   nearly all the cash that IndyMac had on March 31) as of March 31.  Perry

17   purportedly received OTS approval to record the $18 million contribution as if it

18   had occurred on March 31, 2008 and considered IndyMac Bank's capital as of that

19   date.  That backdated capital contribution allowed IndyMac Bank to keep its

20   capital ratio above 10% even if the Auditors' review differences were recorded.

21   As a result of this undisclosed backdated capital contribution, IndyMac reported in

22   its Q1 filings that IndyMac Bank's capital ratio was above the 10% well-

23   capitalized threshold (10.26% instead of 9.98% with the unrecorded review

24   differences but without the backdated contribution).

25   50.    Perry knew, or was reckless in not knowing, that the Q1 Form 10-Q

26   and Q1 Earnings 8-K were false and misleading in that IndyMac Bank had

27   remained well-capitalized based, in part, on this backdated capital contribution.

28   ///

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2766

**D.     Defendants' Roles in IndyMac's False and Misleading Disclosures**

51.     As the CEO and CFO during IndyMac's financial meltdown in 2008, Perry and Keys were well aware of IndyMac's deteriorating capital and liquidity positions.  Each of them regularly received updated forecasts for IndyMac Bank's capital ratio, reports on capital raising through the DSPP, and information on material events such as downgrades on MBS bonds held by IndyMac Bank.  Despite being well informed of IndyMac's financial condition and integral participants in IndyMac's financial reporting process, Defendants knowingly or recklessly failed to disclose the extent of IndyMac's deteriorating capital and liquidity positions to both existing shareholders and purchasers of common stock through the DSPP.

**1.     The Periodic and Current Reports**

52.     Perry and Keys signed the 2007 Form 10-K (and the accompanying Sarbanes-Oxley certifications), while Perry signed the Q1 Form 10-Q (and the accompanying Sarbanes-Oxley certification) and the Q1 Earnings 8-K.

53.     Perry was actively involved in preparing the exhibits to Q1 Earnings 8-K, including the attached earnings press release and presentation and shareholder letter.  For example, in a draft of presentation attached to the Q1 Earnings 8-K, Perry changed the accurate statement that IndyMac "contributed $70 million to … [IndyMac] Bank during Q1 08 and another $[18] million on May 9th" to falsely state that IndyMac "contributed $88 million to the Bank during Q1 08."

54.     As the CFO, Keys was responsible for supervising IndyMac's financial reporting department.  He received and reviewed multiple versions of the 2007 Form 10-K, including a review with the audit committee of IndyMac's board of directors prior to the annual report's filing on February 29, 2008.

55.     Despite their responsibility for and participation in the filing of IndyMac's periodic and current reports and, as discussed above, their knowledge of IndyMac's deteriorating financial condition, Defendants knowingly or

18

1   recklessly failed to take any action to ensure that IndyMac's capital raising

2   activities and deteriorating capital and liquidity positions were fairly and

3   accurately disclosed in IndyMac's periodic and current reports.

4        **2.    The DSPP Offering**

5        56.    Perry and Keys signed the Form S-3 registration statement and

6   approved the dollar amounts and timing of capital raised through the DSPP.  As a

7   member of IndyMac's board of directors, Perry authorized the offer and sale of

8   common stock and the preparation and filing of each DSPP prospectus by the CEO

9   or his delegate.  As IndyMac's CFO (and the CEO's delegate), Keys approved the

10  filing of the October 11, 2007 and April 3, 2008 DSPP prospectuses.

11       57.    Perry and Keys also knew, or were reckless in not knowing, that

12  certain actions were taken to increase the amount of capital raised by the DSPP

13  prior to the release of IndyMac's first quarter 2008 financial results:

14            a.    On or about March 5, 2008, the window period for DSPP sales

15                  was shortened from up to twelve days to just one or two days.

16                  Since DSPP sales were contingent on IndyMac's volatile

17                  common stock price exceeding a certain threshold during a

18                  window of time, shortening the window improved the

19                  likelihood that IndyMac stock would exceed the threshold

20                  price; and

21            b.    On or about April 4, 2008, Perry recommended postponing

22                  IndyMac's earnings release date from May 1 to May 12 to give

23                  IndyMac "the maximum time possible to . . . raise capital

24                  through the DSPP."  At the time, there were a number of

25                  unresolved regulatory, accounting, and auditor issues that could

26                  negatively affect Q1 2008 results and future DSPP sales.  The

27                  delay in the earnings release date permitted IndyMac to raise

28                  $13.3 million through the DSPP between May 1 and 12.

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2768

58.     Despite their responsibility for and participation in IndyMac's DSPP
offering and, as discussed above, their knowledge of IndyMac's deteriorating
financial condition, Defendants knowingly or recklessly failed to take any action to
ensure that the DSPP offering documents fairly and accurately disclosed
IndyMac's deteriorating financial condition.

**3.     Q1 2008 Earning Call**

59.     During IndyMac's Q1 2008 earnings conference call on May 12,
2008, Perry stated that IndyMac had "contribute[d] $88 million … to [the B]ank
during the first quarter to remain well capitalized."

60.     Perry's statement was materially false and misleading because
IndyMac had only contributed $70 million to the Bank during the first quarter of
2008.  The remaining $18 million had been contributed on May 9, 2008, over five
weeks after the end of the first quarter.  Without the backdated contribution,
IndyMac was faced with the choice of either delaying its Q1 10-Q filing on May
12, 2008 or filing the Q1 10-Q with a capital ratio below 10%.

## DEFENDANTS BENEFITED FROM THE FRAUD

61.     During the period at issue, Perry and Keys received substantial
salaries and incentive-based and other forms of compensation.

## FIRST CLAIM FOR RELIEF

## FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

62.     The Commission realleges and incorporates by reference ¶¶ 1 through
61 above.

63.     Defendants, and each of them, by engaging in the conduct described
above, directly or indirectly, in the offer or sale of securities by the use of means or
instruments of transportation or communication in interstate commerce or by the
use of the mails:

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2769

1        a.     with scienter, employed devices, schemes, or artifices to

2               defraud;

3        b.     obtained money or property by means of untrue statements of a

4               material fact or by omitting to state a material fact necessary in

5               order to make the statements made, in light of the

6               circumstances under which they were made, not misleading; or

7        c.     engaged in transactions, practices, or courses of business which

8               operated or would operate as a fraud or deceit upon the

9               purchaser.

10    64.    By engaging in the conduct described above, Defendants violated, and

11  unless restrained and enjoined will continue to violate, Section 17(a) of the

12  Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**

**FRAUD IN CONNECTION WITH THE PURCHASE**

**OR SALE OF SECURITIES**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

17    65.    The Commission realleges and incorporates by reference ¶¶ 1 through

18  61 above.

19    66.    Defendants, and each of them, by engaging in the conduct described

20  above, directly or indirectly, in connection with the purchase or sale of a security,

21  by the use of means or instrumentalities of interstate commerce, of the mails, or of

22  the facilities of a national securities exchange, with scienter:

23        a.     employed devices, schemes, or artifices to defraud;

24        b.     made untrue statements of a material fact or omitted to state a

25               material fact necessary in order to make the statements made,

26               in the light of the circumstances under which they were made,

27               not misleading; or

28  ///

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2770

1    c.  engaged in acts, practices, or courses of business which

2        operated or would operate as a fraud or deceit upon other

3        persons.

4  67. By engaging in the conduct described above, Defendants violated, and

5 unless restrained and enjoined will continue to violate, Section 10(b) of the

6 Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

7 240.10b-5.

8         **THIRD CLAIM FOR RELIEF**

9     **VIOLATIONS OF COMMISSION PERIODIC**

10       **REPORTING REQUIREMENTS**

11   **Aiding and Abetting Violations of Section 13(a) of the Exchange Act**

12     **and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder**

13   68. The Commission realleges and incorporates by reference ¶¶ 1 through

14 61 above.

15   69. IndyMac violated Section 13(a) of the Exchange Act, 15 U.S.C.

16 § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F.R.

17 §§ 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13, by filing with the

18 Commission an annual report on Form 10-K for the year ended December 31,

19 2007, a quarterly report on Form 10-Q for the quarter ended March 31, 2008, and a

20 current report on Form 8-K dated May 12, 2008 that were materially false and

21 failed to include material information necessary to make the required statements, in

22 light of the circumstances under which they were made, not misleading.

23   70. Defendants Perry and Keys, and each of them, knowingly provided

24 substantial assistance to IndyMac in its violation of Section 13(a) of the Exchange

25 Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-1 thereunder, 17 C.F.R.

26 §§ 240.12b-20 & 240.13a-1, in connection with IndyMac's Form 10-K for the year

27 ended December 31, 2007.

28 ///

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2771

1      71.    Defendant Perry knowingly provided substantial assistance to

2  IndyMac in its violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a),

3  and Rules 12b-20, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,

4  240.13a-11 & 240.13a-13, in connection with IndyMac's quarterly report for the

5  first quarter of 2008 and current report dated May 12, 2008.

6      72.    By engaging in the conduct described above and pursuant to Section

7  20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants aided and abetted

8  IndyMac's violations, and unless restrained and enjoined will continue to aid and

9  abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and

10  Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F. R. §§ 240.12b-20,

11  240.13a-1, 240.13a-11 & 240.13a-13.

12  **PRAYER FOR RELIEF**

13      WHEREFORE, the Commission respectfully requests that the Court:

14  **I.**

15      Issue findings of fact and conclusions of law that Defendants committed the

16  alleged violations.

17  **II.**

18      Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

19  permanently enjoining defendant Perry and his agents, servants, employees,

20  attorneys, and those persons in active concert or participation with any of them,

21  who receive actual notice of the order by personal service or otherwise, from

22  violating Section 17(a) of the Securities Act, and Sections 10(b) of the Exchange

23  Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of

24  Sections 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13

25  thereunder.

26  **III.**

27      Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

28  permanently enjoining defendant Keys and his agents, servants, employees,

23

1 | attorneys, and those persons in active concert or participation with any of them,
2 | who receive actual notice of the order by personal service or otherwise, from
3 | violating Section 17(a) of the Securities Act, and Sections 10(b) of the Exchange
4 | Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of
5 | Sections 13(a) of the Exchange Act, and Rules 12b-20 and 13a-1, thereunder.

**IV.**

7 |     Enter an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C.
8 | § 77t(e), and/or 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting
9 | Defendants from acting as officers or directors of any issuer that has a class of
10 | securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l,
11 | or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15
12 | U.S.C. § 78o(d).

**V.**

14 |     Order Defendants to disgorge all ill-gotten gains from their illegal conduct,
15 | together with prejudgment interest thereon.

**VI.**

17 |     Order Defendants to pay civil penalties under Section 20(d)(1) of the
18 | Securities Act, 15 U.S.C. § 77t(d)(1), and Section 21(d)(3) of the Exchange Act, 15
19 | U.S.C. § 78u(d)(3).

**VII.**

21 |     Retain jurisdiction of this action in accordance with the principles of equity
22 | and the Federal Rules of Civil Procedure in order to implement and carry out the
23 | terms of all orders and decrees that may be entered, or to entertain any suitable
24 | application or motion for additional relief within the jurisdiction of this Court.
25 | ///
26 | ///
27 | ///
28 | ///

XL Specialty Ins. Co. v. Perry
Stipulation dated Nov. 23, 2011
Exhibit 39
Page 2773

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: February 11, 2011      Respectfully submitted,

Nicholas S. Chung
Attorney for Plaintiff
Securities and Exchange Commission

25