David Simantob, SBN 155790
dsimantob@tresslerllp.com
Elizabeth L. Musser, SBN 203512
emusser@tresslerllp.com
TRESSLER LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, CA 90067
Telephone: (310) 203-4800
Facsimile: (310) 203-4850

Attorneys for Counterdefendants
Catlin Insurance Company (UK) Ltd.,
Continental Casualty Company, and
Twin City Fire Insurance Company, and
Intervenor Defendant Those Certain Underwriters at
Lloyd's, London Subscribing to Policy No. QA011608

(Additional parties and counsel listed on next page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| XL SPECIALTY INSURANCE COMPANY, *et al.*, | Case No. 2:11-CV-2078-RGK-JCG |
| Plaintiffs, | Hon. R. Gary Klausner |
| v. | **INSURERS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND JOINDER BY TWIN CITY FIRE INSURANCE COMPANY AND CONTINENTAL CASUALTY COMPANY** |
| MICHAEL W. PERRY, *et al.* | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | |

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Theodore A. Boundas (admitted *pro hac vice*)
tboundas@bswb.com
W. Joel Vander Vliet (admitted *pro hac vice*)
wvandervliet@bswb.com
BOUNDAS, SKARZYNSKI, WALSH & BLACK, LLC
200 East Randolph Drive, Suite 7200
Chicago, Illinois 60601
Telephone: (312) 946-4200
Facsimile: (312) 946-4272

Attorneys for Counterdefendant
Catlin Insurance Company (UK) Ltd. and
Intervenor Counterdefendants Those Certain Underwriters at
Lloyd's, London Subscribing to Policy No. QA011608


Michael R. Delhagen (admitted *pro hac vice*)
mdelhagen@tresslerllp.com
Kyle P. Barrett (admitted *pro hac vice*)
kbarrett@tresslerllp.com
TRESSLER LLP
One Penn Plaza, Suite 4701
New York, NY 10119
Telephone: (646) 833-0900
Facsimile: (646) 833-0877

Attorneys for Counterdefendant
Twin City Fire Insurance Company

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

William E. Smith (admitted *pro hac vice*)
jcronic@wileyrein.com
John Howell (admitted *pro hac vice*)
jhowell@wileyrein.com
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
Telephone: (202) 429-7000
Facsimile: (202) 719-7049

Attorneys for Counterdefendant
Continental Casualty Company


Brian D. Harrison, SBN 157123
brian.harrison@sedgwicklaw.com
Robert S. Gebhard, SBN 158125
robert.gebhard@sedgwicklaw.com
Veena A. Mitchell, SBN 161153
veena.mitchell@sedgwicklaw.com
SEDGWICK LLP
333 Bush Street, 30th Floor
San Francisco, California 94104
Telephone: (415) 781-7900
Facsimile: (415) 781-2635

Attorneys for Zurich American Insurance Company


Jason P. Cronic (admitted *pro hac vice*)
jcronic@wileyrein.com
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
Telephone: (202) 429-7000
Facsimile: (202) 719-7049

Attorneys for Plaintiff and Counterdefendant
XL Specialty Insurance Company

3

Gordon J. Calhoun, SBN 84509
calhoun@llbslaw.com
Douglas R. Irvine, SBN 119863
irvine@llbslaw.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
221 N. Figueroa Street, Suite 1200
Los Angeles, CA 90012
Telephone: (213) 250-1800
Facsimile: (213) 250-7900

Attorneys for Plaintiff and Counterdefendant
XL Specialty Insurance Company


Kim W. West, SBN 78553
kim.west@clydeco.us
Alec H. Boyd, SBN 161325
alec.boyd@clydeco.us
CLYDE & CO LLP
101 Second Street, 24th Floor
San Francisco CA 94105
Telephone: (415) 365-9800
Facsimile: (415) 365-9801

Attorneys for Plaintiff and Counterdefendant
Arch Insurance Company


Edward P. Gibbons (admitted *pro hac vice*)
egibbons@wwmlawyers.com
Tiffany Saltzman-Jones (admitted *pro hac vice*)
tsj@wwmlawyers.com
WALKER WILCOX MATOUSEK LLP
One North Franklin Street, Suite 3200
Chicago, IL 60606
Telephone: (312) 244-6700
Facsimile: (312) 244-6800

Attorneys for Plaintiff and Counterdefendant
ACE American Insurance Company

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Ommid Farashahi (admitted *pro hac vice*)
ofarashahi@bcnlaw.com
Andrew W. Smith (admitted *pro hac vice*)
asmith@bcnlaw.com
Michael T. Skoglund (admitted *pro hac vice*)
mskoglund@bcnlaw.com
Ross B. Edwards (admitted *pro hac vice*)
redwards@bcnlaw.com
BATES CAREY NICOLAIDES LLP
191 N. Wacker, Suite 2400
Chicago, IL 60606
Telephone: (312) 762-3100
Fax: (312) 762-3200

Attorneys for Plaintiff and Counterdefendant
AXIS Insurance Company

5

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Counterdefendants Catlin Insurance Company (UK) Ltd., Continental Casualty Company, Twin City Fire Insurance Company, and Zurich American Insurance Company, Intervenor Counterdefendants Those Certain Underwriters at Lloyd's, London Subscribing to Policy No. QA011608, and Plaintiffs/Counterdefendants XL Specialty Insurance Company, Arch Insurance Company, ACE American Insurance Company, and AXIS Insurance Company (collectively, the "Insurers"), by and through their undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, submit this Statement of Uncontroverted Facts and Conclusions of Law in Support of their Motion For Summary Judgment, and in support of the Joinder by Twin City Fire Insurance Company and Continental Casualty Company to the Insurers' Motion for Summary Judgment.

## UNCONTROVERTED MATERIAL FACTS[1]

### I.   IndyMac Bank's Business Model and the Demise of IndyMac

1.     IndyMac Bank, F.S.B. ("IndyMac Bank") failed on July 11, 2008. *See* Ex. 34, Audit Report, Safety and Soundness: Material Loss Review of IndyMac Bank, FSB, Department of the Treasury, Office of the Inspector General (Feb. 26, 2009) (the "OIG Audit Report").

2.     According to the OIG Audit Report, IndyMac Bank was a thrift and mortgage bank that failed because of an aggressive growth strategy, the use of Alt-A and other nontraditional loan products, inadequate underwriting practices, suspect appraisals, undue credit concentrations, and heavy reliance on costly funds borrowed from the Federal Home Loan Bank and from brokered deposits.  *Id.* at 2.

3.     According to the OIG Audit Report, the Bank's liquidity was reduced when housing prices fell in 2007 and the secondary mortgage market collapsed.

---

[1]  Unless otherwise noted, all exhibits cited herein are attached to the Joint Stipulation Regarding Certain Exhibits and Allegations filed in this action on

*Id.* at 3.

4.      According to the OIG Audit Report, the Bank ultimately failed due to unsafe and unsound underwriting practices and the manner in which the company was operated, which in turn led to IndyMac's bankruptcy.  *Id.* at 3.

5.      The OIG Audit Report is specifically cited by the plaintiffs in Tripp, Daniels, and the Trustee Litigation.  *See, e.g.,* Ex. 23 at ¶ 206 (*Tripp*), Ex. 24 at ¶ 100 (*Daniels*), Ex. 33 at ¶ 44 (Trustee Litigation).

## II.     <u>The *Tripp* Litigation</u>

6.      *Tripp, et al. v. IndyMac Bancorp, Inc., et al.*, Case No. 2:07-cv-1635 (C.D. Cal.) (the "*Tripp* Litigation") was filed in March 2007.  *See* Ex. 19, *Tripp* Second ACAC; Ex. 23, *Tripp* Sixth ACAC.  The Tripp Litigation was noticed to insurers during the March 1, 2007 to March 1, 2008 policy period.  Exhibit H to Musser Decl., Letter to F. Boundas dated Apr. 2, 2007.

7.      The *Tripp* Litigation presently alleges securities law violations on behalf of a putative class of IndyMac stockholders during a class period of March 1, 2006 through March 1, 2007.  Ex. 23 at ¶ 1.

8.      The *Tripp* plaintiffs allege that statements concerning IndyMac Bank's financial condition were false and misleading primarily because IndyMac Bank's underwriting practices and internal controls were grossly deficient, and that IndyMac Bank's loan loss reserves were inadequate.  *See* Exs. 19, 23.

9.      The *Tripp* plaintiffs contend that such allegedly deficient underwriting practices were part of IndyMac's company-wide, top-down business strategy, and that senior management encouraged underwriters to disregard underwriting guidelines, manipulate appraisal values, and push bad loans to close.  Ex. 19 at ¶¶ 63-64, 69, 74-77; Ex. 23 at ¶¶ 9, 10, 44-45, 50, 55-58, 70, 130, 146, 147, 215.

10.     The alleged misrepresentations purportedly concealed that "the Company's loan portfolio was severely impaired as a result of Defendants'

November 23, 2011 (Docket No. 193).

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

repeated violations of the Company's internal/operational controls over underwriting[,]" causing IndyMac's stock to trade at inflated levels.   Ex. 23 at ¶ 172.   Similarly, defendants are alleged to have knowingly made false and misleading statements regarding IndyMac's "underwriting, hedging, loan loss provisions . . . internal controls  and compliance with securities laws."  Ex. 19 at ¶ 228.

11.   The *Tripp* plaintiffs allege that IndyMac "created a company-wide culture and practice of ignoring and intentionally overriding the Company's underwriting guidelines for the singular, myopic goal of generating loan volumes . . . [, which] placed the Company's business in the precarious condition of relying on a flimsy base of significantly risky loans[.]"  Ex. 19 at ¶ 3 (reliance on "liar loans"), ¶ 5("Company management  . . . exploited internal control weakness or simply overrode controls to drive loan originations and sales growth.)

12.   The *Tripp* plaintiffs allege that "IndyMac's appraisal reviews were limited and recklessly deficient," Ex. 23 at ¶ 149, and that its "internal/operational controls were grossly deficient." Ex. 23 at ¶ 9; Ex. 19 at ¶ 5 ("internal controls were grossly deficient").

13.   The *Tripp* plaintiffs allege that IndyMac "grew by focusing on utilizing Alt-A, negative/interest only amortizing loans, and other high-risk loans." Ex. 23 at ¶ 3; Ex. 19 at ¶ 44.

14.   The *Tripp* plaintiffs allege that, towards the end of the class period, IndyMac had difficulty selling the loans referenced in paragraph 13, "as the secondary market became less liquid and information about IndyMac's lax credit quality practices began to seep into the marketplace," and as a result, IndyMac was "stuck with a substantial portion of loans that defaulted quickly and which IndyMac was unable to sell on the secondary market." Ex. 23 at ¶ 11; Ex. 19 at ¶ 8.

15.   As alleged in the *Tripp* Litigation, IndyMac ultimately revealed that

its supposed "strongest virtues" were "profoundly weakened and impaired" and the OIG Report attributed its failure to the "unsafe and unsound" manner in which the thrift was operated" and that IndyMac was "well aware of material deficiencies in the Company's underwriting controls . . . ." *See, e.g.,* Ex. 23 at ¶¶ 15, 21, 151; *see also* Ex. 19 at ¶¶ 12, 54 (alleging "business areas . . . touted as its strongest virtues were . . . profoundly weakened and impaired" and that "the underwriting operations and controls at IndyMac were deliberately circumvented to increase loan production.")

16.     The Tripp Litigation makes repeated reference to IndyMac Bank's controls over its underwriting practices.  *See*, *e.g.*, Ex. 19 at ¶¶ 53-104; Ex. 23 at ¶¶ 29-115.

17.     The *Tripp* Litigation alleges a culture of fraud at IndyMac Bank, evidenced by wide-ranging and management-directed violations of company underwriting guidelines and controls.  *See* Ex. 19 ¶¶ 62-77; Ex. 23 at ¶¶ 9, 10, 44-45, 50, 55-58, 70, 130, 146, 147, 215.

18.     The *Tripp* Litigation cites the OIG Audit Report's finding of "weaknesses with property appraisals obtained to support the collateral on the loans."  Ex. 23 at ¶ 206.

19.     The *Tripp* Litigation references the adequacy of the Bank's loan loss reserves and asserts that such reserves did not consider the "effects of any changes in risk selection and underwriting standards" because IndyMac Bank's "'underwriting standards' were wholly ineffective . . . and thus, meaningless as a factor in the calculation of the Company's loan loss reserves."  *See* Ex. 23 at ¶ 129; *see also id.* ¶¶ 171-72 (referencing "misrepresented . . . underwriting standards, risk management policies, and the adequacy of . . . loan loss reserves" and stating that defendants "misrepresented . . . underwriting guidelines . . . risk management policies . . . and . . . the adequacy of IndyMac's loan loss reserves." , 196 ("shoddy underwriting practices"), 207 and 209 (both citing the OIG Audit Report); *see also*

Ex. 19 at ¶¶ 166 (loan loss reserves did not consider the "effects of any changes in risk selection and underwriting standards"); 228 (providing that, during the *Tripp* class period, "Defendants . . . [d]isseminated[ed] statement [they] knew were false and misleading regarding . . . the Company's underwriting . . . loan loss provisions, secondary market reserves . . . internal controls and compliance with securities laws."

## III.   The Related Underlying Matters

### The *Daniels* Litigation

20.    *Daniels v. Perry, et al.*, Case No. 08-cv-5073 (C.D. Cal.) (the "*Daniels* Litigation"), is a putative class action on behalf of all those that purchased/acquired IndyMac securities from March 1, 2007 through May 12, 2008, *See* Ex. 25, *Daniels* Fifth ACAC ¶ 23.

21.    Since this action incepted, the *Daniels* Litigation has been restyled *Coady, et al. v. Perry, et al.*, Case No. 2:08-cv-3812 (C.D. Cal.).  *See, e.g.,* Order Granting Continuance, *Coady v. Perry*, No. 2:08-cv-3812, Docket No. 226 (C.D. Cal. May 8, 2012).

22.    The *Daniels* Litigation alleges that IndyMac "underwrote, originated and sold poor-quality risk-laden mortgages," Ex. 25 at ¶ 2, and employed "reckless loan underwriting and appraisal practices" which led to inadequate loan loss reserves, *id.* at ¶ 26 .

23.    According to the *Daniels* Litigation, IndyMac's aggressive business strategy and deficient underwriting were cited, along with the Bank's lack of core deposits, as being "fatal" to the Bank by the OIG Audit Report.  Ex. 25 at 248. Further, IndyMac ultimately collapsed after the Daniels class period, with the OIG Audit Report concluding that the cause of the failure included its "high risk business strategy . . . inadequate loss reserves . . . and . . . unsound loan underwriting practices."  *Id.* at ¶ 403.

24.    The *Daniels* Litigation expressly quotes and relies upon the

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

allegations of the FDIC-Van Dellen Action.  Ex. 25 at ¶¶ 8-11, 95-96.

25.   The *Daniels* Litigation incorporates by reference allegations of the Securities and Exchange Commission, which purportedly provide "new evidence showing that in 2007 and 2008, Perry and Keys knew the depth of IndyMac's deteriorating financial condition."  Ex. 25 at ¶ 14.

26.   The *Daniels* Litigation alleges that IndyMac Bank's business strategy was driven by a "sales culture" focused on originating and selling risky non-traditional mortgages (i.e., Alt-A and Option Arm loans), without adhering to prudent origination and securitization processes.  *See* Ex. 25 at ¶ 63.

27.   The *Daniels* Litigation alleges that IndyMac's statements about the company's financial health were misleading because IndyMac Bank "systematically disregarded sound underwriting practices, systematically overrode IndyMac's own underwriting standards and risk control procedures . . . and otherwise fostered a corporate culture that encouraged employees to push mortgages through without regard to underwriting standards."  *See* Ex. 24 at ¶ 108; *see also*, *e.g.*, *id.* ¶¶ 62-94 (allegations asserting "IndyMac's Underwriting, Risk Management, and Appraisal Practices Were Grossly Deficient Prior To and During the Class Period").

28.   The *Daniels* Litigation alleges that "IndyMac's appraisal policies were deficient," citing the OIG Audit Report.  Ex. 24 at ¶ 100.

29.   The *Daniels* Litigation relies upon the OIG Audit Report's findings that appraisals in the Home Builders Division were unsound.  *See* Ex. 24 at ¶ 92.

30.   The *Daniels* Litigation alleges that IndyMac's statements regarding the "'conservative' nature of its loan loss reserves" were false.  *See* Ex. 24 at ¶ 17. According to the allegations of the *Daniels* Litigation, the defendants ignored "red flags" demonstrating that allowances for loan losses were insufficient, *see id.* ¶¶ 230-31, and falsely stated that IndyMac was in a sound financial position, even though "IndyMac's loan loss reserves were not even within the realm of reason."

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

*Id.* at ¶ 278.

**The FDIC-Perry Litigation**

31.    In a March 27, 2009 letter and the subsequent action styled *Federal Deposit Insurance Corporation, as the Receiver for IndyMac Bank, F.S.B. v. Michael Perry*, *et al.*, Case No. CV11-5561-ODW (MRWx) (C.D. Cal.) (collectively, the "FDIC-Perry Litigation"), the Federal Deposit Insurance Corporation ("FDIC") alleges that former Bank CEO Perry was negligent in allowing the Bank to implement a risky strategy to increase loan production through loosening credit standards and underwriting guidelines, thus causing IndyMac Bank to incur significant losses. *See* Ex. 35.

32.    The FDIC, as receiver for IndyMac Bank, alleges that Perry negligently permitted and presided over "the Bank's generation of residential loans" that "had one or more elements of substantial risk." Ex. 35, at ¶ 17. The FDIC alleged that "IndyMac's approach to managing credit risk . . . show[ed] fundamental weakness." Ex. 35, at ¶ 80. In support, the FDIC quoted alleged Perry communications admitting that "this system allowed IndyMac to loosen its loan program guidelines too far . . . , which has resulted in excessive EPDs [early payment defaults], credit losses and repurchase risks," *id.* (quoting Perry Mar. 14, 2007 e-mail), that "we loosened our credit guidelines too much over the past year or so," *id.* at ¶ 81 (quoting Perry Apr. 19, 2007 e-mail), and that "[o]ur industry went too far in allowing automated underwriting and risk-based pricing to take precedent [sic] **over common sense underwriting**," *id.* at ¶ 83 (quoting Perry Aug. 13, 2007 e-mail) (alterations and emphasis in FDIC complaint).

33.    The FDIC's demand letter to Perry alleges that the relevant Insureds were negligent "in connection with IndyMac's involvement with the origination, underwriting, securitization and marketing of the securities" of subprime loans leading to Bank losses in the loan markets. *See* Ex. 37 at 2.

34.    The FDIC-Perry Litigation alleges that Perry was negligent in failing

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

to stop the production of billions in risky residential loans as part of an "aggressive gamble to increase market share." *See* Ex. 35 at ¶ 3.

35.     The FDIC Demand alleges that the relevant Insureds were negligent in connection with the Bank's underwriting of residential mortgage loans and cites factual deficiencies relating to these negligent underwriting practices described in the *Tripp* Litigation. *See* Ex. 37 at p. 2.

36.     The FDIC-Perry Litigation alleges that the Bank "wrongly emphasized production and market share over credit quality and quality underwriting." Ex. 35 at ¶ 19.g.

**The FDIC-Van Dellen Litigation**

37.     In a March 27, 2009 letter and the subsequent action styled *FDIC, as Receiver for IndyMac Bank, F.S.B. v. Van Dellen, et al.*, Case No. 2:10-cv-04915-DSF-SH (C.D. Cal.) (collectively, the "FDIC-HBD Litigation"), the FDIC alleges that certain Insureds were negligent or breached their fiduciary duties by permitting the Bank to violate appraisal and underwriting standards in connection with certain loans through its Home Builders Division ("HBD"). *See* Exs. 26, 36.

38.     The FDIC alleges that "HBD's management repeatedly disregarded HBD's credit policies and approved loans to borrowers who were not credit worthy[.]" Ex. 26 at 6, *see also e.g.*, *id.* at ¶¶ 8, 94, 106, 114, 122, 130, 146.

39.     The FDIC alleges that IndyMac Bank's losses from its Home Builders Division also stemmed from its "high-risk growth strategy" and "high-risk underwriting strategy." *See* Ex. 26 at ¶¶ 33-52.

40.     The FDIC alleges that the defendants "disregarded many of [HBD's] own internal credit policies," *e.g.*, Ex. 26 at ¶ 44, waived underwriting policies, *id.* at ¶¶ 45-49, and "ignored regulatory guidance," *id.* ¶¶ 50-51, in pursuit of a "high risk underwriting strategy," *id.* at ¶ 44.   According to the FDIC-Van Dellen Litigation, "HBD pursued both a negligent growth strategy and negligent underwriting practices[.]" *Id.* at ¶ 67.

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

41.   The FDIC-Van Dellen Litigation asserts that defendants are liable due to their "negligently approving loans with inadequate appraisals," Ex. 26 at ¶ 8, and repeatedly alleges that defendants committed negligence or breaches of duty by "[c]ausing or allowing a loan to be made, renewed, and/or extended with inadequate or problematic appraisals."  *See*, *e.g.*, *id.* ¶¶ 78.e, 94.f, 106.f, 154.e, 790.f.

42.   The majority of the loans at issue in the FDIC-Van Dellen Litigation were initially underwritten or extended during the *Tripp* class period.  *See* Ex. 26 at ¶¶ 76, 84, 100, 112, 120, 128, 136, 152, 168, 176, 184, 192, 200, 208, 216, 231, 249, 263, 274, 287, 299, 309, 317, 325, 333, 341, 349, 357, 365, 373, 385, 398, 413, 425.

**The Trustee Litigation**

43.   *Siegel v. Caldera, et al.*, Case No. 2:09-ap-02645-BB, (Bankr. C.D. Cal.) (the "Trustee Litigation"), alleges that the Outside Directors and Perry breached their fiduciary duties to IndyMac by transferring at least $355 million to IndyMac Bank in 2007 and 2008 without regard for IndyMac's deteriorated financial condition.  *See* Ex. 33 at ¶¶ 4-5.

44.   In a previous May 28, 2009 letter (the "Trustee Letter") from counsel for IndyMac's Chapter 7 bankruptcy trustee, Alfred H. Siegel (the "Trustee"), the Trustee alleges that certain Insureds breached their fiduciary duties to IndyMac by disregarding  loan quality and allowing IndyMac to improperly downstream funds to IndyMac Bank.  *See* Ex. 38.

45.   The Trustee Letter asserts that the "Bank's loose underwriting practices and specialization in risky loan products were significant factors in the Bank's eventual failure and in IndyMac's insolvency."  Ex. 38 at 8.  The Trustee Litigation alleges that the defendants "failed to ensure the most basic underwriting standards were in place at the Bank[,]" Ex. 33 at ¶¶ 287(d), 294(d), and that "the Bank did not aggressively implement any policies to fix its weak underwriting standards" or otherwise attempt to originate more saleable loans."  Ex. 33 at 219;

*see also* Exhibit I to Musser Decl., Opposition of Trustee to Motions to Dismiss Filed By Michael W. Perry and By Outside Directors, at I-45 (identifying the referenced allegations as a "specific failure" showing that the Trustee had stated a claim upon which relief could be granted).

46.   The Trustee relies upon the OIG Audit Report's finding that "[a]ppraisals obtained by IndyMac on underlying collateral were often questionable" and contributed to the "significant capital inadequacy at the Bank" that precipitated the alleged wrongful capital contributions. *See* Ex. 33 at ¶ 44.

47.   According to the Trustee's complaint, the IndyMac directors "openly admitted that, among other things, their deliberate and at times blind pursuit of profits and self-interest over safe and sound business practices had created the circumstances that ultimately would cause the Bank's failure and Bancorp's insolvency." *Id.* at ¶ 229.

48.   The complaint in the Trustee Litigation alleges that the Trustee's action is "based upon" "documents filed in *securities* and other class actions." Ex. 33, at 1 (emphasis added).

49.   The complaint in the Trustee Litigation alleges that IndyMac Bank:

> had a heavy production focus on high-risk mortgage loans, for which the secondary market evaporated over the course of 2007[, and that a]s a result, the Bank was unable to securitize and sell billions of dollars of mortgages in late 2007 and instead was required to hold those loans on its balance sheet, creating enormous losses and acute capital inadequacies.

Ex. 33 ¶ 2.

50.   The Trustee has incorporated by reference allegations in paragraphs 1-77 of the Trustee Action  in each count of the Trustee Action.  Ex. 33 at ¶¶ 239, 252, 256, 265, 272, 279, 284, 291, and 298.

51.   The Trustee alleges that defendants failed "to heed and act upon red

flags that indicated the Bank's business model was not sustainable" and "disregarded clear red flags about Bancorp's worsening financial position" as they made the alleged "downstream" transfers.  Ex. 33 at ¶¶ 238, 294.  In his opposition to the defendants' motions to dismiss the Trustee Litigation, the Trustee stated that his complaint "alleges that Defendants[] failed 'to heed and act upon red flags that indicated the Bank's business model was not sustainable[,] and, in turn 'disregarded clear red flags about Bancorp's worsening financial position as the repeatedly violated Bancorp policies to 'downstream' hundreds of millions of dollars to the Bank[.]"   Exhibit I to Musser Decl., Opposition of Trustee to Motions to Dismiss Filed By Michael W. Perry and By Outside Directors, at I-9. The Trustee has further stated that "the gravamen of the Trustee's allegations is that the Defendants' . . . ignoring of 'red flags' regarding Bancorp's financial condition and the Bank's business model . . . demonstrates that Defendants failed to comply with their fiduciary duties to Bancorp insofar as they knew the Downstream Transfers could not prevent the Bank's failure[.]"  *Id.* at 10.  The Trustee also contends that "the Trustee has alleged a specific failure to ensure the Bank  . . . had written loan underwriting guidelines in place[.]"  *Id.* at 45.

52.    The Trustee alleges that the business practices "created the circumstances that ultimately would cause the Bank's failure and Bancorp's insolvency."  Ex. 33 at ¶ 229.

53.    The Trustee alleges that the defendants:

abdicated their corporate responsibilities by consciously failing to stay informed, consciously failing to supervise management, and consciously failing to monitor Bancorp's operations in at least the following way[]:

Failing to heed and act upon red flags that indicated the Bank's business model and origination practices were not sustainable. Indeed as early as October 2006 (if not earlier), red flags were

waved at Defendants indicating the Bank's business model and origination practices were deeply flawed.  These included, but were not limited to, negative analyst reports, the appreciable increase in . . . repurchase demands, the decline in loan sales and forecasting errors, and the Bank's complete lack of any meaningful or proper mortgage loan and underwriting standards.  This deliberate disregard and reckless indifference by the Defendants resulted in their failure to adequately oversee and manage Bancorp's exposure to the mortgage market and to ensure that even the most basic underwriting standards were in place at the Bank, thereby greatly and needlessly exacerbating exposure.

Ex. 33 at ¶ 294 (d); *see also* ¶¶ 287(d), 268(e) and 275(e) (further discussing "red flags").

54.     The Trustee alleges that IndyMac Bank focused on producing and selling "high-risk" mortgage loans and became unable to securitize and sell billions of dollars of mortgage loans in late 2007.  *See* Ex. 33 at ¶¶ 36-37.

55.     The OIG Audit Report is Exhibit 1 to the Trustee Litigation complaint.  Ex. 31 at 1. The OIG Audit Report identified inadequate loss reserves as a cause of IndyMac Bank's failure.  *See* Ex. 34 OIG Audit Report at 10-11.  The OIG Audit Report ("The [Allowance for Loan and Lease Losses] is critical because of its impact on the thrift's capital levels.").  The Trustee alleges that the OIG Audit report "concluded that the primary cause of the Bank's capital inadequacies and its failure was its business strategy of originating and securitizing Alt-A loans on a large scale."  See Ex. 33 at ¶ 44.  The Trustee Alleges that "[a]ccording to the Treasury Report, '[t]his strategy resulted in rapid growth and a high concentration of risky assets[,]" and that "[t]he Treasury Report noted that 'IndyMac often made loans without verification of the borrower's income or

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable." Ex. 33 at ¶ 44.

**The MBS Litigation**

56.     The action styled *IBEW Local 103 v. IndyMac MBS, Inc., et al.*, Case No. BC405843 (Cal. Super. Ct. Los Angeles Cty.) (*see* Ex. 27) and the action styled *In re IndyMac Mortgage-Backed Securities Litigation*, Case No. 09-cv-4583 (S.D.N.Y.) (a consolidation of two prior actions commenced on May 14, 2009 and June 14, 2009) (*see* Ex. 29) are collectively referred to herein as the "MBS Litigation."   That litigation is a consolidated securities class action brought by purchasers of mortgage-backed securities ("MBS") backed by loans originated by IndyMac Bank. *See* Exs. 27, 29.

57.     The MBS Litigation plaintiffs allege that certain Insureds made false and misleading statements regarding the Bank's appraisal practices and underwriting guidelines, causing plaintiffs to purchase MBS that were far riskier than represented. Ex. 29 at ¶¶ 8, 16 112-36, 146-58.

58.     The plaintiffs in the MBS Litigation allege misrepresentations concerning underwriting and appraisals of IndyMac Bank's originated loans, which they contend affected the value of the securities made up of such loans. *E.g.,* Ex. 29 at ¶¶ 8-10, 16.

59.     The MBS Litigation alleges that IndyMac Bank embarked on a path of "aggressive growth" marked by the origination and securitization of risky loans. *See* Ex. 28 at ¶¶ 4, 52-53, 57-58; Ex. 29 at ¶ 9 ("To feed its aggressive growth model, IndyMac Bank ignored its stated underwriting guidelines").

60.     The MBS Litigation is contains allegations of deficient underwriting practices by the Bank. *See* Ex. 28 at ¶¶ 118-142.; Ex. 29 at ¶¶ 112-36

61.     The MBS Litigation relies upon allegations of appraisal abuses by the Bank. *See*, *e.g.*, Ex. 28 at ¶¶ 151-55; Ex. 29 at ¶¶ 146-58.

**The MBS Insurer Litigation**

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

62.     The actions styled *MBIA Insurance Corporation v. IndyMac ABS, Inc., et al.*, Case No. BC422358 (Cal. Super. Ct. Los Angeles Cty.) (*see* Ex. 30), and *Assured Guaranty Municipal Corp. v. UBS Securities LLC, et al.*, Case No. BCC445785, (Cal. Super. Ct. Los Angeles Cty.) (*see* Ex. 32) (collectively, the "MBS Insurer Litigation"), were brought by financial guaranty insurers in connection with MBS backed by loans originated by IndyMac Bank. *See* Exs. 30, 32.

63.     The MBS Insurer Litigation plaintiffs allege that certain Insureds made false statements regarding the Bank's underwriting guidelines, causing investors to purchase MBS that were riskier than represented. *See* Exs. 30 at ¶¶ 5-8,; Ex. 32 at ¶¶ 4-7.

64.     The plaintiffs in the MBS Insurer Litigation allege misrepresentations concerning underwriting and appraisals of IndyMac Bank's originated loans, which they contend affected the value of the securities made up of such loans. *E.g.,* Ex. 30 at ¶¶ 6-9, 104; Ex. 32 ¶¶ 6-9, 101-08.

65.     The MBS Insurer Litigation alleges that IndyMac Bank, in an effort to expand market share, "pressed to generate more loans" by offering nontraditional mortgage loan products and abandoning prudent underwriting practices. *See* Ex. 30 at ¶¶ 6, 35-36; Ex. 32, at ¶¶ 6, 34-35.

66.     The MBS Insurer Litigation alleges that IndyMac Bank "systematically" abandoned or failed to abide by its underwriting guidelines in pursuit of increased loan originations and that the Insureds made misrepresentations regarding underwriting standards. *See* Ex. 30 at ¶¶ 6, 75-88 and Ex. 32, Assured Amended Complaint ¶¶ 6, 82-93.

67.     The MBS Insurer Litigation alleges misrepresentations by IndyMac Bank concerning appraisals, and cites the OIG Audit Report's finding that "IndyMac failed to comply with its own appraisal guidelines." Ex. 30 at ¶ 104; *see also id.* ¶¶ 100-04; Ex. 32 at ¶¶ 101-108.

**The SEC Litigation**

68.     *Securities and Exchange Commission v. Michael W. Perry*, *et al.*, Case No. CV11-01309-GHK (JCx) (C.D. Cal.) (the "SEC Litigation"), is an action brought by the Securities and Exchange Commission (the "SEC") for securities offering fraud and reporting violations against certain Insureds.  *See* Ex. 39.

69.     In the SEC Litigation, the SEC specifically alleges that Perry and Keys violated securities laws by making certain misstatements and omissions because, at the time, they had knowledge regarding IndyMac's deteriorating financial position.  *See* Ex. 39 at ¶¶ 25, 32, 37, 58.

70.     The SEC Litigation relies on IndyMac's "rapidly deteriorating financial condition," including deteriorating capital and liquidity levels.  *See* Ex. 39 at ¶¶ 5, 22.  It further alleges that the downgrading of millions of dollars in IndyMac Bank-sponsored MBS that the Bank held on its balance sheet negatively impacted its capital ratios.  *Id.* ¶ 34.

71.     At the time of filing, the SEC filed a Notice of Related Cases advising that the SEC Litigation is related to both *Tripp* and *Daniels*, as all three actions involve "false and misleading statements . . . regarding IndyMac's financial condition."  *See* Musser Decl. ¶ 3, Ex. A, SEC Litigation Docket No. 2.

72.     The SEC Litigation followed an investigation by the SEC, which included subpoenas issued to IndyMac and to individual insureds.[2]  *See, e.g.,* Musser Decl. ¶¶ 4-5, Exs. B-C, Subpoenas to SEC Defendants Perry and Keys. The subpoenas sought, among other things, "all documents and communications relating to IndyMac's loan underwriting guidelines, policies, and procedures and any deviations therefrom" and relating to its "allowance for loan losses" for the time period January 1, 2005 to July 11, 2008.  *E.g.*, Musser Decl. ¶¶ 4-5, Ex. C at

---

[2]  The *Daniels* Litigation, the FDIC-Perry Litigation, the FDIC-Van Dellen Litigation, the Trustee Litigation, the MBS Litigation, the MBS Insurer Litigation, and the SEC Litigation are collectively referred to herein as the "Underlying Matters."

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

3.

**The 07-08 and 08-09 Policies**

73.    IndyMac obtained directors and officers liability insurance that afforded specified coverage for claims made between March 1, 2007 and March 1, 2008 (the "07-08 Policies"), providing total limits of liability in the amount of $80 million.  *See* Exs. 9-16, 07-08 Policies.

74.    In March 2007, the *Tripp* Litigation was filed against IndyMac Financial, Inc., Perry, IndyMac's Chief Financial Officer, and IndyMac Bank's President.  *See* Ex. 17, *Tripp* Complaint.

75.    The United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") is presiding over IndyMac's bankruptcy under the caption *In re IndyMac Bancorp, Inc.*, No. 08-bk-21752-BB (Bankr. C.D. Cal.).

76.    On December 15, 2008, the Bankruptcy Court entered an order approving a stipulation permitting the advancement of defense costs under certain of the 07-08 Policies in connection with the *Tripp* Litigation, the *Daniels* Litigation, and other actions pending at that time.  *See* Stiplulation Resolving Motions of Current and/or Former Directors and Officers for Determination that Insurance Proceeds are Not Subject to the Automatic Stay and/or Relief from the Automatic Stay Under 11 U.S.C. § 362, *In re IndyMac Bancorp, Inc.*,  No. 08-bk-21752-BB, Docket No. 181 (Bankr. C.D. Cal., filed Dec. 12, 2008) and order approving same, Docket No. 183 (Bankr. C.D. Cal. Dec. 15, 2008).

77.    As additional Underlying Matters were filed and/or additional of the 07-08 ABC Policies were exhausted, the Bankruptcy Court entered orders granting additional stipulations to permit the advancement of defense costs for the Underlying Matters under the 07-08 ABC Policies.  *See* Stipulation re: Relief for Certain D&O Insurance Proceeds for the IBEW Action from the Automatic Stay under 11 U.S.C. § 362, *In re IndyMac Bancorp, Inc.*, No. 08-bk-21752-BB, Docket No. 289 (Bankr. C.D. Cal., filed Apr. 15, 2009) and order approving same Docket

21

No. 298 (Bankr. C.D. Cal. Apr. 24, 2009); Stipulation Resolving Motion for an Order adding Kenneth Shellem and Richard S. Koon, II to Stipulation and Granting Further Relief from Stay to Access Insurance Proceeds, *In re IndyMac Bancorp, Inc.*,  No. 08-bk-21752-BB, Docket No. 349 (Bankr. C.D. Cal., filed Aug. 6, 2009), and order approving same, Docket No. 352 (Bankr. C.D. Cal. Aug. 11, 2009); Stipulation re: Relief for Certain Insurance Proceeds for New York Local Counsel from the Automatic Stay under 11 U.S.C. § 362, *In re IndyMac Bancorp, Inc.*, No. 08-bk-21752-BB, Docket No. 383 (Bankr. C.D. Cal., filed Dec. 3, 2009), and order approving same, Docket No. 393 (Bankr. C.D. Cal. Dec. 22, 2009); Stipulation Extending Prior Orders Granting Relief From Stay to Access Insurance Proceeds and Granting Further Relief, *In re IndyMac Bancorp, Inc.*,  No. 08-bk-21752-BB, Docket No. 446 (Bankr. C.D. Cal., filed May 26, 2010), and order approving same, Docket No. 456 (Bankr. C.D. Cal. June 2, 2010); Stipulation Extending Prior Orders Granting Relief From Stay to Access Insurance Proceedings and Granting Further Relief, *In re IndyMac Bancorp, Inc.*,  No. 08-bk-21752-BB, Docket No. 574 (Bankr. C.D. Cal. filed Apr. 7, 2011), and order approving same, Docket No. 575 (Bankr. C.D. Cal. Apr. 13, 2011); Stipulation re Compromise to Permit Advancement of Specified Costs, Charges and Expenses, *In re IndyMac Bancorp, Inc.*, No. 08-bk-21752-BB, Docket No. 622 (Bankr. C.D. Cal., filed July 11, 2011), and order approving same, Docket No. 626 (Bankr. C.D. Cal. July 20, 2011); Stipulation re Compromise to Permit Advancement of Specified Costs, Charges and Expenses, *In re IndyMac Bancorp, Inc.*, No. 08-bk-21752-BB, Docket No. 661 (Bankr. C.D. Cal., filed Dec. 16, 2011), and order approving same, Docket No. 663 (Bankr. C.D. Cal. Dec. 21, 2011).

78.    Since the inception of this coverage litigation, the relevant Insureds have agreed to resolve *Tripp*, *Daniels*, the MBS Litigation, and the FDIC-Perry Litigation solely with proceeds from the 07-08 policies.  *See* Musser Decl. ¶ 6, Ex. D, A. Scott Keys' Objections and Responses to XL Specialty Insurance

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Company's First Interrogatories, Responses to Interrogatory No. 16; Musser Decl. ¶ 7, Ex. E, Michael W. Perry's Objections and Responses to XL Specialty Insurance Company's First Interrogatories, Responses to Interrogatory No. 16.

79.    Prior to the expiration of the 07-08 Policies, IndyMac negotiated with the Insurers for coverage to incept March 1, 2008.   The Insurers subsequently issued directors and officers liability insurance policies for the March 1, 2008 to April 1, 2009 policy period.  *See* Exs. 1-8 (the "08-09 Policies").

80.    The 08-09 Policies consist of eight policies, each providing $10 million in policy limits, subject to their respective terms, conditions and limitations.  *See id.*

81.    The first four policies, subject to their terms, conditions, and limitations, provide specified coverage for losses resulting from the acts of individual directors and officers (side A coverage), losses resulting from IndyMac's indemnification of such individuals (side B coverage), and losses sustained by IndyMac for securities law violations (side C coverage).  *See* Exs. 1-4 (the "08-09 ABC Policies").   The four 08-09 ABC Policies were issued, respectively, by movants (1) Catlin Insurance Company (UK) Ltd. and Those Certain Underwriters at Lloyd's, London Subscribing to Policy No. QA011608 (2) Zurich American Insurance Company (3) Twin City Fire Insurance Company, and (4) Continental Casualty Company.

82.    The second four policies, subject to their terms, provide only side A coverage (i.e., coverage available solely for the directors and officers of IndyMac and the Bank, not the companies themselves).  *See* Exs. 5-8 (the "08-09 A-Side Policies"). [3]The four 08-09 A-Side Policies were issued, respectively, by movants

---

[3] The four 08-09 ABC Policies were issued, respectively, by movants (1) Catlin Insurance Company (UK) Ltd. and Those Certain Underwriters at Lloyd's, London Subscribing to Policy No. QA011608, (2) Zurich American Insurance Company, (3) Twin City Fire Insurance Company, and (4) Continental Casualty Company. The four 08-09 A-Side Policies were issued, respectively, by movants (1) XL

(1) XL Specialty Insurance Company, (2) Arch Insurance Company, (3) ACE American Insurance Company, and (4) AXIS Insurance Company (collectively, the "A-Side Insurers").

83.    The 08-09 Policies are all "claims made" policies, meaning they afford coverage "only to any Claim first made during the Policy Period . . . ." *See* Ex. 1, Primary Policy, Declarations; *see also* Ex. 5, XL Policy, Section I (coverage available only for "Loss resulting from a Claim first made against the Insured Persons during the Policy Period . . . .").

84.    "Claim" is defined, in relevant part, in the 08-09 ABC Policies as any civil proceeding initiated against the insureds, Ex. 1 at Section II.D, and in the 08-09 A-Side Policies as "any civil . . . proceeding in a court of law or equity . . . ."; Ex. 5 at Section II.C, as amended by Endorsement No. 11.

85.    The 08-09 ABC Policies provide, in relevant part, that all Claims "involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of . . . the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made [or] shall be deemed to have been made . . . ." Ex. 1 at Section IV.C. The 8-09 A-Side Policies provide, in relevant part, that "All Claims arising from the same Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest time at which the earliest such Claim is made or deemed to have been made . . . ." Ex. 5 at Section IV.G.

86.    The 08-09 ABC Policies define "Interrelated Wrongful Acts" as "**Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." *See* Ex. 1 at Section II.L.

---

Specialty Insurance Company, (2) Arch Insurance Company, (3) ACE American Insurance Company, and (4) AXIS Insurance Company (collectively, the "A-Side

87.    The 08-09 A-Side Policies define "Interrelated Wrongful Acts" as "any Wrongful Act based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related facts, circumstances, situations, transactions, or events."   *See* Ex. 5 at Section II.J.

88.    The 08-09 ABC Policies contain a Prior Notice Exclusion that bars coverage for any Claim:

> based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:
>
> 1.    any **Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given prior to the **Policy Period** under any other Directors' and Officers'. . Liability Policy, or
>
> 2.    any other **Wrongful Act** whenever occurring, which, together with a Wrongful Act which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**[.] [1]

*See* Ex. 1 at Section III.B.

89.    The 08-09 Side A Policies contain a Prior Notice Exclusion that bars coverage for any Claim:

> based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation, transaction event or Wrongful Act which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability insurance, Directors' and Officers' insurance, or any other similar insurance.

*See* Ex. 5 at Section III.B.2.

Insurers").

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

90.     The 08-09 Policies contain a Specific Litigation Exclusion (the "*Tripp Exclusion*") that bars coverage for any Claim:

> based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving . . .
>
> 1.     the litigation styled *Wayman Tripp and Sven Mossberg v. Indymac Bancorp, Inc., Michael W. Perry, and Scott Keys*, initiated 12 March 2007, in the United States District Court for the Central District of California under the caption *Claude A. Reese v. Indymac Financial Inc., Richard A. Wohl, and Scott Keys*, case number 2:07-cv-1635-GW-VBK (the "Tripp Litigation"); or
>
> 2.     any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions underlying or alleged in the Tripp Litigation.
>
>     regardless of any legal theory upon which such Claim is predicated.

*See* Ex. 1, Endorsement; Ex. 5, Endorsement No. 16.

91.     The *Tripp* Exclusion was the product of negotiation and agreement between IndyMac and the Insurers.  *See* Musser Decl. ¶ 8, Ex. F, Moss Depo. at 32:3-21, Moss Depo. Exs. 5, 21, 22.

92.     IndyMac was advised by insurance broker Marsh in negotiating the *Tripp* Exclusion.  *See* Musser Decl. ¶ 8, Ex. F, Moss Depo. at 32:3-21; Moss Depo. Exs. 5, 21, 22; *see also* Musser Decl. ¶ 7, Ex. E, Michael W. Perry's Objections and Responses to XL Specialty Insurance Company's First Interrogatories, Responses to Interrogatory Nos. 1, 12.

93.     IndyMac received advice from legal counsel in connection with the negotiation of the *Tripp* Exclusion.   *See* Musser Decl. ¶ 9, Ex. G, MARSH Production 1862-1872, 1886-1887, 2315-2316 (M. Rossi emails).

94.     The policy issued by Twin City Fire Insurance Company contains the

following "Excess Absolute Prior Notice Exclusion":

> In addition to any exclusions made part of the Underlying Insurance, the following exclusion shall apply to this policy: Underwriters shall not be liable to make any payment for loss in connection with any claim made against the Insured(s) where all or part of such claim is, directly or indirectly, based on, attributable to, arising out of, resulting from, or in any manner related to wrongful acts or any facts, circumstances or situations of which notice of claim or occurrence which could give rise to a claim, has been given prior to the effective date of this policy under any other policy.

Ex. 3 at 11, Endt. 3.

95.    The 08-09 ABC Policy issued by Continental Casualty Company states, in part, that:

> Coverage under this Policy shall then apply in conformance with the provisions of the Primary Policy, or any more restrictive provisions of the Underlying Excess Policies, except for the premium, Limit of Liability, and any other provision specifically set forth in this Policy. In no event shall this Policy provide broader coverage than is provided by the most restrictive terms of any Underlying Insurance.

Ex. 4 at Endt. 4.  The 08-09 Twin City Policy is identified as one of the Underlying Excess Policies.  Ex. 4, Declarations, Item 4.

96.    Subject to their own terms, conditions, and limitations, the 08-09 Side A policies issued by Arch, ACE and AXIS apply in conformance with the terms and conditions of the underlying XL Specialty Insurance Company policy, and in conformance with any terms and conditions further limiting or restricting coverage in the underlying policies.  Ex. 6, Section I [Insuring Agreement], para. C, at p. 1 of 4; Ex. 7, Section I [Insuring Agreement] and Section IV.A; Ex. 8, Endorsement

No. 4.

## CONCLUSIONS OF LAW

Based on the foregoing Uncontroverted Facts, the following Conclusions of Law should be made:

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 2201, and 2202.

2.     The Insurers are entitled to summary judgment or partial summary judgment as a matter of law on each or every claim and counterclaim in this action because there is no actual or potential coverage under the 08-09 Policies for the following Underlying Matters, collectively or severally:

        a.     The *Daniels* Litigation;

        b.     The FDIC-Perry Litigation;

        c.     The FDIC-Van Dellen Litigation;

        d.     The Trustee Litigation;

        e.     The MBS Litigation;

        f.     The MBS Insurer Litigation; and

        g.     The SEC Litigation.

3.     Because there is no coverage under the 08-09 Policies for the Trustee Action, the Insurers have not breached the 08-09 Policies by failing to fund the settlement of the Trustee Action.

4.     Judgment should be entered in the Insurers' favor consistent herewith.

1        Respectfully submitted.

2

3   Dated: May 16, 2012          TRESSLER LLP

4

5                  By:   /s/ Elizabeth Musser

6                       David Simantob

7                       Elizabeth L. Musser

8                       Attorneys for Counterdefendants

9                       Catlin Insurance Company (UK) Ltd. and Intervenor Counterdefendants Those Certain Underwriters at Lloyd's, London Subscribing to Policy No. QA011608

10

11

12  Dated: May 16, 2012          BOUNDAS, SKARZYNSKI, WALSH & BLACK LLC

13

14                By:   /s/ W. Joel Vander Vliet

15                       Theodore A. Boundas (*pro hac vice*)

16                       W. Joel Vander Vliet (*pro hac vice*)

17                       Attorneys for Counterdefendants Catlin Insurance Company (UK) Ltd. and Intervenor Counterdefendants Those Certain Underwriters at Lloyd's, London Subscribing to Policy No. QA011608

18

19

20  Dated: May 16, 2012          SEDGWICK LLP

21

22                By:   /s/ Brian D. Harrison

23                       Brian D. Harrison

24                       Robert S. Gebhard

25                       Veena A. Mitchell

26                       Attorneys for Counterdefendant Zurich American Insurance Company

27

28

INSURERS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1   Dated: May 16, 2012          WILEY REIN LLP

2

3                               By:   /s/ William E. Smith
                                      William E. Smith (*pro hac vice*)
4                                     John Howell (*pro hac vice*)
                                      Attorneys for Counterdefendant
5                                     Continental Casualty Company

6

7
    Dated: May 16, 2012          WILEY REIN LLP
8

9                               By:   /s/ Jason P. Cronic
10                                    Jason P. Cronic (*pro hac vice*)
                                      Attorneys for Plaintiff and
11                                    Counterdefendant
                                      XL Specialty Insurance Company
12

13

14  Dated: May 16, 2012          LEWIS BRISBOIS BISGAARD & SMITH LLP

15

16                              By:   /s/ Douglas R. Irvine
                                      Gordon J. Calhoun
17                                    Douglas R. Irvine
                                      Attorneys for Plaintiff and
18                                    Counterdefendant
                                      XL Specialty Insurance Company
19

20

21
    Dated: May 16, 2012          CLYDE & CO LLP
22

23                              By:   /s/ Alec H. Boyd
24                                    Kim W. West
                                      Alec H. Boyd
25                                    Attorneys for Plaintiff and
                                      Counterdefendant
26                                    Arch Insurance Company

27

28

                                      30

1    Dated: May 16, 2012              WALKER WILCOX MATOUSEK LLP

2

3                                     By:   /s/ Tiffany Saltzman-Jones
                                           Edward P. Gibbons (*pro hac vice*)
4                                          Tiffany Saltzman-Jones (*pro hac vice*)
                                           Attorneys for Plaintiff and
5                                          Counterdefendant
6                                          ACE American Insurance Company

7

8    Dated: May 16, 2012              BATES CAREY NICOLAIDES LLP

9

10                                    By:   /s/ Andrew W. Smith
                                           Ommid Farashahi (*pro hac vice*)
11                                         Andrew W. Smith (*pro hac vice*)
                                           Michael T. Skoglund (*pro hac vice*)
12                                         Ross B. Edwards (*pro hac vice*)
13                                         Attorneys for Plaintiff and
                                           Counterdefendant
14                                         AXIS Insurance Company
15

16

17

18

19   LA #122764 (10054-1)

20

21

22

23

24

25

26

27

28

31